Nos. 23-2134, 23-2216, 23-2958, and 23-3035

# United States Court of Appeals for the Seventh Circuit

UNITED STATES, ET AL., EX REL., RONALD J. STRECK,

*Plaintiff-Appellee, Cross-Appellant,*

v.

ELI LILLY AND COMPANY,

*Defendant-Appellant, Cross-Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:14-cv-09412
Hon. Harry D. Leinenweber

## BRIEF AND REQUIRED SHORT APPENDIX FOR APPELLANT

John C. O'Quinn
  *Counsel of Record*
Matthew S. Owen
Mary Elizabeth Miller
Luke P. McGuire
Mark Wigley
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington DC, 20004
Tel: (202) 389-5000
Fax: (202) 389-5200
john.oquinn@kirkland.com

*Counsel for Eli Lilly and Company*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2134; 23-2216; 23-2958, & 23-3035</u>

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Eli Lilly and Company</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Kirkland & Ellis LLP</u>

<u>Troutman Pepper Hamilton Sanders LLP; Faegre Drinker Biddle & Reath LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ John C. O'Quinn</u>    Date: <u>December 20, 2023</u>

Attorney's Printed Name: <u>John C. O'Quinn</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☑  No ☐

Address: <u>1301 Pennsylvania Ave, N.W., Washington, D.C. 20004</u>

_____

Phone Number: <u>+1 (202)-389-5000</u>    Fax Number: <u>+1 (202)-389-5200</u>

E-Mail Address: <u>john.oquinn@kirkland.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2134; 23-2216; 23-2958, & 23-3035</u>

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Eli Lilly and Company</u>

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Kirkland & Ellis LLP</u>

<u>Troutman Pepper Hamilton Sanders LLP; Faegre Drinker Biddle & Reath LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Matthew S. Owen</u>    Date: <u>December 20, 2023</u>

Attorney's Printed Name: <u>Matthew S. Owen</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>1301 Pennsylvania Ave, N.W., Washington, D.C. 20004</u>

Phone Number: <u>+1 (202)-389-5000</u>    Fax Number: <u>+1 (202)-389-5200</u>

E-Mail Address: <u>matt.owen@kirkland.com</u>

rev. 12/19 AK

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-2134; 23-2216; 23-2958, & 23-3035</u>

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Eli Lilly and Company</u>

 

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Kirkland & Ellis LLP</u>

<u>Troutman Pepper Hamilton Sanders LLP; Faegre Drinker Biddle & Reath LLP</u>

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Mary Elizabeth Miller</u>      Date: <u>December 20, 2023</u>

Attorney's Printed Name: <u>Mary Elizabeth Miller</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: <u>1301 Pennsylvania Ave, N.W., Washington, D.C. 20004</u>

Phone Number: <u>+1 (202)-389-5000</u>      Fax Number: <u>+1 (202)-389-5200</u>

E-Mail Address: <u>mary.miller@kirkland.com</u>

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2134; 23-2216; 23-2958, & 23-3035</u>

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐      **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Eli Lilly and Company</u>

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Kirkland & Ellis LLP</u>

<u>Troutman Pepper Hamilton Sanders LLP; Faegre Drinker Biddle & Reath LLP</u>

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

Attorney's Signature: <u>/s/ Luke P. McGuire</u>    Date: <u>December 20, 2023</u>

Attorney's Printed Name: <u>Luke P. McGuire</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address: <u>1301 Pennsylvania Ave, N.W., Washington, D.C. 20004</u>

Phone Number: <u>+1 (202)-389-5000</u>    Fax Number: <u>+1 (202)-389-5200</u>

E-Mail Address: <u>luke.mcguire@kirkland.com</u>

Save As          Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2134; 23-2216; 23-2958, & 23-3035

Short Caption: United States, et al., ex rel., Streck v. Eli Lilly and Company

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐          **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)      The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
Eli Lilly and Company


(2)      The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
Kirkland & Ellis LLP

Troutman Pepper Hamilton Sanders LLP; Faegre Drinker Biddle & Reath LLP

(3)      If the party, amicus or intervenor is a corporation:

i)          Identify all its parent corporations, if any; and

N/A

ii)          list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)      Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)      Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Mark S. Wigley          Date: December 20, 2023

Attorney's Printed Name:  Mark S. Wigley

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐   No ☑

Address:  1301 Pennsylvania Ave, N.W., Washington, D.C. 20004


Phone Number: +1 (202)-389-5000          Fax Number:  +1 (202)-389-5200

E-Mail Address: mark.wigley@kirkland.com

rev. 12/19 AK

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ........................... 6

JURISDICTIONAL STATEMENT ........................................................ 6

STATEMENT OF ISSUES FOR REVIEW ........................................... 7

STATEMENT OF THE CASE ................................................................ 8

    I.     Statutory Background ............................................................ 8

          A.     Average Manufacturer Price Reporting Under
                Medicaid. ........................................................................ 8

          B.     The Agency Tells Manufacturers To Use Their
                Own Reasonable Assumptions In Determining
                How To Calculate AMP ................................................. 10

    II.    Lilly's Wholesaler Agreements And Service Fees. ............... 13

          A.     Lilly Begins Paying Service Fees To Wholesalers ....... 13

          B.     Service Fees And AMP Calculations. ........................... 16

          C.     The Agency's Lack Of Clear Guidance. ....................... 17

    III.   The Parties And Proceedings Below ................................... 21

          A.     The Qui Tam Relator And His Prior Failed *Qui
                Tam* Action On This Theory. ....................................... 21

          B.     Relator's Latest Allegations. ........................................ 23

          C.     The District Court's Summary Judgment Order
                On The Element Of Falsity. .......................................... 24

          D.     Relator's Case At Trial. ............................................... 25

          E.     Verdict And Entry Of Judgment. ................................ 30

SUMMARY OF ARGUMENT ................................................................ 30

STANDARD OF REVIEW .................................................................... 33

ARGUMENT .......................................................................................... 34

    I.     Lilly Is Entitled To Judgment Because Its Statements
         About AMP Were Not False As A Matter Of Law ............... 34

A. The False Claims Act Does Not Impose Liability For Making Reasonable Assumptions Under Unclear Regulatory Regimes. ........................36

B. Lilly's AMP Assumptions Were Reasonable And Did Not Result In False Statements Under The Act...............................................................40

C. The District Court's Contrary Conclusion Was Legal Error. ..............................................................47

II. Relator Cannot Establish Materiality As A Matter Of Law. ....................................................................................55

A. The District Court Erred By Denying Lilly's Rule 50(b) Motion On Materiality. .......................................56

B. The District Court Incorrectly Instructed The Jury. ........................................................................63

III. No Reasonable Jury Could Find That Lilly Knowingly Submitted False Claims.....................................................66

A. Relator Offered No Evidence Showing Lilly Subjectively Believed Its AMP Certifications Were False...............................................................67

B. Relator Presented No Evidence To Overcome Lilly's Repeated Disclosures To The Government. .....70

C. Absent Evidence Of Subjective Intent To Defraud, Reasonable Conduct Under Ambiguous Regulations Cannot Provide A Basis For Inferring Scienter........................................................72

CONCLUSION ...............................................................................74

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

REQUIRED SHORT APPENDIX

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Page(s)**

**Cases**

*Abraham Lincoln Mem'l Hosp. v. Sebelius,*
698 F.3d 536 (7th Cir. 2012) ............................................................. 10

*Astra USA, Inc. v. Santa Clara Cnty.,*
563 U.S. 110 (2011) ............................................................................ 10

*Buffington v. McDonough,*
143 S.Ct. 14 (2022) ............................................................................ 52

*Chapin v. Fort-Rohr Motors, Inc.,*
621 F.3d 673 (7th Cir. 2010) ...................................................... 56, 59

*Comm'r of Internal Revenue v. Acker,*
361 U.S. 87 (1959) ....................................................................... 52, 53

*EEOC v. Charter Commc'ns, LLC,*
75 F.4th 729 (7th Cir. 2023) ............................................................. 33

*FCC v. Fox Television Stations, Inc.,*
567 U.S. 239 (2012) ............................................................................ 52

*Gates & Fox Co., Inc. v. OSHRC,*
790 F.2d 154 (D.C. Cir. 1986) .......................................................... 48

*Hagood v. Sonoma Cnty. Water Agency,*
81 F.3d 1465 (9th Cir. 1996) ...................................................... 37, 45

*Hartpence v. Kinetic Concepts, Inc.,*
792 F.3d 1121 (9th Cir. 2015) .......................................................... 71

---

[*] Unless otherwise noted, all citations have been cleaned up, emphases have been added, and internal citations have been removed.

*Huff v. Sheahan,*
493 F.3d 893 (7th Cir. 2007).......................................................34, 63

*Lanahan v. Cnty. of Cook,*
41 F.4th 854 (7th Cir. 2022) ..............................................................35

*McDonnell v. United States,*
579 U.S. 550 (2016)............................................................................64

*Turubchuk v. S. Ill. Asphalt Co., Inc.,*
958 F.3d 541 (7th Cir. 2020).............................................................34

*United States ex rel. Becker v. Westinghouse*
*Savannah River Co.,*
305 F.3d 284 (4th Cir. 2002).............................................................71

*United States ex rel. Berg v. Honeywell Int'l, Inc.,*
740 F. App'x 535 (9th Cir. 2018).......................................................71

*United States ex rel. Berkowitz v. Automation Aids, Inc.,*
896 F.3d 834 (7th Cir. 2018).............................................................73

*United States ex rel. Durcholz v. FKW Inc.,*
189 F.3d 542 (7th Cir. 1999).............................................................70

*United States ex rel. Foreman v. AECOM,*
19 F.4th 85 (2d Cir. 2021)..................................................................35

*United States ex rel. Gugenheim v. Meridian*
*Senior Living, LLC,*
36 F.4th 173 (4th Cir. 2022) ................................................68, 69, 70

*United States ex rel. Harman v. Trinity Indus. Inc.,*
872 F.3d 645 (5th Cir. 2017)..................................................60, 64, 65

*United States ex rel. Kelly v. Serco, Inc.,*
846 F.3d 325 (9th Cir. 2017).............................................................65

*United States ex rel. Lamers v. City of Green Bay,*
168 F.3d 1013 (7th Cir. 1999).............................................37, 38, 45

*United States ex rel. Marshall v. Woodward, Inc.,*
812 F.3d 556 (7th Cir. 2015)................................................................. 61

*United States ex rel. McBride v. Halliburton Co.,*
848 F.3d 1027 (D.C. Cir. 2017) ...........................................................65

*United States ex rel. Petratos v. Genentech Inc.,*
855 F.3d 481 (3d Cir. 2017) .......................................................... 58, 65

*United States, ex rel. Polansky v. Exec. Health Res., Inc.,*
599 U.S. 419 (2023)..............................................................................66

*United States ex rel. Quinn v. Omnicare Inc.,*
382 F.3d 432 (3d Cir. 2004) .................................................................37

*United States ex rel. Schutte v. SuperValu Inc.,*
598 U.S. 739 (2023)................................................................... *passim*

*United States ex rel. Sheet Metal Workers Int'l Ass'n, Local
Union 20 v. Horning Invs., LLC,*
828 F.3d 587 (7th Cir. 2016).............................................................66

*United States ex rel. Streck v. Allergan, Inc.,*
894 F. Supp. 2d 584 (E.D. Pa. 2012).................................... 21, 22, 43

*United States ex rel. Thomas v. Black & Veatch Special
Projects Corp.,*
820 F.3d 1162 (10th Cir. 2016).........................................................61

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.,*
525 F.3d 370 (4th Cir. 2008).......................................................37, 38

*United States ex rel. Yannacopoulos v. Gen. Dynamics,*
652 F.3d 818 (7th Cir. 2011)................................................. 37, 61, 67

*United States v. Allergan, Inc.,*
746 F. App'x 101 ................................................................... 22, 43, 44

*United States v. Sanford-Brown, Ltd.,*
840 F.3d 445 (7th Cir. 2016).......................................................58, 65

*Universal Health Services, Inc. v. United States ex rel. Escobar,*
579 U.S. 176 (2016) ................................................................ *passim*

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
529 U.S. 765 (2000) ............................................................... 52

*Wang v. FMC Corp.,*
975 F.2d 1412 (9th Cir. 1992) ............................................. 70

## Statutes

28 U.S.C. §1291 .................................................................. 6

28 U.S.C. §1331 .................................................................. 6

28 U.S.C. §1345 .................................................................. 6

28 U.S.C. §1367 .................................................................. 6

31 U.S.C. §3729 ........................................................... *passim*

31 U.S.C. §3732 .................................................................. 6

42 U.S.C. §1396r-8 ...................................................... *passim*

104 Stat. 1388 ..................................................................... 8

## Regulations

42 C.F.R. §447.504 ............................................................ 10

72 Fed. Reg. 39,142-01 (July 17, 2007) .............................. 12, 17, 38, 45

75 Fed. Reg. 69,591-01 (Nov. 15, 2010) ............................... 18, 51

77 Fed. Reg. 5,318-01 (Feb. 2, 2012) ................................... 19

81 Fed. Reg. 5,170-01 (Feb. 1, 2016) .............................. *passim*

## INTRODUCTION

This appeal arises under the False Claims Act, which carries automatic treble damages that the Supreme Court has recognized as "essentially punitive." The district court's rulings in this case threaten to subject regulated parties to effectively unavoidable punishment without fair notice of the conduct supposedly proscribed. That is because, in this complex regulatory regime, the Government expressly refuses to supply that notice; it instead *requires* regulated parties to make their own reasonable *assumptions* about what conduct is permissible. Appellant Eli Lilly and Company ("Lilly") followed that instruction. Indeed, Lilly's assumptions were precisely what the Third Circuit held reasonable in another case. Nevertheless, Judge Leinenweber found Lilly's assumptions categorically unreasonable and instructed the jury that Lilly's determinations were "false" statements.

The district court compounded that error at trial. In violation of the Supreme Court's seminal decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016), the court relieved Relator of the burden of proving materiality, while allowing Relator to prevail on scienter based on arguments sounding in mere negligence.

The result was a $183 million award for what are (*at worst*) mistakes—though Lilly disputes that—about how to calculate certain prices under a labyrinthine regulatory regime. This judgment is wrong legally, factually, and constitutionally: It raises grave concerns about fundamental tenets of due process and fair notice.

This is what happened: *Qui tam* relator Ronald Streck alleged that Lilly failed to correctly calculate the "Average Manufacturer Price" for certain drugs under complicated Medicaid regulations, thereby leading Lilly to pay less money in rebates to the Medicaid program than it otherwise would have. Calculating Average Manufacturer Price, however, is a task so notoriously complicated that the relevant federal agency *refuses to tell* manufacturers how they should perform it. Instead, the agency instructs manufacturers that absent specific guidance—which the agency did not provide here—they must use their own "reasonable assumptions" when calculating price.

Lilly made plainly reasonable assumptions about the small piece of its average price calculation this lawsuit concerns. The relevant statute defines "price" to mean the amount paid "to the manufacturer … by wholesalers" to acquire drugs. But sometimes manufacturers pay money

*to* wholesalers in exchange for services—notably, distributing drugs to pharmacies rather than (as wholesalers used to do) hoarding them in inventory hoping the drugs' resale price will increase. Like numerous others in the industry, Lilly entirely excluded fees paid *to wholesalers* in its calculations of "price paid to the manufacturer." Relator claims, however, that one component of that service fee should count toward a drug's Average Manufacturer Price: When the *amount* of such service fees accounts for post-acquisition price increases for the drugs in a wholesaler's inventory (to eliminate the hoarding incentive and prevent double compensation), Relator says that should be treated as a retroactive change to the original sale price.

Several years ago, the Third Circuit rejected this same Relator's False Claims Act suit, on the very same theory. The court explained that excluding service fees was a reasonable approach to the price calculation in the absence of further, clear regulatory guidance. Lilly took that decision as reliable assurance that its approach was a "reasonable assumption" it could permissibly make.

Without even discussing the Third Circuit's opinion, the district court disagreed and called Lilly's approach not only incorrect but

unreasonable. The court therefore held that Lilly's calculations of average price were falsehoods—*as a matter of law*—under the False Claims Act, granted partial summary judgment for Relator, and instructed the jury that Lilly's price calculations were false.

That was legal error. A party who makes reasonable compliance choices about ambiguous regulatory requirements does not engage in "falsehoods" simply because a court later thinks the best reading of the regulation requires something slightly different. That is precisely why appellate courts have repeatedly held that a merely incorrect interpretation of an ambiguous requirement is not "false" under the Act at the time it was made. Certainly it cannot be "false" in this context, where the defendant's regulatory obligation was *to make its own reasonable assumptions* about how to perform a calculation the agency will not explain.

While that alone requires reversal, the district court committed further errors at trial concerning the other two key elements of False Claims Act liability: materiality and scienter. As for materiality, it is undisputed that Lilly told the agency repeatedly, over the course of a decade, *precisely* what its approach to service fees was. Far from raising

any objections, the Government audited Lilly and never suggested Lilly was wrong—much less took any steps to restrict Lilly's participation in Medicaid or seek penalties. Under those conditions, no reasonable juror could think Lilly's statements were material under *Escobar*. At a minimum, the district court should have instructed the jury in accordance with *Escobar*'s holding, but it refused.

Relatedly, the court allowed Relator's case to go to the jury without any evidence of scienter: No documents suggest Lilly did not believe what it was telling the Government; indeed, that it *did* tell the Government exactly what it was doing is compelling evidence against scienter Relator did not try to rebut. Instead, Relator's jury arguments boiled down to an improper should-have-known negligence standard. But the Act rightly requires more to trigger its draconian punishment of treble damages plus civil penalties.

The district court's ruling undercut the fundamental protections that go to the heart of all three elements required for False Claims Act liability. The judgment should be reversed.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Eli Lilly and Company respectfully requests oral argument, which would aid the Court's resolution of the issues presented.

## JURISDICTIONAL STATEMENT

Because this lawsuit alleges a violation of the False Claims Act, 31 U.S.C. §§3729 *et seq.*, the district court had jurisdiction pursuant to 28 U.S.C. §1331 and §1345. Relator also asserted state statutory claims. R.77. Because those claims rest on substantially the same legal theories and factual allegations as Relator's federal claims, the district court had jurisdiction over them under 31 U.S.C. §3732(b) and 28 U.S.C. §1367(a).

This Court has appellate jurisdiction under 28 U.S.C. §1291. Lilly appeals the judgment after trial, entered on August 3, 2022, in favor of Relator. SA57. On July 31, 2022, Lilly moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a), R.475; on August 31, 2022, Lilly moved for judgment under Rule 50(b) and for a new trial under Rule 59, R.499.

The district court granted in part and denied in part Lilly's post-trial motions on April 26, 2023. R.540; SA58. On May 9, 2023, the district court granted in part and denied in part Relator's Motion to

Amend the Judgment.  R.542; SA71.  Lilly timely filed a notice of appeal from the Amended Judgment on June 6, 2023 (Case No. 23-2134).

On August 1, 2023, Relator moved for quantification of prejudgment interest under two states' laws.  R.555.  On September 26, 2023, the district court entered a Final Judgment on that interest, entered on the docket on October 4, 2023.  SA85.  Lilly timely filed an amended notice of appeal on October 6, 2023 (Case No. 23-2958).

On November 2, 2023, this Court consolidated the two appeals. Case No. 23-2134, Dkt.27.

## STATEMENT OF ISSUES FOR REVIEW

1.  Whether Lilly is entitled to judgment as a matter of law because its statements of its Average Manufacturer Price were not objectively false nor based on unreasonable assumptions.

2.  Whether Lilly is entitled to judgment as a matter of law because the record contains no evidence to prove Lilly's statements were material to the Government.

3.  Whether the judgment should be vacated because the district court erred by failing to instruct the jury of the proper materiality

standard required by *Universal Health Services, Inc. v. United States ex rel. Escobar*.

4.  Whether Lilly is entitled to judgment because no reasonable jury could have found that, in making its required assumptions in the absence of regulatory guidance, Lilly acted knowingly, recklessly, or with deliberate ignorance.

## STATEMENT OF THE CASE

## I.  STATUTORY BACKGROUND

### A.  Average Manufacturer Price Reporting Under Medicaid.

In 1990, Congress created the Medicaid Drug Rebate Program, requiring drug manufacturers participating in Medicaid to pay rebates to States on their Medicaid-eligible purchases.  *See* 104 Stat. 1388.  In 1991, Lilly executed a written agreement with the Department of Health and Human Services, known as the Medicaid Drug Rebate Agreement.  *See* A435.  That agreement requires Lilly to report regularly to the Department's Centers for Medicare & Medicaid Services concerning its "Average Manufacturer Price" for certain drugs—known throughout the industry as "AMP."  42 U.S.C. §1396r-8(a)(1), (b)(3).  The agency uses that information to set rebates manufacturers are required to pay the

Government for Medicaid to cover their products. *See id.* §1396r-8(c). Rebates are generally equal to the drug's AMP (a) minus its "best price" or (b) times a statutory minimum discount. *See* 42 U.S.C. §§1396r-8(c)(1)(A)-(B), 1396r-8(c)(3)(B)(iii). Thus, a higher reported AMP typically means a higher price paid by purchasers or third-party payors, such as the Government, while the manufacturer pays a higher rebate; lower AMP typically results in lower prices and lower rebates.

Federal law only partially defines AMP. It says AMP is "the average price paid *to* the *manufacturer* for the drug in the United States *by wholesalers* for drugs distributed to the retail community pharmacies" or paid directly to manufacturers by pharmacies. §1396r-8(k)(1)(A). The statute does not further define "price paid." For a long time, the statute did not address what happens when (as in this case) there are also payments running in the other direction: when value is conveyed *to wholesalers* by manufacturers in exchange for services. In 2010, however, Congress amended the AMP definition to explicitly *exclude* bona fide service fees, which it defined as fees "paid *by manufacturers to wholesalers* or retail community pharmacies, including (but not limited to) distribution service fees, inventory management fees, product

9

stocking allowances, and fees associated with administrative services agreements and patient care programs." §1396r-8(k)(1)(B)(i)(II). Relator contends that one component (but not the others) of Lilly's contractual fee calculation should have been included in AMP anyway, even though no agency guidance ever said so.

**B.    The Agency Tells Manufacturers To Use Their Own Reasonable Assumptions In Determining How To Calculate AMP.**

The Medicaid provisions have been described as among the "most completely impenetrable texts within human experience," *Abraham Lincoln Mem'l Hosp. v. Sebelius*, 698 F.3d 536, 541 (7th Cir. 2012), and the regulatory regime governing AMP is no exception. *Accord Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 115 (2011) ("Calculation of a manufacturer's 'average' and 'best' prices … is a complex enterprise."). Manufacturers must evaluate many separate transactions to determine whether they should be included in price, *see* 42 C.F.R. §447.504(c)(1)-(3), but without using normal accounting principles. Instead, the agency has instructed manufacturers to calculate AMP using bespoke methods. Centers for Medicare & Medicaid Services, 2016 Final Rule, 81 Fed. Reg. 5,170-01 (Feb. 1, 2016); A517:22-518:6.

No one, however, including the agency, knows what those methods exactly are. Indeed, in 2006, after Congress directed an inquiry, the Department's Inspector General concluded that the "[e]xisting requirements for determining certain aspects of AMPs are not clear and comprehensive." A1 at A13. In response to these findings, the agency "acknowledge[d] that the [Inspector General] has reported some confusion among drug manufacturers about what sales and price concessions must be included when calculating AMP." *Id.* at A68. The agency further noted that AMP "is an extremely complex and technical topic." *Id.*

The regime's complexity creates serious confusion and difficulties for manufacturers like Lilly. Manufacturers need to calculate AMP correctly to avoid the risk of disqualification from the Medicaid program (and losing potentially billions of dollars of business as a result) or facing monetary penalties for violations of the Rebate Agreement. *See* A435 at A442-443, A445. *Over*estimating AMP can create liability by overinflating reimbursement rates paid by government insurance programs to pharmacies. And, as Relator would have it, *under*estimating

11

AMP can create liability through underpayments of rebates. Despite that, the agency has declined to explain how to compute AMP.

Instead, the agency has established a regulatory framework that acknowledges there will be zones of uncertainty. *See* A435 at A442; A457 at A458. In those cases, manufacturers must make "reasonable assumptions." *See* A457 at A458. The agency first issued that instruction at the start of the Rebate Program in 1991, A435, and has repeatedly reaffirmed it.[1] Notably, in the 2016 Rule the government invoked reasonable assumptions 81 times; in the most recent relevant Final Rule (December 31, 2020), reasonable assumptions are invoked 32 times. It is clear that when a manufacturer reports its AMP for a certain drug as $X.XXXXXX, that number results from a complicated series of calculations, many of which rely on the manufacturer's own reasonable assumptions.

---

[1] Centers for Medicare & Medicaid Services, 2007 Final Rule, 72 Fed. Reg. 39,142-01, 39,191 (July 17, 2007); 81 Fed. Reg. at 5,174.

## II. LILLY'S WHOLESALER AGREEMENTS AND SERVICE FEES.

### A. Lilly Begins Paying Service Fees To Wholesalers.

Lilly is a pharmaceutical manufacturer that develops and sells medicines. Like other manufacturers, Lilly does not sell its drugs directly to pharmacies but contracts with wholesalers to distribute Lilly's products. R.77 ¶¶76-77.

Before 2005, wholesalers typically profited by stockpiling manufacturers' drugs until manufacturers raised prices and then reselling the stockpiled drugs at the higher price. A482:7-10, A498:7-10. This practice, sometimes called the "arbitrage model," caused disruptions in the supply chain for needed medicines and rendered wholesalers' own earnings unpredictable. A499:17-500:7; *see also* A319 ¶¶60-61. Lilly found such speculative buying made it "really hard to predict how much [inventory] to manufacture" to ensure there was enough medicine to go to pharmacies and ultimately patients. *See* A499:17-500:7. At wholesalers' suggestion, Lilly transitioned to fee-for-service agreements, under which Lilly paid wholesalers a fee for drug distribution, inventory management, data reporting, and other services. A224; R.77 ¶77; A319 ¶63.

Lilly's service fee was intended to entirely replace the arbitrage model. A503:11-504:17. Lilly recognized it could not *both* compensate wholesalers with a service fee *and* continue to allow them to arbitrage future price increases by hoarding inventory. That would overcompensate the wholesalers (by allowing them more than fair market value for their services); could potentially raise Anti-Kickback Statute concerns; and would not resolve the supply disruptions caused by speculative buying. A490:17-491:19, A504:3-7, A552:14-22.

Thus, Lilly's new agreements provided that wholesalers would receive a "Distribution Fee" for their services, calculated as a percentage of the wholesaler's sales. *See, e.g.*, A468 at A470. Like many manufacturers, Lilly structured its payments to wholesalers into two components. Lilly treated the value of any price appreciation for medicines that wholesalers retained in inventory as a form of in-kind compensation (by increasing the value of the wholesalers' remaining inventory) and paid the remainder of the owed fee in direct monetary compensation. A509:1-14. Lilly's 2005 agreements, for instance, calculated the Distribution Fee by adding "(1) the value of any price increase by Lilly during the quarter for Products in Wholesaler's

14

inventory," which the contract called the "Price Increase Value"; and "(2) a payment or credit by Lilly." A468 at A470. The contract provided that "Price Increase Value for a Product shall be calculated by multiplying the price increase for the Product by the amount of inventory of such Product Wholesaler has on the date of the price increase." *Id.*[2]

The new fee-for-service model was a success. Wholesalers ceased hoarding drugs in anticipation of price increases, as major drug manufacturers adopted service-fee agreements involving comparable provisions. *E.g.*, A319 ¶¶23-58; *see also* A484:4-10, A487:17-488:4. Lilly entered into similar contracts in 2009 and 2016, but for administrative efficiency, began accounting separately for Price Increase Value compensation rather than first subtracting it from a monetary payment.

---

[2]    To illustrate, imagine that the service fee for a particular quarter were $40 million. If the value of a wholesaler's inventory was increased by $5 million due to a price increase—meaning the wholesaler could realize that $5 million on resale—then it already received $5 million in compensation. Lilly would pay the wholesaler an additional "payment or credit" of $35 million. If the wholesaler had sold the inventory before a price increase, it would receive the full $40 million in payment or credit. The wholesaler is now thus indifferent to future price increases after its original purchase: It makes the same $40 million and has the same incentive to get medicine on pharmacy shelves, without double compensation.

A471 at A473; A474; A496:17-497:6. Where Lilly had previously offset price appreciation *before* paying wholesalers the monetary component of their service fees, after 2009, Lilly received the offset *back* from the wholesalers after paying them a monetary amount that would otherwise have covered the full service fee—a change in form but not economic substance. A511:22-512:3, A528:3-19, A529:7-531:2.

## B. Service Fees And AMP Calculations.

When manufacturers first implemented service fees in 2005, they were required to make "reasonable assumptions" about how to treat their new service-fee payments for AMP purposes, since neither the AMP statute nor any regulation resolved the question. *See supra* §I.B.

Manufacturers took two approaches. Some included all service fees in AMP calculations, treating them as deductible "discounts" off the price that wholesalers paid for drugs. A136 at A157-60. This resulted in lower reported AMPs and thus lower rebates paid by the manufacturers to the Government. Others in the industry, including Lilly, took the reasonable approach of excluding wholesaler service fees from AMP calculations. This resulted in higher AMPs and therefore higher Medicaid rebate payments by Lilly. A525:6-8.

Relator thinks everyone got it wrong. He contends manufacturers should generally exclude service fees from AMP, but also that Lilly should have disaggregated the "Price Increase Value" *portion* of its fee calculation and *added that* back as part of AMP. *See, e.g.*, R.316. Lilly's view of the contractual "Price Increase Value" term, by contrast, was that this was not a "price paid *to* the *manufacturer* [Lilly] … by [the] wholesaler[]" under the AMP statute, §1396r-8(k)(1)(A)(i); instead it was, as the contract stated, *compensation from Lilly to the wholesalers* for services provided. That is the disagreement Relator calls fraud on the Government.

## C. The Agency's Lack Of Clear Guidance.

During the relevant period, the agency issued or proposed three AMP regulations—the 2007 Rule, 2012 Proposed Rule, and 2016 Rule. None specifically resolved the question Relator now raises.

### 1. 2007 Rule

When the agency promulgated its first final AMP rule in 2007, it confirmed Lilly's approach by providing that "fees *except fees paid for bona fide services* should be included in AMP." 72 Fed. Reg. at 39,148. The 2007 Rule thus directed manufacturers to exclude service fees from

17

AMP, as Lilly had been doing. The final rule further defined "bona fide service fees" as "a fee paid by a manufacturer to an entity; that represent *fair market value* for a bona fide, itemized service actually performed on behalf of the manufacturer." *Id.* at 39,144. Significantly, it also reaffirmed that "[i]n the absence of specific guidance, manufacturers may make reasonable assumptions consistent with the statute, regulations, and general business practices." *Id.* at 39,171. Because the 2007 Rule did not define "fair market value," manufacturers had to make reasonable assumptions about how to value service fees. *Id.* at 39,148, 39,171, 39,184.

In the years that followed, the agency adopted no regulations contradicting Lilly's approach or providing clarity. Instead, in 2010, the agency rescinded the 2007 Rule, directed manufacturers *not to use* the 2007 definition of bona fide service fees (while leaving in place the reasonable-assumptions rule), and noted that the "treatment of bona fide service fees w[ould] be addressed in future rulemaking." 75 Fed. Reg. 69,591-01, 69,593 (Nov. 15, 2010). But the agency failed to adopt any replacement rule until 2016, meaning *no* regulation governed AMP calculations for six years.

### 2. 2012 Proposed Rule

In 2012, however, the agency *proposed* a potential new AMP rule, the relevant language of which never became final. The proposal included the same definition for bona fide service fees found in the since-withdrawn 2007 Rule. *See* 77 Fed. Reg. 5,318-01, 5,332 (Feb. 2, 2012). By reinstating the old definition, the agency hoped to ensure that those fees represented "fair market value" for wholesalers' services. *Id.*

For the first time, however, the proposal's *preamble* referred to "price appreciation credits." Without addressing any specific circumstances, it suggested "that retroactive price adjustments, sometimes also known as price-appreciation credits, do not meet the definition of a bona fide service fee as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer." 77 Fed. Reg. at 5,332. The proposed regulations themselves were silent on price-appreciation credits, and said nothing about how to treat them in the context of after-sale services.

### 3. 2016 Rule

The agency issued a new final rule four years later. 81 Fed. Reg. 5,170-01 (Feb. 1, 2016). That rule reinstituted the 2007 definition of bona fide service fees withdrawn in 2010. The new regulation likewise did not

define "fair market value," instead describing the determination as "by nature subjective" and covering a "range of values" because "manufacturers should retain flexibility in determining whether service fees are paid at fair market value." *Id.* at 5,179-5,180.

In its preamble, the agency took a more nuanced approach to price-appreciation credits. The agency "continue[d] to believe that price appreciation credits would *likely* not meet the definition of bona fide service fee." *Id.* at 5,228. But it further noted the agency's "understanding that price appreciation credits are *not* issued for the purposes of payment for any service or *offset for a bona fide service performed on behalf of the manufacturer*," but instead "are issued by the manufacturer to adjust (increase) the wholesaler's purchase price of the drugs…. In such situations, these credits would amount to a subsequent price adjustment…." *Id.*

This rule's preamble was unclear to Lilly in two respects. *First*, the phrase "likely not" did not clarify whether price-appreciation credits could *never* be bona fide service fees under the newly enacted regulations, or whether that was *generally* true but not always. A485:12-17. *Second*, the preamble's language seemed to concern an inapplicable factual

scenario wherein manufacturers did *not* issue their price-appreciation credits for the purpose of paying for services. A486:1-21. Lilly was unsure if the agency's outlook still applied where (as here) Lilly *did* pay for services through price-appreciation credits. *Id.* Given this new uncertainty, Lilly began including Price Increase Value in calculating AMP going forward. R.313 ¶121.

## III. THE PARTIES AND PROCEEDINGS BELOW

### A. The Qui Tam Relator And His Prior Failed *Qui Tam* Action On This Theory.

Relator has spent more than fifteen years trying to monetize his theory that manufacturers should include price-appreciation offsets to wholesaler service fees in AMP. In 2008, he brought a *qui tam* action against more than thirty pharmaceutical-industry defendants, including Lilly, in Pennsylvania. *United States ex rel. Streck v. Allergan, Inc.*, 894 F. Supp. 2d 584 (E.D. Pa. 2012) ("*Streck I*"). Relator's theory then was the same as now: that manufacturers should include Price Increase Value—but not the rest of a wholesaler's service fee—in AMP. 894 F. Supp. 2d at 589. As Relator put it, in that case (*Streck I*) he "accus[ed] multiple pharmaceutical companies, including originally Lilly … of exactly what it's being accused of" here. A480:8-12.

21

In response to the *Streck I* complaint, Lilly comprehensively reevaluated its AMP methodology. Lilly ultimately concluded that it was more reasonable to treat the entire service fee as excluded from AMP, rather than to adopt Relator's unilateral interpretation of price increase value, A533:4-534:15, a theory that *no one*, much less the Government, had previously articulated. Lilly informed the agency of its reasoning at the time. A392.

Relator later voluntarily dismissed Lilly and other defendants to "focus" on what he considered his more meritorious claims. R.40 at 7; *see* R.59 at 8. That decision, along with the Government's decision to decline to intervene, R.164, reinforced Lilly's belief that its approach remained reasonable, A544:3-13, A547:9-14.

In 2012, the district court dismissed all claims against the remaining manufacturers. It concluded that their interpretation of the AMP statute and regulations was objectively reasonable given the "dearth of guidance." *Streck I*, 894 F. Supp. 2d at 600. This decision reinforced Lilly's belief in the reasonableness of its approach, too. A545:6-546:17. In 2018, the Third Circuit unanimously affirmed on the same reasoning as the district court. 746 F. App'x 101, 103.

**B.    Relator's Latest Allegations.**

Relator filed this suit, his third *qui tam* action, against 15 drug manufacturers in 2014.  R.1.  Relator alleged that Lilly violated the False Claims Act by understating its "true" AMP between 2005 and 2017. *Id.*; *see also* A576:1-5.  Relator asserted both traditional false claims under 31 U.S.C. §3729(a)(1)(A) and (a)(1)(B) (Count 1), and reverse false claims under §3729(a)(1)(G) (Count 3).[3]  R.77 ¶¶141-47, 154-59.  Both were based on Relator's theory that by miscalculating AMP, Lilly had understated the Rebates that it owed the Government (reverse) and caused the federal government to pay more to the States to make up the difference (traditional).  Relator argued that, regardless of theory, Lilly was responsible for $61 million in damages.  A570:11-12.

Like his prior suits, Relator alleged that defendants falsely reported AMP in two distinct ways.  One group *included* service fees paid to wholesalers in AMP as discounts, which purportedly resulted in lower AMPs.  Another group, including Lilly, *excluded* service fees from

---

[3]    Relator also asserted a claim under §3729(a)(1)(D), for conversion, on the theory that Lilly had taken possession of money owed to the government—effectively a reverse false claim theory. *See* R.77 ¶¶148-53.

calculating AMP, including the price-appreciation-credit portion of those fees, which in turn purportedly reduced reported AMP. Both methods, in Relator's view, were fraudulent. Defendants again moved to dismiss, R.84-87, which the district court denied.

### C. The District Court's Summary Judgment Order On The Element Of Falsity.

Following discovery, Relator and Lilly each moved for summary judgment. R.311, R.314. On February 28, 2022, the district court denied Lilly's motion but granted Relator's as to falsity. SA1 at SA37-40. Judge Leinenweber correctly recognized that a "statement may be deemed false for purposes of the False Claims Act if the statement represents 'an objective falsehood.'" *Id.* Nevertheless, he concluded that Lilly's AMP calculations were objectively false as a matter of law because the Rebate Agreement provides that AMP "must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized"—notwithstanding the cases holding it was *not unreasonable* to exclude price-appreciation values. *Id.*

Remarkably, the district court also concluded that because Lilly began including Price Increase Value in its AMP submissions in 2017— *after* the agency issued its 2016 Rule and injected new uncertainty into

24

the regulatory landscape—that meant Lilly "essentially admitted through its actions that the claims were false" throughout the whole 2005–2017 period. *Id.*

### D. Relator's Case At Trial.

The case proceeded to trial on July 22, 2022. The three principal elements of a False Claims Act case—falsity, materiality, and scienter—were resolved in different ways.

#### 1. Falsity

Per its summary judgment ruling, the district court instructed the jury that Lilly's statements were false. A577:1-5. Relator told the jury that because the district court had already decided that "Lilly submitted legally and factually false certifications to Medicaid," and damages were not disputed, the jury's role was to simply make Lilly pay in accordance with the falsity ruling. A570:8-15.

#### 2. Materiality

At trial, Lilly showed that it repeatedly and consistently disclosed to the Government its approach to AMP, thereby foreclosing any possibility of materiality. In 2005, when Lilly first introduced its fee-for-service model, Lilly met with the agency's Inspector General seeking to clarify whether service fees should be included in AMP. A224 at A228;

A522:13-18, A523:20-524:24. Lilly memorialized its position in a letter stating that it had "decided to exclude the wholesaler service fees from its Medicaid Rebate calculation" because "there [was] no clear guidance on how to treat wholesaler service fees." A224 at A228.

Lilly continued to disclose its approach—including Price Increase Value compensation—in the years that followed. In 2011, Lilly described its approach to service fees and AMP calculations and asked the agency to inform Lilly if it disagreed. A392. Lilly explained that beginning in 2009, it used a "claw back" provision (the Price Increase Value provision) requiring wholesalers to "remit money back to Lilly related to the increased value of the product that it has in inventory at the time of the price increase," which Lilly believed was "an appropriate way for [it] to implement the fair market value requirement" for bona fide service fees. *Id.* at A395. Lilly further explained that from 2005 to 2009, it had likewise "offset[] service fee payments by reducing the service fee by the increased value of the inventory." *Id.* Accordingly, Lilly made clear to the Government that Lilly "excludes service fees paid to wholesalers or distributors, *including the claw back adjustment*" from AMP calculations.

*Id.*; *see* A539:8-18.  The agency took no action and did not respond, let alone suggest in any way that Lilly's approach was wrong.  A540:16-17.

In 2013, as part of a formal audit, the Inspector General requested information regarding 20 drug manufacturers' methodologies for calculating AMP.  A401.  In response, Lilly provided various materials, including a document that made clear how Lilly treated Price Increase Value terms:  Lilly "claws back a portion of the value by which a wholesaler's inventory on hand increases due to price changes made by Lilly," and those "offsets are applied against the service fee payment" and excluded from AMP.  A398 at A400 n.31; A404; A483:12-25.  Lilly thus told "OIG directly that it [was] excluding the price increase value component of the service fee [that] Lilly viewed as an offset from its AMP calculation."  A484:12-15.

In 2014, the Inspector General published an audit report based on the material provided by Lilly and other drug manufacturers.  It concluded the methodologies "used to determine AMPs generally were consistent with Federal requirements," and did not suggest that Lilly's AMP methodology, which Lilly had disclosed, was in any way improper.  A410 at A415.  And in 2016, after the agency promulgated its latest rule,

27

Lilly sought a meeting with agency officials. A230 at A232. At the meeting, Lilly explained that the price-appreciation offset was "part of Lilly's method of making the admin fee payment" as compensation to wholesalers and ensures that distribution fees are fair market value under the bona fide services test. *Id.* at A233; A489:11-22.

Given this lengthy history of disclosure to the Government, Lilly sought a materiality instruction based on the Supreme Court's decision in *Escobar*. A557:19-558:14; *see also* R.478 at 32-34. That proposal would have instructed the jury that, where the Government knows about a defendant's approach but takes no corrective action, "that is very strong evidence" that the Government did not consider the approach material, and that a "misrepresentation cannot be deemed material merely because it inflates the amount charged to the Government or causes the Government to be paid less than it is owed." R.478 at 32-34; *see Escobar*, 579 U.S. at 195. The district court rejected Lilly's proposal and simply read the statute to the jury without explanation. R578:3-5.

### 3. Scienter

The False Claims Act requires the defendant to act with actual knowledge of its wrongdoing or at least recklessness. *United States ex*

*rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 750 (2023).  Nevertheless, Relator's trial presentation on scienter focused on Lilly's size, profits, and alleged *lack of diligence* in calculating AMP.  As Relator himself made plain, "[t]his [was] not a fraud case," *see* A572:2-9, but one that hinged on whether Lilly had "familiarize[ed] [itself] with the applicable rules." A561:6-7; *see also* A560:15 (directing the jury to consider whether Lilly "conducted the required diligence"); A574:7-16 (noting that "Lilly didn't do the work" and that it had to "put some resources" into its decision-making).  Thus, Relator asked the jury to find Lilly liable even if it believed Lilly's decisionmaker had "made a good faith decision at the time," or even if the jury agreed that Lilly's explanation of its calculations "ma[d]e sense."  A574:21-22, A575:7-8.

Instead of trying to prove actual fraud, *deliberate* indifference, or even *reckless* disregard, Relator emphasized Lilly's supposedly "nearly unlimited resources," and argued Lilly "could have paid just about anybody in the world to help" construe agency regulations.  A479:4-9; *see also* A560:13-17, A565:5-6.  And he expressly urged the jury to make Lilly pay because "it's virtually petty cash to a $300 billion company." A570:22-24.

## E. Verdict And Entry of Judgment.

The jury returned a verdict in Relator's favor for $61,229,217, which was automatically trebled under the statute to $183,687,651 before statutory penalties were further imposed. SA57; R.486. After denying in relevant part Lilly's post-trial motions, R.500, R.540, the court entered final judgment on September 26, 2023, SA85. Lilly and Relator both appealed. R.563, R.566.

## SUMMARY OF ARGUMENT

Lilly is entitled to judgment on all three elements of False Claims Act liability: falsity, materiality, and scienter. In the alternative, this Court should order a new trial.

**I.** The district court erred as a matter of law in granting Relator summary judgment on falsity. The Government explicitly instructed Lilly to make "reasonable assumptions" in AMP calculations, and Lilly did so. Lilly's assumptions regarding how to calculate AMP—as confirmed by two federal courts, the Inspector General, and the regulatory guidance available—were *objectively reasonable* and therefore not false as a matter of law. It is difficult to overstate the perniciousness of the district court's ruling. Under Relator's approach, any action a court later thinks a mistake, if it has any financial implications for the

30

Government, will threaten automatic treble damages. That is not only wrong, but violates the fundamental constitutional requirement of fair notice.

**II.** Relator did not establish materiality. *First*, the *per se* theory of materiality on which Relator exclusively relied at trial fails because it ignores the Supreme Court's seminal guidance in *Escobar* that materiality looks to whether the Government "attach[ed] importance" to the purported misrepresentation. 579 U.S. at 193.

*Second*, no reasonable jury could have found that Lilly's AMP calculations were material. The evidence presented at trial overwhelmingly established that the Government considered Lilly's methodology to be immaterial. There was no serious dispute that the Government was aware that Lilly excluded price appreciation from AMP, and that the Government took no responsive action. Quite the contrary: After auditing Lilly, it found Lilly's approach *compliant*.

*Third*, the district court incorrectly instructed the jury on materiality. The barebones materiality instruction failed to capture *Escobar*'s guidance that the standard is "demanding" and that Government acquiescence in a purportedly false statement is "very

31

strong evidence" that the statement is not material. *Escobar*, 579 U.S. at 194-95. At a minimum that requires a new trial.

**III.** No reasonable jury could have found that Lilly "knowingly" submitted false AMP certifications. *First*, there was no serious dispute at trial that Lilly actually held its reasonable interpretation and also that it did not receive *actual* notice that its approach was incorrect—again, all evidence showed the opposite, making this case fundamentally different from *SuperValu*. *Second*, the overwhelming evidence shows Lilly did not act with deliberate ignorance or reckless disregard in deciding that its approach was permissible, much less a belief that it was wrong. Lilly's government-pricing specialist consulted every relevant legal authority and genuinely believed that Lilly was permitted to exclude price-appreciation offsets from AMP. Lilly, in turn, repeatedly informed the Government of its AMP methodology but heard no disagreement, even after an audit. And the Inspector General's conclusions following the audit further reinforced Lilly's belief that its approach was lawful. *Finally, SuperValu* instructs that where a defendant's *actually-held* interpretation is reasonable, and where the defendant had insufficient

notice of the purportedly "correct" interpretation, the defendant lacks the requisite scienter. So it is here, compelling judgment for Lilly.

*      *      *

Taken together, the district court's errors as to falsity, materiality, and scienter unfairly punish good-faith actors. Making assumptions (at your regulator's direction) about an ambiguous regulatory regime that two courts and a governmental audit have found at least reasonable should not subject you to crushing treble damages and penalties. The False Claims Act is "not an all-purpose antifraud statute," much less "a means of imposing treble damages and other penalties for insignificant regulatory or contractual violations." *Escobar*, 579 U.S. at 194, 196. This Court should reject Relator's attempt to turn it into just that.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment *de novo*, "viewing all evidence and drawing all reasonable inferences in the non-moving party's favor." *EEOC v. Charter Commc'ns, LLC*, 75 F.4th 729, 732 (7th Cir. 2023). It "may affirm summary judgment only if the record shows no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

This Court likewise reviews *de novo* a denial of a motion for judgment as a matter of law under Rule 50, viewing the evidence presented at trial "in the light most favorable to the verdict." *Turubchuk v. S. Ill. Asphalt Co., Inc.*, 958 F.3d 541, 548 (7th Cir. 2020). "Judgment as a matter of law is proper if a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Id.* A "denial of a motion seeking a new trial under Rule 59 is reviewed for abuse of discretion." *Id.*

This Court "review[s] jury instructions de novo to determine whether, taken as a whole, they correctly and completely informed the jury of the applicable law." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). This Court will "reverse when the instructions misstate the law or fail to convey the relevant legal principles in full and when those shortcomings confuse or mislead the jury and prejudice the objecting litigant." *Id.*

## ARGUMENT

### I. LILLY IS ENTITLED TO JUDGMENT BECAUSE ITS STATEMENTS ABOUT AMP WERE NOT FALSE AS A MATTER OF LAW.

The False Claims Act imposes liability on one who "knowingly presents, or causes to be presented, a false or fraudulent claim for

34

payment or approval."  31 U.S.C. §3729(a)(1)(A); *Lanahan v. Cnty. of Cook*, 41 F.4th 854, 862 (7th Cir. 2022).  A plaintiff must prove that the defendant "(1) made a statement in order to receive money from the government, (2) the statement was false, (3) [the defendant] knew the statement was false at the time it made the statement, and (4) the statement was material to the government's decision" to pay money. *Lanahan*, 41 F.4th at 862.  Here, Relator contended that Lilly's allegedly false statements of AMP led it to underpay rebates to the Government, A555:11-556:1, and induced the Government to pay extra rebates to the States to make up for lost revenue from Lilly, A554:2-16.[4]  The district court granted summary judgment to Relator on falsity, holding that Lilly's AMP calculations and related certifications were false as a matter of law, SA1 at SA37-40, and similarly denied Lilly's motions for judgment as a matter of law, R.476, 500; SA58.

---

[4]     Because these two theories are two sides of the same coin, the jury was not instructed separately on them, and this brief treats them together.  *See United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 119 (2d Cir. 2021) ("[A] reverse false claim cannot turn on the same conduct underlying a traditional false claim.").

Those rulings were legally erroneous. The False Claims Act does not impose liability where the regulatory requirements are unclear and manufacturers like Lilly must make reasonable assumptions absent specific guidance. That follows both from longstanding False Claims Act precedent and, independently, from the specific regulatory directives here. Because Lilly's assumptions regarding how to calculate AMP were indeed reasonable, its AMP calculations were not false as a matter of law.

## A. The False Claims Act Does Not Impose Liability For Making Reasonable Assumptions Under Unclear Regulatory Regimes.

Lilly's longstanding decision to exclude wholesaler service fees in their entirety from AMP calculations, including the in-kind compensation component (in the form of increasing the value of inventory post-acquisition), cannot create False Claims Act liability as a matter of law. That Act punishes fraud, not reasonable compliance choices that a district court later thinks it would have made differently. That conclusion follows not only from this Court's repeated admonitions, but

*independently* from the specific regulatory regime here, which *required* manufacturers to base AMP on their own reasonable assumptions.

**1.** As Judge Leinenweber correctly recognized, a "statement may be deemed 'false' for purposes of the False Claims Act only if the statement represents 'an objective falsehood.'" *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011); *see* SA1 at SA37. This Circuit and others have long recognized that "imprecise statements or differences in interpretation growing out of a disputed legal question" cannot constitute objective falsehoods under the False Claims Act. *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1018 (7th Cir. 1999); *see also, e.g.*, *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008) (same); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 445 (3d Cir. 2004) (concluding that the "absence of a clear obligation" precluded liability); *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996) ("[A] disputed legal issue ... is not enough to support a reasonable inference that the allocation was false within the meaning of the [the Act]."). That rule ensures that the Act does not become a "vehicle for policing technical compliance with administrative regulations,"

37

*Lamers*, 168 F.3d at 1020, but instead prevents fraud based on "expressions of fact which (1) admit of being adjudged true or false in a way that (2) admit of empirical verification," *Wilson*, 525 F.3d at 377-78. Although it acknowledged this principle, as set forth below, the district court failed to apply it.

**2.** The principle that reasonable regulatory interpretations are not false has independent force in this case because the regulations at issue *specifically require* manufacturers to make statements about AMP *based on their own reasonable assumptions* absent clear guidance on a specific point. *E.g.*, A435 at A442 ("In the absence of specific guidance ... [Lilly] may make reasonable assumptions in its calculations of AMP"); 72 Fed. Reg. at 39,148, 39,171. In other words, Lilly's obligation was *not* to report a Platonically-correct AMP, but rather to determine and report an AMP *grounded in its own reasonable assumptions*. In that circumstance, its AMP calculation cannot be a falsehood unless its assumptions were objectively *unreasonable*.

**3.** Here, there can be no serious dispute Lilly was entitled to make reasonable assumptions about how to treat service fees, including their Price Increase Value component, precisely because it lacked specific

guidance on that question.  Until 2010, the statute provided only that AMP is the "average price paid to the manufacturer for the drug in the United States by wholesalers," but it did not further define "price," or address how payments *to wholesalers* should be treated.  The 2010 amendments, in turn, *confirmed* that bona fide service fees should be excluded from AMP, and they said nothing about separating out the compensation from price appreciation (which Lilly treated as an offset to its monetary fee payments).  §1396r-8(k)(1).[5]  The Rebate Agreement sets out a similar definition, and likewise does not define "price," mention price-appreciation offsets, or explain how offsets to service fees should be handled.  A435 at A436.

Nor did the agency provide formal guidance by rulemaking or otherwise.  For the relevant period, the agency either (a) had no relevant rule at all (2005-2007 and 2010-2016); or (b) had a rule that only spoke to service fees, which Lilly *followed* in excluding them from AMP (2007-2010).

---

[5]   This definition was substantively the same throughout the relevant period.  *See* 42 U.S.C. §1396r-8(k)(1) (1997); *id.* (2007).

Indeed, the rule in place from 2007 to 2010 further confirmed that Lilly had to make reasonable assumptions concerning the Price Increase Value component of the fee. It directed manufacturers to *exclude* all bona fide service fees from AMP, while providing that those fees should represent the "fair market value" for services provided. The agency expressly acknowledged that it had "not further defined 'fair market value' so that manufacturers have *the flexibility to determine fair market value* consistent with industry accepted methods." 72 Fed. Reg. at 39,184. The rule thus instructed Lilly to make reasonable assumptions about how to best calculate service fees, which, under its fee-for-service model, included in-kind compensation from increasing the value of inventory, and was treated as an offset to Lilly's monetary service-fee payments. *Id.* at 39,148, 39,171. Unless objectively *unreasonable*, those assumptions cannot—as a matter of law—constitute false statements simply because a court or agency later disagrees with them, or some subsequent regulatory development arises.

**B. Lilly's AMP Assumptions Were Reasonable And Did Not Result In False Statements Under The Act.**

For at least three reasons, Lilly's approach to wholesaler service fees was objectively reasonable.

**1.** There can be no dispute that paying service fees *to wholesalers* does not in itself affect AMP. Indeed, Relator did not argue that the *total value* of Lilly's compensation to wholesalers (whether in cash, or in-kind price-appreciation credits) was not fair market value for bona fide services rendered.[6]

The only question raised by Relator is whether it was *reasonable* for Lilly to treat price-appreciation value as part of the wholesaler's service-fee compensation (thereby offsetting part of Lilly's direct monetary service-fee payments to the wholesaler), instead of a constructive, retroactive change to the original acquisition price. It was. Lilly's long-running approach to service fees was reasonably aimed at securing services from wholesalers and guaranteeing them a certain return for those services—and no more. Lilly's fee-for-service model was intended to compensate wholesalers for the various services they performed while ensuring they were not double-compensated for hoarding inventory and retaining the value of drug price increases

---

[6] If only cash payments were viewed as part of that service-fee compensation, then payment for services would fluctuate wildly from quarter-to-quarter. A507:17-508:3, A551:1-6.

through stockpiling (*i.e.*, *failing* to distribute drugs). *See* A224. That, in turn, ensured more consistency in the distribution of drugs to pharmacies and consumers; disincentivized wholesalers from stockpiling drugs in anticipation of future price increases; and provided Lilly greater certainty about volumes wholesalers wanted to buy. A499:17-500:7. From the outset, Lilly and wholesalers agreed to calculate quarterly payments by offsetting the value of any price appreciation in Lilly's products in the wholesalers' inventories, treating that as a form of compensation to the wholesalers. As a result, Lilly consistently viewed price-appreciation value as part of wholesaler compensation and thus its bona fide wholesaler service fees (merely offsetting further *monetary* payments)—not as a separate revenue stream to Lilly, much less an adjustment to the wholesaler's *acquisition* price. A501:22-502:5, A506:13-20, A552:14-22.

That approach was reasonable because it compensated wholesalers for the service they provided (steady distribution without regard to post-acquisition price fluctuation), and did not affect what the wholesalers got for their money when they acquired the drug. Indeed, if the wholesalers promptly distributed the drug, there likely would *be no* price appreciation

before resale, meaning their compensation for services would be entirely monetary. There is nothing facially unreasonable about structuring compensation in a manner that both incentivizes prompt distribution and avoids double-compensation to wholesalers for services rendered.

**2.** Importantly, two federal courts in Relator's original case, including the Third Circuit, rejected Relator's theory, demonstrating that Lilly's approach was at the very least *objectively* reasonable. In 2012, the district court dismissed all of Relator's claims against manufacturers who, like Lilly, had excluded price-appreciation credits from their AMP calculations, explaining that there was a "dearth of guidance on price appreciation credits" such that it was "not unreasonable, let alone reckless, for [manufacturers] to have concluded that the 'price paid to the manufacturer' under AMP is just that, the price initially paid to the manufacturer by the wholesaler." *Streck I*, 894 F. Supp. 2d at 600.

In 2018, the Third Circuit unanimously affirmed. *United States v. Allergan, Inc.*, 746 F. App'x 101. The court reasoned that "[n]o version of the statute addressed price-appreciation credits." *Id.* at 107. The AMP statute did not "unambiguously require [that] price-appreciation credits [] be added to the price paid by wholesalers," because such credits are

"not part of the initial value given for the acquisition of a supply of drugs," but rather are "only triggered once a drug is distributed by a wholesaler to a third party after the manufacturer has increased the price of the drug above the amount paid by the wholesaler." *Id.* at 107-08. The court concluded that "while the statute could be interpreted to include price-appreciation credits in the AMP calculation, … *it was not objectively unreasonable*" for manufacturers to exclude price-appreciation credits from AMP calculations, at the very least "between the years of 2004 and 2012." *Id.* at 108, 110. Relator's position charges Lilly with concluding on its own that the Third Circuit was not just wrong, but *unreasonably* wrong. That alone should give this Court pause, but it gave the district court none: Its summary judgment decision did not reference, let alone discuss, the decisions in *Streck I*.[7]

Given the foregoing, it is legally impossible to describe Lilly's identical approach as a "false" statement within the meaning of the False Claims Act. Following a practice that has been previously condoned by a

---

[7] It is of no moment that these decisions considered reasonableness through the lens of scienter, rather than falsity; what matters is that those courts agreed approaches like Lilly's were reasonable.

district court judge and another court of appeals in light of the dearth of applicable regulations cannot be so clearly wrong as to fall outside the bounds of the regulatorily required "reasonable assumptions." *See Lamers*, 168 F.3d at 1018 ("differences in interpretation growing out of a disputed legal question" cannot be objectively false); *Hagood*, 81 F.3d at 1477 (similar).

**3.** The available regulatory guidance further confirmed Lilly's approach was reasonable. The first time the agency provided *any* relevant guidance was the 2007 Rule, which directed manufacturers to exclude bona fide service fees from AMP—exactly what Lilly was doing. 72 Fed. Reg. at 39,148. And although the 2007 Rule was silent about price appreciation, it instructed manufacturers to make reasonable assumptions to ensure service fees represented "fair market value." Again, Lilly had been compensating wholesalers through direct monetary payments *and* in-kind compensation (the increased value of inventory from price increases), structured to ensure wholesalers were not doubly

compensated for services performed by wholesalers. Lilly reasonably interpreted the 2007 Rule as confirmation of its historical approach.[8]

The Inspector General's report alone should doom Relator's case. After auditing Lilly and nearly 20 other drug manufacturers methodologies for calculating AMP, A401, including reviewing Lilly's documents explaining how Lilly treated price increase value terms and used offsets against the monetary component of the service fee payment, A404; A483:12-25; A398 at A400 n.31, the Inspector General concluded the method Lilly used to "determine AMPs generally were consistent with Federal requirements," A410 at A415. Not only was Lilly entitled to rely on this, but Lilly's assumptions cannot possibly now be deemed "unreasonable" in hindsight, when the Inspector General for the agency charged with administering the relevant statute found Lilly's methodology "consistent with Federal requirements."

---

[8]     To be sure, Lilly's Heather Dixson testified that the 2007 Rule clarified that bona fide service fees should be excluded, A527:4-10, and thus no assumptions about treatment of services fees generally were required (at least until the 2007 Rule was rescinded in 2010). But, because the 2007 Rule did not address price appreciation, Lilly made reasonable assumptions about *that* component of its service fees.

Confirming all this, in promulgating the 2016 Rule, the agency further suggested that where price-appreciation valuation is used by the manufacturer "for the purposes of payment for any service or *offset for a bona fide service performed on behalf of the manufacturer*," 81 Fed. Reg. at 5,228, that *would* be permissible. That strongly suggests that Lilly's interpretation was not just reasonable, but correct. In all events, it settles the objective reasonableness of Lilly's approach.

## C. The District Court's Contrary Conclusion Was Legal Error.

The district court, however, not only denied summary judgment to Lilly, but affirmatively held Lilly engaged in falsehoods as a matter of law. Its reasoning was fundamentally flawed and should be reversed.

### 1. The District Court Erred By Concluding Lilly's Treatment Of Service Fees Conflicted With Specific Guidance And Was Unreasonable.

The district court concluded Lilly's approach was categorically unreasonable based on language in the Rebate Agreement and the 2007 Rule, stating that AMP "for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." *See* R.312 at 16; SA1 at SA32; 72 Fed. Reg. at 39,242. Based on that language, the district

47

court held Lilly's exclusion of the price-appreciation component of its service fees from AMP was an attempt to define "price" to mean "initial price." SA1 at SA38-39. The court held that would be an unreasonable interpretation of the statute, because Price Increase Value could be viewed as retroactive price adjustments. *Id.* at SA37-40. But neither the 2007 Rule's language nor the district court's interpretation of "price" renders Lilly's AMP certifications false, much less provides sufficient notice for Lilly to be *punished* for failing to read them as Relator now would. *E.g.*, *Gates & Fox Co., Inc. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.) ("If a violation of a regulation subjects private parties to criminal or civil sanctions, a regulation cannot be construed to mean what an agency intended *but did not adequately express*."). That is so for several reasons.

*First*, the district court misread the 2007 Rule. Focusing solely on its discussion of AMP adjustments paints an incomplete picture; Lilly had to interpret that portion of the Rule alongside its instructions regarding bona fide service fees. And as noted above, the 2007 Rule expressly provided that "all fees *except* fees paid for bona fide services should be included in AMP." 72 Fed. Reg. at 39,148. Based on this

specific guidance regarding the treatment of bona fide services from 2007 to 2010, it was reasonable for Lilly to assume that Price Increase Value—a component of its bona fide service fees for which the agency had not otherwise provided specific guidance—was likewise excludable from AMP. Indeed, the 2007 Rule specifically gave drug manufacturers the flexibility to make reasonable determinations of what constituted bona fide service fees. *See id.* at 39,148, 39,171.[9] And many other manufacturers reached the same, reasonable conclusion as Lilly based on this guidance.

***Second***, the excerpt of the 2007 Rule that the district court relied on does not render Lilly's AMP certifications false as a matter of law. Even the 2007 Rule's reference to "adjust[ing] the AMP for a rebate period if cumulative discounts, rebates, or other arrangements subsequently adjust the prices actually realized" does not clearly require a manufacturer to include Price Increase Value, or other credits against

---

[9]  That Lilly structured how it accounted for Price Increase Value differently at times does not alter the analysis, as Lilly always treated Price Increase Value as a component of compensation that offset the monetary component of service fees paid to wholesalers. *See* A468; A471 at A473; A474; A487:23-488:4, A529:7-531:2.

service fees, in an AMP calculation. *Id.* at 39,242. Rather, as Dixson, Lilly's government pricing specialist, explained, Lilly reasonably understood the 2007 Rule to refer to discounts and rebates that reduced a drug's *original* sale price itself, not to wholesaler service fees (and price-appreciation offsets to the monetary fee payments that might never occur). A535:19-538:13. Lilly was reasonably attempting to comply with the 2007 Rule's requirement that "bona fide service fees … represent fair market value" for the services rendered by a wholesaler. *See* 72 Fed. Reg. at 39,182.[10]

***Third,*** in focusing on one aspect of the 2007 Rule, the district court ignored the Inspector General's contrary determination in 2014. At a minimum, the Inspector General's report reveals a temporal problem with the district court's analysis. Even if the district court's interpretation of the AMP statute were the most correct—indeed, even if *current* agency guidance means what Relator says—the district court did

---

[10] Relator has also pointed to language concerning "cumulative discounts or other arrangements" that "subsequently adjust the prices actually realized" in the Rebate Agreement, A435 at A437, but that language does not render Lilly's AMP assumptions unreasonable for the same reasons.

not explain how the statute and the 2007 Rule constituted "specific guidance" as to the treatment of Price Increase Value *at the time Relator is suing about.* Lilly was required to make reasonable assumptions based on the information available to it at the time about how price appreciation should be treated from 2005 to 2016, and the district court did not explain how the 2007 Rule settles the issue over that entire period. Thus, even if one credited the district court's view of the specificity of the 2007 Rule, that would have no bearing on the reasonableness of Lilly's conduct in 2005 or 2006, and after 2010 when the 2007 Rule *was rescinded. See* 75 Fed. Reg. 69,591-01. That alone demonstrates that the district court's ruling was error: The rule certainly cannot form the basis for liability before its adoption or after its rescission. *Id.* at 69,594. Moreover, it was rescinded precisely because Congress amended the statute to *explicitly require exclusion* of service fees from AMP, while saying nothing one way or the other about service fees that include offsets for price appreciation.

***Finally***, the district court's approach to applying the False Claims Act to AMP calculation raises serious structural and constitutional concerns about fair notice and due process. It fails to respect the

"fundamental principle in our legal system … that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also Buffington v. McDonough*, 143 S.Ct. 14, 19 (2022) (Gorsuch, J., dissenting from denial of cert.) ("[T]he benefit of the doubt about the meaning of an ambiguous law must be given to the individual."). Such clarity is particularly important in False Claims Act cases involving "damages that are essentially punitive in nature." *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 784 (2000). The district court's decision, which effectively imposed *punishment* based on a post-hoc determination that Lilly was wrong, violates that basic principle. *Comm'r of Internal Revenue v. Acker*, 361 U.S. 87, 91 (1959) ("[O]ne 'is not to be subjected to a penalty unless the words of the statute plainly impose it.'").

> **2. The District Court Erred By Treating Lilly's 2017 Policy Changes In Reaction To A New Rule As Conclusive Evidence Of Prior Falsity.**

The sole remaining basis for the district court's summary judgment ruling was both legal error and legally irrelevant. The district court treated Lilly's 2017 policy change, in response to the agency's adoption of

a new Rule in 2016, as conclusive evidence that its *pre*-2017 AMP calculations were false. The court reasoned that "Lilly … essentially admitted through its actions that the claims were false" by including Price Increase Value in its AMP submissions since 2017. SA1 at SA40. In the district court's view, because "Lilly d[id] not intend to argue that these [post-2017] submissions are false," it is "impossible to argue the prior ones were not false." *Id.* Nonsense.

The district court's misguided reasoning flies in the face of the reasoning of Federal Rule of Evidence 407 and, more importantly, rests on a fundamental misunderstanding. "Reasonable assumptions" necessarily depend on the information available at the time they are made. As explained above, Lilly's calculations between 2005 and 2016 resulted from reasonable assumptions made in response to less-than-clear regulatory guidance (or no guidance at all) from the agency. In 2016, the agency issued a new final AMP rule, which included a more complete discussion of price-appreciation credits that differed from the 2012 Proposed Rule. 81 Fed. Reg. at 5,174, 5,228. After considering the 2016 Rule and the questions that it raised, Lilly adjusted its approach and included the Price Increase Value component of its service fees in

AMP.  But that decision—made in response to a changing regulatory landscape—does not mean that its *prior* assumptions were unreasonable when made, let alone objective falsehoods under the Act.

*          *          *

Because Lilly's statements about its AMP were based on reasonable assumptions, they were not false, much less the kind of objective falsehoods sufficient for False Claims Act liability.  There is no genuine dispute of fact that those assumptions actually formed the basis of Lilly's AMP calculations throughout the relevant period, and Relator has not argued otherwise.  *See* R.312.

Should Relator belatedly contest whether Lilly actually made those assumptions, he cannot establish a genuine dispute of material of fact (much less conclusive evidence in *his* favor adequate to support summary judgment).  Lilly consistently documented its reasonable assumptions throughout the relevant period, as the law required.  *See, e.g.*, A224; A237; A313; A392; A513:23-515:6, A522:13-18, A539:8-21.  And it undisputedly operated under these assumptions:  Lilly engaged third-party experts to review its AMP calculations and assumptions, submitted its AMP methodology to the agency's Inspector General as part of its

54

industry audit, and re-evaluated and confirmed its assumptions in response to *Streck I.  See, e.g.*, A404; A428; A483:12-25, A492:23-493:4, A548:19-549:12, A550:6-20.

For all those reasons, the Court should reverse and remand with instructions to enter judgment for Lilly.  Should the Court believe there is a genuine dispute of fact about whether Lilly actually made the assumptions described, it should order a new trial.

## II.   RELATOR CANNOT ESTABLISH MATERIALITY AS A MATTER OF LAW.

Lilly's decision not to use one component of its service fee calculation to tabulate AMP cannot be material within the meaning of the False Claims Act.  The Supreme Court squarely held in *Escobar* that a statement's materiality depends on whether the Government would "attach importance [to the alleged misrepresentation] in determining [its] choice of action in the transaction," 579 U.S. at 193, not merely whether it changes the *amount* of payment to or by the Government. Here, there is no reasonable dispute that (a) the Government knew how Lilly treated service fees for AMP purposes; and (b) the Government attached *no* importance to that knowledge because its "choice of action"

was to do precisely nothing—except, of course, to confirm that Lilly's methodology was "consistent with Federal requirements."

The district court, however, not only refused to enter judgment as a matter of law for Lilly on that point, it also refused to instruct the jury on what materiality means beyond simply reading the text of the False Claims Act to the jury—as if *Escobar* had never been decided. Both decisions were error.

## A. The District Court Erred By Denying Lilly's Rule 50(b) Motion On Materiality.

Lilly is entitled to judgment because "no rational jury" could have found that Lilly's statements were material. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 681 (7th Cir. 2010). At trial, Relator had the burden to present evidence that Lilly's purportedly false claims were "material" to the Government decision at issue. *Escobar*, 579 U.S. at 193. That means either that "a reasonable man would attach importance" to Lilly's methodology in rendering his decision, or that the Government actually

"attache[d] importance" to the methodology, "even though a reasonable person would not." *Id.* There is no evidence of either.

### 1. Relator's Case Rests On A Legally Erroneous *Per Se* Theory Of Materiality.

Relator presented no real evidence of materiality. He relied instead on a legally erroneous *per se* theory going as follows: The Government relies on manufacturers' AMPs to calculate rebates back to the Government; the Government receives less money when a manufacturer underreports; therefore, Relator says, AMP calculations are always material because they necessarily "influence ... the payment or receipt of money." 31 U.S.C. §3729(b)(4); *see* A568:17-569:11. Although the district court initially *rejected* this theory at summary judgment, SA1 at SA41, it reversed course and *adopted* it when denying Lilly's 50(b) motion, SA58 at SA67 (holding Lilly's statements were material because they "caused a payment shortfall to the government of over $61,000,000.00, [which] was not of a minor or inconsequential nature.").

Relator's materiality theory fails for at least two reasons. *First*, it runs headlong into *Escobar*, 579 U.S. 176. There, the Supreme Court instructed that "materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," and that what

matters is whether the Government would "attach importance [to the alleged misrepresentation] in determining [its] choice of action in the transaction." *Escobar*, 579 U.S. at 193. Under Relator's theory, however, it matters not whether the Government *actually* found a representation important, so long as the representation ultimately resulted in less money being remitted.

*Second*, Relator's per se theory of materiality "[c]ollapse[s] the materiality analysis into a causation inquiry" by making "material" every statement that causes the Government to pay or receive less money that it would have otherwise. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 491 (3d Cir. 2017). Far from following *Escobar*'s guidance that the materiality standard be a "demanding" limitation on punitive False Claims Act liability that must be strictly enforced, 579 U.S. at 192, 194, any such interpretation "would render the materiality element 'surplusage,'" *Petratos*, 855 F.3d at 491. As the Supreme Court explained, materiality cannot be reduced to a *per se* rule. It requires more: evidence that the Government would "attach[] importance to the specific matter in determining [its] choice of action." *Escobar*, 579 U.S. at 193; *United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir.

2016) (affirming summary judgment for the defendant where there was "no evidence that the government's decision to pay [the claim] would likely or actually have been different had it known of [the alleged violation]"). Here, there was no evidence of the "more" the False Claims Act requires.

### 2. No Reasonable Jury Could Find That Lilly's Exclusion Of Price Increase Value From AMP Calculations Was Material To Government Action.

Because Relator relied entirely on his *per se* theory at trial, Lilly's overwhelming evidence of *immateriality*—that the Government knew about Lilly's AMP methodology but took no corrective action—stood unrebutted. The Supreme Court has instructed that this is "very strong evidence" that the relevant statements "are not material." *Escobar*, 579 U.S. at 195. "No rational jury" could have rejected Lilly's evidence. *Chapin*, 621 F.3d at 681.

The trial record demonstrates the Government certainly knew about Lilly's methodology. Lilly first disclosed it in 2005, soon after Lilly introduced the fee-for-service model. A224; A522:13-18. And it repeatedly apprised the Government going forward: Lilly wrote to the agency describing its approach and its reasonable assumptions regarding

AMP in 2011, provided the Inspector General an explanation in response to a request for information in 2013, and met with the agency in 2016 to specifically discuss whether Lilly's methodology came within the ambit of the new rule. A392; A224 at A228; A230 at A232; A404; A483:12-25, A489:11-22. If that were not enough, Relator's Complaint in *Streck I*—filed in October 2008—also set out Lilly's approach. A69 at A78, A90-93.

Yet the Government took no corrective action. Despite being authorized to do so under the parties' Rebate Agreement in the event of underpayment, A435 at A442-43, A445, the agency never suggested that Lilly's approach was improper, let alone imposed a fine on Lilly or removed it from the program. Quite the opposite: The Inspector General gave Lilly (and the industry) approval in his audit report, concluding that the methodologies "used to determine AMPs generally were consistent with Federal requirements." A410 at A415; A494:16-17. Further, the Government expressly declined to intervene in Relator's prior lawsuit. A126 at A127-32. No reasonable jury could have ignored this "strong"—and unrebutted—evidence of immateriality. *Escobar*, 579 U.S. at 195; *see also United States ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 663 (5th Cir. 2017) ("[C]ontinued payment by the federal government

after it learns of the alleged fraud substantially increases the burden on the relator in establishing materiality."); *United States ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 563-64 (7th Cir. 2015); *Yannacopoulos*, 652 F.3d at 831; *United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, 820 F.3d 1162, 1174 (10th Cir. 2016) (collecting cases where evidence government inaction was sufficient to establish lack of materiality).

Relator made two attempts to undercut Lilly's overwhelming evidence at trial, but neither is persuasive. Relator accused Lilly of sending its 2011 letter to the agency as an attempt to shield itself from liability. A562:16-563:4. That accusation lacks record support. As Dixson explained at trial, the agency requires manufacturers like Lilly to make reasonable assumptions when its regulations do not provide clear guidance. A542:11-15. Lilly simply took the additional step of *sending* the agency its reasonable assumptions to ensure "greater transparency." A541:21; *see* A392. Regardless, Relator's argument is irrelevant. *Escobar* makes clear that materiality is only concerned with the "likely or actual behavior of the recipient of the alleged misrepresentation," not

the motives of the party placing the Government on notice. 579 U.S. at 193.

Relator also argued that Lilly's 2011 letter to the agency did not count as a disclosure of Lilly's methodology, as the agency had asked manufacturers not to send in their reasonable assumptions regarding AMP. A480:13-22, A562:16-23. But that does not defeat the point that the Government received actual notice; and more fundamentally, that was not the only notice the Government had. Lilly disclosed its methodology to the Inspector General's Office in 2005 and summarized that meeting in a subsequent letter. It explained its approach in response to that Office's 2013 request for information, resulting in the Inspector General's determination. It met with the agency in 2016 to clarify the applicability of the new rule to Lilly's methodology. And Relator's allegations in *Streck I* likewise explained Lilly's approach. The Government was not just on notice, but was aware enough for the Inspector General to confirm Lilly's methodology was "consistent with Federal requirements."

In short, Relator did not attempt to satisfy *Escobar*'s materiality standard with evidence. He pursued a theory under which any but-for

cause of a payment of money is material. Stripped of that legally erroneous argument, Relator cannot point to any evidence sufficient to permit a reasonable jury to conclude that the government's payment decisions were importantly influenced by any deceit from Lilly.

## B. The District Court Incorrectly Instructed The Jury.

In the alternative, and at minimum, Lilly is entitled to a new trial because the district court's instructions "fail[ed] to convey the relevant legal principles in full," which "mislead the jury" and caused Lilly to suffer prejudice as a result. *Huff*, 493 F.3d at 899.

Over Lilly's objection, the court defined materiality for the jury by simply quoting from the statutory definition of the term in §3729(b)(4): "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." A578:3-5. That definition, standing alone, fails to capture the Supreme Court's guidance in *Escobar* that a factfinder must place *significant weight* on the fact that the Government knew about, but took no action against, a purported violation. 579 U.S. at 195; *see Huff*, 493 F.3d at 899 (jury verdict must be set aside when instructions do not "completely and correctly inform[] the jury of the applicable law" and "confuse or mislead the jury"). Lilly

is entitled to a new trial because the district court's instruction failed to capture this essential guidance. *See McDonnell v. United States*, 579 U.S. 550, 577 (2016) (vacating conviction because reciting the statutory definition of "official act[]" and providing a minor explanation of that definition "lacked important qualifications" established earlier in earlier precedent).

The bare statutory definition is legally inadequate in light of *Escobar*. The Supreme Court clarified in *Escobar* that "[t]he materiality standard is demanding." 579 U.S. at 194. If a statement could be material "where noncompliance is minor or insubstantial," the False Claims Act would become "an all-purpose antifraud statute." *Id.* Thus, the Government cannot, for instance, render a misrepresentation material "merely ... [by] designat[ing] compliance with a particular ... requirement as a condition of payment." *Id.* The inquiry is more "holistic," *Harman*, 872 F.3d at 661, and it ultimately looks to the Government's "likely or actual behavior," *Escobar*, 579 U.S. at 193-94. Evidence of the Government's actual behavior—including inaction when it knows of a purported violation—"very strong[ly]" indicates immateriality. *Id.* at 195.

This Court has applied these principles. In *Sanford-Brown*, the Government had "already examined [the defendant] multiple times over and concluded that neither administrative penalties nor termination was warranted." 840 F.3d at 447. Relying on *Escobar*, this Court held that the relator could not establish materiality as a matter of law. *Id.* at 447-48. Other Circuits are in accord. *See Harman*, 872 F.3d at 661-62 (collecting cases and affirming summary judgment for the manufacturer when the "'very strong evidence' ... of [the Government's] continued payment remain[ed] unrebutted"); *see also United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 334-35 (9th Cir. 2017) (placing emphasis on "the government's acceptance of [defendant's] reports despite their non-compliance" and payment of public vouchers for its work); *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1034 (D.C. Cir. 2017). The materiality standard cannot be *lower* when a case is submitted to a jury than it would be at summary judgment.

Despite broad acceptance that *Escobar* has "heightened [the] materiality standard," *Petratos*, 855 F.3d at 492, the district court declined to incorporate that guidance into its instruction. Lilly suffered prejudice as a result because, as discussed *supra*, it presented

overwhelming evidence of Government knowledge and inaction. Lilly is entitled to a new trial.[11]

## III. NO REASONABLE JURY COULD FIND THAT LILLY KNOWINGLY SUBMITTED FALSE CLAIMS.

The district court likewise erred in denying Lilly's motion for a judgment as a matter of law on scienter. *See United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016). Because the False Claims Act's civil penalties are "essentially punitive in nature," its requirements—including scienter—are "rigorous." *Escobar*, 579 U.S. at 182, 192 A False Claims Act plaintiff is required to prove that the defendant acted "knowingly," *SuperValu*, 598 U.S. at 746-47, meaning "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §3729(b)(1)(A). Although the Act "require[s] no proof of specific intent to

---

[11] The judgment should also be vacated to the extent the False Claims Act's *qui tam* structure is unconstitutional. *See United States, ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 449 (2023) (Thomas, J., dissenting).

defraud," *id.* §3729(b)(1)(B), it does not penalize "[i]nnocent mistakes or negligence," *Yannacopoulos*, 652 F.3d at 832.

No reasonable jury could find Lilly acted with the requisite intent. The jury's finding was improperly tainted by the district court's erroneous summary judgment ruling on falsity and its resulting instruction to the jury that Lilly's statements were false as a matter of law. But independently, there was insufficient evidence from which a reasonable jury could conclude that anyone at Lilly *subjectively believed* Lilly's AMP submissions were false. *SuperValu*, 598 U.S. at 749. At most, Relator proved that Lilly made a mistake.

**A. Relator Offered No Evidence Showing Lilly Subjectively Believed Its AMP Certifications Were False.**

In its recent *SuperValu* decision, the Supreme Court held that the "scienter element refers to [defendants'] knowledge and subjective beliefs—not to what an objectively reasonable person may have known or believed." *Id.* Relator did not introduce any evidence to show that Lilly subjectively *knew* that its AMP certifications were false, or even that Lilly was "aware of a substantial risk" of falsity and "intentionally avoided learning" the truth. *Id.* at 751, 757.

67

To the contrary, Lilly's witnesses consistently testified that they genuinely believed that they were calculating AMP in a manner consistent with the available regulatory guidance. It is undisputed that Dixson, Lilly's government pricing specialist, consulted every legal authority that Relator claims supports his interpretation, and that Dixson genuinely believed that Lilly was permitted to exclude its service fees (including its price-appreciation component) from AMP. *E.g.*, A521:15-19, A525:13-20, A526:18-21, A532:21-533:3; A224; A234; A237; A244; A313. Relator even conceded at trial that Lilly "may have made *a good faith decision* at the time," before arguing that because Lilly is a large company, it *"should have"* reached the "correct" interpretation. A574:21-22; *see also* A566:15-16, A567:1-12, A573:8-19. The evidence forecloses Relator's scienter theory as a matter of law.

The Fourth Circuit's recent decision in *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173 (4th Cir. 2022), is instructive. In *Gugenheim*, the relator alleged that the defendants, who operated homes for disabled adults, had submitted claims for Medicaid reimbursement that falsely calculated the amount of care actually provided to beneficiaries. *Id.* at 177-78. Relator argued that

defendants had acted knowingly, "as evidenced by the clarity of the regulation and by the fact Defendants did not ask the regulators for advice." *Id.* at 175. Emphasizing that the False Claims Act does not punish "honest mistakes or incorrect claims submitted through mere negligence," the Fourth Circuit concluded that the defendants' "actions amount, at most, to an error in judgment or mistake." *Id.* at 179-82. The court noted that it was "not enough to show that Defendants *could have* sought more guidance about an ambiguous regulation," and that the relator did "not identify any evidence that Defendants knew, or even suspected, that their interpretation of" the relevant regulation was "incorrect." *Id.* at 181. Nor was there "any evidence that Defendants attempted to avoid discovering how the regulation applied to adult care homes or plowed ahead with a dubious interpretation despite serious doubts about its accuracy." *Id.* at 181-83.

Here, as in *Gugenheim*, Relator did not introduce a shred of evidence that that Lilly subjectively believed that its AMP methodology was wrong, that Lilly attempted to avoid discovering how to account for its service fees and their price-appreciation component in calculating AMP, or that Lilly submitted its AMP certifications despite serious

doubts about their accuracy.  *See id.*  Nor could it.  Lilly *was* forthcoming with the agency; the agency provided no further guidance.  Instead, Relator contended that Lilly, though it may have acted in good faith, did not exercise sufficient *diligence* when calculating AMP.  *See, e.g.*, A564:4-12, A565:5-17.  That argument is belied by the factual record showing Lilly's extensive diligence, but even more fundamentally, it is insufficient to establish knowledge under the False Claims Act, which does not punish negligence.

**B.  Relator Presented No Evidence To Overcome Lilly's Repeated Disclosures To The Government.**

Reversal is also warranted because no reasonable jury could conclude that Lilly—which openly and repeatedly explained its AMP methodology to the Government—nevertheless "knowingly" submitted false claims.  The agency's awareness of, and acquiescence in, Lilly's treatment of its service fees, including their price-appreciation component, precludes any scienter finding.  *See United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 544-45 (7th Cir. 1999) ("If the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim."); *see also Wang v. FMC*

70

*Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992) ("The fact that the government knew of [the defendant's] mistakes and limitations, and that [the defendant] was open with the government about them, suggests that while [the defendant] might have been groping for solutions, it was not cheating the government in the effort."), *overruled on other grounds by United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015); *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002) (concluding government knowledge "negates any knowledge that [defendant] had regarding the truth or falsity of [its] representations").

Given Lilly's disclosures to the agency and the Inspector General's audit, *supra* at 25-28; A410 at A415, absent actual evidence that Lilly did not believe what it was saying (which Relator never introduced), this open communication to the Government about exactly what Lilly was doing forecloses a reasonable jury from finding Lilly intended to submit false claims. *See United States ex rel. Berg v. Honeywell Int'l, Inc.*, 740 F. App'x 535, 538 (9th Cir. 2018) (no reasonable jury could find scienter where defendant disclosed its methodology to the government and relator failed to present evidence "to rebut the inference, based on this 'highly

71

relevant' evidence of government knowledge, that [defendant] did not *knowingly* make a false claim").

**C.  Absent Evidence Of Subjective Intent To Defraud, Reasonable Conduct Under Ambiguous Regulations Cannot Provide A Basis For Inferring Scienter.**

The Supreme Court's recent decision in *SuperValu* confirms that Lilly could not have had the requisite scienter.  In addition to making clear that the False Claims Act's scienter inquiry is focused on subjective knowledge—on which Relator's evidence is insufficient as a matter of law—*SuperValu* explains how courts should consider claims involving ambiguous regulations, like here.  In *SuperValu*, the Court acknowledged that the terms at issue—"usual and customary"—were at least "somewhat ambiguous," but explained that the "ambiguity does not preclude respondents from having learned their correct meaning—or, at least, becoming aware of a substantial likelihood of the terms' correct meaning."  598 U.S. at 753-54.  *SuperValu* analogized to a hypothetical driver directed by a road sign to drive "reasonable speeds:"  If that driver was informed by a police officer a certain speed was unreasonable and then noticed all other cars were driving slower, he might then know what is unreasonable.  *Id.*

Here, Relator did not introduce any evidence that Lilly learned the "correct" interpretation of AMP, or even "bec[ame] aware of a substantial likelihood" of the correct way to calculate it. *See id.* at 753. As Lilly's government-pricing expert testified, other manufacturers *also* excluded the price-appreciation components of their service fees from AMP. A520:11-14. And of course, Lilly presented its position to the Government, but got no further clarity. Far from the speeding car analogy in *SuperValu*, Lilly is the equivalent of the driver who voluntarily tells the policeman how fast it is going, but the policeman does not tell Lilly to slow down, and meanwhile the other cars are going the same speed or faster.

*　　*　　*

Concerns about "fair notice and open-ended liability" are meant to be "effectively addressed through strict enforcement" of the False Claims Act's scienter requirement. *Escobar*, 579 U.S. at 192; *United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) (same). But here, the district court did not enforce that requirement at all. It allowed Lilly to be subjected to punitive liability on a dressed-up negligence theory—for conduct it believed was lawful; *told the*

73

*Government about*; and no one said was unlawful until Relator started suing people.  That cannot stand.

## CONCLUSION

The judgment should be reversed.

Dated: December 20, 2023

Respectfully submitted.

*/s/ John C. O'Quinn*

John C. O'Quinn
  *Counsel of Record*
Matthew S. Owen
Mary Elizabeth Miller
Luke P. McGuire
Mark Wigley
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington DC, 20004
Tel: (202) 389-5000
Fax: (202) 389-5200
john.oquinn@kirkland.com


*Counsel for Eli Lilly and Company*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28(e)(2) and 32(a)(7)(B), as modified by Circuit Rules 28.1 and 32(c), because the brief contains 13,859 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), as modified by Circuit Rule 32(b), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: December 20, 2023

*/s/ John C. O'Quinn*

*Counsel for Eli Lilly and Company*

# ELI LILLY AND COMPANY'S REQUIRED SHORT APPENDIX
## TABLE OF CONTENTS

Order on Motions for Summary Judgment
(Feb. 28, 2022) ....................................................................SA1

Trial Transcript Excerpts Volume 8B, (pgs. 1731-1743)
Jury Instructions.............................................................SA43

Judgment Entered After Trial (Aug. 3, 2022) ..........................SA57

Substantive Order (Apr. 26, 2023)............................................SA58

Order on Trebled Damages, Prejudgment
Interest Under FCA (May 9, 2023).................................SA71

Final Judgment (Sept. 26, 2023)..............................................SA85

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES, *ex rel.* RONALD J. STRECK, | |
| Plaintiff, | Case No. 14 C 9412 |
| v. | Judge Harry D. Leinenweber |
| TAKEDA PHARMACEUTICALS AMERICA, INC., *et al.*, | |
| Defendants. | |

<u>MEMORANDUM OPINION AND ORDER</u>

Relator Ronald J. Streck, on behalf of the United States of America and twenty-six states, brings a Partial Summary Judgment Motion against Defendant Eli Lilly and Company. (Dkt. No. 311.) The Relator argues the undisputed material facts show that Defendant Lilly knowingly submitted false statements and certifications to the United States and several states as part of its Medicaid rebate program in violation of the False Claims Act. Defendant Lilly moves for full summary judgment against the Relator, arguing caselaw establishes affirmative defenses that prevent liability. (Dkt. No. 314.) The parties also move, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to strike various experts that would otherwise be relied upon in trial. (Dkt.

Nos. 293, 295, 297, 299, 301.) For the reasons stated herein, the Court denies Defendant Eli Lilly's Motion for Summary Judgment, denies in part and grants in part Relator's Motion for Summary Judgement, and grants in part and denies in part the Motions to exclude expert opinions and testimony.

## I. <u>BACKGROUND</u>

As discussed in the Court's Memorandum Opinion and Order denying the motion to dismiss (Dkt. No. 122), this lawsuit arises from Lilly's participation in the Medicaid Drug Rebate Program ("MDRP"). The United States historically has been the single largest payer of prescription drugs, primarily through the MDRP. For a drug manufacturer to have the benefit of selling drugs to patients enrolled in Medicaid, that manufacturer must pay a rebate back to the state and federal government to lower the cost of the program. The rebate computations are based on the "Average Manufacturer's Price," or "AMP." Congress defined the AMP in the 1991 National Rebate Agreement as "the average unit price paid to the Manufacturer for the drug in the [United] States by wholesalers for drugs distributed to the retail pharmacy class of trade." (Relator's Resp. to Def.'s Stmt. of Facts ("RSOF") ¶ 25, Dkt. No. 330.) As set forth in the definition, the AMP "must be adjusted by the Manufacturer if

- 2 -

cumulative discounts or other arrangements subsequently adjust the prices actually realized." (*Id.*)

The 1991 National Rebate Agreement also stated that "[i]n the absence of specific guidance in section 1927 of the Act, Federal regulations, and the terms of this agreement, the Manufacturer may make reasonable assumptions in its calculations of AMP and Best Price, consistent with the intent of section 1927 of the Act, Federal regulations and the terms of this agreement." (*Id.* ¶ 30.) An early dispute in the history of the program focused on whether fees paid by a drug manufacturer to drug distributors should be incorporated as part of the AMP calculations. Following a request from Congress, in 2007 the Center for Medicare and Medicaid Services of the Department of HHS ("CMS") provided the following definition of "bona fide service fees" and stated that these fees were exempt from the AMP calculations:

> fees paid by manufacturer to an entity; that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement; and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

42 U.S.C. § 447.502 (2007).

Upon the passage of the Patient Protection and Affordable Care Act of 2010, CMS removed its definition and directed

- 3 -

manufacturers to comply with the newly promogulated statute, which had a similar provision excluding bona fide service fees. In 2012, CMS proposed regulation that contained the preamble, "retroactive price adjustments, sometimes known as price appreciation credits, do not meet the definition of bona fide service fee as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer." 77 Fed. Reg. 5318, 5332 (Feb. 2, 2012). This advice was not formally adopted, however, until 2016. As set forth under the 2016 regulations, CMS stated in its preamble:

> We continue to believe that price appreciation credits would likely not meet the definition of bona fide service fee. Based on our experience with the program, it is our understanding that price appreciation credits are not issued for the purposes of payment for any service or offset for a bona fide service performed on behalf of the manufacturer, but rather are issued by the manufacturer to adjust (increase) the wholesaler's purchase price of the drugs in such instances when the drugs were purchased at a certain price and are remaining in the wholesaler's inventory at the time the manufacturer's sale price of the drug increased. In such situations, these credits would amount to a subsequent price adjustment affecting the average price to the manufacturer and should be recognized for purposes of AMP in accordance with § 447.504(f).

81 Fed. Reg. 5170-01. Starting in 2017, Lilly began including price increase value as part of its AMP submissions. (Def.'s Resp. to Relator's Stmt. of Mat. Facts ("DSOF") ¶ 77, Dkt. No. 334.)

– 4 –

While perhaps counterintuitive, "service fee payments" paid by the drug manufacturer to the drug distributer, if included in the AMP calculations, would reduce the cost of the Average Manufacturer's Price. The service fee essentially offsets the price of the drug product on paper, which would reduce the "average price unit paid . . . by wholesalers for drugs" and thus would decrease the amount due to the government. Prior to CMS clarification, some drug manufacturers were using service fees to artificially lower the AMP calculations, and as stated above, CMS issued a regulation in 2007 to prevent unrelated service fees from being bundled with the price of the unit to manipulate AMP calculations to a lower price. When "service" or "service-related" payments are made in the opposite direction, *i.e.,* by drug distributer to the drug manufacturer, this increases the "average price unit paid . . . by wholesalers" and thus increases the amount of the rebate due to the government. Defendant Eli Lilly has excluded all "service-related" payments since 2005. (RSOF ¶ 57.)

Lilly is a pharmaceutical company based in Indianapolis, Indiana. (RSOF ¶ 1.) In 2005, Lilly changed its contract with its three major drug distributors. (RSOF ¶ 7.) Lilly refers to the post-2005 contracts as "fee-for-service" or FFS Agreements.

- 5 -

(*Id.*) The FFS Agreements had two provisions that are relevant to the suit.

First, the FFS Agreement included a "service fee" or "distribution fee" that Lilly paid the drug distributers. (*Id.* ¶¶ 9, 13.) This fee paid for distribution services, inventory management services, and data reporting services. (*Id.* ¶ 9.) The service fee was calculated "by multiplying Lilly's quarterly sales of Products . . . invoiced to the wholesaler, less Products returned by Wholesaler during the same quarter, by the appropriate Distribution Fee percentage." (*Id.* ¶ 13.) In other words, the more product that the distributors sold, the higher the fee provided by Lilly.

The FFS Agreement also included a "price increase value," ("PIV") also referred to in the Court's prior opinion and throughout this opinion as a "price appreciation credit" or a "PACs." (*Id.* ¶ 11.) The PIV was an adjustment to the "price of Products after Wholesaler has taken possession, but before such Products are purchased by Customers." (*Id.* ¶ 17.) The price adjustment value would be multiplied by the number of products in inventory to create the final PIV. (*Id.*)

The FFS Agreement combined (1) the distribution fee cost to Lilly and (2) the price increase benefit to Lilly as follows:

> Wholesaler shall receive the Distribution Fee through a combination of (1) the value of any price increase

- 6 -

SA6

> by Lilly during the quarter for Products in Wholesaler's inventory ("Price Increase Value") and (2) a payment or credit by Lilly. The Price Increase Value for a Product shall be calculated by multiplying the price increase for the product by the amount of inventory for such Product Wholesaler has on the date of the price increase. … If the Price Increase Value for all Products for a quarter is greater than the total Distribution Fee, any excess shall be carried forward and netted out of future quarterly payments.

(*Id.*) In this way, Lilly would not have to pay any distribution fee unless the drug distributor's sales of Lilly's products were relatively and consistently higher than any drugs remaining in the inventory that were in the process of being "price adjusted" by Lilly. As testified to by Lilly, this was setup was used to prevent wholesalers who, if anticipating price increases, "increased their stock of a particular drug at the lower, then-current price." (*Id.* ¶ 5.) Lilly's updated 2009 agreements had a substantially similar structure, except Lilly was now entitled to payment of the excess PIV by the drug distributors instead of having the excess carried over onto future distribution fee payments. (*Id.* ¶¶ 13–14.)

The 2016 FFS Agreements noted that the distribution fee and the PIV were "administered together for efficiency." (*Id.* ¶¶ 15–22.) After netting the payments together, any excess in either direction was to be paid within 45 days. (*Id.*) Under all variations of the FFS Agreements, the "economic substance of the transaction" remained unchanged. (*Id.* ¶ 23.)

- 7 -

SA7

On September 7, 2018, Relator filed an Amended Complaint alleging three counts under the federal False Claims Act, 18 U.S.C. §§ 3279(a)(1)(A) and (a)(1)(B) (Count 1), § 3729(a)(1)(D) (Count 2), § 3729(a)(1)(G) (Count 3), and twenty-nine claims under various state False Claims Acts. On September 7, 2021, Relator filed a Motion to exclude the opinions and testimony of Charlene Frizzera (Dkt. No. 293), the opinions and testimony of Marcy Imada (Dkt. No. 295), certain opinions and testimony of Heather Bates, (Dkt. No. 297) and the opinions and testimony of Dr. Louis Rossiter. (Dkt. No. 301.) That same day, Eli Lilly filed a Motion to exclude the testimony of Brian C. Becker. (Dkt. No. 299).

On October 7, 2021, Relator filed a Motion for Partial Summary Judgment (Dkt. No. 311) and Defendant Eli Lilly filed a Motion for Full Summary Judgment. (Dkt. No. 314.) The Court now decides all seven pending Motions.

## II.  STANDARD

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001)

- 8 -

(quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A court uses substantive law to "identify which facts are material." *Anderson,* 477 U.S. 248. Viewing the record in a light most favorable to the nonmoving party, a court then determines whether there is a genuine issue for trial. *Id.* at 242.

Expert testimony is permitted under Federal Rule of Evidence 702. Under the Rules, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable." *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589 (1993). As a result, a court reviews the following requirements prior to admittance at trial: (1) the witness must be "qualified as an expert by knowledge, skill, experience, training or education," and (2) "the subject matter of the expert's testimony must consist of specialized knowledge that will be helpful or essential to the trier of fact in deciding the case." FED. R. EVID. 702; *United States v. Lanzotti,* 205 F.3d 951, 956 (7th Cir. 2000). "The party seeking to offer expert testimony has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Rasmusen v. White,* 970 F.Supp. 2d 807, 813 (N.D. Ill. 2013).

### III.  DISCUSSION

#### A.  Motions to Exclude

##### 1.  Motion to Exclude the Opinions and Testimony of Charlene Frizzera

Relator first moves to exclude the opinions and testimony of Charlene Frizzera ("Frizzera"). Frizzera's main qualification is her long tenure at Centers for Medicare and Medicaid Services ("CMS"), where she served, *inter alia*, as Executive Project Officer of Health Care Reform, CMS Acting Administrator, and CMS Chief Operating Administrator, Deputy Director, and Regional Administrator of Philadelphia's Regional Office. (Frizzera CV, Frizzera Expert Report, Ex. B, Dkt. No. 294-1.) Frizzera proffers three opinions, all of which Defendants seek to exclude:

> 1.  CMS did not issue any final rule or published guidance clearly instructing manufacturers how to treat price appreciation credits;
>
> 2.  CMS charges manufacturers with making reasonable assumptions on AMP calculations in the absence of clear guidance, allowing for more than one reasonable interpretation of AMP rules, including regarding price appreciation credits; and
>
> 3.  Information was available to CMS that would have allowed CMS to take action if it wanted Lilly to change its conduct.

(Frizzera Expert Report at 1, Mem., Ex. 1, Dkt. No. 294-1.) Relator begins by arguing that all three opinions provide improper legal conclusions. Allowing an expert witness to testify as to a legal conclusion creates a risk that a jury may

- 10 -

"accord too much weight to that testimony" and use it as legal guidance. *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 610 (7th Cir. 2006). This is particularly true when the legal opinion "determine[s] the outcome of a case." *Id.* (quoting *United States v. Sinclair*, 74 F.3d 753, 757–58 n. 1 (7th Cir.1996). When, as here, the case hinges on a violation of statute, "an expert may not offer opinion testimony as to whether a defendant violated a statute or regulation." *Klaczak v. Consol. Med. Transp. Inc.*, No. 96 C 6502, 2005 WL 1564981, at *4 (N.D. Ill. May 26, 2005).

In support of his argument, Relator cites to Frizzera's testimony, where she asserts the following:

> Q: In your report, you provide opinions about the Medicaid Drug Rebate Program; is that fair?
>
> A: I provide opinions about whether Lilly met the requirements of the rules.

(Frizzera Dep. 65:20—24, Mem. to Exclude Frizzera, Ex. 2, Dkt. No. 494-2.) To the extent that Frizzera intends to testify to that "Lilly met the requirements of the rules," the Court excludes her testimony. Frizzera cannot testify as to how the jury should apply the statute and CMS rules to the case at hand.

On these grounds, the Court also grants the Motion to Exclude Opinion 3 in its entirety. In the third section of the report, Frizzera recounts the facts involved with Lilly's communications with the Federal Government and determines that

- 11 -

Lilly "appropriately sought guidance." This applies the recited facts to the case and reaches a legal conclusion as to Lilly's obligations. Building on this conclusion, Frizzera opined that CMS is required to "take action" to create liability once Lilly seeks the appropriate guidance. The Court finds this to be a legal conclusion and, further, a legally unsound opinion. Under the False Claims Act, the burden is on the individual submitting claims to provide accurate information, not on the government entity to act in response to other communications. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984) ("[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law.")

The first two opinions of Frizzera's report, when read at face value, do not necessarily reach a legal conclusion. An expert who opines regarding the regulatory process for creating (1) CMS guidance to drug manufacturers generally, and (2) CMS's requirement that drug manufacturers to make "reasonable assumptions" as part of their submissions specifically, would be useful at trial. As an employee of CMS for thirty years, Frizzera has the background necessary to provide this information.

Relator next argues that Frizzera did not employ a reliable methodology. When evaluating methodology, "the trial court is

- 12 -

limited to determining whether expert testimony is pertinent to an issue in the case and whether the methodology underlying that testimony is sound." *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). The trial court does not evaluate the underlying facts, but instead evaluates the test administered and the source of information employed. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000).

Relator argues that Frizzera's methodology was to review whether a statute and agency regulation contained the words "average manufacturer price," "price appreciation credits" or "bona fide service fees." Frizzera then opined (1) that there were no clearly published guidelines on price appreciation credits (Opinion 1), and (2) that there could be multiple valid ways to interpret the guidelines as applied to price appreciation credits (Opinion 2).

Relator has two arguments regarding Frizzera's methodology. First, Frizzera's review of the regulations, i.e., searching for "mentions" of the words in the text of the statute, is surface-level and ultimately insufficient to understand the obligations of drug manufacturers. Second, Frizzera does not understand what a "price appreciation credit" means, making her unable to analyze the regulations. In support, Relator highlights the following questions presented at the deposition:

- 13 -

Q. To make that opinion, do you have to have some sort of understanding of what price appreciation credits are?

A. I have to have an understanding of what the CMS rules and guidance were around price appreciation credits.

Q. And to apply those rules and regulations to price appreciation credits, do you need to know what price appreciation credits are?

A. No. CMS didn't issue any rules or guidelines about price appreciation credits.

Q. Did you do anything to educate yourself about how Lilly uses price appreciation credits?

A. I reviewed the documents that I reviewed -- I reviewed the documents I had.

Q. Can you provide the jury with an explanation of how Lilly's price appreciation credits operate?

A. My opinion is that CMS didn't issue any rules or guidance instructing them how to deal with price appreciation credits.

Q. I understand what you're saying with respect to CMS. Do you know sitting here today how Lilly's price appreciation credits function?

A. Can you repeat the question?

Q. Sure. Let me ask it in a more simple way. What is a price appreciation credit?

A. CMS did not issue any rule or guidance regarding price appreciation credits.

Q. Got it. I think I understand your opinion on that. But my question is, what is an actual price appreciation credit?

A. There is no definition of price appreciation credits in the federal rules or guidelines.

- 14 -

SA14

Q. How does Lilly use the term price appreciation credits?

A. Lilly made reasonable assumptions about what price appreciation credits were and how to use them.

(Frizzera Dep 103:21-106:5 (objections omitted).) In response, Lilly argues that Frizzera's methodology consisted of "appl[ying] her experience to a series of agency documents and statements." (Resp. at 13, Dkt. No. 304.) Lilly also argues that Relator is cherry-picking misleading deposition testimony, and that Frizzera demonstrated her knowledge of price appreciation credits from the following exchange:

Q. And why are bona fide service fees relevant to your report?

A. Lilly -- the reason why bona fide service fees are part of my report is because Lilly offset their bona fide service fees by their price appreciation credits.

(Frizzera Dep. 118:1—6.)

The Court finds that the methodology employed for Opinion 1, while simplistic, is straightforward and logical. Relator's arguments about better methods go to the weight of the testimony, and do not merit its exclusion.

Relator's concerns about Frizzera's knowledge of price appreciation credits are less about methodology and more appropriately raised during the second prong of the test. In addition to employing appropriate methodology, the Court must

- 15 -

SA15

also determine whether the expert has specialized knowledge that would be helpful for the trier of fact. Because Frizzera cannot articulate any definition of "price appreciation credit," the Court finds that, for Opinion 2, Frizzera lacks the specialized knowledge which is necessary for her to be an expert on price appreciation credits. In Opinion 2, Frizzera states that there is "more than one reasonable interpretation of . . . price appreciation credits." (Frizzera Rep. at 34.) The Court does not see how any expert can reliably analyze rules for price appreciation credits without first understanding how price appreciation credits work within the drug manufacturer's pricing system.

Lilly's explanation in response is that Frizzera does not need first-hand information to be an expert on price appreciation credits. Lilly's theory is that Frizzera is an expert through her longtime experience with CMS, similar to, for example, "experienced narcotics investigators [who] applied the knowledge gained through years of experience and, essentially, described for the jury what they knew about narcotics dealers." *United States v. Conn,* 297 F.3d 548, 556 (7th Cir. 2002). But if a narcotics investigator, after describing his or her knowledge of narcotics dealers, then was unable to provide information regarding a specific drug by name, the court would be remiss to

- 16 -

think the investigator had enough specialized knowledge to opine on the specifics of that drug. Here, Frizzera has worked for thirty years at CMS, and can provide information about CMS's regulatory processes. Her knowledge, however, does not reach to an understanding of "price appreciation credits," making her unable her to apply her experience to that term beyond her impressions set forth in Opinion 1. The Court grants the Motion to Exclude Opinion 2 and Opinion 3 in Frizzera's report and testimony and denies the Motion to Exclude Opinion 1. (Dkt. No. 293.)

### 2. Motion to Exclude the Opinions and Testimony of Marcy Imada

Relator next moves to exclude the opinions and testimony of Marcy Imada ("Imada"). Imada holds two bachelor's degrees and is a long-time consultant in the life sciences and health care industries. (Imada CV, Imada Expert Report, Ex. A, Dkt. No. 296-1.) Imada sets forth three opinions:

> A. Lilly's exclusion of price appreciation credits from is Average Manufacturer's Price calculation was a reasonable practice.
>
> B. Manufacturers often apply regulations and sub-regulatory guidance in differing, but reasonable, manners.
>
> C. Lilly's repeated disclosures and engagements with government agencies align with industry leading practices.

- 17 -

(Imada Expert Report at 16, 27, 29, Mem., Ex. 1, Dkt. No. 296-1.) At the outset, the Court notes that Opinion A is a legal conclusion, and specifically a legal conclusion that is at the heart of this case. If Lilly's price appreciation credits were reasonably excluded, then Lilly did not make a false claim. As a result, this expert testimony is inadmissible. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("Expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible."). The motion to exclude Opinion A is granted.

Relator provides a similar argument in his Motion to Exclude Imada's Opinion B. Relator argues that Opinion B is only relevant "if Lilly's purported interpretation was in fact reasonable, and for the reasons described above, Ms. Imada cannot provide this opinion." (Imada Mem. to Exclude at 11, Dkt. No. 296.) However, while Imada cannot testify as to whether Lilly's decision was reasonable, she can provide information from which the jury themselves can make that determination. As a result, Imada's expert testimony about regulations generally is relevant and admissible.

In the alternative, Relator argues the testimony is inadmissible under Rule 403 because any probative value is substantially outweighed by unfair prejudice, confusing the

- 18 -

issues, and wastes the jury's time. The Court finds none of these concerns in the proffered testimony. Imada provides examples of different calculations between drug manufactures under CMS regulations. In one example, some manufacturers calculate AMP using "standard" Average Manufacturer's Price, and some use the "5i" Average Manufacturer's Price. The jury can extrapolate whether differences in calculations between AMPs are similar to Lilly's decision to exclude price appreciation credits, or whether there is a difference in scale or intent such that it was not a reasonable decision. These are arguments that should be presented for the jury.

Finally, Relator moves to exclude Opinion C. Relator argues that Imada's methodology regarding "industry leading practices" is either impermissibly vague or nonexistent. Relator argues that Imada does not provide enough basis for her opinion on industry standards. For example, Imada does not cite to publications or other sources on which she bases this conclusion and does not provide examples of other companies who communicated with government agencies in a similar manner.

In response, Lilly cites to *Harms v. Laboratory Corporation of America*, 155 F.Supp. 2d 891 (N.D. Ill. 2001). In *Harms*, the district court found that Randy Chapman, Operation Manager for Defendant, and fact witness for the trial, could not testify

- 19 -

regarding general standards of care, reasoning that industry standards are "classic" expert testimony. *Id.* at 903. However, *Harms* does not allow each and every expert witness to opine on industry standards simply by being designated as experts. An expert witness, even one qualified through experience such as Imada, must explain the "'methodologies and principles' that support [her] opinion; [s]he cannot simply assert a 'bottom line.'" *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) (quoting *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir.2010)).

After reciting the relevant facts, Imada's opinion regarding industry standards is three short paragraphs. She provides one principle, explaining that "[o]utreach to government agencies not only allows the manufacturers to confirm their interpretations or assumptions, but it can also direct the agency's attention to topics for which the rules are not clear or further guidance is needed." (Imada Expert Report at 35, Imada Mem. to Exclude, Ex. 1, Dkt. No. 296-1.) To the extent that there is a methodology, it is through Imada's assertion that she has "routinely advised [her] clients to reach out to regulators." (*Id.* at 34.) While this principle and this methodology, put together, edges slightly beyond a bottom-line assertion rejected by the Seventh Circuit, the Court finds even in the best light

- 20 -

these statements fall short of establishing an "industry standard." Ultimately, Imada's opinion cannot be based solely on her own personal prior practices and reasoning. By the nature of the words "industry standards," information beyond the ideas and practices of one expert is required to be established as a methodology.

The Court grants the Motion to Exclude Imada's Opinion A and Opinion C and denies the Motion to Exclude Imada's Opinion B. (Dkt. No. 295.)

### 3. Motion to Exclude Certain Opinions and Testimony of Heather Bates

Lilly has also proffered the expert Heather Bates ("Bates"), a managing director of a consulting group who holds a bachelor's degree in Economics. (Bates CV, Bates Expert Report, Ex. A, Dkt. No. 298-1.) Bates offers a rebuttal opinion to Relator's damages expert, Eric Kimelblatt. Relator moves to exclude Bates' Opinion 5, which states:

> Mr. Kimelblatt enumerated alleged damages to the Federal government under the Medicaid program but did not consider the impact of Relator's proposed change to Lilly's treatment of PIV credits on Federal government reimbursements under the Medicare and Veteran's Affairs ("VA") programs.

(Bates Expert Report at 22, Mem., Ex. 1, Dkt. No. 298-1.)

Relator first objects to the admissibility of Bates' counter-damages calculations, arguing that any benefits to

- 21 -

Government programs beyond Medicaid, such as Veteran's Affairs, are not relevant to this action. Under Seventh Circuit precedent, damages under the False Claims Act should be calculated by "net trebling," as opposed to "gross trebling." *United States v. Anchor Mortg. Corp*., 711 F.3d 745, 749 (7th Cir. 2013). In other words, "[m]itigation of damages is almost universal." *Id.* Assuming the jury finds liability, the Federal Government is entitled to damages offset by the benefits, and Lilly is entitled to present evidence regarding the benefits of their calculations to other government departments.

Relator provides a variety of other arguments, most of which are speculations on how Bates' calculations will affect the state's payments in relation to the Federal Government. The basis of this suit is the failure to pay the Federal Government under Federal law. The Court fails to see how speculations on how the damages will be split constitutes any separation of power issues. The other reasons in Relator's Motion to Exclude do not attack Bates' methodology, but merely critique how her calculations were made. These arguments are appropriate for Relator to bring on cross-examination or in its own rebuttal report. The Court denies the Motion to Exclude certain opinions and testimony of Bates. (Dkt. No. 297.)

- 22 -

#### 4. Motion to Exclude the Opinion and Testimony of Brian C. Becker

Dr. Brian Becker ("Becker") holds a PhD in applied economics and currently works at an economics consulting firm. (Becker CV, Becker Expert Report, Ex. A, Dkt. No. 300-1.) In his expert report, Dr. Becker provides an economic framework for understanding financials associated with Lilly's contract with drug manufacturers. Dr. Becker's opinion states that the economic difference between paying $100 initially and then a single additional dollar is the exact same as requiring a payment of $101. Lilly argues that Dr. Becker's opinion should be excluded because it is not relevant and outside the scope of an expert testimony.

Lilly argues that Becker's opinion is not relevant because Dr. Becker does not attempt to answer the question as to "whether Medicaid regulations or statutes require price increase value to be included in average manufacturer price." (Mem. at 5, Dkt. No. 300.) However, the purpose of providing experts is not to advise the jury the answer to the ultimate question. It is inadvisable to submit expert testimony that advises on the final decision in the case as it will likely be excluded. The purpose of expert is to provide information which the jury can use to resolve the factual dispute. As explained in *Daubert*, "[t]he study of the phases of the moon, for example, may provide valid scientific

- 23 -

SA23

'knowledge' about whether a certain night was dark, and if darkness is a fact in issue, the knowledge will assist the trier of fact." 509 U.S. at 591. To extend the analogy, Lilly here argues that the expert must be excluded unless the expert testifies that the night was dark. But Lilly's requirement that the 'knowledge' be applied by the expert to the factual issue is wrong; instead, an expert should be providing background information from which the jury can deduce that the night was dark.

Becker does exactly that in his report. Assuming the jury learns of Lilly's obligation to provide an Average Manufacturer's Price to CMS from other testimony, the jury can use Dr. Becker's economic analysis of Lilly's contract with drug distributers to determine whether or not their "price increase value" should be considered part of the Average Manufacturer's Price, or if it was reasonable for Lilly to exclude them.

Lilly brings the Court's attention specifically to *Camelback Properties v. Phoenix Ins. Co.*, No. 10 CV 01467, 2013 WL 1568517 (N.D. Ill. Apr. 12, 2013). In *Camelback*, the magistrate court held that a party could not proffer an expert on real estate industry standards to help interpret an insurance contract. The magistrate court cited the lack of legal precedent incorporating real estate standards, such as the "BOMA code,"

- 24 -

into the separate body of insurance law, and noted that the expert failed to claim that "BOMA standards are commonly used in the insurance industry." *Id.* at *3. For this reason, the magistrate court excluded the expert on the grounds of relevance.

The Court finds this precedent inapplicable. Dr. Becker is not taking unrelated industry standards and applying them to the contract. Economics is a field that is well-suited to analyze the costs associated with the complicated financial transactions in a wide variety of legal settings. The economic result of the contract is useful information for the jury when resolving the factual disputes in this case.

In the alternative, Lilly argues that Dr. Becker did not apply any "scientific, technical, or specialized knowledge" under Federal Rule of Evidence 702. Lilly argues that the contract is straightforward, and Dr. Becker is not using any of his Ph.D. economics skills besides reading the contract. This argument is belied by the fact that Lilly actively disputes the economics of the contract and in fact hired its own economics professor who came to a markedly different opinion in its rebuttal of Dr. Becker's expert report. The Court denies the Motion to Exclude Dr. Becker's Testimony. (Dkt. No. 299.)

- 25 -

### 5.  *Motion to Exclude the Opinion and Testimony of Louis Rossiter*

In response to Becker's report, Lilly proffers expert Dr. Louis Rossiter ("Rossiter") in rebuttal. Dr. Rossiter is a research professor at the public policy school at the College of William & Mary and holds a Ph.D. in Economics. (Rossiter CV, Rossiter Rebuttal Report, Ex. A, Dkt. No. 307-1.) Dr. Rossiter offers three opinions in rebuttal to Becker's economic analysis of Lilly's contract:

> A.  The introduction of FFS contracts, including their PIV provisions, created a more efficient model for the distribution of pharmaceutical products and eliminated various inefficiencies and market distortions that existed under the prior contracts;
>
> B.  Dr. Becker's opinion that the amount of PIV is simply a "part of the price of the drug" fails to consider and articulate the economic rationale and genesis of the PIV provisions as a mechanism for controlling wholesaler inventory levels, one of the specifically enumerated services that wholesalers provide to Lilly; and
>
> C.  Without the PIV provision of the FFS contracts, wholesalers would have continued to engage in speculative buying and received significant additional compensation for performing the same set of services they are compensated for under the FFS contracts. This would have resulted in wholesalers being overcompensated for the services performed.

(Rossiter Rebuttal Report at 7—8, Resp., Ex. 1, Dkt. No. 307-1.) Relator argues that the opinions do not stick to the same subject matter as Dr. Becker's economic analysis and thus are outside the scope of a rebuttal opinion.

- 26 -

Under Federal Rule of Civil Procedure 26(a)(2)(D)(ii), rebuttal evidence is permitted "if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party." Relator reads the words "same subject matter" narrowly and argues that Lilly's rebuttal expert cannot rely on outside information in rebutting Becker's conclusions. The Court finds that Dr. Rossiter's analysis to be based on his own expertise as a health economics professor, and as a result his analysis will differ in sources and conclusions. *See Andersen v. City of Chicago*, 467 F.Supp. 3d 619, 631 (N.D. Ill. 2020) ("[I]t is permissible for [rebuttal expert] Dr. Reich to elaborate on how exactly his own practices and experience informed his opinion.") These differences are not a reason to exclude a rebuttal opinion.

Relator's remaining arguments are that Dr. Rossiter engages in flawed methodologies and that the introduction of Dr. Rossiter's testimony would confuse the jury. However, Relator's arguments are ultimately disagreements with Rossiter's conclusions. Relator states that Dr. Rossiter "ignores highly probative evidence" without "a single citation to any evidence." (Mem., Dkt. No. 302.) These critiques are better suited to cross-examination before the jury than any premature exclusion. The

- 27 -

Court denies the Motion to Exclude Dr. Rossiter's rebuttal report. (Dkt. No. 301.)

### B.  Motions for Summary Judgment

Relator alleges violations of three components of the federal False Claims Act and a variety of state False Claims Acts. The False Claims Act "prohibits the submission of false and fraudulent claims for payment to the government" and "authorizes private citizens (called "relators") to file civil actions on behalf of the government." *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 912 (7th Cir. 2009).

Count I alleges violations of 18 U.S.C. §§ 3279(a)(1)(A) and (a)(1)(B). Under § 3279(a)(1)(A), a liable individual is one who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Under § 3279(a)(1)(B), a liable individual is one who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Count II alleges a violation of § 3729(a)(1)(D), which provides liability for any individual who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property."

- 28 -

Count III alleges a violation of § 3729(a)(1)(G) which creates liability for any individual who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." This is often referred to "reverse false claim." *United States ex rel. Garbe v. Kmart Corp.,* 73 F.Supp. 3d 1002, 1011 (S.D. Ill. 2014), *as amended* (Jan. 12, 2015*), on reconsideration in part sub nom. United States v. Kmart Corp.,* No. 12-CV-0881-NJR-PMF, 2015 WL 11181733 (S.D. Ill. Jan. 9, 2015), *aff'd in part, rev'd in part and remanded,* 824 F.3d 632 (7th Cir. 2016).

FCA civil claims require two primary elements: (1) scienter and (2) falsity. *United States ex rel. Schutte v. Supervalu Inc.,* 9 F.4th 455, 463 (7th Cir. 2021). Falsity is found in the common law meaning of fraud, either "express misrepresentations or 'misrepresentations by omissions.'" *Id.* (quoting *Univ. Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S.Ct. 1989, 1999 (2016)). Scienter requires the liable individual to mean "that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless

- 29 -

disregard of the truth or falsity of the information." *Id.* (citing § 3729(b)(1)(A)). It does not require "proof of specific intent to defraud." *Id.* (citing § 3729(b)(1)(B)).

In addition to these two essential elements, the plaintiff "also must prove that the violation proximately caused the alleged injury" and that defendant's conduct meets "a strict materiality requirement." *United States ex. rel. Prose v. Molina Healthcare of Illinois, Inc.*, 17 F.4th 732, 740 (7th Cir. 2021). In sum, the relator must establish (1) scienter, (2) falsity, (3) causation, and (4) materiality.

In Lilly's motion for summary judgment, Lilly argues that that the Relator cannot meet either the scienter or falsity elements of the claim. Relator cross-motions and asks the Court to find summary judgment as to all four elements. Essentially, Lilly argues that the Relator has a very high burden, and Relator argues that the language is very clear. As is typical in summary judgment motions, both parties make valid points. Relator's burden is very high, and the definitions of "Average Manufacturer's Price" and "bona fide service fees" are also very clear. But while even high burdens are occasionally met, the Court is unable, upon careful review, to find any reasonable interpretation of the statute that would support Lilly's partial exclusion of the price of its drug from its Average

- 30 -

Manufacturer's Price. For the reasons set forth below the Court denies Lilly's Motion entirely and denies in part and grants in part Relator's Motion.

### 1. *Scienter*

Lilly argues that Relator cannot pass the threshold requirement for scienter set forth in *United States ex rel. Schutte v. Supervalu Inc.*, 9 F.4th 455, 463 (7th Cir. 2021). In *Schutte*, the Seventh Circuit adopted the Supreme Court's scienter standard for the Fair Credit Reporting Act from *Safeco Insurance Company of America v. Burr*, 551 U.S. 47, 127 (2007), and applied it to the False Claims Act's scienter provision. *Id.* In *Safeco*, the Supreme Court held that "[a] defendant who acted under an incorrect interpretation of the relevant statute or regulation did not act with reckless disregard if (1) the interpretation was objectively reasonable and (2) no authoritative guidance cautioned defendants against it." *Schutte*, 9 F.4th at 464. The Seventh Circuit held that this requirement reaches all three scienter terms that define "knowingly" in the False Claims Act, and as such is a threshold issue. *Id.* at 467.

Lilly argues that undisputed materials facts demonstrate Lilly was not objectively unreasonable in its interpretation of the MDRP requirements and that CMS provided no authoritative

- 31 -

guidance to warn Lilly away from its incorrect views. As a result, Lilly argues that the Relator cannot show any level scienter that would make Lilly liable under the False Claims Act.

The Court first reviews whether Lilly was objectively unreasonable in excluding "price increase value" from its AMP calculations. "The objectively reasonable inquiry hinges on the text of the statute or regulation that the defendant allegedly violated and as such is a question of law." *Id.* at 468. The Average Manufacturer's Price is defined as "the average unit price paid to the Manufacturer for the drug in the [United] States by wholesalers for drugs distributed to the retail pharmacy class of trade." The definition further states that AMP "must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." The Court then compares this text the definition of a "price increase value" in Lilly's FFS Agreements. A "price increase value" is the difference between the price the wholesaler originally paid for the drug and the current price, multiplied by the number of units. Lilly cannot and does not deny a "price increase value" or "price adjustment credit" was an "adjust[ment]" "paid to the Manufacturer" and "by the wholesalers" on a per unit basis. Instead, Lilly argues that the

- 32 -

statute was unclear as to whether Lilly needed to include the entire price or simply the initial price of the product in the AMP. As already explained, the definition of Average Manufacturer's Price states that subsequent price increases and decreases must be included. For this reason, the explicit text of the statute makes Lilly's position unreasonable.

Nevertheless, Lilly argues that the words "price increase value" are not present in the statute in that exact order and therefore the legal landscape was ambiguous. Lilly argues that, under the 1991 National Rebate Agreement, in the absence of "specific guidance," a drug manufacturer is permitted to "make reasonable assumptions in its calculations of AMP." This strains the meaning of "specific guidance." Under Lilly's standard, any creation and subsequent definition of a new phrase in a contract, as present here, would allow drug manufacturers to avoid its clear obligations under statute. Courts have recognized that "[b]y requiring regulations to be too specific [courts] would be opening up large loopholes allowing conduct which should be regulated to escape regulation." *Freeman United Coal Min. Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 108 F.3d 358, 362 (D.C. Cir. 1997) (citing *Ray Evers Welding Co. v. OSHRC*, 625 F.2d 726, 730 (6th Cir.1980)). The Court declines to allow this loophole reasonable under a plain reading of the statute.

- 33 -

In the alternative, Lilly argues that the "price increase value" could reasonably be considered part of its bona fide service fees. In the FFS agreements drafted by Lilly, the price increase value calculation is in the same paragraph as the bona fide service fees calculation, and the transaction between the two parties happens simultaneously. Lilly argues that CMS has explicitly rejected bona fide fee services from AMP calculations, so Lilly was entitled to add "price increase value" as part of the services fees and thus also exclude them from the AMP.

By definition, bona fide service fees are "fees paid by manufacturer to an entity . . . for a . . . service." In contrast, a "price increase value" is never paid by the manufacturer and is never for a service. Therefore, the Court finds the proximity of the words "price increase value" to the words "bona fide service fee" in the FFS Agreements irrelevant to the Court's analysis. The history of the bona fide service fees in FFS Agreements furthers this conclusion. As recounted by Lilly in its briefing, CMS specifically rejected the bundling of "service fees" with product pricing in 2007. As noted by Lilly, some drug manufacturers tried to incorporate service fees with the full price of the product, which illegally lowered their AMP calculations and thus their payments to the government. Lilly,

- 34 -

characterizing itself as taking "a conservative approach," decided to only bundle price adjustments with service fees. (Mem., Dkt. No. 315.) However, there is nothing conservative about an approach where two distinct transactions that were explicitly not permitted to be coupled, the price of the product and the service fees, are nonetheless combined to lower AMP calculations. A fundamental truth in mathematics and law is that $10(price) - $1(fee) is equal to $9(price) - $1(fee) + $1(price adjustment). Although one uses more steps, they are the same equation and create the same result. Lilly readily admits that CMS prohibits the first equation ($10 - $1) because it artificially lowers the price of AMP. Therefore, it is decidedly not reasonable for Lilly to assume that it may instead use second equation ($9 - $1 + $1), simply because the steps take place a different or more complicated order.

To support its position, Lilly draws parallels to the findings in *United States ex rel. Schutte v. Supervalu Inc.*, 9 F.4th 455, 463 (7th Cir. 2021). There, the Seventh Circuit found that there were two reasonable ways to interpret the meaning of the word "Usual and Customary Price." *Id.* at 469. The Seventh Circuit found that the definition of "Usual and Customary" might mean the price that is "charged" most frequently for a drug, but it could also indicate the retail rather than discount price."

- 35 -

*Id.* As a result, the Seventh Circuit found that Defendant Supervalu did not have an objectively unreasonable interpretation of the statute. *Id.*

The Court finds this precedent inapplicable. Lilly has not proffered, nor has the Court been able to imagine, a reasonable alternative interpretation to both the mechanics and the definition of "price increase value" to be anything other than an adjustment of price and thus within the definition of Average Manufacturer's Price. Instead, the Court agrees with the district court in *United States ex rel. Streck v. Bristol-Myers Squibb Co.*, 370 F.Supp. 3d 491 (E.D. Pa. 2019), who found "nothing ambiguous" in the definition of bona fide service fees and agreed that *Streck* provided sufficient scienter, even under the "objectively unreasonable" standard. 370 F.Supp. 3d at 497. Having determined that Lilly's interpretation of Average Manufacturer Price is objectively unreasonable, the Court finds that Lilly reaches the threshold requirement of *Safeco* and denies the motion to grant summary judgment on the basis of scienter.

Relator, in response, moves for summary judgment in the opposite direction. Relator argues that Lilly, at a minimum, acted with reckless disregard or deliberate ignorance and thus knowingly violated the False Claims Act. As part of electing to participate in the National Rebate Agreement, Lilly has "a duty

- 36 -

to familiarize itself with the legal requirements for cost reimbursement." *Heckler*, 467 U.S. at 64. For the False Claims Act, reckless disregard holds liable "'only those who act in gross negligence,' that is, those who failed 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'" *United States v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013) (quoting S. Rep. No. 99-345, at 20).

While the duty Lilly holds is clear, what Lilly did and the intent with which Lilly did them is hotly contested in the submitted Rule 56.1 statements of material fact. The Court finds that there are insufficient undisputed facts on which the Court can make a summary judgment determination and reserves this question for the jury.

### 2. Falsity

Lilly also argues that the Relator fails to meet the falsity element of the False Claims Act. A statement may be deemed 'false' for purposes of the False Claims Act if the statement represents "an objective falsehood,'" *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011), or "if it is made in contravention of a statute, regulation, or contract." *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014). There are several types of false statements, including "a claim for payment which is itself literally false

- 37 -

and fraudulent," "fraud in the inducement," and "implied false certification." *Prose*, 17 F.4th at 740.

Similar to its scienter argument, Lilly states there is no statute or final regulation that contained the words "price increase value" or "price appreciation credit" until 2016. As a result, Lilly argues no jury could find a "clear obligation" of duty to include this part of the price in the Average Manufacturer's Price. *U.S. ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432 (3d Cir. 2004). Without this obligation, Lilly argues the statute is ambiguous.

To demonstrate the ambiguous nature of the statute, Lilly offers the following alternative interpretation of its obligations under the 1991 National Rebate Agreement: "Congress did not include any temporal limitations on 'price' in the AMP statute, and so one reasonable interpretation is that the undefined term refers to the "initial price" charged to the wholesalers (*i.e.*, excluding PIV)." (Mem. at 33, Dkt. No. 315.) This interpretation is foreclosed by the AMP's definition, which explicitly states that the AMP "must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." The Court finds the requirement for the "price actually realized" forecloses Lilly's theory that it is a reasonable interpretation

- 38 -

of the guidelines to submit an "initial price" for the ultimate AMP calculations. The definition of the word "price," states, "the amount of money given or set as consideration for the sale of a specified thing." *Price, Merriam-Webster Dictionary* (2022) (https://www.merriam-webster.com/dictionary/price). The fact that Lilly tries to define "price" to mean "initial price" is a contortion of the regular meaning of the word and an internally inconsistent with itself.

Finally, Lilly argues that the "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations." *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999). Lilly argues that, when there is a disputed legal issue as to the falsity of a statement, the Court should avoid punitive payments of the FCA. Because the Court finds, as a matter of law, that alternative readings of the statute as proposed by Lilly are objectively unreasonable, this argument also fails.

Relator's motion for summary judgment asks the Court to find that the record conclusively demonstrates that the statements were false in two respects. First, Relator argues that they were factually false because the AMP and related calculations were factually incorrect. Second, Relator ask the Court to find that the AMP certifications were legally false,

- 39 -

because Lilly certified that its AMPs were calculated in compliance with the law, and they were not.

In response, Lilly presents the same arguments discussed, and rejected, above. Lilly believes that the law was ambiguous, and thus the statements could not be false. As pointed out by the Relator, Lilly has essentially admitted through its actions that the claims were false. Since 2017, Lilly has included "price increase value" in its Average Manufacturer's Price submissions. Lilly does not intend to argue that these new submissions are false, making it impossible to argue the prior ones were not false, particular as the Court has determined as a matter of law that Lilly's interpretation of statute was objectively unreasonable. For these reasons, the Court grants Relator's motion for summary judgment on falsity and holds that Lilly's AMP calculations and related certifications were factually and legally false.

### 3. *Materiality and Causation*

Under the False Claims Act, a false statement is material is "a reasonable person would view the condition as important to a choice of action in the transaction" or "the defendant knew or had reason to know that the recipient of the representation attaches importance to that condition." *Prose*, 17 F.4th at 743.

– 40 –

Relator does not seek to apply either of these materiality standards in its briefing. Relator argues that, because Lilly's falsely lowered its Average Manufacturer's Price, it paid less money under the regulatory scheme, and thus materiality is established as a matter of law. This is incorrect. "[S]tatutory, regulatory, and contractual requirements are not automatically material, even if they are labeled conditions of payment." *Universal Health Servs., Inc. v. United States ex. rel. Escobar*, 579 U.S. 176, 191 (2016). Relator must prove more than a difference in payment to show materiality under the False Claims Act.

In seeking summary judgment on causation, Relator does not even articulate the correct standard for causation in his briefing. The Court does not consider this to be a serious argument. The Motion for Summary Judgment as to both materiality and causation is denied.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court rules as follows:

1.  Denies Defendant Eli Lilly's Motion for Summary Judgment (Dkt. No. 314);

2.  Denies in part and grants in part Relator's Motion for Summary Judgement (Dkt. No. 311); and

- 41 -

3.  Grants in part and denies in part the Motions to Exclude
Expert Opinions and Testimony. (Dkt. Nos. 293, 295, 297, 299,
301.)


**IT IS SO ORDERED.**

_____
　　　　　Harry D. Leinenweber, Judge
　　　　　United States District Court

Dated: 2/28/2022

- 42 -

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, *et al. ex rel*. RONALD J. STRECK,

      Plaintiffs-Relator,

-vs-

TAKEDA PHARMACEUTICALS AMERICA, INC., *et al.*,

      Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

Case No. 14 CV 09412

Chicago, Illinois
August 2, 2022
1:50 p.m.

TRANSCRIPT OF PROCEEDINGS - Trial
VOLUME 8B
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

APPEARANCES:

For the Plaintiffs:    WALDEN MACHT & HARAN LLP
                       BY:  MR. DANIEL R. MILLER
                           MR. JONATHAN Z. DeSANTIS
                           MR. DEREK COHEN
                       2000 Market Street, Suite 1430
                       Philadelphia, Pennsylvania 19103

                       MARTIN LAW, P.C.
                       BY:  MR. ROBERT JACKSON MARTIN IV
                       1934 Old Gallows Road, Suite 350
                       Tysons Corner, Virginia 22182

For the Defendants:    KIRKLAND & ELLIS LLP
                       BY:  MR. ANDREW A. KASSOF
                           MS. DIANA M. WATRAL
                           MR. JAMES R.P. HILEMAN
                           MR. RYAN MOORMAN
                       300 North LaSalle Street, Suite 4300
                       Chicago, Illinois 60654

Court Reporter:        CHARLES R. ZANDI, CSR, RPR, FCRR
                       Federal Official Court Reporter
                       United States District Court
                       219 South Dearborn Street, Room 2144-D
                       Chicago, IL  60604
                       Telephone:  (312) 435-5387
                       charles_zandi@ilnd.uscourts.gov

responded to the specific question explaining that Mr. Streck was going to receive a portion of the money.

So, it's not a surprise, and I don't think the relationship between Mr. Streck and the United States is an issue in the case. So, I will decline to give an instruction.

MR. MILLER: Thank you, your Honor.

MR. KASSOF: Thank you, Judge.

(Proceedings heard in open court, jury present:)

MR. MILLER: Thank you, your Honor

THE COURT: All right. Would you pass out -- I'm going to give each of you a copy -- a set of the instructions so you can follow along. Sometimes it's a little easier if you can read it along with my reading of it.

So, we'll start on page 2 when you get to the packet.

Everybody got one? Turn to page 2. The top --

Function of the Jury.

Members of the jury, you have seen and heard all the evidence and arguments of the attorneys. Now I will instruct you on the law.

You have two duties as a jury. Your first duty is to decide the facts from the evidence in the case. This is your job and yours alone. Your second duty is to apply the law that I give you to the facts.

You must follow these instructions even if you disagree with them. Each of the instructions is important,

and you must follow all of them.

Perform these duties fairly and impartially.

Nothing I say now and nothing I said or did during the trial is meant to indicate any opinion on my part about what the facts are or about what your verdict should be.

All Litigants Equal Before the Law.

In this case, Lilly is a corporation. All parties are equal before the law. A corporation is entitled to the same fair consideration that you would give any individual person.

Evidence.

The evidence consists of the testimony of the witnesses, the exhibits admitted into evidence, and declarations.

What is Not Evidence.

Certain things are not to be considered as evidence. I will list them for you.

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet, or television reports you may have seen or heard. Such reports

are not evidence, and your verdict must not be influenced in any way by such publicity.

Third, questions and objections and comments by the lawyers are not evidence. Lawyers have a duty to object when they believe a question is improper. You should not be influenced by any objection, and you should not infer from any rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence. Their purpose is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

Note-Taking.

Any notes you have taken during the trial are only aids to your memory. The notes are not evidence. If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impressions of each juror about the testimony.

Consideration of All the Evidence, Regardless of Who Produced It.

In determining whether or not any fact has been proved, you should consider all the evidence bearing on the

question regardless of who introduced it.

Limited Purpose of Evidence.

You may -- you will recall that during the course of this trial, I instructed you that I admitted certain evidence for a limited purpose. You must consider this evidence only for the limited purpose for which it was admitted.

Weighing the Evidence.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we often look at one fact and conclude from it that another fact exists. In law, we call this inference. The jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

Direct Evidence and Circumstantial Evidence.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require any inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago, and I saw it raining." Circumstantial evidence that it

is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

Testimony of Witnesses, Deciding What to Believe.

You must decide whether the testimony of each of the witnesses is truthful and accurate in part, in whole, or not at all. You must also decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things: The ability and opportunity the witness had to see, hear, or know the things that the witness testified about; the witness's memory; any interest, bias, or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of the evidence in the case.

Redacted Materials.

In some of the documents that you will see in the case, you will notice that parts have been blacked out. In the law, those blacked-out parts of the documents are called redactions, and they represent deletions from the documents.

Redactions may be necessary for a variety of reasons.

For instance, they may delete private, personal, or otherwise sensitive information or information that raises issues that you are not being asked to decide in the case. I have worked with the parties to make sure that all of the redactions are correct and do not delete anything that you need to reach a full and fair decision in this case. You should not speculate regarding the content or nature of the redacted information, and you are not to draw any inference from the fact that information was redacted.

Expert Witnesses.

You have heard testimony -- excuse me. You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such person has given an opinion does not mean that you are required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case.

Summary exhibits.

Certain summaries of damages opinions that Mr. Kimelblatt gave are in evidence. It is up to you to decide if the summaries are accurate.

Applicable Time Period.

The applicable time period for relator's claims is January 1, 2005, through December 31, 2017. Accordingly, you are to determine whether Lilly has violated the False Claims Act with respect to the conduct that occurred during this time period.

Advice of Counsel.

You have heard testimony concerning whether Lilly consulted with lawyers in determining its AMP calculations. Lilly is not asserting as a defense that it relied on specific advice provided by lawyers.

Burden of Proof.

When I say a particular party must prove something by a preponderance of the evidence, or when I use the expression "if you find" or "if you decide," this is what I mean: When you have considered all the evidence in the case, you must be persuaded that it is more probably true than not true.

Elements of False Claims Act Violation.

To succeed in this case, relator must prove each of the following elements by a preponderance of the evidence:

First, that Lilly made or caused to be made a false claim, false statement, or false record;

Second, that Lilly knowingly made or caused to be made the false claim, statement, or record;

Third, that the false claim or statement was material; and,

Fourth, that the false claim or statement proximately caused the alleged government's losses.

I have already determined as a matter of law that the first item listed above (that Lilly made or caused to be made a false claim, false statement, or false record) has been satisfied. You must accept my determination, and as a result, relator does not need to offer any further proof that Lilly made or caused to be made a false claim, false statement, or false record.

If you find that relator has proved each of these things by a preponderance of the evidence, you should find for the relator. If you find that the relator has failed to establish any one of these elements by a preponderance of the evidence, then you must return a verdict for Lilly.

Claim.

A claim means any request or demand, whether under a contract or otherwise, for money or property, and whether or not the government has title to the money or property, that is presented to an officer, employee, or agent of the government.

Statement and Record.

A statement or a record can take any form. It does not matter if the statement or record was in paper or electronic form.

False.

A statement or claim is false if it is incorrect when

made.  I have determined as a matter of law that Lilly's omission of "price increase value" from Lilly's average manufacturer price calculations made those average manufacturer's price and related certifications factually and legally false.

Knowingly.

The term "knowingly" and "knowing" -- "knowing" and "knowingly" mean that a person or corporation with respect to information:

1.  Has actual knowledge of the information;

2.  Acts in deliberate ignorance of the truth or falsity of the information; or,

3.  Acts in reckless disregard of the truth or falsity of the information.

The term "knowingly" does not require any proof of specific intent to defraud.  In evaluating whether Lilly had sufficient knowledge, you should consider that as a participant in the Medicaid Drug Rebate Program, Lilly had a duty to familiarize itself with the applicable legal requirements.

Negligence Does Not Suffice.

A defendant does not act knowingly if its conduct was the result of an innocent mistake or negligence.

A Collective Knowledge of Corporation.

As a corporation, Lilly acts through people such as

employees or other agents.

Material.

The term "material" means having a natural tendency to influence or be capable of influencing the payment or receipt of money or property.

Proximate Cause.

Proximate cause means, 1, the conduct must have been a material element and a substantial factor in bringing about the injury; and, 2, the injury must have been foreseeable, meaning of a type that a reasonable person would see as the likely result of his or her conduct.

Damages.

If you find for the relator, then you must determine the amount of damages, if any, plaintiffs are entitled to recover. If you find that relator has failed to prove any of these claims, then you will not consider the question of damages.

Deliberation.

When you retire to the jury room to deliberate, you may take with you these instructions and your notes. You may at any time request a specific exhibit that the Court has admitted into evidence.

You should select one member of the jury as your presiding juror. That person will preside over the deliberations and will be your representative here in open

court.

I do not anticipate that you will need to communicate with me. If you do need to communicate with me, the only proper way is in writing. The writing must be signed by the presiding juror, or if he or she is unwilling to do so, by some other juror.

The writing should be given to the Marshal, who will give it to me. I will respond either in writing or by having you return to the courtroom so that I can respond orally.

If you do communicate with me, you should not indicate in your note what your numerical division is, if any.

Forms of verdicts have been prepared for you. It amounts to a series of four questions, and I'll read them to you. And I'm going to tell you that each question, in order to be answered, must be unanimous. In other words, all nine of you must agree on an answer before you can check any of the boxes on there.

Special Verdict Form.

1. Did relator prove by a preponderance of the evidence that Lilly knowingly made or caused to be made a false claim, record, or statement?

And then there's a "Yes" and a "No." And whatever your unanimous result -- decision would be, you would check the appropriate box.

Now, if the answer is no, you find for Lilly and do

not answer any more questions. If you answer yes, then you would proceed to question 2.

2. Did relator prove by a preponderance of the evidence that the false claim, record, or statement, was material?

Again, yes or no. If your answer is no, find for Lilly and do not answer any more questions.

3. Did relator prove by a preponderance of the evidence that the false claim, record, or statement, proximately caused the alleged government's losses?

Again, yes or no, and again, your answer must be unanimous.

If you've answered all the questions yes, you find for the relator and you proceed to question 4. If your answer is no, you find for Lilly and do not answer question 4.

Findings on relator's false claim acts claims, we find for -- and then there's a box for relator on the left and Lilly on the right. And again, your answer must be unanimous.

And then question 4. We, the Jury, find the relator has proved by a preponderance of the evidence the following amount of actual damages to the federal and state governments. And then there's a dollar sign and a blank, and you would fill that in.

And once you've completed the verdict form, the presiding juror will date it and sign it. And then you would

notify the Marshal and he will bring you back in to court so that we can publish your verdict.

And again, I want to remind you that the verdict form must be unanimous in all the questions.

Mr. Marshal, would you come forward, please.

(CSO sworn.)

COURT SECURITY OFFICER: I do.

THE COURT: You may take the jury out, please.

(Jury exits courtroom.)

THE COURT: Outside the presence of the jury, anybody want to put anything further on the record?

MR. MILLER: Not for relator, your Honor.

MR. KASSOF: Nothing, Judge. Thank you.

THE COURT: Okay. I mentioned to I think Mr. Cohen, our normal practice is to advise the jury that they may go home -- if they haven't returned a verdict by 5:00 o'clock, that they may go home. If they agree to stay beyond, they're allowed to do so. If they go home, I will have the Marshal -- I will have them return either at 10:00 o'clock or at some earlier point if they unanimously agree to appear earlier. So, that's basically it.

So, if they have not returned a verdict, I will inquire of the Marshal to inquire of them what their wish is, whether they wish to stay or not. And if they -- if not, I do not intend to bring them back in to court before -- we'll just

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3**
**Eastern Division**

United States of America, et al.

                                   Plaintiff,

v.                                  Case No.: 1:14–cv–09412
                                    Honorable Harry D. Leinenweber

Takeda Pharmaceuticals America, Inc., et al.

                                    Defendant.

**NOTIFICATION OF DOCKET ENTRY**

This docket entry was made by the Clerk on Wednesday, August 3, 2022:

        MINUTE entry before the Honorable Harry D. Leinenweber: Trial ends – jury. The jury returns a verdict in favor of the plaintiffs and against the defendants in the amount of $61,229,217.00. Judgment is entered on the verdict. A final civil judgment order as determined by statute and attorneys' fees will be entered at a later time. Mailed notice (maf)

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES, *ex rel.*<br>RONALD J. STRECK, | |
| **Plaintiff,** | **Case No. 14 C 9412** |
| **v.** | **Judge Harry D. Leinenweber** |
| TAKEDA PHARMACEUTICALS<br>AMERICA, INC., *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**I. <u>BACKGROUND</u>**

After a jury verdict, the Court entered judgment in favor of the Relator on this federal False Claims Act (the "FCA") and various state false claim act complaints. Defendant Eli Lilly and Company ("Lilly") has now filed a post-trial Motion under Federal Rules of Civil Procedure 26(B), 54, and 59 for Judgment as a Matter of Law or for a New Trial. Lilly raises 12 points: (1) collateral estoppel; (2) statute of limitations; (3) jury awarded damages for claims conceded to be invalid; (4) failure to prove scienter; (5) failure to show objective knowledge; (6) government acquiescence to Lilly's conduct; (7) incorrect and prejudicial comments by the Relator; (8) failure to show the submissions by Lilly were false; (9) accuracy of Lilly's final

submissions; (10) failure to prove materiality; (11) the public disclosure bar; and (12) failure to prove causation.

## II. **DISCUSSION**

### A. Collateral Estoppel

This defense was raised for the first time immediately prior to trial when Lilly filed a Motion *in limine*, arguing that the Relator was collaterally estopped from arguing scienter. After extensive argument, the Court denied the Motion, reasoning that Lilly had waived the defense by waiting until the eve of trial. The record shows that the Relator filed this case in 2014. Lilly did not respond until 2018 when it moved to dismiss under Rule 12(b)(6) for failure to state a claim. In the Motion, Lilly's position was that this Court should follow the Third Circuit's decision in *U.S. v. Allergan, Inc.*, 746 Fed. App'x. 101 (3rd Cir. 2018) (*Streck 1*), as persuasive authority. Lilly did not argue collateral estoppel in either its Motion, its prayer for relief, or in the body of its brief. The Relator in response argued the lack of precedential authority of the Third Circuit's opinion and that a Third Circuit district court had refused to follow it because it did not consider the opinion binding authority. *See U.S. ex rel. Streck v. Bristol-Myers Squibb,* 370 F.Supp. 3d 491 (E.D. Pa. 2018). Although Lilly did raise collateral estoppel in a footnote to its brief but, as noted, it did not raise it in the Motion itself. Nor did it

argue collateral estoppel in its Reply brief. The Court denied the Motion to Dismiss, without mentioning collateral estoppel, on the basis that the Court disagreed with the Third Circuit's reasoning. Lilly did not move to reconsider. Lilly filed its Answer raising twenty-two boiler plate affirmative defenses, including "[p]laintiff's claims are barred by estoppel."

Lilly filed a Motion for Summary Judgment in 2021, on several issues, including a lack of scienter, government knowledge, a lack of materiality, and a lack of causality, but did not mention collateral estoppel. After the denial of Lilly's Summary Judgment Motion, the case was set for trial in March 2022, and a schedule for filing the pretrial order and motions *in limine* was set. In the fall of 2021, Lilly changed attorneys and asked for the trial to be rescheduled for a later date. Due to logistical problems associated with the COVID-19 pandemic and Lilly's request for postponement, the Court continued the case to July 2022 and reset the dates for filing the pretrial order and motions *in limine* for June 2022. Lilly filed its Motions *in limine*, together with the joint Pretrial Order on June 17, 2022.

The Joint Pretrial Order did include collateral estoppel in Lilly's list of defenses, but as noted above, it was raised for the first time in its Motion *in limine* No. 1. This Motion prayed for an Order prohibiting the Relator from arguing

- 3 -

scienter during the trial which, if granted, would constitute summary judgment due to the lack of scienter, which is contrary to the Court's previous summary judgment decision.

The Court denied the Motion *in limine,* concluding that Lilly had waived this defense through delay, citing *Carr v. O'Leary,* 167 F.3d 1124, 1126 (7th Cir. 1999). In *Carr,* Judge Posner, in finding a defendant had waived a defense, wrote: "Normally failure to plead a defense in a timely fashion is a waiver," and "a party's unreasonable delay in advancing a good ground for a change in a previous ruling is normally a compelling ground for deeming a good ground being waived." This Court also noted that Lilly had pled 22 separate affirmative defenses in its Answer, including "estoppel," but that such boilerplate language did not comply with Rule 8(a), citing *Manley v. Boat U.S. Inc.,* 216 WL 1213731 (N.D. Ill. March 9, 2016).

The Court also relied on the Supreme Court decision in *U.S. v. Mendoza,* 464 U.S. 154, 162-163 (1984), which refused to apply non-mutual offensive collateral estoppel to the government. Lilly argued that a subsequent Supreme Court decision, *U.S. ex rel. Eisenstein v. City of New York,* 556 U.S. 928 (2009) held that in *qui tam* cases in which the government does not intervene, it is not a party. Thus, the government was not entitled to the extended period to file a notice of appeal to

– 4 –

which the government is entitled. The Supreme Court noted that this "harsh" result was dictated by the legislative and not the judicial process and that a court lacked jurisdiction to grant relief. This Court distinguished *Eisenstein* noting that collateral estopppel is dictated by the judicial process and not the legislature, so lack of jurisdiction is not an issue.

Lilly now argues in its Post-Trial Motion that the Relator cannot rely on waiver because he has not shown that he was prejudiced by Lilly's late invocation of collateral estopped. However, Lilly did not argue prejudice prior to this Post-Trial Motion. Also, Lilly did not, and has not to this day, offered any explanation why it failed to raise collateral estoppel earlier. While a court has some discretion in allowing a defendant to amend its answer after discovery is closed and even after summary judgment, a defendant seeking to present a new defense at such a late date needs to provide a reasonable explanation for its failure to seek to do so in a timely fashion.

Lilly waited until the eve of trial to file its motion, without seeking leave of court and without providing any justification for delay and used a motion *in limine* in lieu of a motion for summary judgment to raise collateral estoppel. Although Lilly's motion *in limine* seeks to "estop" Relator from litigating the issue of scienter, the motion clearly seeks to

- 5 -

relitigate Lilly's earlier Motion for Summary Judgment which did not raise collateral estoppel.

As this Court said in *Rainey v. Metropolitan Water Reclamation District*, 2012 WL 2192241 (N.D. Ill, 2012), motions *in limine* are intended to alert the court and the parties of evidentiary issues that may arise during the trial and to exclude anticipated prejudicial evidence before it is offered. They are considered preliminary in nature and subject to reconsideration at a later date on a more complete record. Motions for summary judgment are supposed to be presented early enough in the proceedings to allow the opposing party ample time to defend its position and the Court to consider the motion in an orderly manner. FED. R. CIV. P. 56(b) restricts filing motions for summary judgment without leave of court after 30 days past close of discovery. In addition, Local Rule 56.1 provides many requirements on the filing of motions for summary judgment. Motions *in limine* are not intended to be used as a substitute for an untimely summary judgment motion. To do otherwise encourages trial by ambush. *See Salinas v. Rock Island Boatworks, Inc.,* 2016 WL 3390664 at *2 (C.D. Ill. June 17, 2016). The Court rejects Lilly's Motion for Judgment of Dismissal based on collateral estoppel defense.

**B. Statute of Limitations Defense**

Similarly, the Court considered Lilly's statute of limitations defense as waived due to its untimely presentation. Although Lilly did assert the statute of limitations in one of its twenty-two boiler plate affirmative defenses in its Answer, it did not present this defense in either its Motion to Dismiss, in its Motion for Summary Judgment, or in the Pretrial Order. It also did not present the statute of limitations issue to the jury or request an instruction concerning its application. *See U.S. ex rel Landis v. Tailwind Sports Corp.,* 51 F.Supp. 3d 9, 40 (D.D.C. 2014). Other than its boiler plate assertion as an affirmative defense in its answer filed in 2018, the first time Lilly attempted to argue it substantively, was in its Rule 50(a) Motion filed at the conclusion of the Relator's case on August 31, 2022.

The question raised by Lilly's Motion is when the government received notice or constructive notice of the alleged false payments. The date of notice is when the statute of limitations commences. Lilly argues that the service of the *Streck 1* complaint on the government is notice on the government as a matter of law and is the date when the statute of limitation commences to run. However, a statute of limitations is an affirmative defense and can only be decided prior to trial, if there are no factual issues concerning notice. The

- 7 -

possession by the government of the *Streck 1* Complaint is certainly some evidence of notice, but the Third Circuit's dismissal would raise questions as to the validity of the Relator's claim. The statute of limitations was argued for the first time at the conclusion of the Relator's case, and Court declined to grant Lilly's motion. It should have been presented to the jury for its consideration. It was not submitted to the jury, and it is too late to relitigate the issue on post-trial motions. *See Elusta v. Rubio,* 418 F. App'x 552, 554 (7th Cir. 2011). The Court denies the Motion on the same basis it denied Lilly's Rule 50(a) motion.

### C. Scienter

Next, Lilly argues that it should receive a judgment as a matter of law or receive a new trial on the issue of scienter. However, as Lilly itself stated in its response to the Relator's motion for summary judgment on scienter, the evidence on scienter has been "heavily disputed." The Court agreed with Lilly then and still believes the same to be the case after the trial. The Court also believes the same to be true for the issues of "objectively reasonable interpretation" and "government knowledge." These issues were heavily disputed at summary judgment and at the jury trial. No new facts were elicited at the trial which had not been raised and considered in the cross-motions for summary judgment. The jury was

correctly instructed on these issues which resulted in a verdict in favor of the Relator. There is no basis to upset the jury's verdict and resulting judgment on these issues.

### D. Materiality and Proximate Cause

Lilly contends that no rational jury could have concluded that its false representations were material. The jury was instructed in the words of the statute that conduct is material if it had "a natural tendency to influence, or be capable of influencing, the payment or receipt of money." Lilly's position is that this is insufficient because the Relator must also prove that the government's receipt and acceptance of money was actually influenced by Lilly's failure to comply. However, the case relied upon by Lilly, *Universal Health Services, Inc. v. U.S. ex rel. Escobar,* 579 U.S. 176 (2016) does not require this. The Supreme Court in *Escobar* reviewed the common law definitions of materiality and determined that these definitions all included conduct that a "reasonable man" would attach importance to in determining a course of action or conduct that a defendant had reason to know that recipient attached importance even if a reasonable recipient would not have done so. What the Supreme Court did decide in *Escobar* is that the FCA is interested in serious misconduct, not in cases "where non-compliance is minor or insubstantial." The Supreme Court remanded *Escobar* to determine whether the Relator had actually pled a FCA violation.

- 9 -

In this case, the Court has determined that the Relator had adequately pled a FCA violation, and the Court now holds that the evidence submitted, showing Lilly's false statements caused a payment shortfall to the government of over $61,000,000.00, was not of a "minor or inconsequential" nature. The Court finds that the Relator met the materiality requirement of the FCA.

The Court also finds that the evidence demonstrated a causal relationship between Lilly's conduct and the loss to the government. It appears that Lilly's contention that the Relator failed to prove causation is based on its position that the government was aware of Lilly's treatment of Price Incentive Value ("PIV") in its Average Manufacturer's Price ("AMP") submissions. While there was evidence to the contrary, the jury was entitled to make a finding of causation, under the Court's instruction.

### E. Relator's Statements in Opening and Closing

Lilly contends that the Relator in his opening and closing statements made many assertions that were clear violations of the Court's rulings *in limine*. The Relator responds that whatever objections Lilly may have as to any alleged erroneous statements Relator may have made (and he disputes making any), are waived because Lilly failed to object and, in any event, the Court's instructions cured any harm to Lilly. Lilly denies that it waived any such objections and pointed to remarks of the

- 10 -

Court which it interpreted to mean that the Court's rulings *in limine* eliminated any need to object during the trial. The Court did tell the parties that *in limine* rulings constituted a continuing objection, but Lilly misses the point. The Court said that the parties did not need to object to any evidence, argument or statement that was either allowed or disallowed by the *in limine* rulings. However, the Court did not say that the parties did not have to make objections to violations of the *in limine* rulings. Where the Court ruled that certain evidence could not be introduced or that certain evidence could be introduced, the parties need not object to the evidence allowed in, nor make offers of proof of evidence that had been excluded. The Court's statement did not include violations of the *in limine* rulings because a court may need a reminder of the specific *in limine* ruling that is alleged to be violated, so that the Court could rule on the alleged violation and properly instruct the jury. The matters complained of by Lilly are alleged violations of the rulings *in limine* so that failure to object is a waiver. The main objection raised by Lilly is that the Relator argued to the jury that Lilly was a "big company" that could afford to devote the appropriate resources to conduct an adequate inquiry of its legal obligations, rather than rely on views of one person. This is arguably a violation of the

ruling *in limine* that excluded evidence and arguments related to Lilly's size. There was no objection, so the matter is waived.

### F. Alleged Invalid State Law Claims

Lilly points out that the jury awarded damages to five states covering periods that predated the effective dates of the false claims' statutes of the five states. They include Colorado, Georgia, New Jersey, Oklahoma, and Rhode Island. The damages totaled $147,364.00 (Colorado - $37,622.00; Georgia - $25,690.00; New Jersey - $55,738.00; Oklahoma - $15,991.00; and Rhode Island - $8,320.00). The Relator argues that Lilly waived its objections by not countering the Relator's expert testimony. The better way to handle the matter is for the Court to order a Remittitur of the $147,364.00. The Court therefore orders a Remittitur of $147,364.00. If the Relator refuses to agree to the Remittitur, the Court will order a new trial as to the issue of damages as to these five (5) states.

### G. Other Objections

The other matters raised by Lilly were considered by the Court previously in the Motions to Dismiss and Summary Judgment, and the Court sees no reason to reconsider its earlier rulings. Nor are these matters of sufficient consequence to cause the Court to grant a judgment in Lilly's favor or order a new trial. During the trial the Relator attempted multiple times to get Lilly's witnesses to admit that the "claw back" of the monetary

windfall that Lilly's customers resulting from the increase in value of the customer's inventory of Lilly products after Lilly increased its prices of these products (the "PIV"), needed to be accounted for in determining the "Average Manufacturer's Price" of its products. Lilly's witnesses repeatedly denied that the claw back had to be accounted for in determining the AMP. The jury heard the testimony and determined that Lilly's witnesses were wrong, and its AMPs must include the claw backs and that failure to so caused Lilly to make multiple false clais.

## III. CONCLUSION

For the reasons stated herein, the Post-Trial Motions of Defendant Eli Lilly and Company are denied with exception to the award of damages to Colorado, Georgia, New Jersey, Oklahoma, and Rhode Island. If the Relator refuses to agree to the Remittitur, the Court will order a new trial as to the issue of damages as to these five (5) states.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 4/26/2023

- 13 -

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **UNITED STATES,** *ex rel.* **RONALD J. STRECK,** | |
| **Plaintiff,** | **Case No. 14 C 9412** |
| **v.** | |
| **TAKEDA PHARMACEUTICALS AMERICA, INC.,** *et al.*, | **Judge Harry D. Leinenweber** |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

**I.  BACKGROUND**

After a jury verdict, the Court entered judgment in favor of the Relator Ronald J. Streck ("Relator") against Defendant Eli Lilly and Company ("Lilly") on qui tam actions under the federal False Claims Act (the "FCA") Section 3729 and various state false claims acts (Dkt. No. 486). Relator has now filed a post-trial Motion under Federal Rule of Civil Procedure 59 to Amend Judgment (Dkt. No. 495). Relator seeks trebled damages, prejudgment interest on actual damages, post-judgement interest, and maximum civil penalties. For the reasons stated herein, the Court grants in part and denies in part the Motion.

## II. <u>DISCUSSION</u>

### A. Trebled Damages

Under Section 3729 of the FCA, a defendant is liable for "3 times the amount of damages which the Government sustains because of the act of [the defendant]." 31 U.S.C. § 3729(a). Defendants do not dispute that the relevant state statutes call for the same. The jury determined the actual damages to the federal and state governments to be $61,229,217. (Dkt. No. 486.) This figure tripled amounts to $183,687,651.

Lilly owes trebled damages totaling $183,687,651.

### B. Prejudgment Interest Under the FCA

Relator asks this Court to impose prejudgment interest on pre-trebled damages. While the Seventh Circuit has not yet provided firm guidance on the availability of prejudgment interest, this Court is persuaded by other circuits that have expressly disallowed it. *See e.g., United States v. McLeod,* 721 F.2d 282, 286 (9th Cir. 1983); *Peterson v. Weinberger,* 508 F.2d 45, 55 (5th Cir. 1975); *United States v. Foster Wheeler Corp.,* 447 F.2d 100, 102 (2d Cir. 1971). Relator cites one case for its position, *U.S. v. Coop. Grain & Supply Co.,* 476 F.2d 47, 62 (8th Cir. 1973).

Generally, a remedy is not foreclosed simply because the statute does not mandate it. *See Rodgers v. U.S.,* 332 U.S. 371 (1947); *U.S. v. Texas,* 507 U.S. 529, 535 (1993); *W. Virginia v. U.S.,* 479 U.S. 305, 308 (1987); *Gorenstein Enterprises, Inc. v.*

- 2 -

*Quality Care-USA, Inc.,* 874 F.2d 431, 436 (7th Cir. 1989). Relator relies heavily on *Gornstein,* a 1989 case in which the Seventh Circuit asserted a presumption of prejudgment interest to victims of federal violations. 874 F.2d 436. Since then, the Supreme Court has remarked on the lack of prejudgment interest in the FCA qui tam actions. *See Cook Cnty., Ill. v. U.S. ex rel. Chandler,* 538 U.S. 120, 131 (2003).

This Court finds any presumption of prejudgment interest eclipsed by the FCA itself. The lack of a prejudgment interest provision in Congress's scheme for relator recoveries under Section 3729 of the FCA expressly differs from other portions of the statute. In the provision of the FCA dealing with retaliation against whistleblowers – not at issue here – Congress specifically authorized it. 31 U.S.C. § 3730(h) ("Relief . . . shall include . . . 2 times the amount of back pay [and] interest on the back pay. . . ."). The history of the FCA also renders the scarcity of support for Relator's position unsurprising. Congress was aware of courts' interpretations when it amended the statute in both 1986 and 2009 but never added prejudgment interest to the text. Such inaction suggests that Congress intended to exclude this remedy. *See Cannon v. University of Chicago,* 441 U.S. 677, 703 (1979); *Monessen Sw. Ry. Co. v. Morgan,* 486 U.S. 330, 338 (1988).

The Supreme Court has suggested that an amendment Congress did make, the trebling of damages, renders prejudgment interest

- 3 -

redundant at best. *See Chandler,* 538 U.S. at 131-33. In the 1986 amendments, Congress raised the ceiling on damages recoverable under § 3729(a) from double to treble. *See id.* at 120. While *Grain & Supply,* 476 F.2d 62, also was published before the amendment, the reasoning would make little sense afterwards. In *Grain & Supply,* the 8th Circuit explained that prejudgment interest was important to compensate the plaintiff. *Id*. The Supreme Court has characterized the trebling of FCA damages as exceeding the bounds of compensation now to serve punitive, rather than merely compensatory, purposes. *See Chandler,* 538 U.S. at 133; *Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens,* 529 U.S. 765, 784-86, (2000) ("[T]he current version of the FCA imposes damages that are essentially punitive in nature."); *see also Universal Health Servs., Inc. v. U.S.,* 579 U.S. 176, 182 (2016).

Indeed, as the Supreme Court explained in *Chandler,* the FCA's trebled damages feature ultimately serves more than one purpose. 538 U.S. at 133. Relator sets forth a reasonable policy argument that the recognition of the time value of money, an economic reality accounted for by prejudgment interest, ensures fair compensation. However, the law instructs otherwise, seemingly in pursuit of a countervailing policy goal. "In qui tam cases the rough difference between double and triple damages may well serve . . . to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the

- 4 -

Government, while benefiting himself as well." *Id.* at 131. With an aim for speedy litigation, the exclusion of prejudgment interest makes sense. Congress, recognizing the time value of money, would assume rational relators would push for efficient litigation to obtain the award for themselves, *ipso facto* the Government, as quickly as possible.

For these reasons, the Court declines to award Relator prejudgment interest under the federal FCA.

### C. Prejudgment Interest Under State FCAs

Relator also requests the Court award prejudgment interest on the damages amount under the 27 state FCAs and the District of Columbia FCA ("state FCAs" or "state statutes"). Lilly concedes that claims under Texas and Louisiana statutes (namely, the Texas Medicaid Fraud Prevention Act and the Louisiana Medical Assistance Programs Integrity Law) are entitled to prejudgment interest. The parties present partial, opposing arguments for several additional states and the District of Columbia ("states").

In a lawsuit such as this one involving the laws of various jurisdictions, the availability of prejudgment interest is determined under each jurisdiction's laws. *See In re Air Crash Disaster Near Chicago, Illinois, on May 25, 1979,* 644 F.2d 633, 637 (7th Cir. 1981) ("the availability of prejudgment interest must be determined by reference to state law"); *accord Stulberg v. Intermedics Orthopedics, Inc.,* 1999 WL 759608, at *10 (N.D. Ill.

- 5 -

Aug. 31, 1999) ("When a case arises under federal question jurisdiction, but also contains supplemental state law claims, courts award prejudgment interest on the state law claims under state law and the federal claims under federal law."). Still, given the substantive similarity between state FCAs and the federal FCA, the statutes may be construed consistently, particularly with respect to substantively similar provisions. *See City of Chicago ex rel. Rosenberg v. Redflex Traffic Sys., Inc.,* 884 F.3d 798, 802 (7th Cir. 2018) ("Given the substantive similarity between the Illinois False Claims Act (IFCA) and the FCA, Illinois courts have relied upon federal cases interpreting the FCA in construing the provisions of the IFCA."); *New York v. Amgen Inc.,* 652 F.3d 103, 109 (1st Cir. 2011) ("Given the substantive similarity of the state FCAs . . . and the federal FCA with respect to the provisions at issue in this litigation, the state statutes may be construed consistently with the federal act.").

Accepting, as the parties do, that all relevant state statutes allow trebled damages, and that only Texas and Louisiana contain statutory provisions expressly providing prejudgment interest, the Court finds substantial similarity on the issue of prejudgment interest. Thus, the same rationale for the lack of available prejudgment interest in the federal FCA applies to the relevant state FCAs.

The Court orders prejudgment interest for claims rendered under the laws of Texas and Louisiana. The Court orders no pre-judgment interest for the remaining states.

### D. Post-judgment Interest

Relator requests post-judgment interest at the U.S. Treasury Bill rate. Lilly does not contest that post-judgment interest is available under the federal FCA for federal claims. Rather, Lilly objects to Relator's request for post-judgment interest at the U.S. Treasury Bill rate on his state law claims, arguing that that interest under state FCAs depends on state law. Lilly then contends that Relator waived post-judgment interest on his state law claims by failing to cite state authority.

Under 28 U.S.C. § 1961, interest is allowed "on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961; *Travelers Ins. Co. v. Transp. Ins. Co.,* 846 F.2d 1048, 1053 (7th Cir.1988). Federal district courts generally award post judgment interest. *See Student Loan Marketing Ass'n v. Lipman,* 45 F.3d 173, 176 (7th Cir.1995). The courts calculate post-judgment interest using 28 U.S.C. § 1961(a), which provides for interest from the date of judgment at a floating rate determined by the coupon yield of United States Treasury Bills. 28 U.S.C. § 1961(a). This interest compounds annually. 28 U.S.C. § 1961(b); *Illinois Nat'l Ins. Co. v. Ace Stamping & Mach. Co. Inc.,* 2021 WL 323785, at *2 (N.D. Ill. Feb. 1, 2021). The Seventh Circuit recognizes the

- 7 -

preemption of a federal statutory provision over a state law provision in the post-judgment interest context. *See Travelers Ins. Co. v. Transp. Ins. Co.,* 846 F.2d 1048, 1053 (7th Cir. 1988).

Lilly cites no authority for its position, nor does it explain why there would be a conflict between the state and federal statutes that would negate federal preemption.

As such, the Court awards Relator post-judgment interest for federal and state claims at the U.S. Treasury Bill rate.

### E. Civil Penalties

The Court assesses civil penalties against Lilly for its federal and state violations within the respective statutory ranges. *See U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F.Supp. 2d 719, 741 (N.D. Ill. 2007). Before determining the appropriate penalties, the Court will clarify the appropriate ranges for consideration.

***Civil Penalty Ranges***

The federal statutory minimum is $5000 per violation before November 2015 and $12,537 per violation after November 2015. 28 C.F.R. §§ 85.3, 85.5; see 31 U.S.C. § 3729(a). The federal statutory maximum is $11,000 per violation before November 2015 and $25,076 per violation after November 2015. *Id.* As exhibited in the appendix, many states follow suit. In all relevant statutory schemes at all relevant times, the maximum is twice the minimum. *See* Appendix A. In other words, the statutes' penalty multiplier

- 8 -

is as low as 1 and as high as 2 of the statutory minimums, or as low as .5 or as high as 1 of the maximums. The Court has discretion to award civil penalties within this range. *See United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F. Supp. 2d 719, 741 (N.D. Ill. 2007)

Relator conceded that he originally overstated the penalties available under the District of Columbia ("D.C.") and Wisconsin FCAs. The D.C. FCA states that a violator "shall be liable to the District for a civil penalty of . . . not more than $11,000." D.C. Code Ann. § 2-381.02(a). The Wisconsin FCA in force in 2015 provides that a violator "shall forfeit not less than $5,000 nor more than $10,000 for each violation." Wis. Stat. Ann. § 20.931(2) (2013-14), repealed by 2015-2016 Wisc. Legis. Serv. Act 55, § 945n, eff. July 14, 2015. The parties dispute the penalties available under Hawaii FCA. The Court reads Hawaii's statutory range between November 2015 and 2020 to be $11,463 to $22,927, then to match the federal rate after 2020. *See* Haw. Rev. Stat. § 661-21. Because the conduct at issue predated 2020, the $11,463 to $22,927 range applies. Accordingly, the Court incorporated these deductions with respect to the District of Columbia, Wisconsin, and Hawaii statutes in the addendum. *See* Appendix A.

**Civil Penalty Application**

To assess the appropriate penalties, the Court looks to the totality of the circumstances. *Tyson* 488 F.Supp 2d at 741.

- 9 -

Circumstances include the egregiousness of the conduct, the gravity of the offense, fairness, *see e.g., id.* at 741-42, and the degree of the defendant's scienter, *see e.g., S.E.C. v. Zynergy Int'l Inc.,* 420 F.Supp. 3d 384, 394 (N.D. Ill. 2019).

Relator asks for the Court to impose the maximum civil penalties, arguing Lilly engaged in systematic misconduct for over a decade (2005 to 2017), acted knowingly, and expressed no remorse. Relator cites cases around the country in which courts imposed maximum penalties. Lilly argues that it should not be penalized for exercising its right to a defense and proffers that its remedial actions weigh in favor of minimal, if any, penalties. Lilly changed its practices years before trial, including restating, in 2017, its Average Manufacturer Price ("AMP") amounts back to the date, in 2016, of the relevant agency action. Relator argues that Lilly's correction should have dated back to 2005.

Ultimately, while Lilly could have, of course, behaved better, it could have acted far worse. Lilly's misrepresentations affected the significant portions of its public dealings over several years, and such a grave impact has favored maximum penalties elsewhere. *See United States ex rel. Morsell v. NortonLifeLock, Inc.,* 2023 WL 314506, at *75 (D.D.C. 2023). However, Lilly's conduct did not match the defendants' conduct in cases where courts within the Seventh Circuit have imposed maximum civil penalties. Here, Relator did not claim fraud, and the

- 10 -

evidence on scienter has been heavily disputed. The Court will not consider Lilly's litigation strategies, because a defendant should not be penalized for exercising its right to defense. *See Tyson*, 488 F. Supp. 2d at 742.

For these reasons, the Court considers the civil penalty of twenty percent above the statutory minimum, *i.e.,* the minimum at a factor of 1.2, or 60% of the maximum penalty, appropriate for each offense under each statute. The jury found 43 federal violations before November 2015 and 9 violations afterwards. Therefore, the total minimum federal civil penalty amounts to $349,333, then adding twenty percent, the total is $419,200. *See* Appendix A. (Equally, the maximum is $698,684, sixty percent of which is $419,200.) Among the state and D.C. ("state") claims, the jury found 956 violations prior to November 2015 and 243 afterwards. The total minimum state civil penalties would amount to $7,849,827, and the maximum $15,700,023. *See id.* With a twenty percent increase on the minimum, the total is $9,419,792. Ultimately, the statutes allow total penalties between $8,199,160 and $16,398,707, and the Court orders Lilly to pay $9,838,992 in civil penalties.

Lilly owes $9,838,992 in civil penalties.

### III. <u>CONCLUSION</u>

For the reasons stated herein, Relator's Motion to Amend Judgment (Dkt. No. 495) is granted in part and denied in part. It

is granted insofar as the Court orders damages to be trebled, post-judgment interest on all claims, and prejudgment interest on the Texas and Louisiana claims. The Court denies the Motion as to prejudgment interest on all other state and District of Columbia claims and on federal FCA claims. The Court orders civil penalties for all violations at 20% above the relevant statutory minimums.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: 5/9/2023

- 12 -

## APPENDIX A - Civil Penalties Table

| Jurisdiction | Authority | # Violations pre- Nov. 2015 | Minimum per-violation penalty pre- Nov. 2015 | Maximum violation penalty pre- Nov. 2015 | Total minimum penalty pre- Nov. 2015 violations | Total Penalty for pre- Nov. 2015 violations at Minimum *1.2 | Total maximum penalty for pre- Nov. 2015 violations | # Violations post- Nov. 2015 | Minimum per-violation penalty post- Nov. 2015 | Maximum per-violation penalty post- Nov. 2015 | Total minimum penalty for post- Nov. 2015 violations | Total Penalty for post- Nov. 2015 violations at Minimum *1.2 | Total maximum penalty for post- Nov. 2015 violations | Total minimum civil penalty | Total Penalty at Minimum Penalty *1.2 | Total maximum civil penalty |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| California | Cal Gov't. Code §12651 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Colorado | Colo. Stat. § 25.5-4-305(1) | 18 | $5,500 | $11,000 | $99,000 | $118,800 | $198,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $211,833 | **$254,200** | $423,684 |
| Connecticut | Conn. Gen. Stat. § 4-275(a) | 20 | $5,500 | $11,000 | $110,000 | $132,000 | $220,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $222,833 | **$267,400** | $445,684 |
| Delaware | Del. Code tit. 6, § 1201(a) | 21 | $5,500 | $11,000 | $115,500 | $138,600 | $231,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $228,333 | **$274,000** | $456,684 |
| Florida | Fla. Stat. § 68.082(2) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $5,500 | $11,000 | $49,500 | $59,400 | $99,000 | $286,000 | **$343,200** | $572,000 |
| Georgia | Ga. Code § 49-4-168.1(a) | 34 | $5,500 | $11,000 | $187,000 | $224,400 | $374,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $299,833 | **$359,800** | $599,684 |
| Hawaii | Haw. Rev. Stat. §661-21 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | **$11,463** | **$22,927** | $103,167 | $123,800 | $206,343 | $339,667 | **$407,600** | $679,343 |
| Illinois | 740 Ill. Comp. Stat. 175/3(a) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Indiana | IC 5-11-5.7-2(a) | 42 | $5,500 | $11,000 | $231,000 | $277,200 | $462,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $343,833 | **$412,600** | $687,684 |
| Iowa | Iowa Code § 685.2(1) | 21 | $5,500 | $11,000 | $115,500 | $138,600 | $231,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $228,333 | **$274,000** | $456,684 |
| Louisiana | La. Stat. § 46:438.6 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $5,500 | $11,000 | $49,500 | $59,400 | $99,000 | $286,000 | **$343,200** | $572,000 |
| Massachusetts | Mass. Gen. Laws ch. 12 §5B(a) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Michigan | Mich. Comp. Laws § 400.612 | 27 | $5,000 | $10,000 | $135,000 | $162,000 | $270,000 | 9 | $5,000 | $10,000 | $45,000 | $54,000 | $90,000 | $180,000 | **$216,000** | $360,000 |
| Minnesota | Minn. Stat. §15c.02(a) | 21 | $5,500 | $11,000 | $115,500 | $138,600 | $231,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $228,333 | **$274,000** | $456,684 |
| Montana | Mont. Code 17-8-403 | 25 | $5,500 | $11,000 | $137,500 | $165,000 | $275,000 | 9 | $5,500 | $11,000 | $49,500 | $59,400 | $99,000 | $187,000 | **$224,400** | $374,000 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nevada | Nev. Rev. Stat. §357.040(2)(c) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| New Jersey | N.J. Stat. § 2A:32C-3(g) | 31 | $5,500 | $11,000 | $170,500 | $204,600 | $341,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $283,333 | **$340,000** | $566,684 |
| New York | NY St. Fin. Law §189(1) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| New Mexico | N.M. Stat. § 27-14-4 | 43 | $5,000 | $10,000 | $215,000 | $258,000 | $430,000 | 9 | $5,000 | $10,000 | $45,000 | $54,000 | $90,000 | $260,000 | **$312,000** | $520,000 |
| North Carolina | N.C. Gen. Stat. §1-607(a) | 19 | $5,500 | $11,000 | $104,500 | $125,400 | $209,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $217,333 | **$260,800** | $434,684 |
| Oklahoma | Okla. Stat. tit. 63, §5053.1(B) | 32 | $5,500 | $11,000 | $176,000 | $211,200 | $352,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $288,833 | **$346,600** | $577,684 |
| Rhode Island | R.I. Gen. Laws §9-1.1-3(a) | 31 | $5,500 | $11,000 | $170,500 | $204,600 | $341,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $283,333 | **$340,000** | $566,684 |
| Tennessee | Tenn. Code § 71-5-182 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Texas | Tex. Hum. Res. Code § 36.052 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Virginia | Va. Code § 8.01-216.3 | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $349,333 | **$419,200** | $698,684 |
| Washington | RCW § 74.66.020 | 13 | $5,500 | $11,000 | $71,500 | $85,800 | $143,000 | 9 | $12,537 | $25,076 | $112,833 | $135,400 | $225,684 | $184,333 | **$221,200** | $368,684 |
| Wisconsin | Wis. Stat. § 20.931(2)(g) | 42 | **$5,000** | **$10,000** | $210,000 | $252,000 | $420,000 | 0 | $5,500 | $11,000 | $ - | | $ - | $210,000 | **$252,000** | $420,000 |
| D.C. | D.C. Code §2-381.02(a) | 43 | $5,500 | $11,000 | $236,500 | $283,800 | $473,000 | 9 | **$5,500** | **$11,000** | $49,500 | $59,400 | $99,000 | $286,000 | **$343,200** | $572,000 |
| **State Sub-Total** | | **956** | | | $5,202,000 | **$6,242,400** | $10,404,000 | 243 | | | $2,647,827 | **$3,177,392** | $5,296,023 | $7,849,827 | **$9,419,792** | **$15,700,023** |
| **Federal** | 28 C.F.R. §§ 85.3, 85.5 | **43** | | | $236,500 | **$283,800** | $473,000 | 9 | | | $112,833 | **$135,400** | $225,684 | $349,333 | **$419,200** | **$698,684** |
| **TOTAL** | | **999** | | | $5,438,500 | **$6,526,200** | $10,877,000 | 252 | | | $2,760,660 | **$3,312,792** | $5,521,707 | $8,199,160 | **$9,838,992** | $16,398,707 |

– 14 –

ILND 450 (Rev. 10/13): Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

United States of America, ex rel Streck,

Plaintiff(s),

v.

Takeda Pharmaceuticals America, Inc., et al. ,

Defendant(s).

Case No.  14 C 9412
Judge  Harry D. Leinenweber

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐      in favor of plaintiff(s)
and against defendant(s)
in the amount of $      ,

         which ☐ includes     pre–judgment interest.
                    ☐ does not include pre–judgment interest.

     Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

     Plaintiff(s) shall recover costs from defendant(s).

---

☐      in favor of defendant(s)
and against plaintiff(s)

.

     Defendant(s) shall recover costs from plaintiff(s).

---

☒      other: Final judgment is $193,970,994.91 in favor of Plaintiffs and against Eli Lilly. As set forth in prior rulings, this figure consists of: $183,245,559.00 in trebled damages, $9,838,992.00 in civil penalties, and $886,443.91 in prejudgment interest under Texas and Louisiana law. The final judgment shall bear post-judgment interest at a rate of 5.46%. Such interest shall be computed daily to the date of payment and shall be compounded annually.

---

This action was *(check one)*:
☒ tried by a jury with Judge Harry D. Leinenweber presiding, and the jury has rendered a verdict.
☐ tried by Judge Harry D. Leinenweber without a jury and the above decision was reached.
☐ decided by Judge Harry D. Leinenweber on a motion.

Date:  9/26/2023                    Thomas G. Bruton, Clerk of Court

                                          Melanie A. Foster, Deputy Clerk

SA85

# CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to 7th Circuit Rule 30(d), counsel certifies that all materials required by 7th Circuit Rule 30(a) and (b) are included in the appendix.

*/s/ John C. O'Quinn, P.C.*
John C. O'Quinn, P.C.

*Counsel for Appellant*

# CERTIFICATE OF SERVICE

I, John C. O'Quinn, hereby certify that on December 20, 2023, a true and accurate copy of Defendant-Appellant Eli Lilly and Company's Brief and Required Short Appendix was served upon counsel of record at the addresses indicated by CM/ECF electronic notification.

Dated: December 20, 2023

*/s/ John C. O'Quinn*

*Counsel for Appellant*