Nos. 23-2134, 23-2216, 23-2958, and 23-3035

# United States Court of Appeals
# for the Seventh Circuit

UNITED STATES, ET AL., EX REL., RONALD J. STRECK,

*Plaintiff-Appellee, Cross-Appellant,*

v.

ELI LILLY AND COMPANY,

*Defendant-Appellant, Cross-Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:14-cv-09412
Hon. Harry D. Leinenweber

## APPENDIX FOR APPELLANT
## VOLUME I OF III

John C. O'Quinn
  *Counsel of Record*
Matthew S. Owen
Mary Elizabeth Miller
Luke P. McGuire
Mark Wigley
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington DC, 20004
Tel: (202) 389-5000
Fax: (202) 389-5200
john.oquinn@kirkland.com

*Counsel for Eli Lilly and Company*

# ELI LILLY AND COMPANY'S SEPARATE APPENDIX
## TABLE OF CONTENTS

## VOLUME I OF III

**DOCUMENT**                                                       **PAGE**

Determining AMP for Prescription Drugs Under the Deficit
Reduction Act (dated May 30, 2006) ................................... A1

*Streck I* Complaint (dated October 28, 2008) ........................... A69

*Streck I* United States' Notice Declining to Intervene
(dated May 9, 2011) ......................................................... A126

*Streck I* Fourth Amended Complaint
(dated September 7, 2011) ............................................. A136

## VOLUME II OF III

McElroy Letter to HHS re Wholesaler Service Fees, (dated May 2,
2005)
**Trial Ex. DX-0003** ................................................................ A224

O'Harra Email re Eli Lilly and Company: Meeting Request,
with attachment, (dated March 11, 2016)
**Trial Ex. DX-0004** ................................................................ A230

Q1 2005 Medicaid Critical Path, (dated April 26, 2005)
**Trial Ex. DX-0020** ................................................................ A234

Eli Lilly Medicaid Drug Rebate Program Key Principles, (dated
October 2006)
**Trial Ex. DX-0030** ................................................................ A237

Q4 Management Review Meeting Government Pricing
Materials, (dated January 23, 2008)
**Trial Ex. DX-0043** ................................................................ A244

Dixson Letter to HHS re Quarterly and Monthly AMP and
Quarterly BP Submission, (dated April 28, 2008)
**Trial Ex. DX-0046** ................................................................. A313

*Streck I* Third Amended Complaint, (dated Apr. 25, 2011)
**Trial Ex. DX-0094**................................................................. A319

Dixson Letter to HHS re Quarterly and Monthly AMP and
Quarterly BP Submission, (dated July 25, 2011)
**Trial Ex. DX-0098**................................................................. A392

Medicaid Drug Rebate Program Interim Key Principles,
(dated August 2011)
**Trial Ex. DX-0102**................................................................. A398

## VOLUME III OF III

HHS-OIG Letter to O'Harra, (dated February 7, 2013)
**Trial Ex. DX-0117**................................................................. A401

Letter to HHS-OIG re Zyprexa October 2012 AMP Audit
Response, (dated March 25, 2013)
**Trial Ex. DX-0120**................................................................. A404

2014 HHS-OIG Report, (dated June 2014)
**Trial Ex. DX-0125**................................................................. A410

Lilly Letter to HHS re Reasonable Assumptions Affecting
Quarterly and Monthly AMP and Quarterly BP Submissions,
(dated January 31, 2017)
**Trial Ex. DX-0159**................................................................. A428

Lilly Medicaid Drug Rebate Agreement, (dated February 26, 1991)
**Trial Ex. RX-0063**................................................................. A435

MDRP Manufacturer Release No. 78, (dated June 26, 2007)
**Trial Ex. RX-0066** ............................................................... A457

2005 Amendment to Lilly Warehousing and Distribution Service
Agreement with Amerisource, (dated January 1, 2005)
**Trial Ex. RX-0072**................................................................ A468

2009 Lilly Warehousing and Distribution Agreement with
Cardinal, (dated July 2, 2009)
**Trial Ex. RX-0076**................................................................ A471

2016 Lilly Wholesaler Distribution Services Agreement with
Cardinal, (dated January 1, 2016)
**Trial Ex. RX-0077**................................................................ A474

**Trial Transcript Excerpts Volume 1B** (pgs. 110, 119)
July 22, 2022 (R.507)............................................................. A478
      Opening Statement by D. Miller (for Relator) ...............A479

**Trial Transcript Excerpts Volume 2B** (pgs. 342, 374, 379, 397-
      403, 410-411, 436)
July 22, 2022 (R.509)............................................................. A481
      Direct Examination of J. O'Harra (Lilly Witness) .......... A482
      Cross Examination of J. O'Harra (Lilly Witness) ........... A483
      Re-Direct Examination of J. O'Harra (Lilly Witness)..... A494

**Trial Transcript Excerpts Volume 3B** (pgs. 664-665, 688, 690-
      696)
July 26, 2022 (R.525)............................................................. A495
      Direct Examination of K. Wagner (Lilly Witness) .......... A496
      Cross Examination of K. Wagner (Lilly Witness) ........... A498

**Trial Transcript Excerpts Volume 4A** (pgs. 784, 786-787, 794)
July 27, 2022 (R.512)............................................................. A505
      Direct Examination of H. Dixson (Lilly Witness)............ A506

**Trial Transcript Excerpts Volume 4B** (pgs. 851-852, 880-882)
July 27, 2022 (R.513)............................................................. A510
      Direct Examination of H. Dixson (Lilly Witness)............ A511

**Trial Transcript Excerpts Volume 5A** (pgs. 987-988)
July 28, 2022 (R.514)............................................................ A516
    Cross Examination of H. Dixson (Lilly Witness)............. A517

**Trial Transcript Excerpts Volume 5B** (pgs. 1018, 1041, 1062-1064, 1072, 1096, 1112, 1133, 1135-1137, 1150-1152, 1154-1157, 1173, 1175-1176, 1178)
July 28, 2022 (R.515)............................................................ A519
    Cross Examination of H. Dixson (Lilly Witness)............. A520

**Trial Transcript Excerpts Volume 6A** (pgs. 1198-1200, 1205, 1220-1221, 1224, 1246, 1263)
July 29, 2022 (R.516)............................................................ A543
    Cross Examination of H. Dixson (Lilly Witness)............. A544
    Re-Direct Examination of H. Dixson (Lilly Witness) ...... A551

**Trial Transcript Excerpts Volume 7** (pgs. 1446, 1448-1449, 1483-1484)
August 1, 2022 (R.518) .......................................................... A553
    Bench Argument (D. Miller and J. Hileman) ................. A554

**Trial Transcript Excerpts Volume 8A** (pgs. 1585, 1594, 1602-1603, 1615-1616, 1620, 1623-1625, 1630)
August 2, 2022 (R.519) .......................................................... A559
    Closing Statement by D. Cohen (for Relator) ................. A560

**Trial Transcript Excerpts Volume 8B** (pgs. 1711, 1720, 1727, 1729, 1737, 1739-1740)
August 2, 2022 (R.520) .......................................................... A571
    Rebuttal by D. Miller (for Relator) ................................ A572
    Jury Instructions.......................................................... A576

# Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005



**MAY 3 0 2006**

TO:      The Secretary
           Through:    DS _____
                      COS _____
                      ES _____

FROM:    Inspector General

SUBJECT:   Determining Average Manufacturer Prices for Prescription Drugs Under the
                Deficit Reduction Act of 2005 (A-06-06-00063)

## PURPOSE

As required by section 6001 of the Deficit Reduction Act (DRA) of 2005, which amended
section 1927 of the Social Security Act (the Act), we are providing you with our report on
determining average manufacturer prices (AMPs). Our specific mandate was to (1) review the
requirements for, and manner in which, AMPs are determined under section 1927 of the Act and
(2) recommend appropriate changes by June 1, 2006.

## INFORMATION TEXT

To summarize our report, existing requirements for determining certain aspects of AMPs are not
clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent.
Our previous and ongoing work has found that the manufacturers reviewed interpret AMP
requirements differently. Specifically, our findings demonstrate the need to clarify the definition
of retail class of trade and the treatment of pharmacy benefit manager rebates and Medicaid sales
in AMP calculations. Consistent with our findings, industry groups also emphasized the need to
clarify certain AMP requirements. Further, they raised additional issues related to the
implementation of DRA provisions.

Because the DRA expands the use of AMPs and creates new reimbursement policy implications,
future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or
inappropriate reimbursement amounts as well as rebate errors.

Our report includes several recommendations for use in promulgating regulations and guidance
to clarify AMP requirements.

If you have any questions or comments about this report, please do not hesitate to call me, or your staff may contact George M. Reeb, Assistant Inspector General for the Centers for Medicare & Medicaid Audits, at (410) 786-7104.

Daniel R. Levinson

Attachment

Department of Health and Human Services

**OFFICE OF
INSPECTOR GENERAL**

# Determining Average Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act of 2005



Daniel R. Levinson
Inspector General

May 2006
A-06-06-00063

# *Office of Inspector General*

http://oig.hhs.gov

The mission of the Office of Inspector General (OIG), as mandated by Public Law 95-452, as amended, is to protect the integrity of the Department of Health and Human Services (HHS) programs, as well as the health and welfare of beneficiaries served by those programs. This statutory mission is carried out through a nationwide network of audits, investigations, and inspections conducted by the following operating components:

## *Office of Audit Services*

The Office of Audit Services (OAS) provides all auditing services for HHS, either by conducting audits with its own audit resources or by overseeing audit work done by others. Audits examine the performance of HHS programs and/or its grantees and contractors in carrying out their respective responsibilities and are intended to provide independent assessments of HHS programs and operations. These assessments help reduce waste, abuse, and mismanagement and promote economy and efficiency throughout HHS.

## *Office of Evaluation and Inspections*

The Office of Evaluation and Inspections (OEI) conducts national evaluations to provide HHS, Congress, and the public with timely, useful, and reliable information on significant issues. Specifically, these evaluations focus on preventing fraud, waste, or abuse and promoting economy, efficiency, and effectiveness in departmental programs. To promote impact, the reports also present practical recommendations for improving program operations.

## *Office of Investigations*

The Office of Investigations (OI) conducts criminal, civil, and administrative investigations of allegations of wrongdoing in HHS programs or to HHS beneficiaries and of unjust enrichment by providers. The investigative efforts of OI lead to criminal convictions, administrative sanctions, or civil monetary penalties.

## *Office of Counsel to the Inspector General*

The Office of Counsel to the Inspector General (OCIG) provides general legal services to OIG, rendering advice and opinions on HHS programs and operations and providing all legal support in OIG's internal operations. OCIG imposes program exclusions and civil monetary penalties on health care providers and litigates those actions within HHS. OCIG also represents OIG in the global settlement of cases arising under the Civil False Claims Act, develops and monitors corporate integrity agreements, develops compliance program guidances, renders advisory opinions on OIG sanctions to the health care community, and issues fraud alerts and other industry guidance.

# EXECUTIVE SUMMARY

## BACKGROUND

### Medicaid Drug Rebate Program

Section 1927 of the Social Security Act (the Act) established the Medicaid drug rebate program. For a manufacturer's covered outpatient drugs to be eligible for Federal Medicaid funding under the program, the manufacturer must enter into a rebate agreement with the Centers for Medicare & Medicaid Services (CMS) and pay quarterly rebates to the States. Section 1927(b)(3) of the Act requires a participating manufacturer to report quarterly to CMS the average manufacturer price (AMP) for each covered outpatient drug. Section 1927(k)(1) defines AMP as the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

CMS uses AMP to calculate a unit rebate amount for each covered outpatient drug and provides the unit rebate amounts to the States. The States determine the total rebates that participating manufacturers owe by multiplying the unit rebate amount by the number of units of the drug dispensed to Medicaid beneficiaries.

### Deficit Reduction Act of 2005

The Deficit Reduction Act (DRA) of 2005 requires the Secretary of the Department of Health and Human Services to provide AMP data to the States on a monthly basis beginning July 1, 2006. These data will provide States with pricing information that was generally not available previously, and States may choose to use AMP in setting reimbursement amounts. In addition, the DRA establishes AMP as the new reimbursement basis for drugs subject to Federal upper limit requirements.

The DRA requires the Office of Inspector General (OIG) to (1) review the requirements for, and manner in which, AMPs are determined under section 1927 of the Act and (2) recommend appropriate changes by June 1, 2006. Pursuant to the DRA, CMS must promulgate, by July 1, 2007, a regulation that clarifies those requirements after considering OIG's recommendations.

## OBJECTIVE

Our objective was to review the requirements for, and manner in which, manufacturers determine AMPs under section 1927 of the Act.

## SUMMARY OF RESULTS

Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent. OIG's previous and ongoing work, which has primarily focused on how manufacturers calculate AMP, has found that the manufacturers reviewed interpret AMP requirements differently. Specifically, our findings demonstrate the need to clarify the definition of retail class of trade and the treatment of

pharmacy benefit manager rebates and Medicaid sales in AMP calculations. In addition, work related to the use of AMP by CMS and other agencies highlights the need to consider the timeliness and accuracy of manufacturer-reported AMPs. Consistent with our findings, industry groups also emphasized the need to clarify certain AMP requirements. Further, they raised additional issues related to the implementation of DRA provisions.

Because the DRA expands the use of AMPs and creates new reimbursement policy implications, future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or inappropriate reimbursement amounts as well as rebate errors.

## RECOMMENDATIONS

We recommend that the Secretary direct CMS, in promulgating the AMP regulation, to:

- clarify requirements in regard to the definition of retail class of trade and the treatment of pharmacy benefit manager rebates and Medicaid sales and

- consider addressing issues raised by industry groups, such as:

  o administrative and service fees,
  o lagged price concessions and returned goods,
  o the frequency of AMP reporting,
  o AMP restatements, and
  o baseline AMP.

We also recommend that the Secretary direct CMS to:

- issue guidance in the near future that specifically addresses the implementation of the AMP-related reimbursement provisions of the DRA and

- encourage States to analyze the relationship between AMP and pharmacy acquisition cost to ensure that the Medicaid program appropriately reimburses pharmacies for estimated acquisition costs.

## CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS

In commenting on a draft of this report, CMS stated that it would address each of the recommended areas, as well as the areas raised by industry groups, in its proposed regulation. CMS also stated that it would evaluate the need for additional guidance. CMS's comments are included as Appendix G.

# TABLE OF CONTENTS

**Page**

INTRODUCTION..............................................................................................................1

    BACKGROUND .........................................................................................................1
        Medicaid Drug Rebate Program ..............................................................1
        Deficit Reduction Act of 2005 .................................................................1
        Centers for Medicare & Medicaid Services Guidance ...........................2
        Medicaid Reimbursement of Covered Outpatient Drugs.........................2

    OBJECTIVE, SCOPE, AND METHODOLOGY ...............................................3
        Objective ..................................................................................................3
        Scope........................................................................................................3
        Methodology ............................................................................................3

RESULTS OF REVIEW ................................................................................................4

    SUMMARY OF OFFICE OF INSPECTOR GENERAL WORK .....................4
        Calculating Average Manufacturer Price..................................................4
        Using Average Manufacturer Price in Reimbursement Calculations ......7

    SUMMARY OF INDUSTRY GROUP PERSPECTIVES.................................8
        Calculating Average Manufacturer Price..................................................8
        Using Average Manufacturer Price in Reimbursement Calculations ....10
        Deficit Reduction Act Implementation Issues ......................................11

    RECOMMENDATIONS ...........................................................................................12

    CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS ......................12

**APPENDIXES**

    A – COMMENTS FROM THE BIOTECHNOLOGY INDUSTRY ORGANIZATION

    B – COMMENTS FROM THE GENERIC PHARMACEUTICAL ASSOCIATION

    C – COMMENTS FROM THE HEALTHCARE DISTRIBUTION MANAGEMENT
        ASSOCIATION

    D – COMMENTS FROM THE NATIONAL ASSOCIATION OF CHAIN DRUG
        STORES

    E  – COMMENTS FROM THE NATIONAL COMMUNITY PHARMACISTS
        ASSOCIATION

F – COMMENTS FROM THE PHARMACEUTICAL RESEARCH AND
    MANUFACTURERS OF AMERICA

G – COMMENTS FROM THE CENTERS FOR MEDICARE & MEDICAID
    SERVICES

# INTRODUCTION

## BACKGROUND

### Medicaid Drug Rebate Program

Section 1927 of the Social Security Act (the Act) established the Medicaid drug rebate program. For a manufacturer's covered outpatient drugs to be eligible for Federal Medicaid funding under the program, the manufacturer must enter into a rebate agreement with the Centers for Medicare & Medicaid Services (CMS) and pay quarterly rebates to the States. Section 1927(b)(3) of the Act requires a participating manufacturer to report quarterly to CMS the average manufacturer price (AMP) for each covered outpatient drug. Section 1927(k)(1) defines AMP as the average price paid to the manufacturer by wholesalers for drugs distributed to the retail pharmacy class of trade, after deducting customary prompt pay discounts.

CMS uses AMP and, in some cases, best price data to calculate a per unit (e.g., per pill) rebate amount for each covered outpatient drug and provides the unit rebate amounts to the States.[1] The States determine the total rebates that participating manufacturers owe by multiplying the unit rebate amount for a specific drug by the number of units dispensed to Medicaid beneficiaries.

### Deficit Reduction Act of 2005

The Deficit Reduction Act (DRA) of 2005 contains several provisions affecting the Medicaid drug rebate program and Medicaid drug reimbursement. Sections 6001(c) and (g) of the DRA require the calculation of AMP without regard to customary prompt pay discounts effective January 1, 2007. Section 6001(b) requires the Secretary of the Department of Health and Human Services to provide AMP data to the States on a monthly basis beginning July 1, 2006. These data will provide States with pricing information that was generally not available previously, and States may choose to use AMP in setting reimbursement amounts. In addition, the DRA establishes AMP as the new reimbursement basis for drugs subject to Federal upper limit requirements. Section 6001(a) of the DRA requires that, effective January 1, 2007, Federal upper limits will be based on 250 percent of AMP for the drug with the lowest AMP rather than 150 percent of the lowest published price for therapeutically equivalent products.

Section 6001(c)(3)(A) of the DRA requires the Office of Inspector General (OIG) to (1) review the requirements for, and manner in which, AMPs are determined under section 1927 of the Act and (2) recommend appropriate changes by June 1, 2006. Section 6001(c)(3)(B) requires that CMS promulgate, by July 1, 2007, a regulation that clarifies those requirements after considering OIG's recommendations.

---

[1] Section 1927(c)(1)(C) defines best price as the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity, excluding certain sales.

**Centers for Medicare & Medicaid Services Guidance**

Since the Medicaid drug rebate program began in 1991, CMS has issued a regulation (42 CFR § 447.534) addressing only manufacturers' record retention requirements and time limits for submitting AMP recalculations. CMS has also issued guidance to manufacturers in the form of a standardized drug rebate agreement with manufacturers and memorandums called Medicaid drug program releases (releases).

The rebate agreement further defines AMP and provides a definition of wholesalers:

- AMP is defined as "the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributor's national drug code number)." The rebate agreement further specifies that cash discounts and all other price reductions that reduce the actual price paid are included in AMP (section I(a) of the rebate agreement).

- A wholesaler is defined as "any entity (including a pharmacy or chain of pharmacies) to which the labeler [manufacturer] sells the Covered Outpatient Drug, but that does not relabel or repackage the Covered Outpatient Drug" (section I(ee) of the rebate agreement).

Section I(a) of the rebate agreement also provides that the AMP "for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." Manufacturers can have payment arrangements with entities that do not take title to or possession of drugs. These arrangements can affect the price realized by the manufacturer without changing the price paid by the purchaser that takes title to or possession of the drugs.

To provide additional clarification on rebate issues, CMS sent 72 releases to drug manufacturers from 1991 through March 2006. These releases typically focused on specific definitional or calculation-related concerns.

**Medicaid Reimbursement of Covered Outpatient Drugs**

Each State is required to submit a Medicaid State plan to CMS describing its payment methodology for covered drugs. Federal regulations (42 CFR § 447.331(b)) require, with certain exceptions, that a State's reimbursement for drugs not exceed, in the aggregate, the lower of the estimated acquisition cost plus a reasonable dispensing fee or the provider's usual and customary charge to the public for the drugs. CMS allows States flexibility in defining estimated acquisition cost.

For certain drugs, States also use the Federal upper limit to determine reimbursement amounts. CMS has established Federal upper limit amounts for more than 400 drugs that meet specified criteria. Pursuant to 42 CFR § 447.332(b), Federal upper limit amounts are currently based on 150 percent of the lowest published price for therapeutically equivalent products.

States have generally based estimated acquisition cost on readily available published prices, typically the average wholesale price (AWP). OIG has found that Medicaid drug reimbursement based on AWP often exceeds pharmacies' actual acquisition costs and the prices paid by other Federal programs. AWP data have several critical flaws. AWP is not defined in statute or regulation, is not necessarily linked to actual sales transactions, and is not easily verifiable. While certain aspects of AMP need to be addressed, AMP has several advantages over AWP as a basis of reimbursement. In contrast to AWP, AMP is statutorily defined, is calculated from actual sales transactions, and is subject to audit.

## OBJECTIVE, SCOPE, AND METHODOLOGY

### Objective

Our objective was to review the requirements for, and manner in which, manufacturers determine AMPs under section 1927 of the Act.

### Scope

We limited our review to information obtained through OIG work since 1991 and discussions with representatives of stakeholders in the Medicaid drug rebate program (manufacturers, pharmacies, distributors, and States). The audit objective did not require that we identify or review any internal control systems.

We performed our fieldwork during March and April 2006.

### Methodology

To accomplish our objective, we:

- reviewed the appropriate sections of the DRA, section 1927 of the Act, the rebate agreements between CMS and drug manufacturers, and applicable CMS releases;

- met with congressional staff to discuss the OIG requirements in the DRA;

- interviewed CMS officials;

- analyzed and compiled past and ongoing OIG work related to drug manufacturers, AMP calculations, and the use of AMP;[2]

- met with three manufacturer groups, three pharmacy groups, one distributor group, and one State government group to discuss their concerns related to AMP calculations and the DRA; and

- analyzed written comments provided by six of these groups.

---

[2] Many of the OIG reports contain proprietary information and are therefore not available to the public.

We conducted our review in accordance with generally accepted government auditing standards.

## RESULTS OF REVIEW

Existing requirements for determining certain aspects of AMPs are not clear and comprehensive, and manufacturers' methods of calculating AMPs are inconsistent. OIG's previous and ongoing work has demonstrated that the manufacturers reviewed interpret AMP requirements differently. Consistent with our findings, industry groups also emphasized the need to clarify requirements. Further, they raised additional issues related to the implementation of DRA provisions. Because the DRA expands the use of AMPs and creates new reimbursement policy implications, future errors or inconsistencies in manufacturers' AMP calculations could lead to inaccurate or inappropriate reimbursement amounts as well as rebate errors.

## SUMMARY OF OFFICE OF INSPECTOR GENERAL WORK

Our work on Medicaid drug rebates has focused on how manufacturers calculate AMP and how CMS and other agencies use AMP. Findings in these areas demonstrate the need to clarify the definition of retail class of trade and the treatment of pharmacy benefit manager (PBM) rebates and Medicaid sales in AMP calculations. One issue fundamental to the proper treatment of PBM and other rebates is whether AMP should represent the net price realized by manufacturers or the price paid by purchasers that take possession of the drugs. Our findings also highlight the need to consider the implications of previously reported problems in the timeliness and accuracy of manufacturer-reported AMPs.

### Calculating Average Manufacturer Price

Our first review, initiated in 1991, found that four drug manufacturers used three different methods to calculate AMP; they based the calculations on gross sales to wholesalers, net sales to wholesalers, or direct retail sales and retail sales reported by wholesalers. We recommended that CMS survey other manufacturers to identify the methods used to determine AMP and develop a more specific policy for calculating AMP that would protect the Government's interest and be equitable to manufacturers.

At CMS's request in the mid-1990s, we reviewed the AMP submissions of two manufacturers that had revised their AMP calculation methodologies. For the first manufacturer, we were unable to express an opinion on the revised methodology because the manufacturer lacked adequate documentation to support its changes. The second manufacturer's methodology revision primarily involved the inclusion of price concessions to customers that the manufacturer considered to be retail. For example, the manufacturer decided that price concessions to mail-order pharmacies, nursing home pharmacies, PBMs, independent practice associations, and clinics represented the retail class of trade. Based on our limited review, we disagreed with the manufacturer's designation of these customers as part of the retail class of trade; therefore, we believed that the price concessions should not have been included in AMP. However, at the time, no guidance addressed the retail class of trade issues that we reviewed. Subsequent to that review, CMS issued release 29, which provided guidance on the treatment of some of these customers.

In 2003, we initiated reviews of four manufacturers. We selected these manufacturers because they had reported to CMS that they had changed their AMP calculation methodologies and had, as a result, received State refunds of previously paid rebates. We once again found differences in the ways that manufacturers treated certain elements of their AMP calculations. As discussed below, these reviews identified significant issues related to the treatment of PBM rebates and Medicaid sales.

*Treatment of Pharmacy Benefit Manager Rebates*

A major factor contributing to inconsistencies in manufacturers' AMP calculations is the business relationship between a manufacturer and various groups involved in distributing drugs. PBMs, in particular, have assumed a prominent role in the drug distribution network.

Health plans and third-party payers often hire PBMs to help manage the drug benefits paid by those plans. PBMs may act on behalf of many types of customers, of which some could be considered a part of the retail class of trade. Unless a PBM has a mail-order component, it generally does not purchase drugs or take delivery of or title to the drugs.

PBMs may negotiate and receive rebates and other payments from manufacturers based on services provided (e.g., formulary development and communications to patients) and/or based on a drug's utilization or market share. PBMs may share or "pass through" to their customers some or none of the rebates or fees they receive from manufacturers. Manufacturers are generally not parties to the contracts between PBMs and their customers. Manufacturers have indicated that they may not know how much, if any, of the rebates received by a PBM are passed on to the PBM's customers. Retail pharmacy groups have indicated that PBM rebates do not get passed on to pharmacies.

Three of the four manufacturers audited as part of our ongoing work reduced their AMP values for rebates paid to PBMs. The inclusion of PBM rebates in an AMP calculation reduces AMP, resulting in lower Medicaid rebates to the States.

- Two manufacturers included all rebates paid to PBMs when calculating AMPs. One manufacturer believed that PBMs act like wholesalers because they manage the flow of drug products through their network of pharmacies. The other manufacturer indicated that, with the lack of formal guidance addressing how to handle PBM rebates, nothing precluded it from including payments to PBMs.

- The third manufacturer included a portion of its PBM rebates in the calculation of AMP based on an analysis of the health plans represented by PBMs. The manufacturer determined the percentage of health plans that it considered to be "retail," allocated rebates paid to PBMs for those plans, and included that percentage of the rebates in the AMP calculations.

Conversely, the fourth manufacturer did not include rebates paid to PBMs in its AMP calculations. This manufacturer decided not to characterize transactions with PBMs as "sales"

because PBMs do not take possession of drugs; therefore, this manufacturer believed that including the rebates in AMP would not be consistent with section 1927 of the Act.

Neither section 1927 of the Act nor the rebate agreement addresses the issue of how to treat rebates that manufacturers pay to PBMs. CMS issued three releases in 1997 that discussed PBMs. Releases 28 and 29 stated that "drug prices to PBMs" had no effect on AMP calculations unless the PBM acted as a wholesaler as defined in the rebate agreement. (CMS did not explain what it meant to act as a wholesaler in the context of PBMs, which do not typically take delivery of and title to drugs.) In release 30, CMS recognized existing confusion relating to the treatment of PBMs and stated that it intended to reexamine the PBM issue and hopefully clarify its position in the future. However, to date, CMS has not done so.

*Treatment of Medicaid Sales*

Another factor contributing to inconsistencies in manufacturers' AMP calculations is the different interpretation of what sales should be included/excluded in the calculations. For example, our recent reviews found that some manufacturers excluded from the calculations a portion of sales to pharmacies that dispense prescription drugs to Medicaid beneficiaries. Two manufacturers subtracted Medicaid sales from their AMP calculations. Removing Medicaid sales from gross sales generally lowered AMP for these manufacturers.

Medicaid does not directly purchase drugs from manufacturers or wholesalers but reimburses pharmacies after the drugs have been dispensed to Medicaid beneficiaries. Because a pharmacy that dispenses drugs to Medicaid beneficiaries likely dispenses drugs to non-Medicaid patients from the same containers of the product, it would be nearly impossible for a manufacturer to specifically identify a sale that would be considered a Medicaid sale. However, two manufacturers estimated Medicaid sales amounts to subtract from the AMP calculations by multiplying the number of units that States reported when billing the manufacturer for rebates by the price the wholesaler paid for the drug.

The two manufacturers justified removing Medicaid sales for different reasons. One manufacturer indicated that because the rebate agreement did not allow a reduction of gross sales by the value of Medicaid rebates paid in calculating AMP, the sales associated with the rebates should also be excluded. The other manufacturer likened Medicaid sales to State Pharmaceutical Assistance Programs, which provide drug coverage to certain qualified individuals. CMS's release 29 provides that sales under these programs should not be considered in AMP, so the manufacturer concluded that Medicaid sales should also not be considered.

Like Medicaid, State Pharmaceutical Assistance Programs do not purchase drugs from manufacturers or wholesalers but reimburse pharmacies for dispensing the drugs and may receive rebates from manufacturers. However, release 29 did not address the question of whether only the rebates paid to the programs should be excluded from AMP calculations (similar to the statutory requirement to exclude Medicaid rebates) or whether the underlying sales associated with the rebates should also be excluded.

We disagree with the reasoning of both manufacturers. The exclusion of Medicaid sales is not addressed in section 1927 of the Act, the rebate agreement, or any of the releases. In addition, retail pharmacies that very often dispense drugs to the Medicaid population would seem to fall squarely within the plain language of the "retail pharmacy class of trade" provision of the AMP definition.

**Using Average Manufacturer Price in Reimbursement Calculations**

Concerns related to AMP calculations take on additional significance given that the DRA has expanded the use of AMP. Prior to the DRA, AMP was primarily used as the fundamental component in determining the amount of Medicaid drug rebates. However, the DRA provides for the use of AMP as a basis for Medicaid reimbursement for the first time. Issues arising from the use of AMP in connection with the 340B drug-pricing program provide useful lessons as CMS (and potentially the States) prepares to use AMP as a basis for Medicaid reimbursement.

The 340B program, established by the Veteran's Health Care Act of 1992, is a drug discount program for certain qualified covered entities (including Public Health Service and other safety-net providers) that serve vulnerable patient populations. Under the 340B program, manufacturers agree to charge participating covered entities prices that are at or below a specified maximum price (known as the ceiling price) for purchases of outpatient drugs (42 U.S.C. § 256b(a)(1)). The ceiling prices are based, in part, on the reported AMP and unit rebate amounts for covered drugs (42 U.S.C. § 256b(a)).

In our review of the 340B program, we found two primary issues that have implications for the use of AMP as the basis of Medicaid reimbursement: the timely submission of AMP data by manufacturers and the accuracy of reported AMP data.

Our review found that manufacturers did not always report AMP in a timely manner or, in some cases, did not report AMP at all.[3] For example, the 340B ceiling price file for the first quarter of 2005 was missing 28 percent of the prices necessary to calculate 340B ceiling prices. For 70 percent of these missing prices, the file did not contain the AMP.

Manufacturers are required to report their drugs' AMPs and, where applicable, the best price within 30 days after a quarter's end so that CMS can calculate the drug's Medicaid unit rebate amount (section 1927(b) of the Act). CMS staff reported that if the data were late, they typically contacted the manufacturers that submitted incomplete data and requested prompt submission. According to CMS, most manufacturers were responsive to these contacts and typically provided the missing data with their next quarter's submission.

While timely submission of AMP data is important to the Medicaid rebate program, it will become even more critical when Medicaid uses AMP data as a basis for reimbursement. Late submissions of AMP data may delay, rather than prevent, State Medicaid agencies' rebate collections. However, late submissions may prevent CMS from calculating accurate Federal upper limit prices and hinder States' ability to accurately reimburse pharmacies.

---

[3]"Deficiencies in the Oversight of the 340B Drug Pricing Program" (OEI-05-02-00072, October 2005).

Our reviews have also found issues related to the accuracy of reported AMP data. CMS's edit of a manufacturer's AMP submission is designed to reject an AMP that is 50 percent higher or lower than the manufacturer's submission for the previous quarter. When the edit detects aberrant AMP values, CMS sends a report to the manufacturer requesting corrected information. While inaccuracies may ultimately be corrected, inaccurate AMP submissions also affect the timeliness of CMS's receipt of the correct AMPs and could affect reimbursement made before the data are corrected.

In our review of States' accountability and control over Medicaid rebate collections, we noted problems with unit rebate amounts of zero that resulted from inaccurate AMPs and the untimely reporting of AMPs.[4] This created accountability problems in some States' administration of their rebate programs and could also create problems for reimbursement based on AMP.

## SUMMARY OF INDUSTRY GROUP PERSPECTIVES

We met with eight groups that represented a cross-section of interested stakeholders, including manufacturers, pharmacies, distributors, and States, and invited the groups to provide written comments for our consideration. Six of the eight groups provided written comments. We have summarized some of their comments and suggestions below and have included their complete written comments in Appendixes A through F. We believe that the industry comments provide CMS with valuable information to use in clarifying requirements related to calculating AMP, using AMP in reimbursement calculations, and implementing provisions of the DRA.

### Calculating Average Manufacturer Price

*Definition of Retail Class of Trade*

Consistent with our own findings, industry groups emphasized the need for clarification of entities included in the retail class of trade for AMP calculations. The manufacturer groups commented that CMS had not fully addressed which classes of trade are to be considered "retail" for purposes of calculating AMP. Release 29 clarified the retail status of some classes of trade but not all. The manufacturer groups pointed out the lack of guidance for classes of trade such as physicians, clinics, and patients (i.e., coupons or other patient discount programs).

While they agreed on the need for clarification, respondents presented different suggestions for addressing this issue. One manufacturer group suggested that the retail class of trade be defined to include only entities that dispense drugs to the general public on a walk-in basis (e.g., retail, independent, and chain pharmacies) and mail-order pharmacies that dispense drugs to patients who do not receive other specialized or home care services from the entity. Another manufacturer group did not recommend a particular definition but encouraged a definition that stipulates the criteria or rationale used to determine whether classes of trade are retail or nonretail.

The pharmacy groups advocated that the retail class of trade be limited to traditional retail outlets such as chain and independent pharmacies. These groups also believed that manufacturer sales

---

[4] "Multistate Review of Medicaid Drug Rebate Programs" (A-06-03-00048, July 6, 2005).

to mail-order and nursing home pharmacies should not be considered retail for the purposes of calculating AMPs.

The decision to include or exclude certain entities has important implications for AMP. The entities in question, i.e., physicians, clinics, and mail-order and nursing home pharmacies, may not all purchase drugs at the same price, so including or excluding sales to these entities may have the effect of decreasing or increasing AMP.

*Treatment of Pharmacy Benefit Manager Rebates*

Also in keeping with our findings, respondents raised issues surrounding the treatment of PBM rebates. One manufacturer group commented that CMS's limited PBM guidance had caused confusion. This group did not want any requirement that obligates manufacturers to gather information from "downstream" entities (e.g., PBM customers). The group indicated that contracts between PBMs and their customers do not have uniform provisions on the sharing of manufacturer rebates, and the group was not sure whether manufacturers could contractually require the information. Additionally, the group noted that it would be difficult to incorporate such information into AMP calculations.

The pharmacy groups and the distributor group all favored excluding PBM rebates from the AMP calculation (i.e., not subtracting rebate payments from the sales dollars) because the rebates are not passed on to the retail pharmacies.

*Treatment of Administrative and Service Fees*

Industry groups also sought clarification of the treatment of administrative and service fees, and respondents raised some specific points for CMS to consider in determining how to treat these fees. One manufacturer group noted that release 14 was the only guidance addressing fees and that it did not provide needed specificity. Release 14 states that administrative fees should be included in AMP if they are paid to an entity whose sales are included in the AMP calculation and if the fees ultimately affect the price realized by the manufacturer.

Another manufacturer group suggested that if CMS were to apply the average sales price criteria to service and administrative fees, it should clarify whether the definition of bona fide service is satisfied in relation to traditional wholesaler functions (e.g., pick, pack, and ship services).[5] In addition, one manufacturer group did not want the decision to include or exclude fees to require a manufacturer to obtain information regarding transactions between downstream entities.

---

[5]The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 established the average sales price as the basis for determining reimbursement amounts for most Medicare Part B drugs. CMS guidance (question and answer 3318 on the CMS Web site at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/) indicates that administrative fees are included in the average sales price if they are paid to an entity whose sales are included in the average sales price calculation and if they ultimately affect the price realized by the manufacturer. Additionally, question and answer 4136 indicates that "bona fide service fees that are paid by a manufacturer to an entity, that represent fair market value for a bona fide service, and that are not passed on" to the entity's clients or customers are not included in average sales price calculations because the fees would not ultimately affect the price realized by the manufacturer. Ongoing OIG audits have shown that manufacturers treat average sales price-related administrative and service fees inconsistently.

The pharmacy groups and the distributor group, however, did not believe that these fees should be used to reduce sales values included in AMP calculations.

Including these fees would generally result in lower AMPs and, therefore, lower rebates and reimbursement (for those drugs with reimbursement based on AMP).

*Lagged Price Concessions and Returned Goods*

The industry groups indicated that the timing of price concessions and returned goods could create inconsistent AMPs from one period to the next, thereby creating problems with using AMP as a basis for reimbursement.

One manufacturer group stated that a methodology should be prescribed to account for late-arriving discount and rebate data. Another manufacturer group did not specifically mention lagged price concessions but commented that AMP should be calculated in such a way that would avoid the need for retroactive adjustments. The group noted that returns should be addressed. Yet another manufacturer group recommended that CMS encourage "smoothing" to accommodate transaction timing.

One pharmacy group and the distributor group recommended that lagged rebates and discounts be smoothed over a rolling 12-month period, similar to the manner in which average sales price is calculated. They also recommended that returned goods not be considered in AMP calculations.

**Using Average Manufacturer Price in Reimbursement Calculations**

One manufacturer group stated that AMP should not be used to set reimbursement rates until a standardized methodology for calculating AMP has been established. The group noted that the use of AMP in setting the Federal upper limits is scheduled to start January 1, 2007, but CMS is not required to issue its regulation until July 1, 2007. Another manufacturer group commented that the regulations should ensure that AMPs used in reimbursement are calculated in a way that avoids the need for restatements and unnecessary quarter-to-quarter volatility. The group also recommended that OIG caution States about potential volatility in AMP that may occur as a result of this report and CMS's expected regulation. A third manufacturer group commented that large-volume purchasers such as large national chain drug stores could affect AMP and result in inadequate reimbursement for independent pharmacies.

The pharmacy groups expressed concern about using AMP, which was created for rebate purposes, as a benchmark for reimbursement.

**Deficit Reduction Act Implementation Issues**

*Frequency of Average Manufacturer Price Reporting*

The manufacturer groups noted that the DRA required monthly AMP reporting but did not change the quarterly rebate-reporting period in the Act. Because of this discrepancy, the groups indicated that it was unclear whether manufacturers would be required to calculate and report:

- a monthly AMP using 1 month's data;

- a monthly AMP using the most recent 3 months' data (e.g., a rolling average methodology);

- a monthly AMP using a methodology different from that used for rebate purposes;

- a quarterly AMP separate from the monthly AMPs; or

- a quarterly AMP that is an average of the monthly AMPs.

*Average Manufacturer Price Restatements*

One manufacturer group wanted to know whether AMP calculations would be considered final when submitted or whether manufacturers would be able, or even required, to restate their AMP calculations when they recognize that a prior AMP calculation was incorrect. Another manufacturer group asked whether AMP resubmissions would be permitted. A third manufacturer group believed that manufacturers should be able to restate quarterly AMPs, but not the monthly AMP.

*Baseline Average Manufacturer Price*

Baseline AMP represents the AMP calculated for the first full quarter a drug is on the open market. It is used to determine whether an additional rebate is owed to the Medicaid program. Essentially, if an AMP rises in value faster than the baseline AMP (after adjusting for inflation) the manufacturer must pay an additional rebate. Pursuant to the DRA, prompt pay discounts should no longer be considered in calculating the current quarter's AMP. Previously, section 1927(k)(1) of the Act required that prompt pay discounts be used to reduce the sales values included in the baseline AMPs. Excluding these discounts could potentially result in an increase in AMPs that exceeds the inflation adjustment, thereby triggering the additional rebate. Two manufacturer groups expressed concern that manufacturers could be penalized if baseline AMPs were not adjusted to conform to the new AMP definition. The groups indicated that manufacturers would pay an unfair amount of additional rebates related to the methodology change unless the baseline AMP is also adjusted.

One manufacturer group recommended that manufacturers be allowed, but not required, to adjust baseline AMPs. The group was concerned that a requirement to adjust baseline AMPs would be impractical for some manufacturers due to data availability and operational burden issues.

Another manufacturer group recommended that CMS work with manufacturers to develop reasonable methodologies to adjust baseline AMPs.

As a related issue, two manufacturer groups commented that any changes in AMP methodology should be made only prospectively and not retrospectively.

## RECOMMENDATIONS

We recommend that the Secretary direct CMS, in promulgating the AMP regulation, to:

- clarify requirements in regard to the definition of retail class of trade and the treatment of PBM rebates and Medicaid sales and

- consider addressing issues raised by industry groups, such as:

    o administrative and service fees,
    o lagged price concessions and returned goods,
    o the frequency of AMP reporting,
    o AMP restatements, and
    o baseline AMP.

We also recommend that the Secretary direct CMS to:

- issue guidance in the near future that specifically addresses the implementation of the AMP-related reimbursement provisions of the DRA and

- encourage States to analyze the relationship between AMP and pharmacy acquisition cost to ensure that the Medicaid program appropriately reimburses pharmacies for estimated acquisition costs.

## CENTERS FOR MEDICARE & MEDICAID SERVICES COMMENTS

In commenting on a draft of this report, CMS stated that it would address each of the recommended areas, as well as the areas raised by industry groups, in its proposed regulation. CMS also stated that it would evaluate the need for additional guidance.

CMS's comments are included as Appendix G.  Attached to those comments were technical comments, which we addressed as appropriate.

# APPENDIXES



BIOTECHNOLOGY
INDUSTRY
ORGANIZATION

March 31, 2006

Marcia Sayer
External Affairs
Office of the Inspector General
330 Independence Ave, SW
5th Floor, Room 5541
Washington, DC 20201

The Biotechnology Industry Organization (BIO) appreciates this opportunity to provide comments to the Department of Health and Human Services Office of Inspector General (OIG) regarding the content of its report to the Secretary and Congress, due June 1, 2006. That report is to contain recommendations regarding the calculation and reporting of Average Manufacturer Price (AMP) under section 1927 of the Social Security Act.

BIO is the largest trade organization to serve and represent the biotechnology industry in the United States and around the globe. BIO represents more than 1,100 biotechnology companies, academic institutions, state biotechnology centers, and related organizations in the United States. BIO members are involved in the research and development of health-care, agricultural, industrial and environmental biotechnology products.

BIO accepted the OIG's invitation to meet on March 15, 2006 to describe our views about the requirements for, and the manner in which, average manufacturer prices are determined. At that meeting, the OIG representatives requested that BIO supplement its discussion in the meeting with a written submission, by March 31, 2006. This letter responds to that request. As we noted in that meeting, the central principle of BIO's comments is that the OIG's recommendations should promote consistency, clarity, and economic fairness in the calculation and reporting of AMP.

Monthly Reporting of AMP

The Deficit Reduction Act (DRA), at section 6001(b)(1), changes the current quarterly reporting timetable for Average Manufacturer Price (AMP) and Best Price (B) to a monthly period. This monthly reporting is meant to facilitate the use of AMP figures to set monthly Federal Upper Payment Limits, or FULs, under

1225 EYE STREET, N.W., SUITE 400
WASHINGTON, D.C. 20005-5958

202-962-9200
FAX 202-962-9201
A-23
http://www.bio.org

DRA section 6001(a) for multiple source drugs. While the DRA did change the AMP and BP reporting timetable, the DRA did not change the statutory definition of "rebate period," i.e. the period for each state rebate claim, contained at 42 U.S.C. § 1396r-8(k)(8), which remains "a calendar quarter or other period specified by the Secretary." Given the intended use of AMPs to set reimbursement rates and the current inconsistency between the statutory reporting and rebate periods, BIO requests that the OIG's recommendations address the following issues:

**1. Monthly calculation of AMP figures.** The OIG recommendations should specify whether or not the new monthly timetable for reporting AMP figures also requires manufacturers to calculate AMP figures on a monthly basis, as opposed to requiring manufacturers to report a quarterly AMP figure on a monthly basis. This clarification is of paramount importance and necessary so that manufacturers can prepare for the 2007 implementation timetable.

**2. The calculation methodology for monthly AMP figures**. If the OIG recommends that the DRA be interpreted to require monthly calculation and reporting of AMP figures, then the OIG recommendations should also address the methodology for calculating AMP on a monthly basis. The use of monthly AMP figures to set reimbursement rates suggests that such figures, like Average Sales Price, should be final when submitted and not subject to manufacturer revisions during the three year restatement period currently permitted by regulation (42 C.F.R. § 447.534(h)(2)(i)). The OIG recommendations should address this issue. In doing so, the OIG recommendation should consider the significant added administrative burden and operational complexity that a requirement to restate monthly AMP figures would impose on manufacturers, CMS, and the States.

If the OIG recommendation is that monthly AMP figures should <u>not</u> be subject to subsequent revision by manufacturers, then the OIG recommendations should also address in specificity the methodology that manufacturers should use to estimate late-arriving data that is used to quantify AMP-eligible discounts and rebates and AMP-ineligible sales, the level of accuracy needed for such calculations, as well as the process for manufacturers to follow should they discover errors in previously submitted figures.[1] Whether the OIG recommends for or against the continued availability of the restatement period, given the prevalence in the industry of quarterly performance periods under discount and rebate contracts, the OIG recommendations also should address how such quarterly discount measurements should be accounted for in a monthly calculation.

---

[1] While the DRA does not direct the OIG to also provide recommendations regarding the calculation of Best Price, should the OIG recommend that AMP and BP figures not be subject to revision, BIO requests that the OIG also recommend a methodology for accounting for late-arriving data in the calculation of Best Price.

**3. The statutory rebate period**. The OIG recommendations should address whether the rebate period should continue to be a quarterly one, and if so, how the quarterly rebate amount will be derived from reported monthly AMP and BP figures.[2] For a quarterly rebate period, a possible solution is to require manufacturers to submit a quarterly weighted average AMP figure with its monthly submission for the third month of the quarter, with the quarterly weighted average AMP being derived from the AMPs reported for each of the months in the quarter and weighted based on AMP-eligible units for each month. Another approach would be to have manufacturers calculate monthly AMPs for the first two months of the quarter, but have the AMP for the third month of a quarter be calculated as a quarterly figure. Either approach would also provide a solution for calculating future base date AMP figures, which the Medicaid statute requires be determined based on the statute's quarterly rebate period, see 42 U.S.C. § 1396r-8(c)(2)(A), as well as for deriving Public Health Service Ceiling Prices, which federal law also requires to be derived from quarterly prices, see 42 U.S.C. § 256b(a)(2).

The OIG recommendations should also address whether manufacturers would be permitted to revise such quarterly AMP figures to reflect late-arriving data relating to AMP-eligible discounts and rebates and AMP-ineligible sales. Even if the OIG were to recommend against the availability of such revisions in relation to the AMP figures reported on a monthly basis and used to set reimbursement rates, the OIG recommendations should separately address the availability of such revisions for the AMP figures used to calculated Medicaid unit rebate amounts, and if the ability to make such revisions remains available, whether such revisions are mandatory. The continued availability of the 3-year restatement period would permit manufacturers to ensure that the AMP figures used to calculate rebate amounts are as accurate as possible and based on actual sales and discount data. However, given the added administrative burden of such revisions to both manufacturers and the States, should the OIG recommend against the availability of restatements for monthly AMP figures and direct the use of estimation methodologies for that reason, the OIG should permit manufacturers also to choose to rely on those monthly AMP figures for purposes of deriving an AMP for the rebate calculation. Manufacturers should be permitted to revise those AMP figures, to reflect late-arriving actual sales data, but not be required to do so.

**4. Effective date for monthly reporting**. The DRA, at section 6001(b)(1), requires CMS to begin its own monthly reporting of AMP figures to the States on July 1, 2006, using "the most recently reported average manufacturer prices." The DRA change to a monthly reporting timetable for manufacturers does not include its own effective date, and therefore appears to be governed by section 6001(g) of the DRA, which provides for an effective date of January 1, 2007

---

[2] BIO notes that any recommendation to change to a rebate period that is shorter than a quarter would require a significant implementation preparation period for manufacturers as well as the States.

where effective dates are not otherwise provided. Given the significance of this effective date to manufacturers, the OIG recommendations should confirm that that the monthly reporting obligation for manufacturers begins with the AMP and BP figures for January 2007.

**5. Use of AMPs for Reimbursement Rates Prior to Issuance of Methodology Guidance.** The DRA, at section 6001(a)(2), requires the use of AMP to set federal upper payment limits for multiple source drugs effective January 1, 2007, but, at section 6001(c)(3), does not require CMS to issue its rule regarding the AMP calculation until July 1, 2007. BIO believes that any AMPs used to set reimbursement rates should be calculated using a standardized methodology that is the result of input from all government and private-sector stakeholders, to ensure that the resulting reimbursement rates are fair and equitable as well as to ensure that patient access is not adversely impacted by variation in manufacturer methodology assumptions. The OIG therefore should recommend that CMS either postpone the use of AMPs to set reimbursement rates until the effective date of its rule regarding the AMP methodology, or that CMS in the short term issue interim guidance that will apply to the AMP calculation until the rule is issued and effective.

<u>Inflation Penalty Rebate Calculation and the Prompt Pay Discount</u>

The DRA, at section 6001(c)(1), directs that customary prompt payment discounts extended to wholesalers no longer be included as a reduction to AMP starting January 2007.[3] The inflation penalty component of the quarterly rebate calculation requires the comparison of an inflation-adjusted AMP for the first full quarter of sales (the base date AMP) with the current quarter's AMP. Where the current quarter AMP exceeds the inflation-adjusted base date AMP, the difference is added to the Medicaid rebate. If customary prompt payment discounts are excluded from AMP only for the current quarter's AMP, and not also for the base date AMP, this comparison will falsely conclude that an inflation penalty is due for that proportion of the increase in the current quarter's AMP caused by the exclusion of the prompt pay discount.

The OIG recommendations should include a proposed methodology for avoiding this result. One approach would be to permit, but not require, manufacturers to recalculate their base date AMP figures to exclude customary prompt payment discounts, and to use those recalculated base date AMP figures for rebate calculations effective in 2007. The OIG should not require such a recalculation because, for certain manufacturers, data availability and the operational burden of such recalculations may make such recalculations impractical. For example, this approach would require many manufacturers to access pricing data that is many years old, stored in legacy information technology systems, and possibly relating to quarters outside of the 10 year document retention period specified in

---

[3] The OIG recommendations should also confirm whether the definition of "wholesaler" in the Medicaid Agreement is the definition that should be used when interpreting this provision.

42 C.F.R. § 447.534(h). This approach also would require manufacturers and CMS to store and track two different base date AMP figures: one for rebate calculations relating to quarters prior to 2007 and one for quarters in 2007 and later years. As the recalculation of base date AMP would serve only to lower rebate liability, should the OIG choose this approach, manufacturers should be permitted to choose whether or not to recalculate their base date AMP figures.[4]

An alternative, and more streamlined, solution would be to revise the calculation methodology for the inflation penalty component of the rebate calculation so as to mathematically offset the impact of excluding prompt pay discounts for AMPs reported for January 2007 and later. One method for doing so would be to direct that the inflation penalty calculation include a standardized, formula-based upward adjustment to the base date AMP. For example, if the OIG were to conclude that the customary prompt payment discount percentage was 2%, then the OIG could recommend that the inflation penalty rebate calculation be adjusted to divide each reported base date AMP by .98, before applying the CPI-U based inflation factor, so as to upwardly adjust that base date AMP so that it no longer reflects customary prompt payment discounts. In this example, if the base date AMP is $98, where it would be $100 without inclusion of the prompt pay discounts, dividing that $98 base date AMP by .98 will result in a revised base date AMP of $100. This formula-based approach would have the advantage of avoiding the calculation and maintenance by CMS and manufacturers of separate base date AMP figures for rebate periods before and after 2007. This approach would also ensure that all manufacturers address this issue in the same manner.

<u>Classes of Trade</u>

The definition of AMP remains "the average price paid to the manufacturer for the drug in the United States for drugs distributed to the retail pharmacy class of trade." 42 U.S.C. § 1396r-8(k)(1)A(). Very little written guidance exists from CMS regarding the definition of the retail pharmacy class of trade. The OIG recommendations should define the retail pharmacy class of trade with specificity. This definition should address particular classes of entities, examples of which are discussed below, but also include the general rule that the OIG recommends be used when evaluating entities not otherwise addressed by OIG or CMS guidance. Such a general rule will provide manufacturers with a crucial baseline for use in evaluating new entity types, and will promote the important goals of consistency, clarity, and economic fairness.

---

[4] If the OIG recommendation is to permit manufacturer recalculation of base date AMPs, the recommendation should also address whether the manufacturer must use the same AMP methodology the manufacturer had in place during the base date quarter. Many manufacturers have revised their AMP methodologies over time to address CMS guidance, and a legacy AMP methodology also may no longer be supported by a manufacturer's information technology. For these reasons, the OIG recommendation should permit manufacturers to use their current AMP methodology to recalculate the base date AMP.

**1. Classes of trade for which guidance is needed.** Current CMS guidance either does address, or does not address with sufficient specificity, the retail or non-retail status of: physicians, clinics, patients (including coupon arrangements for discounts or non-contingent free product), Part D utilization, Specialty Pharmacy, Competitive Acquisition Program or CAP sales, Pharmacy Benefit Manager mail order and retail pharmacy utilization, State Pharmacy Assistance Program (SPAP) and Medicaid program utilization, and health care plan utilization. The OIG recommendations should address each of these entity types, define each such class of trade in a manner specific enough to permit manufacturers to readily determine into which category any entity should be placed, and specify the OIG's rationale for the recommended retail or non-retail status of each class.

**2. Calculation treatment of discounts and units.** The OIG recommendations should specify for each class of trade the treatment of gross sales, discount dollars, net sales, if applicable, and the respective sales units associated with that class of trade. Specifically, the OIG recommendations for each class of trade should specify (1) whether gross sales, net sales, and/or discounts extended to that class of trade should be used to reduce the AMP numerator, and (2) whether the units associated with that class of trade, whether identified through sales or reimbursement transactions, should remain in the AMP denominator. This specificity is necessary to ensure clear guidance regarding treatment of a given class of trade in the AMP numerator (sales dollars) and denominator.

<u>Additional AMP Methodology Issues</u>

In addition to the issues identified above, BIO requests that the OIG recommendations also address the following issues:

**1. Prospective application only.** The OIG recommendations should specify that any clarifications and/or changes in CMS directions regarding the calculation of AMP are to be applied on a prospective basis only. The very nature of the OIG recommendations and CMS' implementation of them suggests that they are changes to existing practice, provided because of the absence of guidance in the past. These changes therefore should be prospective only. Moreover, given the complexity of the DRA changes to the AMP calculation and reporting timetable, and the operational complexity that implementing those changes presents to manufacturers, the OIG recommendations also should specify that CMS implement the DRA changes using a single, prospective implementation date that provides manufacturers with a minimum of six months lead time to make the necessary preparations.

The OIG recommendations should also include a recommendation that any and all CMS guidance in the future specify whether that guidance is to be applied prospectively and or retrospectively. Should the OIG recommend that

monthly AMP and BP figures not be open to revision by manufacturers during the three year regulatory period, and should CMS adopt that approach, it will be even more imperative that any future CMS guidance regarding calculation issues be prospective in application only.

**2. Service and administrative fees.** The OIG recommendations should address the treatment of service and administrative fees paid to entities included in the calculation of AMP. Such guidance does exist as to the calculation of ASP, in the form of two Q&As (numbered 3318 and 4136 at the FAQ link at http://www.cms.hhs.gov/McrPartBDrugAvgSalesPrice/). However, the existing guidance for AMP is limited to that contained in Release to Participating Manufacturers 14, and does not provide needed specificity regarding the circumstances under which such fees may and may not be included in the AMP calculation. If the OIG recommends use of the same criteria in the AMP calculation as CMS has directed be used in the calculation of ASP, the OIG recommendations should clarify whether the definition of "bona fide service" is satisfied in relation to traditional wholesaler functions such as pick, pack, and ship services.

**3. Methodology change review and approval process.** The OIG recommendations should also address a process and timeline for approval of manufacturer-proposed AMP methodology changes. The current CMS process is described by CMS itself as one through which manufacturers submit requests for approval, and as to which CMS provides no response or resolution. The OIG should recommend a process that details the information needed with a submission, the criteria for approval, and a deadline for CMS resolution.

In conclusion, BIO appreciates this opportunity to provide comments to the OIG regarding its recommendations to CMS as to the calculation and reporting of Average Manufacturer Price. We hope our suggestions will help the OIG to identify and provide substantive recommendations that will help manufacturers submit the data needed to calculate appropriate Medicaid reimbursement and rebate amounts for drugs and biologicals. Please contact me at 202-312-9273 if you have any questions regarding our comments. Thank you for your attention to this very important matter.

Respectfully submitted,

Jayson Slotnik
Director, Medicare Reimbursement and
Economic Policy
Biotechnology Industry Organization



April 20, 2006

Office of the Inspector General
Department of Health and Human Services
330 Independence Avenue, SW
Washington, DC

*Re: HHS OIG study of Average Manufacturer Price*

As discussed during our March 16 meeting, GPhA has concerns over the implementation of the Medicaid reform legislation. These concerns are in the areas of reimbursement methodology and program administration. We recognize that there is a need for the Medicaid Program to realize savings through the continued and expanded use of generic prescription medicines. To that end, we need to work together to ensure that all entities in the supply chain retain incentives for the continued manufacturing and dispensing of generic medicines.

Methodology for Calculating AMP:

In order to understand GPhA's concerns regarding the importance of a clearly defined methodology for calculating Average Manufacturer Price (AMP), it is important to understand the typical chain of distribution for the products of generic pharmaceutical manufacturers. Generic pharmaceutical manufacturers currently distribute their products directly to warehousing chain pharmacies, mail order pharmacies, various managed care entities, wholesalers and distributors (who themselves resell to non-warehousing chain pharmacies, independent pharmacies, hospitals, clinics, etc.). For reference, warehousing chain pharmacies include, but are not limited to, Brooks / Eckerd, CVS, Rite Aid, Walgreens, and Wal*Mart; mail order pharmacies include Caremark, Medco, and Express Scripts; and wholesalers include AmerisourceBergen, Cardinal, and McKesson. (Note: Some large chains like Walgreens and CVS also have mail order divisions.)

The legislation contemplates not only the publication of manufacturer AMP data, but also changes to the methodology for calculating. As we understand it, the AMP is intended to account for all recorded sales and discounts within the reported period; however, as you are undoubtedly aware, fluctuating order patterns and erratic timing of transactions result

in unpredictable fluctuations in AMP from month to month, or quarter to quarter based on customer mix, discount payments, returns and other normal business transactions. Moreover, given the ambiguity in the current regulatory guidance for calculating AMP, different manufacturers may very well be employing different assumptions either on their own or in conjunction with regulatory counsel to calculate their respective AMPs, which results in a variability across AMPs that prevents a true apples-to-apples comparison of pricing data across manufacturers.

It is also important to note that a manufacturer's AMP is actually a weighted average price, heavily influenced by the purchasing power of large national chain drug stores, and mass merchants. The prices paid by these volume purchasers generally are not available to others in the pharmacy community, including the independent pharmacies that portions of the Medicaid population rely upon.[1,2] In areas where this is true, this inequity in pricing creates the potential for access to be a significant issue in the implementation of the proposed Medicaid reform. Whether sales to such volume purchasers should be included in AMP is just one of the questions raised by this legislation.

Another question concerns the legislation's current approach of using the lowest AMP reported for multi-source products upon which to base reimbursement. This model does not provide a means to measure:

1. De minimis sales volume associated with a given manufacturer's AMP,
2. A manufacturer's decision to sell a product to a single entity, regardless of volume, at a discounted price which would not represent a widely available price,
3. Discounts available to large volume purchasers based on the purchase of bulk package sizes; thereby creating a potential for reimbursement to be based on pricing that is not widely available, and in fact a statistical outlier,
4. The widespread availability to all pharmacy purchasers of certain manufacturers products,
5. The continued availability of a product for which an AMP is generated, and
6. Substantial wholesaler/distributor markup fees that apply to a majority of 30,000+ independent retailers/small chains (this subset represents almost 60% of U.S. retail pharmacy) that primarily purchase through wholesalers.

Whatever the answers to these questions, we ask only that your recommendations include a clear and concise methodology for calculating AMP that leaves no room for doubt as to the methodology that should be employed by each manufacturer in calculating AMP.

Program Administration:

In addition to the issues identified around the AMP calculation methodology, there are numerous procedural issues raised and many questions still surrounding the

---

[1] 2005 NCPA- Pfizer Digest
[2] 2005 NACDS Chain Pharmacy Industry Profile

administration of the program.  As an initial matter, despite the inherent ambiguity in the current AMP calculation methodology, the legislation appears to require CMS to make public the most recent manufacturer AMP data on or about July 1, 2006.  Not only does this raise the variability issues, set forth above, but publishing this data not just to the states, but to the public at large, raises serious concerns about the evisceration of the private sector reimbursement model by displaying data known to be flawed.  It is one thing to demand transparency under the guise of government accountability and provide this information to the states; it is quite another to eliminate certain pro-competitive advantages that one manufacturer may have over another in the public sector by publishing a baseline price as to each product of every manufacturer.  CMS has the responsibility to publish a price that accurately reflects the market, nothing more.

Moreover, as outlined above, fluctuations and timing within the generic market make AMP reporting erratic and unpredictable.  This currently occurs with the existing quarterly reporting requirements, and would only be exacerbated with monthly reporting. Products with low unit volume will have a disproportionate influence on the lowest AMP than potential higher AMP products with higher unit volume.  This again reflects concerns over a system not designed around a widely available price, as the current FUL. AMPs could result from pricing available only to a certain minority of providers, yet become the reimbursement standard for the total pharmacy community.  "Smoothing" will also have a huge impact on AMPs due to the large dollar value of chargebacks processed for wholesaler sales for generic products.  CMS has been silent on smoothing in the quarterly AMPs, although CMS does require smoothing for ASP pricing for Medicare Part B.  Generic manufacturers should be encouraged to smooth data in the AMP calculation for reimbursement to accommodate transaction timing.

GPhA and its member companies appreciate the opportunity to share our concerns and thoughts with the OIG and stand ready to provide additional assistance and input as this process moves forward.

Sincerely,

Kathleen D. Jaeger
President and CEO

Attachment:  Questions to Consider

**Additional questions for consideration by OIG**

Once more clarity exists around the AMP calculation methodology, we would like to reserve the opportunity to discuss issues identified, which may include, but are not limited to the following:

1) Will manufacturers be required to submit a monthly AMP for FUL and quarterly AMP for rebates?

2) Will the government provide class of trades for all reimbursable entities in the US, so that these codes are not subjectively assigned by manufacturers? This will ensure consistency across manufacturers when calculating AMPs.

3) Will AMP for FUL be calculated at the 9 or 11 digit NDC? The price would be more accurate if calculated at the 9-digit level.

4) Explain the exclusion of <u>wholesaler</u> cash discounts? Does this apply to all customers?

5) Explain the separate reporting requirement for cash discounts

6) How does a manufacturer report a negative AMP calculation for reimbursement? <u>Comment</u>: For the quarterly AMP for Medicaid rebates, CMS requires that the last quarterly positive AMP be reported.

7) Please explain how AMP and BP are to be calculated for brands/authorized generics? Will the AG give data to the brand for the brand's submission? If so, at what level of detail? Or will CMS calculate based on the Brand and AG's submission?

8) Similar to current AMPs/BPs, will the supplied monthly/quarterly AMP information for each manufacturer be kept confidential, not subject to the FOIA? It could have a negative effect on manufacturers if individual AMPs were posted.

9) Would a manufacturer be permitted to resubmit a monthly AMP for a prior submission?

10) Will there be an incentive to purchase generics via dispensing fees? Will the fees be a flat dollar amount or based on a percentage of AMP?



Healthcare Distribution
Management Association

# RECOMMENDATIONS FOR REGULATIONS DEFINING AMP

## EXCLUDE PROMPT PAY DISCOUNTS

RECOMMENDATION

**The regulations should affirmatively state that customary prompt pay discounts are not to be deducted when AMP is calculated.**

RATIONALE

The Deficit Reduction Act of 2005 (DRA) amended the statutory definition of Medicaid Average Manufacturer Price (AMP) in Social Security Act § 1927(k)(1) by deleting the requirement for "deducting customary prompt pay discounts" when AMP is calculated. HDMA understands Congress took this action because prompt pay discounts are a common practice widely accepted across many industries and should be viewed as a financial transaction representing the time value of money and risk mitigation, not as a component of the cost of the product.

Regulations affirmatively addressing the proper handling of prompt pay discounts are needed to ensure that manufacturers are alert to the statutory change in the definition of AMP that Congress chose to make by deletion. Such an alert is particularly important since the requirement to deduct prompt pay discounts from AMP has been in place since the Medicaid drug rebate program began in 1991.

The DRA includes a safeguard provision designed to ensure that the elimination of the deduction of customary prompt pay discounts from AMP is not abused in that it requires manufacturers to report on "customary prompt pay discounts extended to wholesalers" when they report AMP. This safeguard, coupled with the industry's longstanding use of prompt pay discounts, removes the need for implementing regulations that further define customary prompt pay discounts.

# EXCLUDE WHOLESALER SERVICE FEES

RECOMMENDATION

**The regulations should affirmatively state that fair-market-value (FMV) fees paid to pharmaceutical distributors for distribution services that are actually provided by the distributor are not to be deducted when AMP is calculated so long as there is no implicit or explicit agreement between the manufacturer and the distributor requiring the fees to be passed on, in whole or in part, to the distributors' customers.**

**Service fees, derived from manufacturer – distributor negotiations, are structured in a variety of ways. The preamble to the AMP regulation should discuss factors that manufacturers and distributors should consider in determining FMV.**

**The preamble also should recognize that manufacturers may treat service fees as a reduction from total revenues for purposes of financial accounting even though the AMP rule instructs them not to deduct the fees when they calculate AMP.**

RATIONALE

Both Finance Committee Chairman Grassley and Energy and Commerce Committee Chairman Barton stated in separate floor statements that, "It was not the intent of the conferees to suggest that by dropping bona fide service fees from the final agreement [Deficit Reduction Act of 2005] that those service fees should be included in the calculation of the Medicaid Average Manufacturer Price (AMP) reimbursement methodology as established in the pharmacy reimbursement provisions of the conference agreement."

CMS has provided guidance to the industry as a whole in the form of a Frequently Asked Question (FAQ) and directly to HDMA and Specialty Biotech and Distributors Association (SBDA) in a Dec. 9, 2004 letter, indicating that bona fide, FMV services fees should not be deducted when the Average Sales Price (ASP) is calculated. The stated rationale for the ASP instruct applies equally in the AMP context. Specifically, so long as service fees are not passed on to the distributors' customers, they "would not ultimately affect the price realized by the manufacturer."

In spite of the FAQ, manufacturers have not handled service fees consistently in their ASP calculations. Some manufacturers have elected to deduct service fees when ASP is calculated despite the FAQ instruction. These manufacturers have expressed concerns about how to determine whether fees are FMV. To avoid this same confusion in the AMP context, it is imperative for the AMP regulation itself or for the preamble to that rule to discuss how manufacturers can establish that service fees, including those set based on a percentage of associated drug costs and other services, are FMV.

Some manufactures have expressed concerns about the fraud and abuse risks associated with accounting for service fees differently for financial accounting and ASP purposes. They note that GAAP-accounting principals mandate treating fees as reductions to revenue when the fees are paid to a distributor that takes title to products and argue that failure to treat the fees as a price concession for ASP purposes creates an unacceptable disconnect between ASP reporting and financial reporting. They also note that accounting rules permit service fees to be treated as an expense on the income statement when a third-party logistics company is retained to distribute drugs without taking title to the products. As a result, these manufacturers argue that they must contract with such services rather than use traditional wholesalers to safely avoid having to deduct distribution costs from ASP, even if doing so is more costly or less efficient.

It is inappropriate and inequitable for the costs for very similar services, such as the distribution of drugs to providers, to be treated differently under a price reporting rule. There is already precedent for a similar disconnect between accounting and price reporting with respect to AMP. The IRS has ruled that Medicaid drug rebates should be treated as reductions to revenue even though the Rebate Agreement prohibits manufacturers from deducting the rebates when AMP is determined (Revenue Ruling 2005-28, published in Internal Revenue Bulletin 2005-19 (May 9, 2005)). OIG and CMS should anticipate such accounting concerns in the AMP context and address them either in the regulation or the rule's preamble, by stating that bona fide, FMV service fees are not to be deducted when AMP is calculated regardless of whether those fees are paid to wholesalers or distributors that take title or to third-party logistics companies that do not, or incurred internally by a manufacturer that self-distributes.

# MINIMIZE PERIOD-TO-PERIOD VARIABILITY IN AMP

RECOMMENDATION

**The regulation should specify a smoothing methodology for accounting for all price concessions in the AMP calculation in a manner like that specified for use with lagged discounts under the ASP rule. The methodology should be well-defined enough to ensure consistent treatment by all manufacturers.**

RATIONALE

The current instructions for calculating AMP are silent on whether chargebacks, rebates and other lagged discounts should be accounted for on an as-paid or an as-earned basis. As a result, different manufacturers have adopted different approaches. Some use the as-paid methodology for both chargebacks and rebates. Others use as-paid for chargebacks because the amount of chargebacks paid during a period is readily available within a few days after the period closes, but use an accrual approach for rebates. Still others accrue for both chargebacks and rebates.

Many large purchasers often buy pharmaceuticals in bulk and then sell from inventory for many months. The buying pattern can result in periods when a manufacturer's sales outstrip price concessions accounted for on an as-paid basis leading to an artificially high AMP, followed by one or more periods when discounts outstrip sales, leading to an artificially low AMP. Monthly reporting of AMP likely will exacerbate this problem. If a manufacturer elects to address this problem by accounting for lagged discounts on an accrual basis, it must periodically true-up AMP and Best Price reports to address accrual errors. Such true-ups can tax the capabilities of the rebate processing teams at the state Medicaid programs as well as the price reporting teams at the manufacturers. Moreover, the true-up approach, while it does allow for the eventual payment of the correct amount of Medicaid rebates, is inconsistent with the use of AMP prospectively as the reimbursement metric that will set the Federal Upper Limit (FUL) for multiple source drugs and, possibly, by some state Medicaid programs as a

reimbursement metric in formulas that determine the payment amounts that retail pharmacies will receive for drugs dispensed to Medicaid patients.

Because upfront discounts on large purchases meant to be sold out of inventory over an extended period of time can also distort pricing available to retail pharmacies in the market when they are factored into the AMP calculation on an as-paid basis, OIG/CMS should implement a well-defined smoothing methodology for handling all price concessions that must be considered in AMP that operates like the methodology specified for quantifying lagged discounts under the ASP rule. If OIG/CMS are not inclined to include upfront discounts in a smoothing methodology for AMP, it is imperative, particularly for multiple source products, that chargebacks be singled out for lagged treatment on a routine basis along with rebates despite the availability of as-paid chargeback data for a period within days after the period close because such chargebacks can often relate back to sales several periods prior.

# EXCLUDE RETURN GOODS

RECOMMENDATION

**The regulation should instruct manufacturers to disregard return goods when they calculate AMP.**

RATIONALE

Returns to a manufacturer during a period of slow sales can actually result in a negative AMP. This, of course, is inconsistent with the use of AMP as a reimbursement metric, even for the limited purpose of setting FULs. There are two approaches to address this issue. First, as is the current CMS practice for rebate purposes, the government could revert to the last positive AMP for reimbursement purposes. Alternatively, returns could be disregarded in the calculation of AMP as they are in the ASP calculation. Given that comparisons between ASP and AMP are one of the pricing safeguards built into the ASP system, we favor the adoption of parallel rules for treating various parameters where appropriate. This would seem to be one of those situations.

# PROVIDE FOR THE CALCULATION OF AMP AT 11-DIGIT LEVEL

RECOMMENDATION

**The regulation should stipulate that manufacturers must calculate and report AMP at the 11-digit NDC level.**

RATIONALE

Currently, in accordance with the terms of the Medicaid Rebate Agreement, manufacturers calculate and report AMP as a weighted average for a given drug, strength and dosage form across all package sizes. In other words AMP is tied to the first 9-digits of the National Drug Code (NDC) number and ignores the last two digits which represent package size.

The weighted average AMP reporting process can become problematic when the weighted average value is overshadowed by sales of one package that is significantly larger than other packages of the same drug name/strength/dosage form. The difficulty with applying the weighted average approach across all products is that physicians often dictate the package size a pharmacy must dispense. For example, a physician may prescribe a 15-gm tube of cream to treat a small rash. The price per gram for the larger 60-gm tube is typically less. Applying the 9-digit NDC price may cause an AMP-based reimbursement rate to be too low to fairly reimburse the pharmacy for the 15-gm tube.

Similarly, averaging the typically higher costs of products used extensively in long-term care (LTC) facilities (due to the added cost of packaging as unit doses) with the cost of the same product packaged for retail settings, artificially inflates the AMP of the product and simultaneously depresses the AMP for the LTC setting.

The definition of AMP in Social Security Act § 1927(k)(1), as amended by DRA, does *not* require AMP to be calculated as a weighted average across all package sizes. This approach was adopted by CMS when it

drafted the Rebate Agreement used in lieu of regulations to implement the Medicaid drug rebate program in 1991. Accordingly, CMS has the authority to change course and require 11-digit NDC-specific reporting of AMP, just like it has required 11-digit NDC-reporting of ASP. It is important to do so since States will be permitted to incorporate AMP into reimbursement formulas that will be applied to drugs dispensed to Medicaid patients by retail pharmacy.

# EXCLUDE REBATES PAID TO PBMs ON RETAIL NETWORK SALES

RECOMMENDATION

**The regulation should stipulate that rebates that do not reduce the effective price, such as those paid to PBMs on retail network sales, are not to be taken into consideration when AMP is calculated regardless of whether those rebates are linked to sales to Part D PDPs or MA-PD plans.**

RATIONALE

Brand manufacturers typically pay rebates to pharmacy benefit managers (PBMs) for prescriptions dispensed to enrollees at retail pharmacies that participate in the PBM's retail network. The rebate payments are made to PBMs, even though the PBM does not actually purchase or dispense drugs to which the rebates are attached. Those monies are not shared with the retailers and should not be treated as a price concession that reduces AMP now that AMP will be used to set FUL and may become an element in the formulas that some state Medicaid programs use to reimburse retail pharmacies.

CMS has never issued clear guidance on how manufacturers should treat rebates paid to PBMs for retail network sales for purposes of AMP and manufacturers have adopted differing approaches.

To encourage manufacturer discounting under Part D, the Medicare Prescription Drug, Improvement and Modernization Act of 2003 excluded rebates paid to Part D PDPs and MA-PDs, or the PBMs that operate these plans, from the calculation of Best Price. The MMA did not, however, address how Part D rebates should be handled for purposes of AMP.

CMS has historically excluded price concessions carved out of the Best Price formula from consideration when AMP is calculated and it should take a consistent approach with respect to the Part D Best Price carve out. Doing so would be consistent with the need to carve PBM retail network rebates out of AMP when those rebates are on non-Part D sales.

March 16, 2005



NATIONAL ASSOCIATION OF
CHAIN DRUG STORES

2006 MAR 22 AM 8:39

OFFICE OF INSPECTOR
GENERAL

March 21, 2006

The Honorable Daniel Levinson
Inspector General
U.S. Department of Health and Human Services
Wilbur J. Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201

**Subject: Chain Pharmacy Recommendations Relating to Definition of Average
Manufacturers Price (AMP)**

Dear Inspector General Levinson:

The purpose of this letter is to supplement the comments that representatives of the
National Association of Chain Drug Stores (NACDS) and the chain drug industry provided
to staff of the HHS Office of the Inspector General (OIG) at our March 15, 2006 meeting
regarding the calculation of the average manufacturers price (AMP). As you know, OIG is
directed by the Deficit Reduction Act (DRA) of 2005 (P.L. 109-171) to make
recommendations to the Centers for Medicare and Medicaid Services (CMS) by June 1,
2006 regarding the factors and methods that should be included in the calculation of the
AMP.

NACDS represents more than 200 companies that operate more than 35,000 community
retail pharmacies. Collectively, our membership base dispenses more than 70 percent of
all retail prescriptions in the United States. Our membership will be significantly impacted
by the use of AMP as a reimbursement benchmark because it could result in significant
underpayments for prescription medications if not accurately redefined.

In general, "AMP is the average price paid to manufacturers by wholesalers for drugs
distributed to the retail pharmacy class of trade. AMP was created specifically in OBRA
90 to approximate the amounts that states were paying retail pharmacies for prescription
drugs." In theory, the calculation of AMP is supposed to provide manufacturers with a
credible value on which to base the rebates that they pay to states.

However, starting in January 2007, AMP will be used for the first time to set generic
reimbursement rates for pharmacies. In addition, AMP values for single source and
multiple source drugs will be made public and provided to the states starting this July.
Therefore, accurate and consistent calculation of AMP is critical. AMPs must be
calculated such that they are reflective of the prices at which retail community pharmacies
purchase medications, or pharmacies will be underpaid for these medications.

413 North Lee Street

P.O. Box 1417-D49

Alexandria, Virginia

22313-1480

(703) 549-3001

Fax (703) 836-4869

www.nacds.org

Although AMP has been calculated by manufacturers for over 15 years, clear direction and guidance has never been given to manufacturers by CMS. This has resulted in wide inconsistencies in these calculations. In addition, the definition of AMP has not kept pace with changes in the pharmaceutical marketplace since 1990. For example, when AMP was originally defined, there were few PBMs in the marketplace. However, rebates, discounts and price concessions given by manufacturers to PBMs and health plans have become an important component of today's pharmaceutical marketplace. In this letter, we reiterate the key points made at our meeting about the factors that we believe should be considered in the calculation of AMP.

- **Include Only Manufacturers' Sales to Wholesalers for Traditional Retail Pharmacies**: Only manufacturers' sales to wholesalers for products that are ultimately sold to traditional community retail pharmacies – traditional chain, independent, mass merchandise pharmacies, and supermarket pharmacies – should be included in the calculation of AMP. In our view, these are the only entities that should be considered the "retail class of trade." Past audit reports done by the OIG appear to agree with that interpretation of "retail class of trade." We also note that in CMS' final rule implementing the Medicare Part D prescription drug benefit program, the agency defines "retail pharmacy" as "any licensed pharmacy that is not a mail order pharmacy from which Part D enrollees could purchase a covered Part D drug without being required to receive medical services from a provider or institution affiliated with that pharmacy." Thus, it would be consistent with CMS' current Part D definition of "retail pharmacy" for the agency to indicate that only sales to true retail pharmacy establishments represent the "retail class of trade" for the purpose of calculating the AMP.

  Given this suggested definition, only incentive-based discounts, rebates or other price concessions that are ultimately received by retail pharmacies should be deducted by the manufacturer from total retail pharmacy sales in calculating the AMP. Manufacturers should deduct chargebacks only to the extent that they know that these were provided for products sold by wholesalers to retail pharmacies. It is fair and reasonable that only amounts paid by manufacturers that are actually passed through to retail pharmacies should be deducted from manufacturers' sales to retail pharmacies when calculating the AMP.

- **Omit Mail Order and Nursing Home Sales in AMP Calculation**: Including manufacturers' sales of pharmaceuticals to wholesalers that are eventually sold to mail order pharmacies and nursing home pharmacies is inappropriate, in our view, even though CMS has instructed manufacturers to include sales to these purchasers. That is because these purchasers receive discounts, rebates and price concessions that are not available to traditional retail pharmacies, such as market share movement and formulary placement discounts. These discounts are either retained by the PBM, or passed through in whole or part by the PBM to the payer. They are not made available to retail pharmacies. Thus, including these sales or rebates would lower the AMP for traditional retail pharmacies below their acquisition costs.

- **Omit Rebates paid by Manufacturers to PBMs**: When AMP was originally created in OBRA 90, PBMs had little prominence in the pharmaceutical marketplace. Now, most prescriptions are paid for through a third party entity – such as a PBM – that receives rebates and discounts from pharmaceutical companies.

National Association of Chain Drug Stores (NACDS)
March 21, 2006
Page 2

Manufacturers should not deduct these amounts from their sales to retail pharmacies when calculating the AMP. That is because retail pharmacies do not receive these price concessions. Including PBMs' sales and discounts unfairly lowers the AMP, making it unreflective of sales to retail pharmacies. Medicaid also loses millions of dollars each year in manufacturer rebate revenues by including these non-retail sales in the definition of AMP.

- **Omit Customary Prompt Pay Cash Discounts Extended to Wholesalers**: As defined by law (and as amended by the Deficit Reduction Act of 2005), the AMP should be calculated without regard to prompt pay cash discounts extended by manufacturers to wholesalers. Cash discounts are provided to some retail pharmacies based on financing terms negotiated between the wholesaler and the pharmacy. These are not performance-based discounts. That is, a pharmacy may receive a small discount from the wholesalers or manufacturers for paying for the drugs in a shorter period of time than other purchasers. In addition, because not all pharmacies have the distribution infrastructure (i.e. warehousing and logistical capabilities) and cash flow to capitalize on these more favorable terms, the inclusion of prompt pay cash discounts in the calculation of AMP would be inappropriate. Given that the current rebate agreement defines wholesalers as "any entity (including a pharmacy or chain of pharmacies) to which the labeler sells covered outpatient drugs...", prompt pay discounts extended to chain warehouses that are also licensed as wholesalers should also be excluded from the AMP calculation.

- **Omit Payments made by Manufacturers for Bona Fide Service Fees**: Payments made by manufacturers to entities such as wholesalers and pharmacies for inventory management agreements or distribution service agreements should not be deducted from a manufacturer's retail pharmacy sales when calculating AMP. These payments reduce manufacturers' revenues from the sale of their drugs, but they do not lower the pharmacies' costs of purchasing prescription drugs. Moreover, not all pharmacies are able to participate in these agreements, so deducting them when calculating AMP would be unfair to many retail pharmacies. CMS has already determined that such fees should be omitted from the calculation of the "average sales price," the basis of payment for Medicare Part B drugs. Specifically, CMS has indicated that bona fide service fees are "expenses that are for an itemized service actually performed by an entity on behalf of the manufacturer, which would have been paid by the manufacturer at the same rate had these services been performed by other entities." OIG should recommend that a similar approach be adopted for AMP.

- **Omit Manufacturer Payments for Pharmaceutical Returns**: Each year, billions of dollars in expired and recalled pharmaceuticals must be returned by pharmacies and wholesalers to manufacturers. Manufacturers issue credit to wholesalers and pharmacies for these goods. Unfortunately, the level of credit provided is insufficient to cover the products' replacement value, the pharmacy's inventory cost of carrying the product to expiration, the reverse logistics cost of returning the expired and recalled product, as well as the administrative expense incurred by wholesalers and pharmacies to manage this process. A manufacturer's payment to a wholesaler or a pharmacy for expired and recalled merchandise as well as the fees for the associated services should be excluded from the manufacturer's AMP calculation.

If these payments and service fees are included in the AMP calculation, community pharmacies will actually incur not only the deficiency in the level of manufacturer's credit for the product and service, but also a reduction in reimbursement going forward for the associated products. Payments for expired and recalled pharmaceuticals and the associated services should not be interpreted as discounts or rebates and should be omitted from the AMP.

- **Omit Manufacturer Payments for Patient Care Programs**: Many pharmacies receive payments from manufacturers for performing certain patient care services, such as patient education and compliance and persistency programs. These payments should be omitted from the AMP calculation. These services provide valuable benefits to patients and overall the health care system because they improve patients' understanding of their medications and enhance patient compliance. Although they reduce the revenue that manufacturers receive on the sales of these drugs, they do not reduce the retail pharmacy's cost of purchasing the drugs. If these payments are included in AMP, pharmacies would lose incentive to offer these programs because it would reduce the value of the AMP, thus potentially reducing reimbursement. This could make it appear that the pharmacy's acquisition cost for the drug is lower than it actually is. Moreover, not all pharmacies participate in these programs so it would be unfair to many pharmacies to include these payments in the AMP.

Because of the wide inconsistencies in the way that manufacturers currently calculate AMP, we urge OIG to recommend that CMS not make the AMP data public this July until the agency publishes a final rule that defines AMP. We believe that a great disservice will be done to states, payers, consumers, and especially pharmacies by releasing data that have wide variability in their meaning, and are likely unreflective of the approximate prices paid by retail pharmacies for prescription medications. Only when the marketplace completely understands the methodology that is used to calculate AMP, as well as its relationship to the prices paid for pharmaceuticals by retail pharmacies, should the data be made public.

We also urge OIG to make several recommendations to CMS on how the agency applies the new Federal Upper Limit (FUL) for generic drugs which, beginning in January 2007, will be based on 250% of the lowest published AMP for a generic. In order to encourage continued generic drug dispensing in Medicaid, it is critical that the FUL be based on prices for products that are currently widely available in the marketplace. For example, we believe that only a generic product that is AB-rated in the FDA Orange Book, and is widely and nationally available to pharmacies for purchase in consistent supplies, should be used as the reference product to set the FUL.

In addition, the AMP used as the reference product to set the FUL should be weighted by sales across all the package sizes of the particular dosage form and strength of the drug. The sales included in this weighted calculation should be those to retail pharmacies only. This will assure that the AMP is weighted according to the package size most frequently purchased by pharmacies. As we discussed at our meeting, we also believe that OIG should recommend that CMS adopt a process that would allow manufacturers, when calculating AMP for a quarter, to "smooth" over a rolling 12-month period of time any discounts or rebates that are passed through to retail pharmacies. This will help reduce the potential for any significant fluctuations in AMP from quarter to quarter, and maintain some consistency in reimbursement levels. Such a process was developed by CMS for manufacturers' calculation of the Average Selling Price (ASP), which is used as the basis for Medicare Part B drug reimbursement.

Without this process, it is very possible that upper limits for generics could be based on AMPs that are simply not reflective of the current market prices for drugs, further reducing generic dispensing incentives.

Finally, to assure that generic drug dispensing in Medicaid can be maintained or even increased, we urge that the FUL amount be the minimum payment that states make for a particular dosage form and strength of a generic drug. We believe that State Maximum Allowable Cost (MAC) programs for generics should be discouraged because further reductions in state payment for generics can ultimately result in reduced generic dispensing. States should also be advised of the need to consider increases in generic drug dispensing fees for 2007 to assure that pharmacies have appropriate incentives to continue to dispense lower-cost generic drugs.

We appreciate the opportunity to meet with you and provide our views on these important issues. Please contact us if we can provide any additional insight on these specific recommendations. We look forward to reviewing OIG's recommendation and to discussing these matters further. Thank you.

Sincerely,

Lee L. Verstandig
Senior Vice President, Governmental Affairs



**NCPA**

NATIONAL COMMUNITY
PHARMACISTS ASSOCIATION

To:        OIG, HHS

From:      Charlie Sewell, Vice President, Government Affairs

Date:      March 16, 2006

Re:        NCPA Comments on AMP provisions of Deficit Reduction Act of
           2005

The National Community Pharmacists Association (NCPA) appreciates your continued interest in community pharmacy and for taking the time to meet today to discuss the issues, challenges and problems arising from implementation of the Deficit Reduction Act of 2005 ("the Act"). Most specifically, we are providing you with this comment memorandum regarding implementation of the Act and how its problematic use of a nebulously defined benchmark could have significant, harmful effects on Medicaid recipients, community pharmacies, local economies and states.

**NCPA's Request:**
In sum, NCPA requests that: 1) you use your authority to ensure that the definition of AMP covers all of pharmacists' acquisition costs; 2) the study of pharmacy reimbursement called for in the Act include an analysis of state-determined dispensing fees to ensure that pharmacy operating costs are adequately covered under state reimbursement formulas; and 3) HHS promulgate the rules on implementing that Act no later than September 1, 2006 to provide adequate time for community pharmacies to prepare for the implementation of these major changes in the Medicaid program.[1]

**The Troubling Result From Using AMP:**
NCPA represents the nation's community pharmacists, including the owners of more than 24,000 pharmacies that dispense nearly half of the nation's retail prescription medicines. Because many Medicaid recipients depend on their local community pharmacies to provide them with needed medication, NCPA is compelled to alert you to language in the Act that negatively affects the costs savings that could otherwise benefit drug purchasers, States and the federal government.

As you know, the Act greatly reduces pharmacy reimbursement on generic drugs for Medicaid prescription drug recipients. The law ties reimbursement to a price index known as the Average Manufacturers Price (AMP). Leading generic drug manufacturers estimate that, as currently defined by the Manufacturers Rebate Agreement, **AMP will, on average, only reflect 50% of actual ingredient**

---

[1] The new Medicaid law requires that CMS disclose, starting July of 2006, the AMP pricing data to state Medicaid programs and the public. Unfortunately, the Secretary is not required to implement a regulation defining AMP until July 2007, one year after the AMP data are made public.

100 Daingerfield Road
Alexandria, VA 22314-2888
(703) 683-8200 PHONE
(703) 683-3619 FAX

**cost for generic drugs**. Considering the unknown reliability of AMP and insufficient dispensing fees, the planned Federal Upper Limit (FUL) as contained in **the Act will effectively gut the reimbursement for generic drugs** under the Medicaid program. In stark contrast, brand name drugs are unaffected, and will be the only drugs on which pharmacists will be able to recoup their costs.

The result of promoting the use of brand name drugs over generics would be very costly. For every one percent of market share filled with a brand name drug that could be filled with a generic, Medicaid – and thus needy beneficiaries and taxpayers – will lose hundreds of millions of dollars. The lowest generic fill rate among states failing to promote generic drugs is 42%. If AMP is not correctly defined, and if dispensing fees are not increased, the potential for savings from generic drug utilization will be lost. An inadequate reimbursement level and concomitant decrease in use of generics will drive many pharmacies from the Medicaid program. Access in rural areas of the country could be particularly harmed. This resulting lack of access to quality prescription care will drive state Medicaid expenses higher as more patients require emergency room or nursing home care.

This outline of resulting harm is realistic, yet difficult to quantify. Estimating the real financial impact on retail pharmacies is extremely difficult because CMS has not publicly released AMP or issued clear guidance on how manufacturers should calculate AMP.

Based on how AMP is currently reported by manufacturers, it is clear that harmful consequences would follow from using the current AMP. NCPA respectfully urges you to use the wide statutory authority granted HHS regarding the definition of AMP to ensure that it covers 100% of pharmacists' acquisition costs. Doing so would ensure adequate reimbursements for generic drugs, thus promoting savings to the government and the health care system.

**Problems With Using AMP as the Bench Mark to Determine Reimbursement Amounts and Rates:**
In theory, AMP data approximates the prices at which retail pharmacies purchase medications from manufacturers via wholesalers.[2] For various reasons that are discussed below, however, AMP data is not at all likely to reflect the prices at which retail pharmacies purchase drugs. Because AMP was created, and is used, as a benchmark for rebate payments paid by manufacturers to state Medicaid programs, there is an inherent incentive on the part of the manufacturer to report the lowest price possible – a price that does not reflect true market costs for community pharmacy.

This fundamental problem in creating, using and monitoring the use of AMP is manifest in the following structural flaws:

- Currently, each manufacturer defines AMP differently, thus creating great inconsistencies in what is reported to CMS. In a February 2005 study (GAO-05-102), the Government Accounting Office reported that these inconsistencies are documented in the four Office of Inspector General (OIG) reports on audits of manufacturer-reported prices since the programs inception in 1991 (the reports were issued in 1992, 1995, 1997 and 2001). The GAO reported that the OIG reviews found "considerable variation in the methods that manufacturers use to determine AMP and some methods could have reduced the rebates state Medicaid programs received." (GAO-05-102

---

[2] AMP is defined by statute as the average price paid to a manufacturer for the drug by wholesalers for drugs distributed to the real pharmacy class of trade. *See* 42 U.S.C. §1396r-8(k)(1). There is no definition in the statute for "retail pharmacy class of trade."

at p.5). Furthermore, "in four reports issued from 1992 to 2001, OIG stated that its review efforts were hampered by unclear CMS guidance on how manufacturers were to determine AMP, by a lack of manufacturer documentation, or by both." (*Id.*, p.4).

- The GAO study found that **clear guidelines on how AMP is to be calculated have not been issued by CMS, nor has CMS resolved price determination problems.** "OIG found problems with manufacturers' price determination methods and reported prices. However, CMS has not followed up with manufacturers to make sure that the identified problems with prices and price determination methods have been resolved" (*Id.*).

  o Examples of some manufacturers taking advantage of the opportunity to alter AMP include:
    - Sales to mail order pharmacies and nursing homes when calculating AMP. Because mail order and nursing homes pay lower prices than retail pharmacies, including them in the calculation lowers the AMP below the price a traditional retail pharmacy pays.

    - Rebates paid to health plans and Pharmacy Benefit Managers (PBMs) when calculating AMP. These discounts are typically extended to bulk purchasers such as chain pharmacies, major wholesalers, and mail-order facilities that buy directly from the manufacturer. These discounts are simply not available to independent pharmacies, further widening the gap between AMP and market price.

    - These price concessions, however, are not available to retail pharmacies and therefore do not lower the pharmacies' costs of purchasing prescription drugs. Including PBMs' sales and discounts may lower the AMP to a level that does not reflect the cost to a retail pharmacy.

    - As the manufacturer must pay rebates based on AMP, the manufacturer then has an incentive to report the lowest numbers possible.

  o Wholesaler costs and margins will not be covered by AMP. Federal law also makes few provisions for state determined dispensing fees which will become critical in ensuring that the professional services of pharmacists remain available to Medicaid patients.

  o State MAC lists currently are lower than the FUL – significantly lower for some products and in some states. If states follow their current practice, often states will reimburse below the 250%. A study is needed to evaluate what currently happens and to find out how much below 250% of AMP states are reimbursing.

## Conclusion:

Since all reimbursement cuts will come from generic prescription drugs, the AMP must be defined to cover acquisition costs or a perverse incentive will be created to dispense brands that could end up costing the program much more. To avoid the drastic consequences employing AMP in a situation for which it was not designed, NCPA respectfully requests that you recommend that: 1) HHS use its authority to ensure that the definition of AMP covers all of pharmacists' acquisition costs; 2) the study of pharmacy reimbursement called for in the Act include an analysis of state-determined dispensing fees to ensure that pharmacy operating costs are adequately covered under state reimbursement formulas; and 3) HHS promulgate the rules on implementing that Act no later than September 1, 2006 to provide adequate time for community pharmacies to prepare for the implementation of the major changes in the Medicaid program.



April 7, 2006


**VIA HAND DELIVERY AND E-MAIL**


Daniel R. Levinson, Inspector General
Office of Inspector General
Department of Health and Human Services
Cohen Building
330 Independence Avenue, S.W.
Washington, D.C. 20201


Re:  **Average Manufacturer Price Recommendations**

Dear Mr. Levinson:

 The Pharmaceutical Research and Manufacturers of America (PhRMA) is pleased to provide the following information on the determination of Average Manufacturer Price (AMP) in response to the Office of Inspector General's (OIG's) request for input on these issues.  PhRMA is a voluntary nonprofit organization representing the country's leading research-based pharmaceutical and biotechnology companies, which are devoted to inventing medicines that allow patients to lead longer, healthier, and more productive lives.  PhRMA companies are leading the way in the search for cures.

 PhRMA has a long-standing interest in working with the government to develop clear and carefully-considered rules on the calculation of Medicaid rebates and the reimbursement of pharmaceutical products.  Given this interest, and the Government Accountability Office's (GAO's) finding that clearer guidance is needed regarding AMP calculations,[1] we were pleased that Congress recently charged the OIG with reviewing "the requirements for, and manner in which" AMP is determined and submitting any recommendations it considers appropriate "for changes in such requirements or manner" to the Centers for Medicare and Medicaid Services (CMS) and Congress.[2]  We believe this mandate provides an important vehicle for helping to improve the clarity and

---

[1] GAO, Medicaid Drug Rebate Program, Inadequate Oversight Raises Concerns about Rebates Paid to States, GAO-05-102, 4 (Feb. 2005).

[2] Deficit Reduction Act of 2005, P.L. 109-171, § 6001(c)(3) (2006).  Following its receipt of the OIG's recommendations, CMS must issue regulations clarifying AMP calculations, taking into consideration the OIG's recommendations, by July 1, 2007.

*Pharmaceutical Research and Manufacturers of America*

consistency of AMP calculations, which will now, in addition to affecting Medicaid rebates, affect pharmacies' Medicaid reimbursement rates for certain pharmaceuticals.

We appreciate the recent opportunity OIG provided to PhRMA to meet and discuss these issues, and we have focused our written comments on several of the issues raised by OIG during that meeting. Specifically, our comments address the following topics: the function of AMP, defining the "retail pharmacy class of trade," the ability to capture transactions between downstream entities in manufacturers' AMP calculations, the timing and application of changes in AMP, the issues associated with using AMP as a reimbursement metric, and the frequency of AMP reporting. These comments are preceded by general principles that PhRMA hopes the OIG will consider as it develops recommendations concerning the methodologies and manner in which AMP is calculated.

- As a general matter, AMP calculations should result in a calculated price that represents the amount realized by the manufacturer for product sold and distributed to wholesalers in the relevant period for purchasers who are in the retail pharmacy class of trade.

- Guidance concerning the calculation of AMP should be formalized in regulations that give stakeholders adequate opportunity for notice and comment.

- CMS should apply its regulations prospectively and give manufacturers ample time to operationalize systems, policies, and procedures to support the new AMP calculation.

- CMS should issue regulations to ensure that AMPs that now will be used in reimbursement formulas are calculated in a way that avoids: (1) the need for retroactive restatements; (2) zero or negative amounts; and (3) unnecessary quarter-to-quarter volatility, which needlessly creates instability for providers who submit reimbursement claims.

- Any procedures developed by CMS should recognize that there may be instances that call for restatements of AMP notwithstanding efforts to ensure the accuracy of reported data.

- Because the DRA changes the definition of AMP, CMS should develop a mechanism to conform baseline AMPs to the revised statutory definition of AMP for purposes of the additional rebate.

\*　　\*　　\*

2

## A.    Retail Pharmacy Class of Trade

AMP is defined by statute as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade."[3] As Congress recognized in the Deficit Reduction Act of 2005 (the DRA) when it directed the OIG to develop recommendations, and CMS to issue regulations concerning AMP, there is a need for clear and consistent guidance concerning the definition and calculation of AMP. This need for clarity is particularly critical given the use of AMP to establish Medicaid drug rebates. Moreover, it will take on even greater significance because AMP also will be used to establish upper payment limits for State Medicaid prescription drug payments beginning in 2007. Notably, the statute does not define AMP as a metric that approximates pharmacy acquisition costs. As discussed above, AMP is defined as the "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade."[4] The statute does not define AMP as retail pharmacy acquisition costs. Moreover, Congress further demonstrated its understanding that AMP does not directly measure pharmacies' acquisition costs when it chose to apply a 2.50 multiplier to establish FULs for multiple source drug products.

CMS has issued guidance previously regarding the definition of AMP in the Medicaid Rebate Agreement, certain Medicaid Rebate Releases, and proposed rules, but it has not defined the term "retail pharmacy class of trade" or provided a comprehensive listing of which entities fall inside and outside the retail pharmacy class. The language in the Rebate Agreement bearing on this issue provides that:

> [AMP] means . . . the average unit price paid to the Manufacturer for the drug in the States by wholesalers for drugs distributed to the retail pharmacy class of trade (excluding direct sales to hospitals, health maintenance organizations and to wholesalers where the drug is relabeled under that distributor's national drug code number). Federal Supply Schedule prices are not included in the calculation of AMP.[5]

In the preamble to proposed (but never finalized) regulations published in 1995, CMS similarly stated that:

> [S]ales that a manufacturer makes to other than the retail class of trade must be excluded [from AMP]. Thus, sales where the buyer relabels or repackages the drug with another NDC number and sales through wholesalers where the manufacturer pays a chargeback for sales to an

---

[3]    42 U.S.C. § 1396r-8(k)(1). Under the DRA section 6001, customary prompt pay discounts extended to wholesalers will be excluded from AMP calculations by 2007.

[4]    Id.

[5]    Medicaid Rebate Agreement, § I(a), *available at*, http://www.cms.hhs.gov/MedicaidDrugRebateProgram/downloads/rebateagreement.pdf.

3

excluded buyer, such as a hospital, would not be considered sales to the retail class of trade.

We would also exclude from this definition direct sales to hospitals, health maintenance organizations and to distributors where the drug is relabeled under that distributor's NDC number because these entities are not considered the retail pharmacy class of trade. We would also exclude Federal Supply Schedule (FSS) prices from the calculations of AMP since the statute does not include FSS and FSS does not represent a retail level of trade.[6]

Finally, in Medicaid Rebate Release 29 (1997), CMS listed certain categories of sales as either included in or excluded from AMP. Specifically, the release provided that: (1) AMP includes mail order and retail pharmacy sales, "nursing home primary/contract pharmacy sales," and "sales to other manufacturers who act as wholesalers and do not repackage/relabel under the purchaser's NDC"[7]; (2) AMP excludes direct sales to hospitals, HMO sales, Public Health Service (Section 340B) covered entity sales, "state-funded only-pharmacy assistance programs," "VA/DoD excluded sales," Federal Supply Schedule sales, and "sales to other manufacturers who repackage/relabel under the purchaser's NDC"; and (3) sales to wholesalers are included in AMP "except for sales to wholesalers which can be identified with adequate documentation as being subsequently sold to any of the excluded sales categories."[8] Although Release 29 clarified some issues, it did not address a variety of entities and arrangements that could affect the calculation of AMP. Moreover, Release 29 is likely outdated given the continuously evolving nature and functions of various entities in the pharmaceutical distribution chain.

For example, CMS has not specified whether other specific categories of sales are included in or excluded from AMP. Some of the customers not addressed in Release 29 include, for example, physician groups, clinics other than Section 340B covered entities, and patients (i.e., there is no guidance on whether patient coupons or other patient discount programs affect AMP calculations).[9] There has also been a lack of clear guidance regarding whether rebates to PBMs or payors (including Medicare Part D plans) should be excluded from AMP calculations, and (if so) whether manufacturers should simply exclude the rebates themselves from AMP calculations or should remove from the AMP numerator and denominator the underlying sales to wholesalers to which the rebates are attributed.

---

[6]    60 Fed. Reg. 48442, 48462 (Sept. 19, 1995).

[7]    The Rebate Agreement defines a "wholesaler" as "any entity (including a pharmacy or chain of pharmacies) to which the [manufacturer] sells the Covered Outpatient Drug, but that does not repackage or relabel the Covered Outpatient Drug." Rebate Agreement, § I(ee).

[8]    Rebate Release No. 11 (1994) also states that "sales of hemophilic drugs to home health care providers must be included in the calculation of AMP," indicating that home health care providers would be considered part of the retail pharmacy class of trade. (Emphasis omitted.)

[9]    CMS has issued guidance on this topic in the Best Price context.

4

As a result of the unaddressed questions regarding the "retail pharmacy class of trade," the GAO found that manufacturers made different assumptions about which entities were considered within the class.[10] Consequently, to reduce manufacturers' uncertainties and increase the consistency of AMP calculations, it will be important for the OIG to make strong recommendations regarding the clarification of these definitional issues.

In an evolving marketplace, terms such as "wholesaler" and "retail" may be interpreted in different ways by different companies and entities. Entities are more appropriately categorized for purposes of defining AMP by the actual functions they perform rather than by the names by which they generally are known at any given time. Thus, PhRMA believes that an optimum approach is to use function-based analysis that recognizes that the function of an entity in the distribution chain may govern whether particular transactions should be included in the calculation of AMP. We suggest the following function-based definitions for the key AMP terms: "wholesaler" and "retail class of trade."

  i. **Wholesaler** shall mean those entities that purchase covered outpatient prescription drugs as defined in Section 1927(k) directly from the manufacturer, or its authorized agent, and that take legal title to the prescription drug product.

  ii. **Retail Class of Trade** (a) shall mean, subject to subsection (b), those entities or such subdivisions, departments or lines of business that:

   1. dispense covered outpatient drugs to patients, who are members of the general public on a walk-in basis, pursuant to a prescription, including for example, retail, independent, and chain pharmacy;

   2. dispense covered outpatient drugs to patients through the mail (or other common carrier) pursuant to a prescription and the patient does not receive other specialized or home care services in addition to the dispensed drug;

   and (b) shall not include such entities or such subdivisions, departments or lines of business that:

   1. only dispense covered outpatient drugs to inpatients of the entity (e.g., inpatient hospitals);

---

[10]    GAO, Medicaid Drug Rebate Program: Inadequate Oversight Raises Concern, at 16.

2. administer the drug "incident to" a physician or other licensed prescriber's services' (<u>e.g.</u>, physician offices);

3. dispense only to a defined and exclusive group of patients who have access to dispensing services (<u>e.g.</u>, closed pharmacy, staff model HMO, or correctional facility);

4. are federal, state, or local government purchasers and those purchasing under the federal supply schedule (<u>e.g.</u>, VA);

5. are exempt from best price (<u>e.g.</u>, 340B entity, SPAP, Part D Plans);

6. are other wholesalers or distributors that do not dispense to patients;

7. negotiate or arrange for pricing terms for third parties but that do not take possession of the drug product (<u>e.g.</u>, GPO);

8. repackage or relabel under the entity's own NDC; or

9. are entities to which sales below 10% of AMP are considered to be nominal sales under Section 1927(c)(1)(D).

All parenthetical examples are for illustrative purposes and manufacturers may document that sales to such an entity should be included or excluded in the retail class of trade based on its function in a manner that differs from the illustrative example. Two areas where it would be helpful for the OIG to provide recommendations concern the application of these functional standards to long-term care facilities, PBMs, and other entities that reimburse for drugs but do not take title or possession of the drug product.

**B.** <u>**Taking Into Account Transactions Between Downstream Entities in AMP Calculations**</u>

In PhRMA's recent meeting with the OIG, the OIG expressed interest in obtaining additional information on the pharmaceutical distribution chain and the flow of payments within the pharmaceutical system. The OIG also indicated that it was interested in this information on the pharmaceutical supply chain and payment system partly in order to gain an understanding of whether manufacturer payments were passed through by their recipients to other parties. In addition, the OIG asked whether it would be feasible for manufacturers to require contractually that recipients of

6

payments inform the manufacturer about whether the payments had been passed through to others.

As noted at the meeting, PhRMA does not obtain information on member companies' pricing practices due to antitrust concerns, and information on pricing and payment arrangements between many of the participants in the pharmaceutical system is closely held and generally unavailable to manufacturers in any case. However, we have included in the appendix a brief general overview of the pharmaceutical distribution chain and payment system, based on information from publicly available reports.[11] In addition, we address the question raised in the meeting about the feasibility of requiring contractual reporting of downstream payments.

In past guidance, CMS has sometimes suggested that whether a certain manufacturer payment should be taken into account in the manufacturer's pricing calculations may depend on whether the payment is passed through by its recipient to another party.[12] In recent Average Sales Price (ASP) guidance on service fees paid to buyers, CMS stated that "[b]ona fide service fees that are paid by a manufacturer to an entity, that represent fair market value for a bona fide service, and that are not passed on in whole or in part to a client or customer of an entity" should be excluded from ASP because "these fees would not ultimately affect the price realized by the manufacturer."[13] However, the ASP analysis may not adequately capture the fluid nature of certain transactions with and among downstream entities or the role of different entities in the distribution chain. Accordingly, PhRMA believes that OIG and CMS should clarify that there is no automatic requirement that manufacturers affirmatively obtain information concerning transactions between downstream entities.[14] We believe that such a requirement would create serious problems and urge the OIG not to recommend this approach. Manufacturers have no authority to demand that payment recipients disclose to the manufacturer whether they have shared the payment in question with their own customers or clients, and there is no guarantee that payment recipients would agree voluntarily to such disclosures. The payment recipient might reject such disclosure provisions due to, for example, concerns about its ability to

---

[11]     Our discussion is based exclusively on publicly available sources cited in the appendix. Principal among the sources are (1) Federal Trade Commission, Pharmacy Benefit Managers: Ownership of Mail Order Pharmacies, Aug. 2005 (FTC report); (2) Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain, report prepared for The Kaiser Family Foundation by The Health Strategies Consultancy LLC, March 2005 (Follow the Pill); (3) Navigating the Pharmacy Benefits Marketplace, report prepared for the California HealthCare Foundation by Mercer Human Resource Consulting, Jan. 2003 (Navigating the Pharmacy Benefits Marketplace); (4) Study of Pharmaceutical Benefit Management, report by PricewaterhouseCoopers LLP for the Health Care Financing Administration, June 2001 (PricewaterhouseCoopers report); and (5) Department of Health and Human Services, Report to the President: Prescription Drug Coverage, Spending, Utilization and Prices, April 2000 (HHS report).

[12]     CMS alluded to pass-through issues in its rebate guidance on PBMs (which has caused interpretive difficulties), stating in part that "where the effect on the manufacturer for using the PBM is to adjust actual drug prices at the wholesale or retail level of trade, such adjustments need to be recognized in best price calculations." Medicaid Rebate Release No. 29 (1997).

[13]     CMS Frequently Asked Question ID 4136 (last updated Feb. 14, 2006).

[14]     At the same time, OIG and CMS should recognize the need for clear guidance concerning these transactions and their role (if any) in AMP calculations.

A58

preserve the confidentiality of this competitively sensitive information once it was routinely disclosed to manufacturers; concerns about the administrative burdens associated with such reporting obligations; or concerns about the potential liability risks associated with furnishing manufacturers with information that would be used in the manufacturer's AMP calculations, and that could thus result in incorrect rebate payments and Medicaid reimbursement rates if the information turned out to be inaccurate in some respect. Consequently, manufacturers simply might be unsuccessful in negotiating contractual provisions requiring disclosure of pass-through information, or they could experience prolonged delays in negotiating contracts important to their ability to sell products or to acquire needed services.

Moreover, even if manufacturers could negotiate and enforce pass-through reporting provisions, the resulting information could be difficult to incorporate into a manufacturer's systems for calculating and reporting AMP. As discussed in the appendix, for example, PBMs' contracts with their clients do not have uniform provisions on the sharing of manufacturer rebates. To report whether the rebates paid by a manufacturer for a specific quarter were passed through, the PBM might need to determine the clients to which those rebates were attributable and separately identify pass-through and non-pass-through rebates. In turn, the manufacturer could not rely on a standard protocol specifying that (say) PBM rebates are taken into account in AMP calculations; instead, each AMP-reporting period, manufacturer personnel would need to review each PBMs' disclosure report and make case-by-case decisions about the appropriate treatment of PBM rebates in the AMP calculation. These kinds of frequent manual interventions in the AMP-calculation process could substantially increase the complexity of these calculations and heighten the risk of error, thus making it difficult for manufacturers to provide CMS with accurate AMP data on a timely basis. Similarly, delayed pass-through reports from payment recipients could complicate AMP calculations and cause overly burdensome restatements in previously reported AMP figures.

Given the problems with requiring that manufacturers contract with customers to obtain information on pass-through issues and then incorporate that information into their AMP calculations, we urge the OIG to recommend that CMS not adopt such an approach.

### C.     Other Issues

During PhRMA's meeting with the OIG on March 16th, PhRMA raised a number of issues concerning implementation of the AMP provisions in the DRA and changes to the definition and methodology used to calculate AMP. PhRMA's written comments and recommendations concerning several of these issues are set forth below.

8

## 1.    Conforming Baseline AMPs to the New AMP Definition

The "additional rebate" for innovator drugs equals the current-period AMP minus the inflation-adjusted baseline AMP (usually the AMP from the first full quarter after launch).[15] Because the DRA changes the definition of AMP, it raises the question of what mechanism should be used to conform baseline AMPs (as of the quarter when the AMP definition changes to exclude prompt pay discounts) to the revised statutory definition of AMP.  The OIG may wish to recommend that CMS work with companies to develop reasonable methodologies to make this correction.[16]

## 2.    Prospective Application of Clarification of AMP Guidance

The OIG should recommend that CMS issue regulations and guidance that make only prospective changes in AMP calculations.  This recommendation would be consistent with the DRA, which calls for regulations that clarify "the requirements for, and manner in which, average manufacturer prices are determined," not were determined in the past, and would recognize GAO's finding that manufacturers have historically had to rely on reasonable assumptions in certain areas due to the absence of clear guidance.[17]  Prospective application of changes to AMP calculations would also avoid the difficulties and disruptions associated with industry-wide retrospective recalculations of past period AMPs.

## 3.    Timing Issues Associated With Changes in AMP

The DRA contains a number of AMP-related provisions that take effect (or have deadlines) at different dates, which could result in a series of sequential changes to AMP calculations unless CMS makes an effort to synchronize the changes.[18]

Recognizing that manufacturers need sufficient lead time to change their systems and collect any additional data that may become relevant to AMP calculations, OIG should issue a recommendation that CMS provide adequate phase-in periods for any changes in AMP.  The OIG also should recommend that CMS issue proposed and final AMP regulations as promptly as possible and seek to avoid a series of sequential changes in AMP calculations; frequent changes in AMPs due to a series of regulatory

---

[15]    See 42 U.S.C. § 1396r-8(c)(2).

[16]    We note that any changes in the existing requirements for calculating AMP that CMS adopts in its regulations on AMP calculations could raise similar questions regarding the baseline AMP.

[17]    DRA § 6001(c)(3).  (Emphasis added.)

[18]    Some of the relevant dates for DRA AMP provisions are: June 1, 2006 (deadline for OIG recommendations regarding the requirements for and manner in which AMP is determined); July 1, 2006 (CMS must provide AMP data on a website accessible to the public); January 1, 2007 or earlier (AMP definition changes to exclude customary prompt pay discounts extended to wholesalers); January 1, 2007 (DRA section 6003 takes effect, which modifies the AMP definition "[i]n the case of a manufacturer that approves, allows, or otherwise permits any drug of the manufacturer to be sold under a new drug application approved under section 505(c) of the Federal Food, Drug, and Cosmetic Act"); and July 1, 2007 (deadline for CMS to issue regulations on AMP).

9

changes could heighten instability for providers that receive AMP-based payments for multiple source drugs, confuse the public (which will soon have access to AMP data), and require repeated changes in manufacturers' data collection and reporting systems. Similarly, the OIG may wish to caution manufacturers that changing their AMP reporting systems in response to the OIG recommendations could exacerbate these problems, as the final AMP regulations issued by CMS could differ from the OIG recommendations, and require that manufacturers adopt a different set of changes in AMP calculations.

### 4. Issues Associated With Using AMP as a Reimbursement Metric

Effective January 1, 2007, the DRA bases the Medicaid federal upper limit for multiple source drugs on AMP. Any recommendations or regulations should ensure that AMPs that are used in reimbursement formulas can be calculated in a way that avoids: (1) the need for retroactive restatements; (2) zero or negative amounts;[19] and (3) unnecessary quarter-to-quarter volatility, which needlessly creates instability for providers who submit reimbursement claims. This could raise issues regarding AMP similar to issues that have been raised in the context of ASP (the drug reimbursement metric generally used under Medicare Part B).[20] Notwithstanding efforts to ensure the accuracy of reported data, there may be instances that call for restatements of AMP. This raises a dilemma given AMP's new role as a reimbursement metric, because the restatement could occur after a state has set the AMP-based reimbursement rates for a particular period. The OIG may want to formulate recommendations on a method for resolving this dilemma.

Moreover, the OIG also may wish to caution the states about the potential volatility associated with using AMPs that may change substantially due to sequential changes that will occur as the OIG issues recommendations in June 2006, and CMS issues a regulation by July 2007, concerning the new definition and clarification of AMP.[21]

### 5. AMP Reporting Frequency Issues

Section 6001 of the DRA appears to amend SSA § 1927(b)(3)(A)(i) to call for monthly reporting of AMP and Best Price.[22] However, section 6003 then strikes section

---

[19] Zero or negative amounts should not be an issue under existing CMS guidance, which provides that if a zero or negative AMP occurs in a given quarter, the manufacturer should report the last calculated AMP with a value greater than zero. Medicaid Rebate Release No. 38 (1998).

[20] As in the ASP context, returns should also be addressed.

[21] The DRA requires the Secretary to make available to the states the AMPs for single source and multiple source drugs beginning in July 1, 2007. These AMPs may be substantially different from AMPs calculated after January 1, 2006 because of the newly promulgated definition of AMP which now directs manufacturers to exclude prompt pay discounts to wholesalers. Moreover, AMPs may change as a result of OIG's recommendations (due in June 2006) and CMS regulations (due July 1, 2007).

[22] Section 6001(b)(1)(A) amends Social Security Act § 1927(b)(3)(A)(i) to state that manufacturers with rebate agreements shall report AMP and Best Price to the Secretary "not later than 30 days after the last day of each month of a rebate period under the agreement . . . ." (Emphasis added.)

1927(b)(3)(A)(i) and replaces it with new language that refers to AMP and Best Price being reported "not later than 30 days after the last day of each rebate period."[23] Thus, it appears that the law did not effectively change the frequency of manufacturers' reporting obligations. In the event that the DRA were to be interpreted to call for monthly reporting of AMP and Best Price, a number of issues would arise, and it may be helpful for OIG to develop recommendations on these points should they become relevant. OIG should recommend how quarterly rebates should be calculated and should recommend against basing rebates on weighted averages of monthly AMPs. In addition, OIG should recommend that restatements of quarterly AMPs continue to be permitted and that any monthly AMPs (should the statute ultimately be interpreted to require such calculations) not be restated.

*   *   *

PhRMA hopes that these comments will be helpful to the OIG as it formulates its recommendations to CMS and the Congress regarding AMP reporting and looks forward to providing additional input. We appreciate the time taken by OIG staff to meet with us and consider our comments, and the substantial effort your office is making to develop recommendations that can lead to clearer ground rules for AMP reporting and an improved system. Please do not hesitate to contact us with any questions or requests for additional information.

Sincerely,

Maya J. Bermingham
Assistant General Counsel

Ann Leopold Kaplan
Assistant General Counsel

---

[23]    DRA § 6003(a)(1).

11

## Appendix

## <u>Overview of the Pharmaceutical Payment System [24]</u>

While there is variation in the way that prescription drugs are distributed, the payment and pricing system is much more complex than the distribution system, and continually is evolving. Partly this increased complexity is because payment and pricing arrangements involve additional parties that generally do not play a role in the physical distribution of pharmaceuticals: in particular, PBMs and payors. As summarized in one report, "while the flow of products through the pharmaceutical chain is relatively straightforward, the flow of money involves a wider range of players and complex financial relationships."[25] The discussion below begins with a general summary of the payment arrangements between the key entities involved in the distribution chain — manufacturers, wholesalers, and pharmacies —and then briefly describes some of the other participants in the payment system and the roles they play.

As noted earlier, manufacturers most commonly sell to wholesalers that resell to pharmacies. Manufacturers' list prices to wholesalers are known as wholesale acquisition cost (WAC).[26] Wholesalers typically purchase at a discount off of WAC[27]; examples of discounts for branded products include prompt pay discounts, volume discounts, and "short-dated" product discounts (where the wholesaler assumes the risk that the product will expire before it can be resold).[28] In recent years, the major wholesalers have sought to move to a "fee-for-service" model in which they negotiate fees with manufacturers for activities such as distribution and inventory management.[29]

Pharmacies that purchase from wholesalers pay an amount negotiated with the wholesaler. According to one report, pharmacies typically pay wholesalers WAC plus some negotiated percentage.[30] In some cases, pharmacies or other "end-user" customers that purchase through wholesalers may negotiate rebate agreements with manufacturers, or they may negotiate a contracted price with the manufacturer. When

---

[24]     As noted earlier, this appendix provides a brief general overview of the pharmaceutical distribution chain and payment system based on information in publicly available reports. Particularly given the complexity of the payment system, there may be arrangements or practices not captured in these reports.

[25]     Navigating the Pharmacy Benefits Marketplace at 18.

[26]     As defined in the Medicare Modernization Act, WAC represents "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price . . . as reported in wholesale price guides or other publications of drug and biological pricing data." Social Security Act §1847A(c)(6)(B).

[27]     Follow the Pill at 18.

[28]     Id.

[29]     See, e.g., R. David Yost, New Economics of the Pharmaceutical Supply Chain, 62 Am. J. Health-System Pharm. 525 (March 2005).

[30]     Follow the Pill at 18.

wholesalers sell to customers that have a contract price with a manufacturer, they charge the contract price and then bill the manufacturer for a "chargeback"; the chargeback equals the differential between WAC and the contract price.[31]

Smaller pharmacies also may use group purchasing organizations (GPOs) in some cases to negotiate prices with wholesalers or manufacturers.[32] GPOs are entities that negotiate discounted prices on behalf of their members (which primarily are hospitals and other healthcare providers) from manufacturers and distributors of pharmaceuticals and other healthcare products. Pharmaceutical manufacturers and other vendors pay administrative fees to GPOs, which (at least in the case of six GPOs that were studied by the OIG) distribute a portion of their administrative fee revenues to their members.[33]

PBMs play a number of roles in the pharmaceutical payment system. Normally PBMs are not directly involved in the product supply chain, since they do not take physical possession or control of pharmaceuticals as part of their core pharmacy benefit management functions.[34] However, many PBMs own and operate mail order pharmacies and (in their capacity as mail order pharmacies) buy drugs from wholesalers or manufacturers and dispense them to patients.[35]

PBM clients can generally be described as "payors." That is, a PBM's clients usually are entities that provide prescription drug insurance to their enrollees or members, such as self-insured employers, insurers, and HMOs and other managed care organizations.[36] The specific services a PBM performs will vary depending on its contract with particular clients, but PBM functions generally include forming pharmacy networks and negotiating discounted reimbursement rates with network pharmacies; developing and administering formularies and related features of the plan design (e.g., formulary tiering structures, utilization management tools such as prior authorization); negotiating rebates with manufacturers; and processing claims.[37]

Payments that PBMs negotiate with manufacturers of brand-name drugs include rebates, and administrative fees that compensate the PBM for formulary-related administrative activities.[38] The effect of manufacturer rebates to PBMs on

---

[31]     Id. at 19.

[32]     Navigating the Pharmacy Benefits Marketplace at 25; Follow the Pill at 19-20.

[33]     See HHS OIG, Review of Revenue From Vendors at Three Group Purchasing Organization and Their Members, A-05-3-00074, Jan. 2005 (the GPOs studied collected $1.8 billion in administrative fee revenue during the audit period and distributed $898 million to members); HHS OIG, Review of Revenue From Vendors at Three Additional Group Purchasing Organizations and Their Members, A-05-04-00073, May 2005 (GPOs studied collected $513 million in administrative fee revenue during the audit period and distributed $217 million to members).

[34]     Follow the Pill at 14-15; FTC report at 7.

[35]     Follow the Pill at 14-15; FTC report at 5-6.

[36]     FTC report at v; PricewaterhouseCoopers report at 17. In some cases, these entities can be purchasers of drugs as well as payors; for example, some "staff model" HMOs operate on-site pharmacies at their facilities.

[37]     See, e.g., PricewaterhouseCoopers report at 50-58.

[38]     See, e.g., FTC report at 50-55. In some instances manufacturers also may pay PBMs fees for compliance, therapeutic interchange, and other programs related to particular drugs. Id. at 55. In addition to entering into

pharmaceutical prices has been described as follows: "This rebate does not affect the price paid by a wholesaler to a manufacturer for the drug, the price paid by a retail pharmacy to the wholesaler, or the price paid by the PBM to the pharmacy. It is a separate transaction between the PBM and the manufacturer and thus affects the total amount spent by the PBM. To the extent that a portion of the rebate is passed along, the insurer, employer, or beneficiary may realize a part of these savings."[39]

Both the FTC's recent study on PBMs and an earlier study by PricewaterhouseCoopers reported that PBMs commonly pass through a share of manufacturer rebates, but not administrative fees, to their clients.[40] In addition, both studies indicated that the share of rebates passed through to a PBM's clients varies considerably from contract to contract.[41] For example, the FTC examined the retention rates for all pharmaceutical manufacturer payments (including non-pass-through administrative fees) on 11 PBM contracts, and found that in 2003 the PBMs' retention rates on these contracts ranged from 25% to 91% (i.e., pass-through rates ranged from 75% to 9%).[42] The PricewaterhouseCoopers study reported that the percentage of rebates PBMs share with their clients can range from zero to 100%.[43]

The FTC also noted that the percentage of manufacturer rebates that a PBM passes through to a client cannot be viewed in isolation, because clients make payments to PBMs (e.g., administrative fees for claims processing and other services, and reimbursement for the drugs dispensed to plan beneficiaries) and a client could negotiate lower payments in exchange for receiving a lower percentage of manufacturer rebates. Thus, "PBMs could adjust any of a number of terms (e.g., dispensing fees, discounts off of ingredient costs) to make the contract more attractive to plan sponsors" and "in this way manufacturer payments to PBMs could be passed on to plan sponsor clients through a complex array of adjustments to contract provisions relating, for example, to the services that would be provided by the PBM and the prices and fees that would be paid by plan sponsor clients."[44]

---

agreements with PBMs providing for rebates and administrative fees, manufacturers may enter into similar agreements with insurers or other health plan sponsors that manage their own drug benefits, as well as with public programs that provide drug coverage.

[39]     HHS report at 104.

[40]     PricewaterhouseCoopers report at 9, 16, 52; FTC report at 59.

[41]     The FTC found that PBMs and their clients have agreements with three different types of rebate sharing models. In addition to contracting for a certain percentage of manufacturer rebates, PBM clients may also negotiate arrangements in which they receive a specific dollar amount per brand-name drug prescription from the PBM rather than receiving a share of the actual rebates paid to the PBM, or arrangements in which they receive a specified share of rebates subject to a guaranteed minimum rebate payment. FTC report at 57-58.

[42]     FTC report at 59.

[43]     PricewaterhouseCoopers report at 88. See also HHS report at 105 (noting that industry sources report that PBM clients typically receive 70-90% of rebates).

[44]     FTC report at 60. CMS made a similar point in a recent "call letter" to Medicare Part D plans; CMS stated there that "[w]e must assume that if a PBM retains a portion of the manufacturer rebates it negotiates on behalf of a Part D sponsor, the direct payment the sponsor pays the PBM for its services will be less, i.e., the sponsor receives a price concession from the PBM." CMS PDP Call Letter April 3, 2006, at 10.

As noted earlier, PBMs also establish networks of retail and mail-order pharmacies where patients with PBM-administered benefits can fill prescriptions, and negotiate the reimbursement rates network pharmacies receive (i.e., the total payment the pharmacy receives, including the PBM payment and the patient copayment or coinsurance amount). These negotiated reimbursement rates are lower than the rates that pharmacies charge to uninsured "cash-paying" patients, and usually vary depending on the restrictiveness of the pharmacy network (i.e., pharmacies can obtain more business by participating in a more exclusive network, and may thus be willing to accept lower reimbursement rates).[45] The drug ("ingredient cost") reimbursement rates negotiated between PBMs and network pharmacies reportedly are often based on a discount from Average Wholesale Price for brand-name drugs and a Maximum Allowable Cost limitation for generics;[46] pharmacies usually also receive a dispensing fee. The amount that the PBM itself is reimbursed by its clients may or may not equal the amount paid by the PBM to the pharmacy (i.e., ingredient cost plus dispensing fee minus patient copay/coinsurance); the PBM may be paid for pharmacy costs based on a contractually-specified pharmacy reimbursement rate, and could thus experience a profit or loss on pharmacy costs.[47]

The amount paid to the pharmacy by a patient depends on whether the patient is insured. Patients with insurance pay the copayment or coinsurance amount set by their insurer for the drug in question; uninsured patients usually would pay the "cash price."[48] By one estimate, the cash price is approximately 15% higher than the pharmacy's total payment (i.e., insurance payment plus patient copay) for an insured patient.[49] Of course, insured patients ordinarily pay a premium for their coverage as well as the payments they make on prescriptions.

Although this brief overview of the pharmaceutical payment system cannot catalogue all of the system's complexities, it suggests that the "price" of a pharmaceutical product is not easily captured and will depend on the perspective one wishes to examine. Rather than being a single number, the average "price" for a product at a particular time may vary depending on whether one examines the amount realized by the manufacturer; the amount paid by wholesalers; the amount paid by pharmacies; the amount paid by PBMs; the amount paid by PBM clients such as insurers or other health plan sponsors; or the amount paid by patients.

---

[45]   FTC report at 5; PricewaterhouseCoopers report at 57, 70.

[46]   PricewaterhouseCoopers report at 86-87; FTC report at 4-5; Follow the Pill at 19.

[47]   PricewaterhouseCoopers report at 71; FTC report at 9-10.

[48]   Patients with traditional indemnity insurance also may pay the cash price at the pharmacy counter and then submit a claim for reimbursement to their insurer.

[49]   HHS report at 96.



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

MAY 2 3 2006                    200 Independence Avenue SW
Washington, DC 20201

2006 MAY 24  AM 9: 31

OFFICE OF INSPECTOR
GENERAL

**TO:**        Daniel R. Levinson
               Inspector General

**FROM:**      Mark B. McClellan, M.D., Ph.D.
               Administrator

**SUBJECT:**   Office of Inspector General (OIG) Draft Report: "Determining Average
               Manufacturer Prices for Prescription Drugs Under the Deficit Reduction Act
               of 2005" (A-06-06-00063)

Thank you for the opportunity to comment on the above draft report. This report looks at
the manner in which the Medicaid average manufacturer price (AMP) is determined for
drugs under the Deficit Reduction Act of 2005 (DRA).

As discussed in this report, the provisions of the DRA affected not only the Medicaid
drug rebate program, but Medicaid reimbursement for drugs, as well. The DRA revises
the definition of AMP to exclude customary prompt pay discounts to wholesalers. The
DRA requires the OIG to review the requirements for and manner in which AMP is
determined and recommend changes to the Secretary by June 1, 2006. The DRA also
requires the Secretary to clarify the requirements for and the manner in which AMPs are
to be determined by publishing a regulation no later than July 1, 2007.

Prior to the enactment of the DRA, AMP under the Medicaid program has been used
solely to calculate drug manufacturer rebates. The DRA allows AMP to be used as a
basis for reimbursement. States may use the publicly available AMP in setting their
payment methodologies for retail pharmacies. The Centers for Medicare & Medicaid
Services (CMS) will use the information to set Federal upper limits (FULs) on payments
for multi-source drugs.

The OIG based its recommendations on information gathered through prior
investigations. It also met with staff from CMS, Congressional staff, and stakeholder
groups and analyzed written comments from six of the stakeholder groups.

**OIG Findings and Recommendation**

The OIG found that existing requirements for determining certain aspects of AMPs are
not clear and comprehensive and that manufacturers' methods of calculating AMPs are
inconsistent. While the OIG notes the history of CMS actions in clarifying the definition
of AMP and recommends that CMS should consider further modification, it does not
recommend a specific definition of AMP.

Page 2- Daniel R. Levinson

**Recommendations:** The OIG recommends that CMS clarify requirements related to retail class of trade, the treatment of rebates to pharmacy benefit managers (PBMs), and the treatment of Medicaid sales. In addition, the OIG recommends that CMS consider addressing other issues that were raised by industry groups, specifically, administrative and service fees, lagged price concessions and returned goods, the frequency of AMP reporting, AMP restatements, and baseline AMP. Finally, the report recommends that CMS issue guidance in the near future addressing the implementation of the AMP-related reimbursement provisions of the DRA and encourage States to analyze the relationship between AMP and pharmacy acquisition cost when using this data source to determine payment rates to pharmacies.

## CMS Response to Findings

The CMS acknowledges that the OIG has reported some confusion among drug manufacturers about what sales and price concessions must be included when calculating AMP. This is an extremely complex and technical topic that has been made more difficult due to changes in the chain of sales and the evolution of new entities, especially PBMs. For this reason, CMS had hoped that the OIG would have provided more specific recommendations for us to consider as we develop a proposed rule to address this topic. However, we appreciate the efforts of the OIG in the past, as well as this report, and we look forward to continuing to work with the OIG on this important issue.

## CMS Response to Final Recommendation

In our proposed regulation to implement the AMP and reimbursement provisions of the DRA, CMS will take the opportunity to address each of the areas recommended by the OIG in this report as well as each of the areas raised by the stakeholders in the meetings with the OIG and subsequent written comments. We will issue the Notice of Proposed Rulemaking as expeditiously as possible. Likewise, we will review and respond quickly to public comments on the regulation, so that a final rule can be put in place as soon as possible. CMS will evaluate the need for additional guidance and provide this as we believe it would be beneficial.

Attachment

# *Streck I* Complaint



**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**



OCT 2 8 2008

~~UNDER SEAL~~



MICH~~.~~ ~~. L. .~~ Clerk
By: ____ Dep. Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RONALD J. STRECK, and THE STATE OF CALIFORNIA, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW MEXICO, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE STATE OF VIRGINIA, AND THE DISTRICT OF COLUMBIA, *ex rel.* RONALD J. STRECK<br><br>Plaintiffs,<br><br>v.<br><br>ALLERGAN, INC., AMGEN, INC., ASTELLAS PHARMA US, INC., ASTRAZENECA PLC, BIOGEN IDEC, INC., BOEHRINGER INGELHEIM, GMBH, BRADLEY PHARMACEUTICALS, INC., BRISTOL-MEYERS SQUIBB COMPANY, CELGENE CORPORATION, CEPHALON, INC., COLLAGENEX PHARMACEUTICALS, INC., EISAI, INC., ELI LILLY & COMPANY, GENZYME CORPORATION, JOM PHARMACEUTICAL SERVICES, INC., MALLINCKRODT/COVIDIEN LTD., MERCK & CO., INC., NOVO NORDISK, A/S, PURDUE PHARMA, LLP, RELIANT PHARMACEUTICALS, INC., DAIICHI SANKYO, INC., SANTARUS, INC., SCHWARZ PHARMA, AG, SCIELE PHARMA, INC., SEPRACOR, INC., SHIRE, PLC, STONEBRIDGE PHARMA LLC, | CIVIL ACTION NO. O3-5135<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 *et seq.*]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt Code §12650 *et seq.*]; DELAWARE FALSE CLAIMS AND FALSE REPORTING ACT [6 Del. C. §1201]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 *et seq.*]; HAWAII FALSE CLAIMS ACT [Haw. Rev. Stat. §661-21 *et seq.*]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat. §175 *et seq.*]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [IC 5-11-55]; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. Rev. Stat. §437 *et seq.*]; MASSACHUSETTS FALSE CLAIMS LAW [Mass. Gen Laws ch.12 §5 *et seq.*]; MICHIGAN MEDICAID FALSE CLAIMS ACT [MI Public Act 337]; MONTANA FALSE CLAIMS ACT [Mont. Stat. Ann. 17-8-401 *et seq.*]; NEVADA FALSE CLAIMS ACT [Nev. Rev.Stat. Ann. §357.010 *et seq.*]; NEW HAMPSHIRE FALSE CLAIMS ACT [N.H. Rev. Stat. Ann. §167:61 *et seq.*]; NEW MEXICO MEDICAID FALSE CLAIMS ACT [N.M. Stat. Ann. §27-2F-1 *et seq.*]; TENNESSEE FALSE CLAIMS ACT AND TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §§4-18-101 *et seq.* and 71-5-181 *et seq.*]; TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann §36.001 *et seq.*]; VIRGINIA FRAUD AGAINST TAXPAYERS |

OCT 28 2008

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

| TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., UPSHER-SMITH LABORATORIES, INC., and WATSON PHARMACEUTICALS, INC. | ACT [Va. Code Ann §8.01-216.1 *et seq.*]; and DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT [D.C. Code Ann. §2-308.14 *et seq.*] |
|---|---|
| Defendants. | **JURY TRIAL DEMANDED** |

1. This Complaint, brought under the Federal False Claims Act ("FCA"), is filed *UNDER SEAL*, pursuant to 31 U.S.C. §§3729, et seq. Plaintiff-Relator Ronald J. Streck ("Relator"), through his attorneys Faruqi &Faruqi, LLP, on behalf of the United States of America, the State of California, the State of Delaware, the State of Florida, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Massachusetts, the State of Michigan, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Mexico, the State of Tennessee, the State of Texas, the State of Virginia, and the District of Columbia (collectively "the States"), for this Complaint against defendants Allergan, Inc., Amgen, Inc., Astellas Pharma Us, Inc., Astrazeneca Plc, Biogen Idec, Inc., Boehringer Ingelheim, Gmbh, Bradley Pharmaceuticals, Inc., Bristol-Meyers Squibb Company, Celgene Corporation, Cephalon, Inc., Collagenex Pharmaceuticals, Inc., Eisai, Inc., Eli Lilly & Company, Genzyme Corporation, Jom Pharmaceuticals, Inc., Mallinckrodt/Covidien Ltd., Merck & Co., Inc., Novo Nordisk, A/S, Purdue Pharma, Llp, Reliant Pharmaceuticals, Inc., Daiichi Sankyo, Inc., Santarus, Inc., Schwarz Pharma, Ag, Sciele Pharma, Inc., Sepracor, Inc., Shire, Plc, Stonebridge Pharma Llc, Takeda Pharmaceuticals North America, Inc., Upsher-Smith Laboratories, Inc., Watson Pharmaceuticals, Inc. alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

## NATURE OF THE ACTION

2. This is an action under the Federal False Claims Act ("FCA"), 31, U.S.C. §3729, *et seq.*, and the false claims acts of several states, alleging omissions and misrepresentations in

2

pharmaceutical manufacturers' calculating and reporting of critical sales and pricing data related to the Medicaid Program reimbursement rates and rebate amounts. Plaintiff Relator, on behalf of the United States and several of the States, seeks to recover damages and civil penalties arising from false and/or fraudulent statements, records, and claims made and caused to be made by Cephalon, Inc. and other manufacturers of pharmaceuticals and/or their agents, employees and co-conspirators.

3. As the cost of prescription drugs has skyrocketed over the past decades, far outpacing other health care costs Congress has enacted several statutes, designed to control the prescription drug costs of government-funded health care programs, including Medicaid. The statutes impose drug pricing formulae that assist Medicaid in limiting the price the government will pay for covered drugs.

4. The statutory schemes mandate that pharmaceutical manufacturers maintain and report accurate sales and pricing information such as their "average manufacturer price," "best price," "wholesale acquisition cost" and "average wholesale price," as each of these terms is defined in the statute or implemented by the Center for Medicare and Medicaid Services ("CMS"). Armed with accurate sales and pricing data, CMS applies the pricing formulae to determine appropriate reimbursement rates to retail pharmacies.

5. In addition, pharmaceutical manufacturers whose products are sold to Medicaid beneficiaries must execute a rebate agreement, agreeing to pay rebates to Medicaid for the difference between the reimbursement amounts and, in general, the best price manufacturers receive from their largest customers. Given that the reimbursement and rebate formulae depend entirely on sales and pricing data that the pharmaceutical manufacturers self-report, the honesty, completeness and accuracy of the sales and pricing data they report is critical to fair reimbursement rates and rebates.

6. Manufacturers such as Defendants, however, developed a means of manipulating pricing data that has caused Medicaid to receive materially inadequate rebates and to reimburse

3

retail pharmacies at materially inflated rates. Since 2003, the three largest wholesalers and the manufacturers have executed distribution services agreements ("DSA") containing a new trade policy structure known as fee-for-service ("FFS") arrangements. DSAs also contain price appreciation clauses. In essence, the FFS clause entitles wholesalers to a payment equal to a set percentage of sales of the manufacturers' products, paid quarterly, purportedly for services the wholesalers provide. The price appreciation clause, however, allows manufacturers to offset the FFS where a wholesaler has inventory-on-hand and on order – purchased at a lower price – that it can sell for a higher price and increased profit when the manufacturer implements a price increase.

7.        Indeed, for each quarter Defendants reduced the service fees they owed to distributors by a factor relating to the amount of inventory appreciation that distributors realized at the time of a price increase:

> (a)     Defendants captured the Service Fee within the AMP calculations and showed a lower AMP. While the Service Fee enabled Defendants to show a lower AMP, the service fees were reduced by the inventory appreciation amount before it was applied to the AMP calculation.

> (b)     Further, Defendants received credit for distributors' inventory appreciation but did not capture those credits in the AMP calculation. As a result, Defendants paid materially inadequate rebates to Medicaid. The distributors' inventory appreciation, if captured by Defendants, became retroactive price increases which Defendants were required to apply to their calculation of AMP as additional unit rebate amount dollar for dollar over the cumulative CPI-U for the product.

> (c)     Still further, Defendants did not reflect the service fee as a reduction in reporting their wholesale acquisition cost or the average wholesale prices. Medicaid, therefore, over-reimbursed retail pharmacies as a direct result of

4

> the purposeful or reckless reporting violations of Defendants. Indeed
> Defendants treated the service fees as bona fide fees for service for
> purposes of reporting WAC or AWP even while it is not being offered at a
> fair market value associated with the efficient distribution of drugs.

8. By executing these DSAs, Defendants were able purposefully to manipulate their reported average market price as fully described below. In turn, the rebate amounts they paid were materially insufficient based on their true sales and pricing data. In addition, the FFS agreements constituted discounts even though Defendants recognized them as legitimate fees. By failing to recognize the FFS payments as discounts, the manufacturers manipulated their average wholesale prices. In turn, the rate at which Medicaid reimbursed retail pharmacies for outpatient pharmaceuticals was materially and artificially inflated.

9. During the period covered by this Complaint, Defendants abused their reporting obligations by knowingly providing false, fraudulent and misleading price and sales data in required submissions to government health care programs. Plaintiff Relator seeks to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein, in every jurisdiction to which defendant's misconduct has extended.

10. While the precise amount of the loss to the federal and state governments cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against defendant Cephalon, alone, under the facts alleged in this Complaint amount to one hundred and fifty million dollars. It is estimated that the damages and civil penalties that may be assessed against all the Doe Defendants under the facts alleged in this Complaint amount to over two and a half billion dollars.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. In

5

addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in Counts 4-20 of this Complaint. Under 31 U.S.C. 3730(e), and under the comparable provisions of the state statutes listed in paragraph 17 above, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator is the original source of the facts and information alleged in this Complaint.

12. This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States. Moreover, the defendants can be found in this District and transact business in this District.

13. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the defendants can be found in and transact business in this District. At all times relevant to this Complaint, defendants regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## PARTIES

14. Plaintiff/Relator Ronald J. Streck ("Relator"), a lawyers and pharmacist, is a resident of Reston, Virginia. He has worked for years in the pharmaceutical industry in sales, regulatory affairs and association management. Relator served as president and chief executive officer of the Healthcare Distribution Management Association for 11 years. The Healthcare Distribution Management Association has as its active members all of the primary wholesalers and as associate members a majority of the top fifty pharmaceutical manufacturers in the country.

15. Through his work at Rx Distribution Network, Plaintiff Relator discovered that Cephalon's pharmaceutical price and sales records contain false, fraudulent, and misleading data, and that Cephalon misreported price and sales data to government programs, including Medicaid. As President and CEO of Rx Distribution Network, Plaintiff Relator became thoroughly familiar

6

with substantially similar distribution agreements that manufacturers, including Cephalon and the Doe Defendants, execute with wholesalers – agreements that enable defendants to report or indirectly allow the reporting of materially inaccurate sales and pricing data to the relevant price data compilation services.

16.     Defendant Allergan, Inc. ("Allergan") is a Delaware corporation, headquartered at 2525 Dupont Drive, Irvine California 92612 Allergan describes itself as a multi-specialty health care company focused on developing and commercializing innovative pharmaceuticals, biologics and medical devices that enable people to see more clearly, move more freely and express themselves more fully. Allergan touts its diversified approach, enabling it to follow its research and development into new specialty areas where unmet needs are significant.

17.     Defendant Amgen, Inc. ("Amgen") is a Delaware corporation, headquartered at One Amgen Center Drive, Thousand Oaks, CA 91320-1799. Amgen describes itself as a global biotechnology company that discovers, develops, manufactures and markets human therapeutics based on advances in cellular and molecular biology, operating in one business segment — human therapeutics.

18.     Defendant Astellas Pharma US, Inc. ("Astellas") is the United States affiliate of Tokyo-based Astellas Pharma, Inc., headquartered at Three Parkway North, Deerfield, IL 60015-2537. Astellas describes itself as a pharmaceutical company dedicated to improving the health of people around the world through the provision of innovative and reliable pharmaceutical products. It touts its commitment to becoming a global pharmaceutical company by combining outstanding R&D and marketing capabilities and continuing to grow in the world pharmaceutical market.

19.     Defendant AstraZeneca PLC ("AstraZeneca") is and English corporation, headquartered at 15 Stanhope Gate, London W1K 1LN. AstraZeneca describes itself as a major international healthcare business engaged in research, development, manufacturing and marketing of prescription pharmaceuticals and supplier for healthcare services. AstraZeneca

7

touts itself as one of the world's leading pharmaceutical companies with healthcare sales of $29.55 billion and as a leader in gastrointestinal, cardiovascular, neuroscience, respiratory, oncology and infection product sales.

20.     Defendant Bayer HealthCare Pharmaceuticals ("Bayer Healthcare") was created in 2006 when Berlex Inc.'s German affiliate was acquired by Bayer AG. Headquartered at 340 Changebridge Road, PO Box 1000, Montville, NJ 07045-1000, Bayer Healthcare touts itself as the seventh largest specialty pharmaceutical company worldwide with more than $11.7 billion in annual revenues. The combined company's core strengths in specialty pharmaceuticals include Women's Healthcare, Diagnostic Imaging, Specialized Therapeutics, Hematology/Cardiology, Primary Care, and Oncology.

21.     Defendant Biogen Idec, Inc. ("Biogen") is a Delaware corporation, headquartered at 14 Cambridge Center, Cambridge MA 02142. Biogen boasts that it creates new standards of care in therapeutic areas with high unmet medical needs. It describes itself as a global leader in the development, manufacturing, and commercialization of innovative therapies. Biogen sells its products in more than 90 countries to address diseases such as multiple sclerosis, lymphoma and rheumatoid arthritis.

22.     Defendant Boehringer Ingelheim, GmbH ("Boehringer") is a German Corporation, headquartered at Binger Str. 173 55216 Ingelheim, Germany. Boehringer describes itself as one of the world's 20 leading pharmaceutical companies. It boasts operations globally with 135 affiliates in 47 countries and 39,800 employees. Since it was founded in 1885, Boehringer touts its commitment to researching, developing, manufacturing and marketing novel products of high therapeutic value for human and veterinary medicine.

23.     Defendant Bradley Pharmaceuticals, Inc. ("Bradley") is a Delaware corporation, headquartered at 383 Route 46 West, Fairfield, NJ 07004. It is a wholly owned subsidiary of Nycomed US, Inc.. Bradley describes itself as a specialty pharmaceutical company that

8

acquires, develops and markets prescription and over-the-counter products in niche therapeutic markets, including dermatology, podiatry, gastroenterology and women's health.

24.     Defendant Bristol-Meyers Squibb Company ("Bristol-Meyers") is a Delaware corporation, headquartered at 345 Park Avenue, New York, NY 10154. Bristol-Meyers claims to operate in three reportable segments, including the research, development, manufacturing and marketing of pharmaceutical products.

25.     Defendant Celgene Corporation ("Celgene") is a Delaware corporation, headquartered at 86 Morris Avenue, Summit, NJ 07901. Celgene describes itself as a global integrated biopharmaceutical company primarily engaged in the discovery, development and commercialization of innovative therapies designed to treat cancer and immune-inflammatory related diseases.

26.     Defendant Cephalon, Inc. ("Cephalon") is a company incorporated under the laws of Delaware, with its principal place of business at 41 Moores Road, Frazer, Pennsylvania, 19355. Cephalon develops, manufactures and markets pharmaceutical products in the United States.

27.     Defendant CollaGenex Pharmaceuticals, Inc. ("CollaGenex") is a Delaware corporation, headquartered at 41 University Drive, Newtown, PA 18940. CollaGenex describes itself as a specialty pharmaceutical company currently focused on developing and marketing innovative proprietary medical therapies to the dermatology market.

28.     Defendant Eisai, Inc. ("Eisai") is the wholly owned U.S. subsidiary of Eisai, Ltd., a Japanese corporation. Eisai is headquartered in 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677 and describes itself as a research-based human health care company that discovers, develops and markets pharmaceutical products throughout the world.

29.     Defendant Eli Lilly & Company ("Eli Lilly") is an Indiana corporation, headquartered at Lilly Corporate Center, Indianapolis, IN 46285. Eli Lilly is a pharmaceutical company that discovers, develops, manufactures, and sells pharmaceutical products.

9

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

30. Defendant Genzyme Corporation ("Genzyme") is a Massachusetts corporation, headquartered at 500 Kendall Street, Cambridge, MA 02142. Genzyme describes itself as a global biotechnology company dedicated to making a major impact on the lives of people with serious diseases. Our broad product and service portfolio is focused on rare disorders, renal diseases, orthopaedics, organ transplant, diagnostic and predictive testing, and cancer.

31. Defendant JOM Pharmaceutical Services, Inc. ("JOM")

32. Defendant Mallinckrodt/Covidien Ltd. ("Mallinckrodt") is a Bermuda company, headquartered at 131 Front Street, Hamilton HM 12 Bermuda. Mallinckrodt describes itself as a global leader in the development, manufacture and sale of healthcare products for use in clinical and home settings. According to Mallinckrodt, its products are found in almost every hospital in the United States, and it has a significant and growing presence in non-U.S. markets. Its mission is to create and deliver innovative healthcare solutions, developed in collaboration with medical professionals, which enhance the quality of life for patients and improve outcomes for our customers and our shareholders.

33. Defendant Merck & Co., Inc. ("Merck") is a New Jersey corporation, headquartered at One Merck Drive, Whitehouse Station, NJ 08889. Merck describes itself as a global research-driven pharmaceutical company that discovers, develops, manufactures and markets a broad range of innovative products to improve human and animal health. Its operations are principally managed on a products basis and are comprised of two reportable segments: the Pharmaceutical segment and the Vaccines segment.

34. Defendant Novo Nordisk, A/S ("Nov Nordisk") is a corporation of the Kingdom of Denmark, headquartered at Novo Alle 1, DK-2880, Bagsvaerd, Denmark. Novo Nordisk describes itself as a healthcare company and a world leader in diabetes care. In addition, Novo Nordisk touts its leading position within areas such as haemostasis management, growth hormone therapy and hormone replacement therapy. Novo Nordisk manufactures and markets

10

pharmaceutical products and services that make a significant difference to patients, the medical profession and society.

35.     Defendant Purdue Pharma, LLP ("Purdue") is a privately held pharmaceutical company, headquartered at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901-3431. According to Purdue it is focused on meeting the needs of healthcare providers and the patients in their care. Purdue boasts that it, together with its affiliates and associated companies, is dedicated to finding, developing, and bringing to market new medicines and related products that improve health outcomes. Purdue touts that it is known for its pioneering research on persistent pain, a principal cause of human suffering.

36.     Defendant Reliant Pharmaceuticals, Inc. ("Reliant"), a wholly owned subsidiary of Glaxo SmithKline, Plc, is a Delaware corporation, headquartered at 110 Allen Road, Liberty Corner, NJ 07938. Reliant describes itself as a rapidly growing pharmaceutical company that specializes in the development, commercialization and marketing of prescription therapeutic products, including four cardiovascular products in the United States, including our lead product Lovaza.

37.     Defendant Daiichi Sankyo, Inc. ("Daiichi"), headquartered in Two Hilton Court Parsippany, NJ 07054, is a wholly owned subsidiary of Daiichi Sankyo Ltd. of Japan.

38.     Defendant Santarus, Inc. ("Santarus") is a Delaware corporation, headquartered at 10590 West Ocean Air Drive, Suite 200, San Diego, CA 92130. Santarus describes itself as a specialty pharmaceutical company focused on acquiring, developing and commercializing proprietary products that address the needs of patients treated by gastroenterologists or primary care physicians.

39.     Defendant Schwarz Pharma, AG ("Schwarz") is a wholly owned subsidiary of UCB-Group of Belgium, headquartered in Monheim Germany. Schwarz describes itself as a leading global biopharmaceutical company dedicated to the research, development and commercialization of innovative pharmaceutical and biotechnology products in the fields of

11

central nervous system disorders, allergy/respiratory diseases, immune and inflammatory disorders and oncology. UCB focuses on securing a leading position in severe disease categories.

40. Defendant Sciele Pharma, Inc. ("Sciele") is a Delaware corporation, headquartered at 5 Concourse Parkway, Suite 1800, Atlanta, GA 30328. Sciele describes itself as a pharmaceutical company, specializing in sales, marketing and development of branded prescription products focused on Cardiovascular, Diabetes, Women's Health, and Pediatric treatment.

41. Defendant Sepracor, Inc. ("Sepracor") is a Delaware corporation, headquartered at 84 Waterford Drive, Marlborough, MA 07152. Sepracor describes itself as a research-based pharmaceutical company focused on discovering, developing and commercializing differentiated products that address large and growing markets and unmet medical needs and that are prescribed principally by primary care physicians and certain specialists.

42. Defendant Shire, Plc ("Shire") is a public limited company, incorporated under the laws of England and Wales and headquartered at Hampshire International Business Park, Chineham, Basingstoke, Hampshire, England, RG24 8EP. Shire describes itself as a leading specialty biopharmaceutical company that focuses on meeting the needs of the specialist physician.

43. Defendant Stonebridge Pharma LLC ("Stonebridge"), a wholly owned subsidiary of Stiefel Laboratories, Inc., is a limited liability company, headquartered at 6340 Sugarloaf Parkway, Duluth, GA 30097.

44. Defendant Takeda Pharmaceuticals North America, Inc. ("Takeda"), formerly known as TAP Pharmaceutical Products, Inc. in is a wholly owned subsidiary of Takeda Pharmaceutical Company Ltd. of Japan, headquartered at One Takeda Parkway, Deerfield, IL 60015. Takeda claims to focus on a variety of therapeutic areas including bone and joint disorders, cardiovascular disease, central nervous system disorders, chronic kidney disease, diabetes, gastroenterology, gynecological disorders and infectious disease.

12

45.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith"), is a Minnesota corporation, headquartered at 6701 Evenstad Drive, Maple Grove, MN 55369. Upsher-Smith describes itself as actively pursuing product development opportunities in the therapeutic areas of epilepsy and Parkinson's disease.

46.     Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation, headquartered at 311 Bonnie Circle, Carona CA 92880-2882. Watson describes itself as a leading specialty pharmaceutical company engaged in the development, manufacture, marketing, sale and distribution of brand and generic (off-patent) pharmaceutical products.

## SUBSTANTIVE ALLEGATIONS

### *Background*

47.     For purposes of the allegations herein, there are several important characteristics relating to the flow of goods in the market for prescription drugs. First, the drug industry is extremely competitive. Competition exists within drug categories between patented brand name drugs manufactured by competing drug companies, as well as between brand name drugs and their generic counterparts. Manufacturers fiercely compete with one another for market share. This climate of competition allows institutional or large volume customers to demand lower prices from manufacturers lest the customer transfer its business to a competing manufacturer with a therapeutically equivalent drug. Thus, manufacturers routinely and aggressively discount their products to large customers – discounts federal law mandates they must pass on to Medicaid.

48.     Second, wholesalers play a central role in the sales and distribution of pharmaceuticals. Defendants sell a majority of their pharmaceuticals through "primary wholesalers" that stock various manufacturers' drugs and resell the drugs directly to retail pharmacies. As a result, wholesaler sales and pricing data are critical to the pharmaceutical manufacturers' reporting their sales and pricing information to various government programs,

13

including Medicaid. Indeed, given the overwhelming volume of outpatient pharmaceuticals the manufacturers sell to and through wholesalers, any material distortion of sales and pricing data to wholesalers will likely directly cause government programs like Medicaid drug program to overpay for outpatient pharmaceuticals.

### *Distribution Services Agreements*

49.     In the 1980s and 1990s wholesalers engaged in speculative buying of pharmaceuticals from manufacturers based on predicted future price increases. In anticipation of price increases, wholesalers increased their stock of a particular drug at the lower, then-current price. When the price increased, the wholesalers had stock on hand that they had purchased at a lower price. This alleviated their need immediately to purchase pharmaceuticals at the increased price. They were, however, able to include the price increase as they sold the drugs down the distribution chain. Not only were the manufacturers losing profits from this practice, but it caused them significant operational problems.

50.     To end the practice of speculative buying, manufacturers instituted "inventory management agreements" with wholesalers. In exchange for agreeing to the inventory management agreements, when drug prices were raised, wholesalers were given the opportunity to purchase drugs at the previous lower price for a term of one to four months ("buy-ins") or, wholesalers received price increase credits from manufacturers for one to four months.

51.     The inventory management agreements and the buy-ins or credits, however, were not as profitable for wholesalers. In response, starting as early as 2003, the wholesalers sought to create a new trade policy structure known as fee-for-service ("FFS") clauses in new distribution services agreements ("DSA"). Gone was the focus on resale profit margin in favor of fee-for-service ("FFS") clauses that obligated manufacturers periodically to pay a set fee, often stated as a percentage of sales of the manufacturers' products.

14

52. FFS clauses allowed wholesalers to extract discounts from manufacturers that protected part of the profits they once derived from speculative buying. DSAs, however, prevented further windfall profits by establishing certain inventory control procedures and by allowing the manufacturers to "claw-back" profits for drugs that wholesalers maintained in their inventory after the manufacturers raised prices. These price appreciation clauses ("PAC" or "appreciation clause") enabled the manufacturers to share in any windfall profit that the wholesalers were making by having inventory purchased prior to a price increase on hand and available for sale after a price increase. The manufacturers also tied appreciation clauses directly to the FFS clause, mandating that any profits wholesalers earned through less costly inventory would offset the FFS payment.

53. In general, Cephalon's DSA with wholesalers is a prototype for industry-wide FFS clauses incorporated in DSAs. For example, the purpose for Cephalon's DSA is to establish a "Wholesaler Discount Program" intended to "provide a discount to the Wholesaler for a Contract Year in recognition of its handling all distribution and related support service functions to all retail, institutional and specialty customers purchasing CEPHALON Products." Purportedly in exchange for these services – most of the services the wholesalers had performed for Cephalon for free prior to executing the DSA – Cephalon discounts nearly all pharmaceutical product sales to certain wholesalers by 2% and by 1% for Cephalon Specialty/Other Products. Cephalon pays the discount quarterly as wholesaler service agreement ("WSA") credits toward future purchases of Cephalon products by that wholesaler.

54. The DSA agreements between Defendants and wholesalers, however, contain appreciation clauses. For example, in one particular DSA that Defendant Cephalon executed, the PAC takes the form of offsets to the WSA credits. To calculate WSA credits, "CEPHALON will credit back to the Wholesaler an amount equal to 2.00% of the Wholesaler's Pharmaceutical Products and 1.00% of CEPHALON Specialty/ Other Products purchases during the calendar

15

quarter, *less any Calculated Inventory Appreciation*, and any applicable performance penalties. . . ." (Emphasis added).

55.     The DSA defines "Calculated Inventory Appreciation" as "the value of inventory appreciation benefit recognized by the Wholesaler at the time of Price Change. This is calculated as New Price minus Old Price multiplied by actual inventory on hand plus any product on order or in transit at the Old Price at the time of the Price Change." Thus, the manufacturer – Cephalon in this case – offsets the FFS credit with a give-back from the wholesaler.

56.     Cephalon's DSA with wholesalers is typical of substantially all of the DSAs in the industry.

### DSAs Materially and Improperly Distort Medicaid Rebates and Reimbursement Rates

57.     The Medicaid Program ("Medicaid") is a public assistance program providing payment of medical expenses for low-income and needy persons. It covers approximately 44 million individuals, including children, the aged, blind, and/or disabled, and people who are eligible to receive federally assisted income maintenance payments. The federal government and the various states shared the funding burden for Medicaid. While the various states actually administer the Medicaid program, they adhere strictly to federal guidelines.

58.     Not only does the Medicaid program assist with the costs of treatment, but it also covers the costs of certain outpatient pharmaceuticals for those who qualify for its benefits. Federal statutes and regulations restrict the drugs and drug uses that Medicaid covers. When a Medicaid beneficiary has a drug prescription filled, the Medicaid Program reimburses the retail pharmacist.

59.     For the past several decades outpatient pharmaceutical costs have been increasing dramatically. Expenditures for outpatient prescription drugs have far outpaced other health care costs, and are the fastest growing cost of health plans funded by the state and federal

16

governments, including Medicaid. Congress responded to escalating costs by enacting several statutes designed to control the prescription drug costs of government-funded health care programs, including Medicaid. To curb mounting Medicaid drug expenditures, Congress created the Medicaid drug rebate program ("DRP") under the Omnibus Budget Reconciliation Act of 1990. The intent of the DRP was to set maximum prices that Medicaid would pay for outpatient pharmaceuticals, ensuring that the Program availed itself of the same discounts and price concessions that pharmaceutical manufacturers offer their most favored commercial customers, including, in particular, the wholesalers.

60. Congress and regulators created certain pricing formulae that tie the price Medicaid ultimately pays to reimburse for outpatient pharmaceuticals to the best prices manufacturers offer to their largest customers. Congress accomplished this by mandating that manufacturers pay a rebate to the government for all outpatient pharmaceuticals Medicaid covers. That is, Medicaid reimburses retail pharmacies for the cost of prescriptions and then, under the terms of the DRP, seeks a rebate from the manufacturer of the drug in question that reflects a far larger volume purchase. The Centers for Medicare and Medicaid Services ("CMS")[1] determines the amount of the required rebates that manufacturers owe the Medicaid Program based on the sales and pricing data that manufacturers must collect and report as conditions of participating in the Medicaid Program.

61. Thus, critically, the pharmaceutical pricing formulae mandated by Congress rely upon the integrity of the pharmaceutical manufacturers. In setting prices, the government relies upon – and the law requires – manufacturers to provide honest, complete, and accurate sales and pricing data upon which Medicaid can rely.

62. Under the DRP, to receive Medicaid coverage for outpatient prescription drugs, Cephalon and other manufacturers are required to enter into a Medicaid Rebate Agreement with

---

[1] CMS is an agency of the United States Department of Health and Human Services that administers the Medicaid program on behalf of the states.

17

CMS.[2] The rebate amount is based upon average manufacturer price ("AMP"),[3] or the difference between the AMP and best price ("BP")[4] for each "covered outpatient drug," multiplied by the total number of units of each drug paid for by the states during the quarterly rebate period.[5]

63.     BP is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . ."[6]  The Best Price includes all discounts, rebates, or other price concession.[7]  The minimum rebate amount is 15.1 percent of the AMP.[8] Manufacturers are required to report their AMP and BP for each covered drug to CMS within 30 days of each quarterly rebate period.[9]

64.     The rebate payment is the last step in the Medicaid reimbursement process. Typically, beneficiaries submit prescriptions to their pharmacy. The pharmacy submits a claim for reimbursement to the state Medicaid program. The claim specifies the drug, its manufacturer and the strength and number of dosage dispensed. The state Medicaid offices tie the rate of

---

[2] *See* 42 U.S.C. §1396r-8(a)(1).

[3] Average Manufacturer Price is the average price paid to the manufacturer for the drug by wholesalers for distribution to retail pharmacies, after deducting customary prompt pay discounts. § 1927(k)(1) of the Social Security Act, 42 U.S.C. §1396r-8(k)(1). The Deficit Reduction Act of 2005 revised the definition of AMP to exclude customary prompt pay discounts to wholesalers effective July 1, 2007.

[4] Best Price is the lowest price at which a manufacturer will supply a drug to any wholesaler, retailer, provider, HMO or nonprofit or governmental entity in the U.S., subject to certain exceptions. §1927(c)(1)(C) of the Social Security Act, 42 U.S.C. §1396r-8(c)(1)(C).

[5] *See* 42 U.S.C. §1396r-8(c)(1)(A).

[6] See 42 U.S.C. §1396r-8(c)(1)(C)(i).  Excluded from the calculation of BP are sales to certain agencies of the federal government such as the Indian Health Service, the Department of Veterans Affairs and the Department of Defense and pharmaceutical assistance programs of the various states. *Id.*

[7] *See* 42 U.S.C. §1396r- 8(c)(1)(C)(ii).

[8] *See* 42 U.S.C. §1396r-8(c)(1)(B)(i).

[9] *See* 42 U.S.C. §1396r-8(b)(3)(A)(i).

18

The Guidance states that one of the "areas of significant concern" to the government
enforcement community is the "integrity of data used by state and federal governments to
establish payment amounts" for covered drugs under Medicaid, Medicare, and other government
health care programs. The Guidance explains:

> Many federal and state health care programs establish or ultimately determine
> reimbursement rates for pharmaceuticals, either prospectively or retrospectively,
> using price and sales data directly or indirectly furnished by pharmaceutical
> manufacturers. The government sets reimbursement with the expectation that the
> data provided are complete and accurate. The knowing submission of false,
> fraudulent, or misleading information is actionable. A pharmaceutical
> manufacturer may be liable under the False Claims Act if government
> reimbursement (including, but not limited to, reimbursement by Medicare and
> Medicaid) for the manufacturer's product depends, in whole or in part, on
> information generated or reported by the manufacturer, directly or indirectly, and
> the manufacturer has knowingly (as defined in the False Claims Act) failed to
> generate or report such information completely and accurately.

68.   The Guidance further provides:

> [M]anufacturers' reported prices should accurately take into account price
> reductions, rebates, up-front payments . . . or other price concessions or similar
> benefits offered to some or all purchasers.

* * *

> Given the importance of the Medicaid Rebate Program, as well as other programs
> that rely on Medicaid Rebate Program benchmarks . . . , manufacturers should pay
> particular attention to ensuring that they are calculating Average Manufacturer
> Price and Best Price accurately and that they are paying appropriate rebate
> amounts for their drugs. *In sum, pharmaceutical manufacturers are responsible
> for ensuring the integrity of data they generate that is used for government
> reimbursement purposes.* [Emphasis added].[15]

69.   Defendants' practices alleged in this Complaint are precisely the type of practices

identified in the Guidance that violate the FCA. As described below, Cephalon reported

fraudulent prices that hid discounts to wholesalers through fee for service agreements and

knowingly failed to ensure the accuracy and integrity of data used in pricing and rebate

calculations and reporting. As a direct result, Cephalon's pricing and rebate reporting was

---

[15] *Id.* at 23733-34.

The Guidance states that one of the "areas of significant concern" to the government enforcement community is the "integrity of data used by state and federal governments to establish payment amounts" for covered drugs under Medicaid, Medicare, and other government health care programs. The Guidance explains:

> Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A pharmaceutical manufacturer may be liable under the False Claims Act if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly (as defined in the False Claims Act) failed to generate or report such information completely and accurately.

68.    The Guidance further provides:

> [M]anufacturers' reported prices should accurately take into account price reductions, rebates, up-front payments . . . or other price concessions or similar benefits offered to some or all purchasers.

\* \* \*

> Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks . . . , manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs. *In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.* [Emphasis added].[15]

69.    Defendants' practices alleged in this Complaint are precisely the type of practices identified in the Guidance that violate the FCA. As described below, Cephalon reported fraudulent prices that hid discounts to wholesalers through fee for service agreements and knowingly failed to ensure the accuracy and integrity of data used in pricing and rebate calculations and reporting. As a direct result, Cephalon's pricing and rebate reporting was

---

[15] *Id.* at 23733-34.

20

inaccurate and incomplete and caused (1) the federal and state governments to receive materially less in rebates than that to which they were entitled and (2) the Medicaid Program to pay more for prescription drugs than it otherwise should have paid but for Defendants' wrongful conduct.

### *Defendants' Scheme to Defraud the United States and The Various States*

70.     During the period covered by this Complaint, Defendants abused their reporting obligations by knowingly providing false, fraudulent and misleading price and sales data in required submissions to government health care programs.  As a result of its unlawful conduct, Defendants have (1) avoided paying rebates they owe to the United States and the States under the Medicaid rebate program and (2) inflated the price paid to Defendants directly or indirectly by the United States and the States for Defendants' pharmaceuticals covered by government health care programs.  Additionally, Defendants' failure to abide by their reporting obligations caused the United States and States to provide inflated reimbursements to retail pharmacies.  Cephalon thereby obstructed and prevented the United States and the States from receiving the intended benefit of laws designed to limit their prescription drug costs under the Medicaid Program.

71.     As described above, the PAC works in tandem with the FFS.  The PAC applies when the manufacturer raises its price for a drug.  These price increases are large and frequent.  At the time of a price increase, wholesalers often have product in stock and on-order that the wholesaler paid for at the lower price.  At the time of a price increase, however, the wholesalers with product in stock and on-order sells the stock at the new price and earns greater profit or the wholesaler may use the lower price at which it purchased the product to create a competitive advantage.

72.     Under the PAC, manufacturers re-capture part of the price-appreciation for the inventory the wholesaler has on-hand and on-order by crediting it against the 2% FFS it owes the wholesaler.  Manufacturers are able to do this by capturing daily purchase and sales data the

21

wholesaler agrees to provide in the FFS agreement. Thus, the PPC retroactively captures for the manufacturer the inventory appreciation the wholesaler accumulates from the increases in the price for pharmaceuticals even though the product has already been sold by the manufacturer and title has already passed to the wholesaler.

73. For a fee to be determined not to be a discount, and thus to be excluded from the calculation of the AMP, the following conditions must be met: (a) the fee paid must be for a *bona fide*, itemized service that is actually performed on behalf of the manufacturer; (b) the manufacturer would otherwise perform or contract for the service in the absence of the service arrangement; (3) the fee represents fair market value; and (4) the fee is not passed on in whole or in part to a client or customer of any entity.

74. For drugs in a wholesaler's inventory and on-order, the appreciation is credited back to the manufacturers when they announce price increases. The result of this is an increase in the actual price the wholesaler pays for products initially purchased at a lower price. On information and belief, however, Defendants do not reflect this credit in their calculation of AMP. As is the case with any rebate or other price reduction, Defendants are obligated by law to include all fees in its pricing submissions to the government. During the period covered by this Complaint, Defendants knowingly failed to include the full extent of the credits it took for FFS obligations to wholesalers in Defendants' calculation of AMP.

75. Relator discovered that drug sales and price information maintained by Defendants, and submitted to the government, was fraught with major flaws that rendered the data false, fraudulent, and misleading.

76. Defendants knowingly failed to correlate their payment of FFS to services associated with the efficient distribution of drugs by their primary wholesalers. Defendants failed to pay the FFS to primary wholesalers when prices increased for products already on order to the wholesalers or in the wholesalers' inventory.

22

77.     On information and belief, Defendants did not include credits it took for FFS into its calculation of AMP. In this way, Defendants knowingly understated their AMP figures and knowingly distorted, directly or indirectly, other benchmark calculations such as AWP. The understating of AMP unlawfully decreased Defendants' Medicaid rebate obligation and unlawfully inflated the payments it received, directly and indirectly, from Medicaid and various government health care programs.

### *Defendants' Distortion of the Reported AMP Reduces Rebates Defendants owe to the United States and the Various States*

78.     Purposeful miscalculation of AMP has allowed and allows Defendants to pay lower than required rebates to the states' Medicaid programs without the knowledge of the federal government of the governments of the various states.

79.     As noted above, manufacturers must report AMP to CMS on a quarterly basis. As manufacturers are well aware, CMS uses the AMP number to conduct Unit Rebate Amount Calculations ("URA Calculations"). The URA Calculations are a multi-step process that calculates the rebates that manufacturers like Cephalon must pay state Medicaid. The total amount owed by a manufacturer in rebates is the Total Unit Rebate Amount ("Total URA"). Total URA is the sum of its two principal components: Basic URA and Additional URA. Basic URA is the amount that manufacturers will rebate to Medicaid. Basic URA is the greater of (1) 15.1% of AMP or (2) the difference between AMP and Best Price. Additional URA is the amount, if any, that manufacturers will rebate to Medicaid because of price increases above CPI-U.

80.     Defendants' scheme to avoid including credits taken on FFS after price increases permitted them to lower their AMP. In turn, that practice prevents CMS from demanding the proper Total URA that Defendants owe in the form of Basic URA and Additional URA.

81.     Under the Medicaid Program, Medicaid has a price guarantee with drug manufacturers. The guarantee states that the government will not be subject to price increases

23

above CPl-U after drugs are entered into the Medicaid Program. The guarantee is enforced through calculation of Additional URA. When price increases beyond CPI-U are detected through the calculation of Additional URA, manufacturers must rebate any price increase above and beyond CPl-U to the government dollar for dollar of additional price increase above and beyond CPI-U. In general, pharmaceutical prices for branded products have risen annually an average of 2-3 times the CPI-U since the year 2000. Therefore, nearly every price increase during the same period for Cephalon and "Does" has been beyond CPI-U and subject to the Additional URA dollar for dollar.

82. The scheme alleged in this Action is a means by which Defendants circumvent the price guarantee by distorting the calculation of Additional URA.

83. As described above, each time Defendants take credits against a wholesaler's inventory through the Appreciation Clause in the Agreement and fails to include it in AMP, the AMP number reported to CMS is improperly deflated. The calculation of Additional URA begins with AMP.

84. The calculation of Additional URA begins with CMS dividing baseline AMP by baseline CPI-U. The resulting number is multiplied by quarterly CPI-U. If this number is less than the quarterly AMP, it is subtracted from the quarterly AMP to determine the Additional URA.

85. Accordingly, by reporting artificially deflated AMP to the government, Defendants pay the government smaller rebates in the form of URA and Additional URA than are required.

### Defendants Underreport AMP and Basic URA

86. For calculations of Basic URA, an underreported AMP insures that either 15.1% of AMP is lower than it should be or the difference between AMP and Best Price is lower than it

24

should be. By virtue of this systematic underreporting of AMP, Cephalon pays smaller than required rebates.

87. For example, in April 2007, Defendant Cephalon supplied CMS with its 1st quarter AMP and Best Price calculations. Defendant Cephalon failed to report an additional calculation under AMP reflecting credit for inventory appreciation from its wholesalers as a retroactive price increase. Defendant Cephalon sent memos to wholesalers in July 2007 crediting the inventory price appreciation against the FFS.

88. If Defendant Cephalon took credit for the inventory appreciation from the price increase then it should have included the full two percent in its AMP calculation. On information and belief, Defendant Cephalon failed to include the full two percent in its AMP calculation despite taking the full 2% credit against the FFS due wholesalers for the quarter.

### *Defendants' Distortion of Average Wholesale Price ("AWP") Causes the Government to Overpay Retail Pharmacies*

89. When a Medicaid beneficiary fills a drug prescription, the retail pharmacy is reimbursed by Medicaid. Medicaid, through the states, generally pays the drug's estimated acquisition cost ("EAC") plus a dispensing fee. The EAC is the state Medicaid agency's best estimate of the price generally and currently paid by providers for the drug. Most states use the AWP of a drug to determine EAC. Some states also base their EAC on the WAC and add a percentage mark-up.

90. WAC is reported for each drug sold to wholesalers by manufacturers directly or indirectly. When Cephalon reports price increases, it sends notices to its direct customers. The direct accounts forward the new WAC to *Red Book* and other compendia.

91. AWP represents WAC, or the actual price that manufacturers charge a wholesaler plus a predetermined mark-up. For example, for Defendant Cephalon's drugs the mark-up is 20%.

25

92.     The FFS that Defendants pay wholesalers constitutes discounts. Discounts are generally not included in WAC, but Defendants do not include the FFS as a discount in their notices to their direct customers which are then forwarded to *Red Book* and other compendia that publish WAC and AWP which is derived from WAC.

93.     The FFS agreement with an "appreciation clause," however, is not *bona fide* for a number of reasons. First, the fee owed is not related to fair market value. The fee owed and paid each quarter varies depending on whether the manufacturer has price increases. Increasing the number and the extent of price increases lowers the fee that will be owed and paid for the quarter. In fact, in Defendant Cephalon's case there were many quarters when, after the inventory appreciation credit was deducted from the FFS, the wholesaler ended up owing Cephalon; Cephalon recouped what the wholesalers owed it by taking a credit against the next quarter's fee-for-service.

94.     Next, the fee negotiated was based on replacing the margins the large distributor made when speculative purchasing the manufacturer's products and is not related to the market value of services provided.

95.     Third, initially Defendants contracted for the service with only to a few high volume distributors and not with regional distributors providing the same or similar services. During that period the manufacturer did not perform or contract for the service in the absence of the service arrangement. A number of regional wholesalers who provide the same or similar services, however, do not receive fees for service from many of the Defendants, and Defendants have not performed or contracted for the service in the absence of a service arrangement with these regional distributors.

96.     Last, regional distributors have contacted manufacturers that are providing FFS agreements to only the large distributors to provide the manufacturers notice that the fee is being passed on by the large distributors in offers to customers of the regional distributors.

26

97.   After WAC is released, directly or indirectly by a manufacturer, it is converted to AWP and published in industry publications such as *Red Book*. State Medicaid agencies rely on published AWP to determine the amount of reimbursements paid to retail pharmacies.

98.   Here, Defendants' failure to account for the FFS discount it pays to wholesalers and direct customers inflates WAC and, therefore, AWP. Accordingly, reimbursements based on Cephalon's released WAC and AWP, are inflated. When state Medicaid programs such as Medi-Cal of California use either AWP or WAC to determine its EAC, the final EAC figure is also inflated. The overstated AWP leads directly to overpayment by state Medicaid to retail pharmacies.

99.   Compounding this problem are confidentiality clauses within DSAs. For example, Defendant Cephalon's DSA with wholesalers contains a "Confidentiality" clause, assuring that no party to the agreement discloses any of the terms of the agreement. In fact, nearly all of the agreements prohibit the parties from even admitting that there is an agreement between the parties. The terms of the agreement and the history of these agreements with Price Appreciation Clauses show a tendency to guard the secrecy of the fraud. There have been numerous conferences on FFS agreements. The issue of PACs as they relate to and affect FFS clauses, rebates and reimbursements has never been disclosed or discussed. Comments by the industry regarding the proposed CMS Rule on AMP, which discussed FFS and what constitutes a bona fide fee-for-service, never disclosed or discussed the presence of Price Appreciation Clauses.[16]

100.   While a thorough audit would be required to determine the exact amount in lost rebates and overpayments, a brief review of Defendant Cephalon's annual sales, products receiving price increases and amount of price increases serves to estimate both lost rebates and overpayments demonstrates the large losses Medicaid has potentially suffered as a result of

---

[16] *See* Federal Register, Vo. 72, No. 136 (July 17, 2007), 42 C.F.R. Part 447 [CMS-2238-FC].

27

Defendants' wrongful conduct. From 2005 through projected 2008, Cephalon's Medicaid sales were $113 million, $180 million, $196 million, and $224 million constituting 12%, 14%, 14% and 14% of Cephalon's total U.S. sales respectively. Using average annual Medicaid price increases of 20% from 2005-2008, Medicaid overpaid for Cephalon's prescription drugs by approximately $14,260,000. In addition, by means of its fraudulent scheme, Cephalon improperly withheld rebate payments to Medicaid in the amount approximately $17,190,000. Altogether, therefore, Cephalon, itself, owes the United States $31,450,000, exclusive of penalties, interest and exemplary damages.

101.   Calculating damages requires gathering the following information:

(a)   Copies of Distribution Service Agreements or other agreements that the Defendants have with distributors, or chains, from January 2004 forward;

(b)   Copies of credit memoranda and worksheets provided to distributors, or chains by Defendants at the time of quarterly or annually reconciliation of the above agreements from January 2004 forward;

(c)   Copies of the same quarter's Medicaid submission with Defendants' AMP calculations for Medicaid from January 2004 forward; and

(d)   Spreadsheets of price increases for the time period include the product, the effective date of increase and the amount of increase stated in total dollars and as a percentage of the former price from January 2004 forward.

## COUNTS

## COUNT I

### False Claims Act
### 31 U.S.C. §§3729(a)(1) and (a)(2)
(Against All Defendants)

102.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

28

103.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

104.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1).

105.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false or fraudulent claims paid or approved by the United States Government, within the meaning of 31 U.S.C. §3729(a)(2).

106.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

107.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

108.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by defendants arising from their unlawful conduct as described herein.

## COUNT II

### False Claims Act
### 31 U.S.C. §§3729(a)(3)
(Against All Defendants)

109.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

110.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

29

111. By virtue of the acts described above, defendants conspired with each other and with others unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, within the meaning of 31 U.S.C. §3729(a)(3). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

112. By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

113. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. §3729(a)(3) as described herein.

## COUNT III

### False Claims Act
### 31 U.S.C. §3729(a)(7)
(Against All Defendants)

114. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

115. This is a claim for penalties and treble damages under the Federal False Claims Act.

116. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government, within the meaning of 31 U.S.C. §3729(a)(7).

117. As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the defendants, and other costs were sustained by the United States.

30

118. By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

119. Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT IV

### Unjust Enrichment

120. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

121. By virtue of their conduct, Defendants have been unjustly enriched at the expense of the United States and the various states. By obtaining moneys as a result of their violations of federal and state law, Defendants were unjustly enriched, and are liable to account and pay such amounts to be determined at trial.

122. By this claim, Relator demands a full accounting of all revenues (and interest thereon) and costs incurred by Defendants on sales to customers based on the DSAs containing fee for service provisions and price appreciation clauses and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States and the states.

## COUNT V

### Common Law Fraud

123. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

124. Defendants made or caused to be made material and false representations concerning the pricing of their pharmaceutical products with knowledge of their falsity or with reckless disregard for the truth. Defendants intended to and did cause the United States and the

31

various states to act upon those misrepresentations to their detriment. The United States acted in justifiable reliance upon Defendants' misrepresentations by making payments on the false claims.

125. Had Defendants made truthful statements, the United States and the states would not have made payments in excess of monies due or, in the case of the United States, foregone rebates to which it was entitled.

126. As a direct and proximate cause of Defendants' conduct, the United States and the various states have been damaged in an amount to be determined at trial.

## COUNT VI

### California False Claims Act
### Cal Govt Code §12651(a)(1)-(3)
(Against All Defendants)

127. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

128. This is a claim for treble damages and penalties under the California False Claims Act.

129. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

130. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

131. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

32

132.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

133.     By reason of the defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

134.     Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VII

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(3)

(Against All Defendants)

135.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

136.     This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

137.     By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

138.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

139.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

33

aware of the falsity of the records, statements

by defendants, paid

the claims that would not be paid but for defendants' unlawful conduct.

141.    By reason of the defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

142.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)
(Against All Defendants)

143.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144.    This is a claim for treble damages and penalties under the Florida False Claims Act.

145.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

146.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

147.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

34

140.   The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

141.   By reason of the defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

142.   Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)
(Against All Defendants)

143.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144.   This is a claim for treble damages and penalties under the Florida False Claims Act.

145.   By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

146.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

147.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

34

148.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

149.    By reason of the defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

150.    Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)
(Against All Defendants)

151.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

152.    This is a claim for treble damages and penalties under the Hawaii False Claims Act.

153.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

154.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

155.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

35

156.    The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

157.    By reason of the defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

158.    Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(3)
(Against All Defendants)

159.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

160.    This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

161.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

162.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

163.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

36

164.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

165.    By reason of the defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

166.    Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(1) and (2)
(Against All Defendants)

167.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

168.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

169.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

170.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

171.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Indiana State Government.

37

172. The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

173. By reason of the defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

174. Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT XII

### Louisiana Medical Assistance Programs Integrity Law
#### La. Rev. Stat. § 437 et seq.
(Against All Defendants)

175. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

176. This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

177. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

178. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

179. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

38

180. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

181. By reason of the defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182. Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(3)
(Against All Defendants)

183. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

185. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

186. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

187. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

188. The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

39

180. The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

181. By reason of the defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182. Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(3)
(Against All Defendants)

183. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184. This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

185. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

186. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

187. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

188. The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

39

defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

189. By reason of the defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

190. Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIV

### Michigan Medicaid False Claims Act
#### Mich. Public Act 337
(Against All Defendants)

191. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

192. This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

193. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

194. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

195. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Michigan State Government.

196. The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

40

197.    By reason of the defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

198.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV

### Montana False Claims Act
### Mont. Code Ann. 17-8-403 (1)(a) and (b)
(Against All Defendants)

199.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

200.    This is a claim for treble damages and penalties under the Montana False Claims Act.

201.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

202.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

203.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

204.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

205.    By reason of the defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

41

206. Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI

### Nevada False Claims Act
### Nev. Rev. Stat. Ann. §357.040(1)(a)-(c)
(Against All Defendants)

207. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

208. This is a claim for treble damages and penalties under the Nevada False Claims Act.

209. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

210. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

211. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

212. The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

213. By reason of the defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

214. Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

42

## COUNT XVII

### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. §167:61-b(I)(a)-(c)
(Against All Defendants)

215. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

216. This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

217. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

218. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

219. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Hampshire State Government.

220. The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

221. By reason of the defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

222. Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

43

## COUNT XVIII

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-2F-4
(Against All Defendants)

223.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

224.    This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

225.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

226.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

227.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

228.    The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

229.    By reason of the defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

230.    Additionally, the New Mexico State Government is entitled to civil penalties for each and every violation alleged herein.

44

## COUNT XIX

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)
(Against All Defendants)

231. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

232. This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

233. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

234. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

235. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

236. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

237. By reason of the defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

238. Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

45

## COUNT XIX

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)
(Against All Defendants)

231.  Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

232.  This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

233.  By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

234.  By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

235.  By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

236.  The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

237.  By reason of the defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

238.  Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

45

## COUNT XX

### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002
(Against All Defendants)

239. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

240. This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

241. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

242. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

243. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

244. The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

245. By reason of the defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

246. Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

46

## COUNT XXI

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(3)
(Against All Defendants)

247. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

248. This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

249. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

250. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

251. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

252. The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

253. By reason of the defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

254. Additionally, the Virginia State Government is entitled to the maximum penalty $10,000 for each and every violation alleged herein.

47

## COUNT XXII

### District of Columbia Procurement Reform Amendment Act
#### D.C. Code Ann. §2-308.14(a)(1)-(3)
(Against All Defendants)

255.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

256.     This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

257.     By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

258.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

259.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

260.     The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

261.     By reason of the defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

262.     Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

48

## **PRAYER FOR RELIEF**

263.    WHEREFORE, Relator prays for judgment against the defendants as follows:

A.    that defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*, and the counterpart provisions of the state statutes set forth above;

B.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

C.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of California has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §1651(a);

D.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

E.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. §68.082(2);

F.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

G.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

H.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendants' actions, plus a civil penalty of at least $5,000 for each violation of IC 5-11-55;

49

I.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et. seq.;

J.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

K.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of MI Public Act 337;

L.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Mont. Stat. Ann. 17-8-401;

M.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

N.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of defendants' actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. §167:61-b(I);

O.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendants' actions, plus civil penalties for each violation of N.M. Stat. Ann. §27-2F-4;

P.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

50

Q.     that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

R.     that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. §8.01-216.3(a);

S.     that this Court enter judgment against defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §2-308.14(a);

T.     that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

U.     that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

V.     that Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

264.     Plaintiff Relator demands a trial by jury.

Dated: October 28, 2008                    Respectfully Submitted:

### FARUQI & FARUQI, LLP

/s/ Jacob A. Goldberg JAG 3869
Kendall S. Zylstra
(Pa Bar No. 64006)
Jacob A. Goldberg
(Pa Bar No. 66399)
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Tel: (215) 914-2460
Email:kzylstra@faruqilaw.com
jgoldberg@faruqilaw.com

*-and-*

51

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

Nadeem Faruqi
Richard Schwartz
369 Lexington Avenue, 10th Floor
New York, NY 10017
Tel: (212) 983-9330
Email:nfaruqi@faruqilaw.com
rschwartz@faruqilaw.com

*Attorneys for Relator Ronald J. Streck*

52

## CERTIFICATE OF SERVICE

Pursuant to 31 U.S.C. §3730(b)(2) and Federal Rule of Civil Procedure 4(d)(4), on this

28th Day of October 2008, I caused a true and correct copy of this Complaint to be served upon

Eric Gill, Assistant United States Attorney at the Office of the United States Attorney, Eastern

District of Pennsylvania at 615 Chestnut Street, Suite 1250, Philadelphia, PA 19106.

/s/ Jacob A. Goldberg JAG3869

2008

Clerk
Clerk

# *Streck I* United States' Notice Declining to Intervene

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

PLAINTIFFS UNDER SEAL,      : **FILED UNDER SEAL**
                                :
                                :

     v.                        :
                                :
                                : CIVIL ACTION NO. 08-5135
DEFENDANTS UNDER SEAL,     :
                                :
                                :

## THE UNITED STATES' NOTICE THAT IT IS NOT INTERVENING AT THIS TIME AS TO ONE DEFENDANT AND DECLINING TO INTERVENE AS TO ALL OTHER DEFENDANTS

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Chief, Civil Division

ERIC D. GILL
Assistant United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106
(215) 861-8250
(215) 861-8618 (Facsimile)
Eric.Gill@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : **FILED UNDER SEAL** |
| ex rel. RONALD J. STRECK, et al., | : |
| | : |
| Plaintiffs, | : |
| v. | : |
| | : CIVIL ACTION NO. 08-5135 |
| ALLERGAN, INC., et al., | : |
| | : |
| Defendants. | : |

## ORDER

The United States having not intervened at this time as to Eisai, Inc. and having declined to intervene as to all other defendants pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(4), the Court rules as follows:

IT IS ORDERED that:

1. The Third Amended Complaint [Docket No. 45, filed April 25, 2011] be unsealed and served upon the defendants by the relator;

2. All other contents of the Court's file in this action remain under seal and not be made public or served upon the defendants, except for this Order and the United States' Notice That It Is Not Intervening at this Time with Respect to Defendant Eisai, Inc. and Declining to Intervene with Respect to all Other Defendants, which the relator will serve upon the defendants only after service of the Third Amended Complaint;

3. The seal be lifted as to all other matters occurring in this action after the date of this Order;

4. The parties shall serve all pleadings and motions filed in this action, including supporting memoranda, upon the United States, as provided for in 31 U.S.C. § 3730(c)(3). The

United States may order any deposition transcripts and is entitled to intervene in this action, for good cause, at any time;

  5.  The parties shall serve all notices of appeal upon the United States;

  6.  All orders of this Court will be sent to the United States; and that

  7.  Should the relator or the defendants propose that this action be dismissed, settled, or otherwise discontinued, the Court will solicit the written consent of the United States before ruling or granting its approval.

So ORDERED, this _____ day of _____ _____, 2011.

BY THE COURT:

_____
HON. EDUARDO C. ROBRENO

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>ex rel. RONALD J. STRECK, et al., | : **FILED UNDER SEAL**<br>:<br>: |
| Plaintiffs, | : |
| v. | :<br>: CIVIL ACTION NO. 08-5135 |
| ALLERGAN, INC., et al., | :<br>: |
| Defendants. | : |

## THE UNITED STATES' NOTICE THAT IT IS NOT INTERVENING AT THIS TIME AS TO DEFENDANT EISAI, INC. AND DECLINING TO INTERVENE AS TO ALL OTHER DEFENDANTS

Pursuant to the False Claims Act, 31 U.S.C. § 3730 (b)(4), the United States notifies the

Court of its intention not to intervene at this time with respect to defendant Eisai, Inc., and

declining to intervene with respect to all other defendants.[1]

In its last Order, dated April 25, 2011, the Court indicated that the Government must

make its intervention decision by May 10, 2011. The Government's review of the allegations in

this case against defendant Eisai, Inc. has not been completed and, as such, the United States is

not able to decide whether to proceed with this action against that defendant. Accordingly, the

United States hereby notifies the Court that it is not intervening at this time as to defendant Eisai,

Inc.

---

[1] The states and District of Columbia identified as co-plaintiffs will separately file with the Court their notice regarding their respective decisions to intervene or decline.

- 1 -

With respect to all other defendants in this action, the United States hereby notifies the Court that it is declining to intervene with respect to them. Accordingly, the United States declines to intervene with respect to Allergan, Inc.; Abbott Labs., Inc.; Amgen, Inc.; Astellas Pharma US, Inc.; AstraZeneca Pharmaceuticals LP; Bayer Healthcare Pharmaceuticals; Bigoen Idec, Inc; Boehringer Ingelheim Pharmaceuticals, Inc.; Bradley Pharmaceuticals, Inc.; Bristol Meyers Squibb Co.; Celgene Corp.; Cephalon, Inc.; Collagenex Pharmaceuticals, Inc; Daiichi Sankyo, Inc.; Eli Lilly & Co.; Genzyme Corp.; Johnson & Johnson; Mallinckrodt Inc.; Merck & Co, Inc.; Novo Nordisk, Inc.; Pfizer, Inc.; Purdue Pharma, LLP; Reliant Pharmaceuticals, Inc.; Roche Labs., Inc.; Sanofi-Aventis U.S.; Santaurus Inc.; Schwarz Pharma, LLC; Schie Pharma, Inc; Sepracor, Inc.; Shire US Inc.; Stonebridge Pharma LLC; Takeda Pharmaceuticals North America, Inc.; Teva Pharmaceuticals USA; Upsher-Smith Labs., Inc.; and Watson Pharmaceuticals, Inc.

The United States respectfully refers the Court to 31 U.S.C. § 3730(b)(1), which allows the relator to maintain the action in the name of the United States; it provides, however, that the "action may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." Id. Therefore, the United States requests that, should either the relator or the defendants propose that this action be dismissed, settled, or otherwise discontinued, this Court solicit the written consent of the United States before ruling or granting its approval.

Furthermore, pursuant to 31 U.S.C. § 3730(c)(3), the United States requests that all pleadings filed in this action be served upon it; the United States also requests that orders issued

-2-

by the Court be sent to the Government's undersigned counsel.  The United States reserves its right to order any deposition transcripts and to intervene in this action, for good cause, at a later date.  The United States also requests that it be served with all notices of appeal.

Finally, the Government requests that only the relator's Third Amended Complaint, this Notice, and the attached proposed Order be unsealed.  The United States requests that all other papers on file in this action remain under seal; in discussing the content and extent of the United States' investigation, such papers are provided by law to the Court alone for the sole purpose of evaluating whether the seal and time for making an election to intervene should be extended.

A proposed order accompanies this notice.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division

ERIC D. GILL
Assistant United States Attorney

Dated:  May 9, 2011

-3-

## CERTIFICATE OF SERVICE

I hereby certify that a copy of only the United States' Notice of its Intention Not to

Intervene at this Time with Respect to Defendant Eisai, Inc. and Declining to Intervene with

Respect to All Other Defendants and Proposed Order were sent by United States mail, postage

prepaid, this day, to the following:

Kendal S. Zylstra
Jacob A. Goldberg
FARUQI & FARUQI
101 Greenwood Ave.
Suite 600
Jenkintown, PA 19046

Todd S. Collins
Daniel R. Miller
Joy Clairmont
Shauna Itri
BERGER & MONTAGUE, P.C.
1600 Locust Street
Philadelphia, PA 19103

*Counsel for Relator*

Kamala Harris
California Attorney General
Office of the Attorney General
1300 "I" Street, Suite 1740
P. O. Box 944255
Sacramento, CA 95814

George Jepsen
Connecticut Attorney General
Office of the Attorney General
55 Elm Street
Hartford, CT 06141

Beau Biden
Delaware Attorney General
Office of the Attorney General
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

Pam Bondi
Florida Attorney General
Office of Attorney General
The Capitol, PL-01
Tallahassee, FL 32399-1050

Alex Sink
Chief Financial Officer
Florida Department of Financial Services
200 East Gaines Street
Tallahassee, FL 32399-4228

Sam Olens
Georgia Attorney General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, GA 30334

David Louie
Attorney General of Hawaii
Department of the Attorney General
425 Queen Street
Honolulu, HI 96813

Lisa Madigan
Illinois Attorney General
Office of the Attorney General
100 West Randolph Street
Chicago, IL 60601

Greg Zoeller
Indiana Attorney General
Office of the Attorney General
Indiana Government Center South
302 W. Washington Street, 5th Floor
Indianapolis, IN 46204

David O. Thomas, Inspector General
Office of the Inspector General
315 W. Ohio Street, Room 104
Indianapolis, IN 46202

James D. Caldwell
Louisiana Attorney General
Office of the Attorney General
P. O. Box 94095
Baton Rouge, LA 70804

Martha Coakley
Massachusetts Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108

Bill Schuette
Michigan Attorney General
Office of the Attorney General
G. Mennen Williams Building, 7th Floor
525 W. Ottawa Street
Lansing, MI 48909

Steve Bullock
Montana Attorney General
Office of the Attorney General
Department of Justice, Justice Building
215 North Sanders
Helena, MT 59620-1401

Catherine Cortez Masto
Nevada Attorney General
Office of the Attorney General
100 North Carson Street
Carson City, Nevada 89701-4717

Michael A. Delaney
New Hampshire Attorney General
Office of the Attorney General
33 Capitol Street
Concord, NH 03301

Paula T. Dow
New Jersey Attorney General
Office of the Attorney General
Richard J. Hughes Justice Complex
8th Floor, West Wing, 25 Market Street
P.O. Box 080
Trenton, NJ 08625-0080

Gary King
New Mexico Attorney General
Office of the Attorney General
P. O. Drawer 1508
Santa Fe, NM 87504

Eric Schneiderman
New York State Attorney General
Office of the Attorney General
Department of Law - The Capitol, 2nd Floor
Albany, NY 12224-0341

F. Edward Kirby, Jr.
Assistant Attorney General
Medicaid Fraud Investigations Unit
State of North Carolina
3824 Barrett Drive, Suite 200
Raleigh, NC 27609

Scott Pruitt
Oklahoma Attorney General
Office of the Attorney General
313 NE 21st Street
Oklahoma City, OK  73105

Peter Kilmartin
Rhode Island Attorney General
Office of the Attorney General
150 South Main Street
Providence, RI 02903

Robert E. Cooper, Jr.
Tennessee Attorney General
Office of the Attorney General and Reporter
425 5th Avenue North
Nashville, TN 37243

Greg Abbott
Texas Attorney General
Office of the Attorney General
Capitol Station
P. O. Box 12548
Austin, TX 78711

Ken Cuccinelli
Virginia Attorney General
Office of the Attorney General
900 East Main Street
Richmond, VA 23219

J. B. Van Hollen
Wisconsin Attorney General
Office of the Attorney General
State Capitol, Suite 114-E
Madison, WI 53707-7857

Irvin Nathan
District of Columbia Attorney General
Office of the Attorney General
John A. Wilson Building, Suite 409
1350 Pennsylvania Avenue, NW
Washington, D.C.  20009

Robert B. Teitelman
Assistant Attorney General
State of Connecticut
55 Elm Street
Hartford, CT  06106-1774

Date:  May 9, 2011

ERIC D. GILL
Assistant United States Attorney

# *Streck I* Fourth Amended Complaint

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, THE STATE OF CALIFORNIA, THE STATE OF CONNECTICUT, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF GEORGIA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE COMMONWEALTH OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW JERSEY, THE STATE OF NEW MEXICO, THE STATE OF NEW YORK, THE STATE OF NORTH CAROLINA, THE STATE OF OKLAHOMA, THE STATE OF RHODE ISLAND, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE COMMONWEALTH OF VIRGINIA, THE STATE OF WISCONSIN, AND THE DISTRICT OF COLUMBIA, *ex rel.* RONALD J. STRECK<br><br>Plaintiffs,<br><br>v.<br><br>ALLERGAN, INC., AMGEN, INC., ASTRAZENECA PHARMACEUTICALS LP, AZTRAZENECA LP, BIOGEN IDEC, INC., BRADLEY PHARMACEUTICALS INC. n/k/a NYCOMED US, INC., CEPHALON, INC., EISAI, INC., GENZYME CORPORATION, MALLINCKRODT INC., NOVO NORDISK, INC., RELIANT PHARMACEUTICALS, INC., SEPRACOR n/k/a SUNOVION PHARMACEUTICALS INC., and UPSHER-SMITH LABORATORIES, INC.,<br><br>Defendants. | **RELATOR'S FOURTH AMENDED COMPLAINT PURSUANT TO THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§3729 *ET SEQ.* AND SUPPLEMENTAL STATE FALSE CLAIMS ACTS**<br><br><br><br>CIVIL ACTION NO. 08-5135<br><br><br><br>**JURY TRIAL DEMANDED** |

1.       Ronald J. Streck ("Relator") brings this action on behalf of the United States, the State of California, the State of Connecticut, the State of Delaware, the District of Columbia, the State of Florida, the State of Georgia, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the Commonwealth of Massachusetts, the State of Michigan, the State of Montana, the State of Nevada, the State of New Jersey, the State of New Hampshire, the State of New Mexico, the State of New York, the State of North Carolina, the State of Oklahoma, the State of Rhode Island, the State of Tennessee, the State of Texas, the Commonwealth of Virginia, and the State of Wisconsin (the "Plaintiff States" and collectively with the United States, the "Government Plaintiffs"), for violations of the Federal False Claims Act, 31 U.S.C. §§3729 *et seq.*, as well as for violations of the following state false claims acts: The California False Claims Act, Cal. Gov't Code §§12650 *et seq.*; The Connecticut False Claims Act, Conn. Gen. Stat. § 17b-301b; The Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, §§1201 *et seq.*; The District of Columbia False Claims Act, D.C. Code Ann. §§2-308.03 *et seq.*; The Florida False Claims Act, Fla. Stat. §§ 68.081 *et seq.*; The Georgia False Medicaid Claims Act, Ga. Code Ann. §§49-4-168 *et seq.*; The Hawaii False Claims Act, Haw. Rev. Stat. §§661-21 *et seq.*; The Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. Stat. Ann. §§175/1 *et seq.*; The Indiana False Claims and Whistleblower Protection Act, Indiana Code §5-11-5.5; The Louisiana Medical Assistance Programs Integrity Law, La. R.S. 46:437.1 *et seq.*; The Massachusetts False Claims Act, Mass. Ann. Laws. Ch. 12, §§5A *et seq.*; The Michigan Medicaid False Claims Act, MCLS §§400.601 *et seq.*; Montana False Claims Act, Mont. Code Anno. §§17-8-401 et *seq.*; The Nevada False Claims Act, Nev. Rev. Stat. §§ 357.010 *et seq.*; The New Hampshire False Claims Act, RSA tit. XII, Ch. 167: 61-b; The New Jersey False Claims Act, N.J. Stat. §2A:32C-1 *et seq.*; The New Mexico Medicaid False Claims

Act, N.M. Stat. Ann. §§ 27-14-1 *et seq.*; The New York False Claims Act, NY CLS St. Fin. §§187 *et seq.*; The North Carolina False Claims Act, 2009-554 N.C. Sess. Laws §§1-605 *et seq.*; The Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, §§5053 *et seq.*; The Rhode Island False Claims Act, R.I. Gen. Laws §§9-1.1-1 *et seq.*; The Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-171 *et seq.*; The Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001 *et seq.*; The Virginia Fraud Against Taxpayers Act, Va. Code §§8.01-216.1 *et seq.* and the Wisconsin False Claims for Medical Assistance Act, Wis. Stats. §§20.931 (hereinafter referred to as the "State False Claims Acts") to recover all damages, civil penalties and all other recoveries provided for under the Federal False Claims Act and the State False Claims Acts against the following defendants, and their affiliates, subsidiaries, agents, successors and assigns: Allergan, Inc., Amgen, Inc., AstraZeneca Pharmaceuticals LP, Biogen Idec, Inc., Bradley Pharmaceuticals, Inc., Cephalon, Inc., Eisai, Inc., Genzyme Corporation, Mallinckrodt Inc., Novo Nordisk, Inc., Reliant Pharmaceuticals, Inc., Sepracor, Inc., and Upsher-Smith Laboratories, Inc. (collectively, "Defendants").

## I.  SUMMARY

2.  Congress established the Medicaid Drug Rebate Program to ensure that Medicaid, the government health care program for the indigent, would enjoy the same discounts on the price of prescription drugs as other large public and private purchasers. Congress therefore decided to "establish a rebate mechanism in order to give Medicaid the benefit of the best price for which a manufacturer sells a prescription drug to any public or private purchaser." H.R. Rep. No. 101-881, at 96 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2017, 2108.

3.  To ensure that state Medicaid programs receive the best or lowest possible price for pharmaceuticals, the Social Security Act ("SSA") requires manufacturers whose products are sold to Medicaid beneficiaries to execute a rebate agreement with the federal government. 42

2

U.S.C. § 1396r-8(a)(1). Under this agreement, manufacturers pay rebates to state Medicaid programs. The amounts of the rebates are based on the Average Manufacturer's Price ("AMP") each manufacturer reports for its prescription drugs.

4.      AMPs are reported by manufacturers to the Centers for Medicaid and Medicare Services ("CMS"). Since Medicaid rebates depend entirely on pricing data that the pharmaceutical manufacturers self-report to CMS, the accuracy of the data is critical.

5.      Generally, the higher the AMP reported by a manufacturer, the greater the rebate owed by the manufacturer to Medicaid. The necessity of paying rebates incentivizes unscrupulous manufacturers to minimize their reported AMPs.

6.      The Defendants named in this Complaint knowingly reported materially inaccurate AMPs to CMS from 2004 through the present (the "Relevant Time Period"), and thereby defrauded the Government Plaintiffs.

7.      Beginning no later than 2004, Defendants and the pharmaceutical industry's wholesalers began executing and implementing distribution services agreements ("Service Agreements"). Service Agreements provide for a new trade structure known as "fee-for-service." Service Agreements generally obligate manufacturers to pay a fee to wholesalers (also referred to herein as "distributors") in exchange for services the wholesalers provide (the "Service Fee"). The Service Fee is typically an amount equal to a set percentage of the wholesalers' gross purchases of the manufacturers' products. For example, if a wholesaler's Service Fee is 2% of gross purchases, and gross purchases for a given quarter are $100, the Service Fee owed by the manufacturer is $2.

8.      In exchange for the Service Fee, the wholesaler provides certain services to the manufacturer. While the Service Agreements at issue in this case differ in certain particulars,

3

many of the primary services addressed in the various Service Agreements are similar and include distribution services (buying, storing, packing and shipping drugs), inventory management services (maintaining an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs), and data reporting services (providing detailed daily, weekly or monthly reports of sales and inventory data). *See* Section V below for a more detailed discussion of the services provided under the Service Agreements.

9. Defendants use these Service Fees to artificially lower their reported AMPs, which enables them, in violation of law, to materially underpay rebates to the state Medicaid programs. Each of the Defendants executed this fraud through one of two schemes: a) the "Discount Scheme," or b) the "Service Fee Scheme." Accordingly, the Defendants in this case fall into two categories which can be denoted as follows: a) the "Discount Defendants," and b) the "Service Fee Defendants."

10. The Discount Defendants – In calculating AMP, manufacturers must include all discounts they offer to wholesalers and other purchasers. 42 U.S.C. §1396r-8(k)(1); Medicaid Rebate Agreement, §I(a). The practical effect of including a discount in AMP is to *lower* AMP by the amount of the discount.

11. For reasons which are discussed in detail later in this Complaint, each of the services provided by a wholesaler has value to the manufacturer who purchases the service. That is to say, in the absence of a wholesaler to perform these services, the manufacturer would have to pay a third party to perform the services (or perform those services on its own at a substantial cost to the company). As such, the fees paid for these services are *bona fide*.

12. Notwithstanding the bona fide nature of the Service Fees they pay, the Discount Defendants fraudulently characterized their payments to wholesalers for these services as

4

"discounts" to the wholesalers, as opposed to what they were: fees for valuable services actually rendered. Since discounts, by law, are included in the calculation of AMP, this knowing mischaracterization of the fees paid to wholesalers reduced the manufacturers' reported AMPs by the amount of the "discount." Consequently, the Discount Defendants fraudulently understated their rebate obligations to the Government Plaintiffs.

13.    The Service Fee Defendants – As noted above, manufacturers *must include all price increases in AMP*. Price increases cause AMP to rise, resulting in higher rebate obligations for manufacturers. However, all *bona fide* service fees are *excluded* from AMP. Thus, to the extent a manufacturer can disguise a price increase by hiding it within its contractual definition of "Service Fee," the price increase will not cause the manufacturer's reported AMP – and its consequent rebate obligations to the Government Plaintiffs – to rise.

14.    The Service Agreements at issue in this case contain so-called "price appreciation" clauses. These clauses provide that when a manufacturer *increases* its prices on a particular drug, the Service Fee owed by the manufacturer to the wholesaler is *lowered* by the amount of the wholesaler's units in inventory (of that drug), multiplied by the amount of the price increase. Thus, when a manufacturer raises the price of a drug, that price increase *applies retroactively to the wholesaler's inventory*, even though the wholesaler previously purchased that inventory at a lower price.

15.    The effect of these "price appreciations" is that the wholesaler retroactively pays the manufacturer in the amount of the price increase, dollar for dollar. Price "appreciations," therefore, are retroactive price increases. However, no invoice is sent from the manufacturer to the wholesaler for these price increases. For purposes of this Complaint, "price appreciations on inventory" and "price appreciation credits" will be referred to as "off-invoice price increases."

5

16.     Under the Medicaid Drug Rebate Program, manufacturers must include all price increases – including off-invoice price increases – in their calculations of AMP. In violation of this obligation, the Service Fee Defendants disguised these off-invoice price increases by cramming them into the definition of Service Fee. This led to a reduction in the Service Fee by the amount of the off-invoice price increase, rather than an increase in AMP by the amount of the off-invoice price increase, thus providing Service Fee Defendants with a convenient but illegal method to exclude off-invoice price increases from their AMP calculations.

17.     Through these two schemes, the Discount Defendants and the Service Fee Defendants knowingly reported, and continue to report, materially deflated AMPs for the drugs governed by the Service Agreements (the "Relevant Drugs"). By purposely and materially understating their AMPs, both the Discount Defendants and the Service Fee Defendants paid and continue to pay materially inadequate rebates to the Government Plaintiffs.

## II.     JURISDICTION AND VENUE

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1345, 28 U.S.C. §1367, and 31 U.S.C. §3732.

19.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §3732(a).

20.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants transact business in this District.

## III.     PARTIES

21.     Relator Ronald J. Streck is a lawyer and pharmacist. He has worked in the pharmaceutical industry for more than 40 years in various capacities, including sales, regulatory affairs and association management, including 11 years as the president and chief executive officer of the Healthcare Distribution Management Association. The active members of the

6

A143

Healthcare Distribution Management Association include prescription drug wholesalers. At the time of the filing of this complaint, Relator served as the president and chief executive officer of Rx Distribution Network ("the Network"), a network of regional pharmaceutical wholesalers. In his capacity as CEO of the Network, Relator has negotiated the terms of agreements between pharmaceutical manufacturers and the wholesalers the Network represents, including the agreements at issue in this *qui tam* action.

22.    Through his work as CEO of the Network, Relator became thoroughly familiar with the distribution agreements that manufacturers, including Defendants, execute with wholesalers. Relator discovered that Defendants, as a matter of contract, misreported and continue to misreport AMP data to government programs.

23.    The United States is a plaintiff in this action. Throughout the Relevant Time Period, the United States Department of Health and Human Services ("HHS") and the Centers for Medicare & Medicaid Services ("CMS") were agencies of the United States and their activities, operations and contracts were paid from United States funds. Throughout the Relevant Time Period, Defendants' Relevant Drugs were provided to Medicaid recipients and the cost of those prescriptions were paid for in part by the United States.

24.    The above-named States are plaintiffs in this action. Throughout the Relevant Time Period, Defendants' Relevant Drugs were provided to Medicaid recipients in each of the Plaintiff States, and those prescriptions were paid for in part by the Plaintiff States' respective Medicaid programs.

25.    Defendant Allergan, Inc. ("Allergan") is a Delaware corporation, headquartered at 2525 Dupont Drive, Irvine California 92612. Allergan's drug products include those in the specialty areas of eye care, neurosciences, medical dermatology and urologics. During the

7

Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

26.     Defendant Amgen, Inc. ("Amgen") is a Delaware corporation, headquartered at One Amgen Center Drive, Thousand Oaks, CA 91320-1799. Amgen specializes in human therapeutics including those to treat cancer, kidney disease and rheumatoid arthritis. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

27.     Defendant AstraZeneca Pharmaceuticals LP ("AstraZeneca") is a Delaware corporation, headquartered in Wilmington, Delaware. AstraZeneca's pharmaceutical products are concentrated in six therapeutic areas: gastrointestinal, cardiovascular, neuroscience, respiratory, oncology and infection. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

28.     Defendant Biogen Idec, Inc. ("Biogen") is a Delaware corporation, headquartered at 14 Cambridge Center, Cambridge, MA 02142. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

29.     Defendant Bradley Pharmaceuticals, Inc. n/k/a Nycomed US, Inc. ("Bradley") was a Delaware corporation, headquartered in West Fairfield, NJ. In 2008, Nycomed US, Inc., a New York corporation based in Melville, NY, acquired Bradley Pharmaceuticals, Inc., and

8

integrated Bradley's pharmaceuticals into its PharmaDerm division. Bradley's "Distribution Services Agreement" dated July 1, 2004 provides that it is binding upon the parties and their respective successors and assigns. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

30.     Defendant Cephalon, Inc. ("Cephalon") is a company incorporated under the laws of Delaware, with its principal place of business at 41 Moores Road, Frazer, Pennsylvania, 19355. Cephalon's pharmaceutical products treat central nervous system disorders, pain and cancer. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

31.     Defendant Eisai, Inc. ("Eisai") is the wholly owned U.S. subsidiary of Eisai, Ltd., a Japanese corporation. Eisai is headquartered at 100 Tice Boulevard, Woodcliff Lake, NJ 07677. Eisai sells and markets pharmaceutical products for the treatment of Alzheimer's disease, acid reflux and epilepsy. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

32.     Defendant Genzyme Corporation ("Genzyme") is a Massachusetts corporation, headquartered at 500 Kendall Street, Cambridge, MA 02142. Genzyme's product portfolio is focused on rare disorders, renal diseases, orthopedics, organ transplant, diagnostic and predictive testing, and cancer. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

33.     Defendant Mallinckrodt Inc. ("Mallinckrodt") is a Delaware corporation, headquartered in St. Louis, Missouri. Mallinckrodt's pharmaceutical products include generic and brand drugs for the treatment of depression, and the treatment of cold-related cough. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

34.     Defendant Novo Nordisk, Inc., ("Novo Nordisk") is a Delaware corporation with its principal office in Princeton, New Jersey. Novo Nordisk's product line focuses on diabetes care, growth hormone therapy and hormone replacement therapy. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

35.     Defendant Reliant Pharmaceuticals Inc. is a Delaware corporation, headquartered at 110 Allen Road, Liberty Corner, NJ 07938. Reliant Pharmaceuticals Inc.'s product line focuses on cardiovascular drugs. In 2007, GlaxoSmithKline, PLC ("Glaxo") acquired Reliant Pharmaceuticals Inc. Reliant's "Distribution Services Agreement" dated February 1, 2005 provides that it is binding upon the parties and their respective successors and assigns. Reliant Pharmaceuticals Inc. and Glaxo are referred to collectively herein as "Reliant." During the Relevant Time Period, the Reliant's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

36.     Defendant Sepracor, Inc. n/k/a Sunovion Pharmaceuticals Inc. ("Sepracor") was a Delaware corporation, headquartered in Marlborough, MA. In 2009, Dainippon Sumitomo

10

Pharma Co., Ltd, a Japanese company, acquired Sepracor. In 2010, Sepracor's name was changed to Sunovion Pharmaceuticals Inc. Sepracor's "Distribution Services Agreement" dated January 1, 2007 provides that it is binding upon the parties and their respective successors and assigns. During the Relevant Time Period, Sepracor's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

37.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith"), is a Minnesota corporation, headquartered at 6701 Evenstad Drive, Maple Grove, MN 55369. Upsher-Smith's product portfolio is focused in the areas of women's health, dermatology and cardiology. During the Relevant Time Period, the company's Relevant Drugs were paid for by the Government Plaintiffs, and the company materially and fraudulently underpaid its Medicaid rebate obligations to the Government Plaintiffs.

## IV.    THE APPLICABLE LAW

### A.    The Federal and State False Claims Acts

38.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or any person who knowingly makes uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States for treble damages and a civil monetary penalty. 31 U.S.C. § 3729(a)(1)(A)-(B).[1]

39.     The FCA further provides that any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money

---

[1] Prior to the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Public Law 111-21 (enacted May 20, 2009), Section 3729(a)(1)(A) was Section 3729(a)(1), which imposed liability on any person who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval."

or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States for treble damages and a civil monetary penalty.  31 U.S.C. § 3729(a)(1)(G).[2]

40.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  Proof of specific intent to defraud is not required.  31 U.S.C. § 3729(b)(1)(B).

41.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

42.     Each of the Plaintiff States has individually enacted a False Claims Act.  Each of those Acts is modeled after the Federal FCA, and each contains provisions similar to those quoted above.  Relator asserts claims under the State FCAs for the State portion of Medicaid false claims detailed in this complaint.

**B.     The Medicaid Drug Rebate Program**

43.     To curb mounting Medicaid drug expenditures, Congress created the Medicaid Drug Rebate Program ("Medicaid Rebate Program" or "Rebate Program") under the Omnibus Budget Reconciliation Act of 1990.  To receive Medicaid coverage for outpatient prescription drugs, drug manufacturers are required to enter into a Medicaid Rebate Agreement with the Secretary of Health and Human Services.  *See* 42 U.S.C. § 1396r-8(a)(1).

44.     Under the Rebate Program, manufacturers pay a rebate to each individual state's Medicaid program for all outpatient pharmaceuticals paid for by that state's Medicaid program.

---

[2] Prior to FERA, Section 3729(a)(1)(G) was formerly Section 3729(a)(7), which imposed liability on any person who "knowingly makes, uses, or causes to be made or used a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government."

That is, Medicaid reimburses retail pharmacies for the cost of prescriptions and then, under the terms of the Rebate Program, the state Medicaid programs receive rebates from manufacturers. This process is designed to give Medicaid the benefit of the lowest price at which a manufacturer sold a drug to any commercial customers.

45.     Medicaid is a jointly-funded federal-state program.  42 U.S.C. §1396b(a)(1); 42 U.S.C. §1396r-8(b)(1)(B).  The amount paid by the federal government is known as the Federal Matching Assistance Percentage ("FMAP").

46.     Each state's request for money from the federal government and the corresponding FMAP is submitted to CMS on Form CMS-64.  This form includes exact dollar figures reflecting the "Drug Rebate Offset" as well as a "Medicaid Drug Rebate Schedule."  The amount received by a state in Medicaid rebates is considered a reduction in the total amount expended under that state's Medicaid plan.  Therefore, the less any individual state receives in Medicaid rebates, the greater the total amount expended by the state, and the more the federal government must correspondingly pay to the state to meet the federal government's share of the joint costs.

47.     More specifically, each quarter, state Medicaid programs report to CMS their utilization data – the quantity of each drug paid for by each state Medicaid program during that quarter.  42 U.S.C. § 1396r-8(b)(2).  At or about the same time, manufacturers report to CMS the AMPs of their drugs for that quarter.  *Id.* § 1396r-8(b)(3).  Relying on the accuracy of the data provided by manufacturers, CMS calculates the unit rebate amount ("URA"), which the states then use to invoice each manufacturer for the rebate it owes.

48.     The amount of the rebate on a generic drug is calculated as the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) 11% of

the AMP for the rebate period (or, from Jan. 1, 2010 to the present, 13% of the AMP for the rebate period). *See* The Patient Protection and Affordable Care Act, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(3).

49.     For a brand-name drug, the total amount owed by a manufacturer in rebates is the sum of its two principal components: 1) the Basic Unit Rebate Amount ("Basic Rebate"), and 2) the Additional Unit Rebate Amount ("Additional Rebate").  42 U.S.C. §1396r-8(c)(1).

50.     The Basic Rebate for brand drugs is equal to the product of: (1) the total number of each dosage form and strength paid for during the rebate period and (2) the greater of (a) the difference between AMP and the best price ("BP") [3] for the dosage form and strength of the drug, or (b) 15.1% of the AMP for the rebate period (or, from Jan. 1, 2010 to the present, 23.1% of the AMP for the rebate period).  *See* The Patient Protection and Affordable Care Act, Pub. Law No. 111-148, §2501(a) and (b); 42 U.S.C. §1396r-8(c)(1).

51.     When the percentage increase in AMP for a dosage form and strength of a drug exceeds the percentage increase in the Urban Consumer Price Index ("CPI") since the initial sale of the drug, the manufacturer owes an Additional Rebate.[4]

52.     During the Relevant Time Period, pharmaceutical prices for brand name drugs have risen annually at a pace which far exceeds increases in the CPI.  Consequently, nearly every one of Defendants' price increases during the same period exceeded the growth in the CPI. Appended as Exhibit A is a chart, hereby incorporated by reference as if fully set forth herein,

---

[3] Specifically, Best Price is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . ." *See* 42 U.S.C. §1396r-8(c)(1)(C)(i).  Best Price includes all discounts, rebates, or other price concession. *See* 42 U.S.C. §1396r- 8(c)(1)(C)(ii).

[4] *See* 42 U.S.C. §1396r-8(c)(2) (describing the calculation of additional rebate as the amount by which the AMP "for the dosage form and strength of the drug for the period exceeds the [AMP] for. . . for the calendar quarter beginning July 1, 1990. . . increased by the percentage by which the consumer price index for all urban consumers for the month in which the rebate period begins exceeds such index for September 1990").

showing drugs manufactured by each Defendant, and the corresponding prices for those drugs.[5] This chart shows actual price increases for each Defendant's products and the percentage increase over the previous price.[6] Appended hereto as Exhibit B is a chart, hereby incorporated by reference as if fully set forth herein, showing the increase in the CPI during the Relevant Period. This data demonstrates that, with respect to the Relevant Drugs, prices increased far faster than the CPI over the same period, and thus Additional Rebates are owed by Defendants.

#### (i) The Definition of AMP

53.     From the beginning of the Relevant Time Period until November 2010, the SSA defined AMP as "the average price paid to the manufacturer for the drug in the United States by wholesalers for drugs distributed to the retail pharmacy class of trade." 42 U.S.C. §1396r-8(k)(1) (Feb. 2010). That definition confirms that: 1) discounts are included in AMP (because they lower the price "paid to the manufacturer"), and 2) fees paid in exchange for services should be excluded from AMP, because such fees are payments for legitimate services rendered by wholesalers (and thus are not related to drug prices).

54.     Through the rulemaking process, CMS promulgated a regulation effective July 2007 which stated what was already obvious: *bona fide* Service Fees are excluded from the calculation of AMP. 72 Fed. Reg. 39142 (July 17, 2007) (codified at 42 C.F.R. Part 447) ("2007 AMP Regulation")("AMP excludes . . . [b]ona fide service fees"). 42 C.F.R. §447.504(h)(19).

55.     The 2007 AMP Regulation defined *bona fide* service fees as:

> fees paid by a manufacturer to an entity, that represent fair market value for a *bona fide*, itemized service actually performed on

---

[5] These prices are based on Wholesale acquisition cost ("WAC"), which is the price at which a pharmaceutical company typically sells a drug to a wholesaler, less any applicable discounts. Because AMP data is Defendants' proprietary information and is inaccessible to Relator, Relator uses WAC here to approximate AMP.

[6] This data comes from Medi-Span, which is a commercial publisher of drug transaction data which is relied upon by government agencies and health care providers across the United States.

behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement; and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug.

42 C.F.R. §447.502.

56.  This definition encompasses the following four elements:

1)  The fee paid must be for a *bona fide*, itemized service that is actually performed on behalf of the manufacturer;

2)  The manufacturer would otherwise perform or contract for the services in the absence of the service arrangement;

3)  The fee represents fair market value; and

4)  The fee is not passed on in whole or part to a client or customer of an entity.

*See* 71 Fed. Reg. 69624, 69667-9 (Dec. 1, 2006) (ASP regulations' definition of *bona fide* service fees); 72 Fed. Reg. 39142, 39182 (2007 AMP Regulation expressly adopts the interpretation of the definition of *bona fide* service fees as set forth in the ASP regulations). CMS interprets the first two elements "to encompass any reasonably necessary or useful services of value to the manufacturer that are associated with the efficient distribution of drugs." 71 Fed. Reg. at 69667-9. With respect to the third element that the fee must represent fair market value, CMS recognizes that it is appropriate to either calculate fair market value for a set of itemized services, or to calculate fair market value on a per-service basis. *Id.* As to the fourth element that the fee is "not passed on," if the fee meets the first three requirements, the manufacturer may presume it was not passed on to a client or customer of an entity. *Id.*

57.  In November 2010, the definition of AMP was re-codified to specifically state what was already obvious, i.e., that *bona fide* service fees are excluded from AMP:

(i) In general. – The average manufacturer price for a covered outpatient drug shall exclude –

16

A153

*****

> (II) *bona fide* service fees paid by manufacturers to wholesalers or
> retail community pharmacies, including (but not limited to)
> distribution service fees, inventory management fees, product
> stocking allowances, and fees associated with administrative
> services agreements and patient care programs (such as medication
> compliance programs and patient education programs);

42 U.S.C. § 1396r-8(k)(1).[7]

58.     Further, as to the Discount Defendants, the Medicaid Rebate Statute again
expressly states that discounts must be included in AMP: "any discounts, rebate payments, or
other financial transactions that are received by, paid by, or passed through to, retail community
pharmacies shall be included in the [AMP] for a covered outpatient drug." *Id.*

### (ii) The Medicaid Rebate Agreement

59.     The Medicaid Rebate Agreement entered into by all manufacturers participating
in Medicaid – which includes all of the Defendants in this lawsuit – states that AMP is "the
average unit price paid to the Manufacturer for the drug . . . by wholesalers." Medicaid Rebate
Agrmt, § I(a).   The Rebate Agreement further clarifies that "AMP includes cash discounts
allowed and all other price reductions . . . which reduce the actual price paid." *Id.*   Also, the
Rebate Agreement requires manufacturers to revise AMP for previous quarters if "discounts or
other arrangements subsequently adjust the prices actually realized." *Id.*

---

[7] This Medicaid Rebate Statute amendment was part of the March 23, 2010 passage of the Patient Protection and
Affordable Care Act ("ACA"). Among its provisions, the ACA amended section 1927(k) of the Social Security Act,
42 U.S.C. §1396r-8(k), clarifying the definition of AMP. 75 Fed. Reg. 69591, 69592 (Nov. 15, 2010). This was
partly in response to previous litigation by the National Association of Chain Drug Stores and others against the
Department of Health and Human Services, challenging the calculations of federal upper limits based on the
definition of AMP. *National Ass'n of Chain Drug Stores v. U.S. Dep't of Health & Human Servs.*, 631 F. Supp.2d
17, 18 (D.D.C. 2009). As a result of this Medicaid Rebate Statute amendment, CMS withdrew its 2007 AMP
Regulation. *See* 75 Fed. Reg. 69591.

17

### (iii) The Medicaid Rebate Operational Training Guide

60.     The Medicaid Rebate Operational Training Guide, F11 (2001), states that AMP should be reduced by discounts:

> Basically, AMP is calculated as NET quarterly sales divided by the number of units sold.
>
> "Net quarterly sales" are derived after all required adjustments are made (e.g., discounts, rebate for state-only programs, breakage, etc.).

### (iv) Conclusion: AMP Includes Discounts and Excludes Service Fees Throughout the Relevant Time Period

61.     Although the AMP statute, the AMP regulation, the Rebate Agreement, and the Medicaid Rebate Operational Training Guide have been amended over time, three things have remained consistent.  First, discounts are included in AMP because they affect prices actually realized by manufacturers.    Second, fees paid in exchange for services rendered are not discounts.  Third, off-invoice price increases cannot be excluded from AMP by cramming those price increases into a self-serving definition of Service Fees or by offsetting Service Fees by off-invoice price increases.

62.     In addition, there is a parallel statutory drug pricing benchmark – average sales price ("ASP") – which directly corroborates Relator's statement of the law.

63.     ASP is a pricing benchmark which applies to Medicare Part B, while AMP is a pricing benchmark which applies to Medicaid.  Both serve a similar function: to limit or "cap" the government's prescription drug costs.

64.     ASP expressly states that discounts should be included in the ASP calculation.  42 U.S.C. § 1395w-3a(c)(1), (c)(3).  Further, in 2006, CMS enacted ASP regulations defining *bona fide* Service Fees.  The regulations expressly re-affirmed that Service Fees are payments for

18

A155

legitimate services rendered (and thus are not related to the price of the drug), and thus manufacturers must exclude *bona fide* Service Fees from ASP. *See* 71 Fed. Reg. 69624, 69668 (Dec. 1, 2006) (relevant sections codified at 42 C.F.R. § 414.802, 414.804).

## V.    DEFENDANTS' SCHEMES TO DEFRAUD GOVERNMENT PAYERS

65.    Starting no later than 2004, manufacturers and wholesalers developed a new trade structure which involved the use of Service Agreements.    Under Service Agreements, manufacturers periodically pay wholesalers Service Fees.    Service Fees are calculated by multiplying a wholesaler's gross purchases of a manufacturer's product by a certain percentage.

66.    While the Service Agreements at issue in this case differ in certain particulars, many of the primary services provided by wholesalers pursuant to Service Agreements are as follows:

- **Distribution Services** – buying storing, packing and shipping drugs from the manufacturer to customers.    This includes emergency delivery services – delivering the manufacturer's products on an emergency 24/7/365 basis.

- **Data Reporting Services** – generating daily, weekly, or monthly inventory reports (EDI 852 data)  and sales reports (EDI 867 data).

  The inventory reports (852 data) provides the manufacturer with aggregate sales, the wholesaler's inventory levels (on-hand and on-order), demand forecasts, "morgue inventory" (returned goods), special needs forecast by the distributor for particular events, units ordered by customers, and orders filled by the wholesaler.

  The sales reports (867 data) provides the manufacturer with specific information regarding the distributors' customers, including the identity and location of the customer, and the amounts ordered and amounts returned by the customer.

- **Inventory Management** – maintaining an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs in anticipation of a price increase (also known as "speculative buying" or "spec buying"), including using automated inventory balancing systems, and maintaining environmentally controlled storage facilities.

67.    Other categories of services, described more fully below, include:

19

- Chargeback and returns processing services
- Customer service support
- New product launch services
- Consolidated deliveries to providers
- Consolidated accounts receivable management
- The provision of sophisticated ordering technology

## A. The Discount Defendants' Scheme

68. Under the law defining AMP during the Relevant Time Period, all discounts are included in AMP. The practical effect of including a discount in AMP is to *lower* AMP by the amount of the discount.

69. As noted above, each of the services provided for in the Service Agreements has real value to the manufacturer/purchaser. That is to say, in the absence of wholesalers to perform these services, the manufacturer would have to pay third parties to perform the services (or perform those services on its own at a substantial internal cost).

70. Distribution services, including emergency delivery services, are valuable to Defendants. If wholesalers did not provide distribution services to the manufacturers, the manufacturers would be required to pay a third party logistics company – e.g., FedEx – to pick up, pack, and ship its products. These costs can be particularly high when emergency delivery is needed on a 24/7/365 basis.

71. The 852 inventory data service is valuable to Defendants – among other things, it permits Defendant to use a series of numeric metrics to make critical decisions regarding when and how much of their products need to be manufactured. If the wholesalers did not provide 852 data services to the manufacturers, the manufacturers would be required to pay a third party to for this information, including aggregate sales data, inventory levels (on-hand and on-order), demand forecasts, "morgue inventory" (returned goods), special needs forecasts for particular events, units ordered by customers, and orders filled.

72.    The 867 sales data service is valuable to Defendants – among other things, it permits Defendants to understand who their customers are (including their "problem" customers who return an undue amount of products), and, conversely, to see which potential customers are *not* buying from the manufacturer (and thus who the manufacturer should target for marketing/sales). If the wholesalers did not provide 867 data services to the manufacturers, the manufacturers would be required to pay a third party for this information.

73.    Inventory management services are valuable to Defendants. By requiring wholesalers to maintain an adequate supply of the manufacturer's drugs in inventory, without "over-purchasing" drugs in anticipation of a price increase (also known as "speculative buying"), manufacturers are able to retain profits which would otherwise inure to wholesalers. Additionally, by requiring wholesalers to use and maintain environmentally-controlled storage facilities for inventory, manufacturers avoid the cost and expense of paying a third party to store its products in such an environment.

74.    Based on the Service Agreements themselves, the Discount Defendants fraudulently characterized their payments to wholesalers as "discounts," as opposed to what they were: payments for *bona fide* services rendered. Since discounts, by law, are included in AMP, this artificial device created by the Discount Defendants worked: it served to *reduce* AMP by the amount of the "discount." Consequently, the Discount Defendants knowingly and fraudulently understated their rebate obligations to the Government Plaintiffs.

**B.    The Service Fee Defendants' Scheme**

75.    As noted above, *bona fide* service fees are *excluded* from AMP. Thus, to the extent a manufacturer can disguise a price increase by offsetting it against a Service Fee which it excludes from its AMP calculations, the price increase will not cause the manufacturer's AMP – and its rebate obligations to the Government Plaintiffs – to rise as it should.

21

76.     Also as noted above, the Service Agreements executed by the Service Fee Defendants contain "price appreciation" clauses.     These clauses provide that when a manufacturer increases its prices, the Service Fee owed by the manufacturer to the wholesaler is *lowered* by the amount of the wholesaler's units in inventory, multiplied by the amount of the price increase.  No invoice is sent from the manufacturer to the wholesaler for these price increases.  Instead, the Service Fee Defendants simply reduce the Service Fees they owe to the wholesaler by the amount of the price increase on inventory.  Thus, when a manufacturer raises the price of a drug, that price increase applies to the wholesaler's inventory, even though the wholesaler previously purchased that inventory at a lower price.  The Service Fee Defendants thereby bury these off-invoice price increases in their accounting for Service Fees.[8]

77.     "Price appreciation" on inventory a wholesaler has previously purchased at a lower price, therefore, is a retroactive price increase that manufacturers must include in their AMP calculations.  The effect of the offset against the Service Fee, however, is to disguise the price increase and to illegally exclude it from the calculation of AMP.

78.     The Service Fee Defendants' definition of Service Fee has enormous evidentiary and legal impact:

- The legal definition of AMP excludes *bona fide* Service Fees.

- As a matter of contract, the Service Fee Defendants defined Service Fees in a manner which "absorbed" off-invoice price increases on inventory.

- The Service Agreements provide direct written evidence that the Service Fee Defendants crammed off-invoice price increases into their respective definitions of Service Fees.

---

[8] It should be noted that during the Relevant Time Period, the Relator has attended numerous industry conferences which addressed Service Agreements.  The issue of appreciation clauses as they relate to and affect service fees, rebates and reimbursements was not disclosed or discussed to the Relator's knowledge.  Nor did comments by the industry regarding the proposed CMS Rule on AMP ever mention or discuss the presence of price appreciation clauses. *See* Federal Register, Vo. 72, No. 136 (July 17, 2007), 42 C.F.R. Part 447 [CMS-2238-FC].

- Since Service Fees are excluded from AMP, and the Service Fee Defendants included off-invoice price increases in their calculation of Service Fees, *a priori*, the Service Fee Defendants knowingly *did not* factor off-invoice price increases into their AMP calculations.

- This knowing failure violated the Medicaid Rebate Statute and the Medicaid Rebate Agreement, and caused substantial financial harm to the Government Plaintiffs.

79. In sum, the law requires manufacturers to factor all price increases into AMP. Defendants knowingly failed to include off-invoice prices increases on inventory into their AMP calculations, thereby fraudulently reducing their rebate obligations to the Government Plaintiffs.

## VI. SPECIFIC ALLEGATIONS AGAINST EACH DEFENDANT

### A. Service Fee Defendants

#### 1. Allergan

80. Allergan is a Service Fee Defendant.

81. On January 1, 2006, Allergan executed a "Distribution Services Agreement" with a national wholesaler ("Allergan DSA").[9] According to the Allergan DSA, the purpose of the agreement is for Allergan to purchase certain services from the wholesaler including "distribution services, logistics and inventory management services, data reporting services, administrative services, and financial services, and Customer wishes to purchase such services from Service Supplier."

82. Article 2 of the Allergan DSA states that "Customer agrees to compensate Service Supplier in accordance with the fee structure set forth on Schedule A for each of the services described below and provided by Service Supplier to Customer"

83. In § 2.1 of the Allergan DSA, the wholesaler agrees to provide "Base Distribution Services[,]" including the provision of sophisticated ordering technology, daily deliveries to

---

[9] A redacted version of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

providers, emergency shipments to providers, contract and chargeback administration, returns processing, customer service support, adequate inventories, and licensed and environmentally controlled facilities.

84.    Section 2.2 requires the wholesaler to provide certain "Inventory Management Services[,]" including inventory maintenance levels, purchase limits and best efforts to ensure product availability.  Section 2.3 requires the wholesaler to provide certain "Data/Reporting Services[,]" including daily inventory reports ("852 data") and weekly sales reports ("867 data") for all products and formulations.  In addition, the Allergan DSA requires the wholesaler to provide certain service levels, order monitoring, new product launch support, and purchase forecast requirements, *see* § 2.4-2.6.  The Allergan DSA expressly describes the relationship between Allergan and the wholesaler as that of a "service buyer-seller."  Allergan DSA § 4.1.

85.    In exchange for these services, Allergan agrees to pay the wholesaler a "Value Guarantee" (i.e., a service fee), of 3.3% on its products[10] on a yearly basis.  *See* Art. 2 Preamble; Schedule A.  The salient portions of Schedule A are excerpted below.

> Value Guarantee and Credits:  During each year of this Agreement, Service Supplier will receive a total of 330 Basis Points (3.30%) of value on Service Supplier's total Net Product Purchases excluding Botox® or Botox® Cosmetic (which are handled separately as set forth below) (the "Value Guarantee").  For purposes of this Schedule A, "Net Product Purchases" are defined as gross purchases less shortage claims, product refusals, product damaged in transit and refused by Service Supplier, and product returns.  **Customer will receive credit towards the Value Guarantee for all margins earned by Service Supplier on Aggregate Inventory – DSD and Aggregate Inventory – Brokerage resulting from a pricing action by Customer, quarterly promotions, deals, off-invoice allowances, discounts, incremental service opportunities, or any other promotional undertaking or method, excluding those that are intended for Providers** (collectively "Value Credits").  Within thirty (30) days of the end of each year during the term of this Agreement, Customer will perform a true-up and make payment of remuneration payable to Service Supplier under this paragraph, and in event the amount of the Value Guarantee exceeds the amount of the Value

---

[10]   Except Botox® and Botox Cosmetic®, which are handled separately in another portion of the Allergan DSA.

Credits, then Customer shall pay to Service Supplier such difference within sixty (60) days of the end of such year. (emphasis added).

86. Although the Allergan DSA references various contractually defined terms and uses otherwise camouflaged language, the bottom line is that in return for services rendered, the wholesaler contracted to receive a Service Fee of 3.3% on its purchases from Allergan, and Allergan contracted to subtract any off-invoice price increases from the Service Fee. In other words, the parties agreed that Allergan would not invoice the wholesaler for price increases on products previously purchased by the wholesaler, but rather would collect that price increase by cutting back the Service Fee on a dollar-for-dollar basis. This artificial device – purely a creature of contract – "permitted" Allergan to disguise retroactive, off-invoice price increases within the definition of Service Fee. Consequently, since Service Fees are *excluded* from AMP, Allergan was able to exclude these price increases from its AMP reporting by the terms of its own contract, AMP was knowingly understated, and Allergan failed to meet its rebate obligations to the Government Plaintiffs.

87. There is further evidence that Allergan did not factor off-invoice price increases into its AMP calculations. In 2005, Relator questioned Allergan about the legality of certain distribution practices. Then-Vice President and Assistant General Counsel at Allergan, Matthew Maletta, responded in a December 8, 2005 letter to Relator, stating:

the issue of fee-for-service agreements bears no relation to the prices Allergan charges for its products. Allergan's prices are not affected in any way by fee-for-service arrangements. In fact, these arrangements do not involve Allergan selling any product or service; to the contrary, where Allergan has entered into such arrangements, Allergan is the purchaser.

88. Through the Allergan DSA and the above letter, Allergan has admitted that it did not factor Service Fees – which Allergan expressly defined to include price increases on inventory – into its AMPs, and thus fraudulently understated its rebate obligations to the

25

A162

Government Plaintiffs. During the Relevant Time Period, Defendant Allergan participated in the Medicaid Program and Allergan's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Allergan's drug, Alphagan P Opthalmic Solution 0.15%, 5 units, NDC# 00023-9177-05,[11] had approximately $74,940,721.98 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

89.     Further, the prices on Allergan's Relevant Drugs increased during the Relevant Time Period. *See* Exhibit A (showing price increases on Allergan's Relevant Drugs). For example, the price of Alphagan P Opthalmic Solution 0.15%, increased a total of 87.22%, with prices increases occurring on the following dates: 1/10/2004; 2/5/2005; 1/22/2006; 2/3/2007; 1/19/2008; 8/2/2008; 1/3/2009; 5/2/2009; 8/1/2009; and 7/10/2010. *See* Exhibit A (showing price increases on Amgen's Relevant Drugs).

90.     By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

91.     By failing to factor its off-invoice price increases in its AMP calculations, Allergan: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to from Allergan, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Allergan violated

---

[11] NDC stands for National Drug Code.

Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

    **2.**    **Amgen**

92.    Amgen is a Service Fee Defendant.

93.    On February 1, 2007, Amgen executed a "Wholesale Distribution Agreement" ("Amgen WDA") with a national wholesaler.[12] The Amgen WDA provides that the wholesaler will distribute Amgen products and provide certain other services, including maintaining sufficient inventory, providing environmentally controlled storage facilities, and providing particularized sales information reports. The Agreement further states that "relationship between Amgen and Wholesaler is that of a buyer and a seller and a service provider and recipient." Amgen WDA § 12.9.

94.    With respect to price, Section 4.1 states that the price to the wholesaler "shall be Amgen's WAC prevailing at the time of ordering by [the wholesaler]."

95.    Amgen agreed in Section 4.6 to make payments to the wholesaler but reserved the right to offset any such payments with any price increases on product. Specifically:

> Amgen Payments to Wholesaler. Amgen shall make the payments to Wholesaler as described in, and subject to the conditions set forth in, Exhibit 4.6. Notwithstanding the foregoing, Amgen shall have the right to set off any such payments against any amounts payable by Wholesaler hereunder pursuant to and in accordance with Section 12.10 herein.

96.    Exhibit 4.6 to the Amgen WDA details the itemized services that the wholesaler provides and the fee that Amgen pays for each service in return. For example, Section 1 of Exhibit 4.6 describes the "Order Fulfillment Service Fee" whereby Amgen pays a fee to the wholesaler of up to $1,189,200 based on the wholesaler's order fulfillment rate. Section 2 details

---

[12] A redacted version of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein. The parties amended the Amgen WDA, twice, on June 29, 2007 without materially altering its terms. Those amendments are also attached within Exhibit C and are incorporated by reference as if fully set forth herein.

information services that the wholesaler provides in exchange for monthly "Data Fees" of up to

$261,076. Section 3 details an "inventory management performance fee" of up to $396,400. As

Amgen and the wholesaler agreed that these Service Fees represent the fair-market value of the

services the wholesaler performs, the Amgen WDA intends that the parties treat the Service Fees

as *bona fide*.

97.    The Amgen WDA further supports the *bona fide* nature of the Service Fees.

Specifically, Section 8.6 of the Amgen WDA states:

> [The wholesaler] represents and warrants that prices it charges
> customers for drugs shall not be related in any way to the service
> fees earned by the wholesaler pursuant to this agreement, and that
> no such amounts received by the wholesaler through this
> agreement shall be passed on, directly or indirectly, to any such
> customer. Wholesaler represents and warrants that the fees earned
> in this agreement represent fair market value for bona fide services
> Wholesaler provides on behalf of Amgen. Wholesaler shall
> cooperate with Amgen or its valuation consultant in confirming the
> foregoing.

98.    As noted above, the Amgen WDA provides that off-invoice price increases are

netted against Service Fees. More specifically, Section 5 of Exhibit 4.6 states:

> **Price increase deduction**. Following any Product price increase,
> Amgen shall calculate the value of any price increase by taking the
> value, at the pre-price increase WAC of [The wholesaler's]
> inventory on-hand at the time of the price increase ("Wholesaler
> Inventory Value") and multiplying the Wholesaler Inventory Value
> by the percent price increase ("Inventory Value Change"). Amgen
> shall have the right to deduct the Inventory Value Change from
> any fees payable by Amgen hereunder. In the event the Inventory
> Value Change exceeds the amount of fees payable by Amgen,
> Amgen shall notify [The wholesaler] of same in writing, and [The
> wholesaler] shall pay to Amgen the amount of the Inventory Value
> Change within thirty (30) days of such written notice.

99.    By deducting Inventory Value Changes (i.e., off-invoice prices increases) from

the Service Fees it pays, Amgen crams off-invoice price increases into its contractual definition

of Service Fees. Since Service Fees are excluded from AMP, Amgen was able to exclude these price increases from its AMP reporting by the terms of its own contract. Amgen's knowing failure to factor off-invoice price increases in its AMP calculations resulted in understated AMPs, and in turn, less money in rebate payments to the Government Plaintiffs.

100. As alleged above, during the Relevant Time Period, Defendant Amgen participated in the Medicaid Program and Amgen's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Sensipar Oral Tablet 30 MG, 30 units, 55513-0073-30 had approximately $134,207,171.01 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

101. Further, the prices on Amgen's Relevant Drugs increased during the Relevant Time Period. For example, the price of Sensipar Oral Tablet 30 MG increased a total of 52.35%, with prices increases occurring on the following dates: 4/5/2004; 4/1/2005; 4/1/2006; 12/1/2006; 9/6/2007; 8/1/2008; 5/8/2009; 1/8/2010; 9/9/2010. *See* Exhibit A (showing price increases on Amgen's Relevant Drugs).

102. By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

103. By failing to factor its off-invoice price increases in its AMP calculations, Amgen: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to from Amgen, and (4) caused the federal government to pay more than it should

have in FMAP funds to the states. As a result of this fraudulent conduct, Amgen violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 3. Bradley

104. Bradley is a Service Fee Defendant.

105. On March 7, 2005, Bradley executed a "Distribution Services Agreement" ("Bradley DSA") with a national wholesaler. The agreement states that it is effective as of July 1, 2004. The parties executed an amendment to the Bradley DSA on August 1, 2007.[13]

106. The Bradley DSA provides that the wholesaler will distribute Bradley's products and provide other services, including logistics and inventory management services, administrative services, financial services and "certain additional services . . . as needed and agreed upon by both parties." In Section 2.1 of the Bradley DSA, the wholesaler agrees to provide "Base Distribution Services," including, without limitation, ordering technology, daily consolidated deliveries to providers, consolidated accounts receivable management, contract and chargeback administration and customer service support.

107. Section 2.2 of the Bradley DSA requires the wholesaler to provide certain "Inventory Management Services," including but not limited to inventory maintenance levels, purchase limits, and best efforts to ensure product availability. Section 2.3, requires the wholesaler to provide certain Data/Reporting services, including weekly Inventory Reports (852 data) and monthly Sales Reports (867 data). In addition, the contract provides for service levels, order monitoring, new product launch support, and purchase forecast requirements.

---

[13] A redacted version of this agreement and the amendment are attached within Exhibit C and are incorporated by reference as if fully set forth herein.

108.     Consistent with the above, Section 4.1 of the Bradley DSA describes the relationship between Bradley and The wholesaler as that of a "service buyer-seller." Thus, by the terms of its DSA, Bradley pays the wholesaler a *bona fide* service fee.

109.     In return for these services, the preamble to Article 2 of the Bradley DSA refers to Schedule A for a fee structure. For the first three years of the Bradley DSA, the fee, broken into a Base Service Fee and a Purchase Forecast Requirement Fee, ranged from 7%-7.5%.[14] However, in the event of a "price appreciation" on inventory after a "pricing action," (i.e., a retroactive, off-invoice price increase), Bradley is entitled to "credit" toward the Service Fee.

110.     More specifically, Schedule A to the Bradley DSA defines "Service Fee Credits" as credits toward the Service Fee, resulting from "price appreciation on inventory on hand after a Customer pricing action," and "[m]argin earned on quarterly promotions, deals, off-invoice allowances, or any other method, excluding those that are intended for Service Supplier's Providers." Schedule A to the August 2007 amendment further describes the credits to which Bradley is entitled for "Inventory Appreciation." Under the modified arrangement, Bradley continues to adjust the Service Fee by "the difference in value of on hand inventory and on order inventory actually received at the lower price immediately preceding a price increase and the value of such inventory immediately after a price increase for Product."

111.     By virtue of the *bona fide* nature of the services the wholesaler provides to Bradley, the express terms of the Bradley DSA indicate that Bradley treats the Service Fees it pays as *bona fide*, thus "allowing" Bradley to exclude those fees from its calculations of AMP. By netting off-invoice price increases against the Service Fees, Bradley improperly excludes

---

[14] In Schedule A to the amendment to the Bradley DSA, the fee dropped to 6.75% from August 1, 2007 and thereafter.

31

price increases from its AMP calculations, in turn understates its AMP, and consequently underpays the rebates it owes to the Government Plaintiffs.

112. As alleged above, during the Relevant Time Period, Defendant Bradley participated in the Medicaid Program and Bradley's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Bradley's drug, Solaraze Transdermal Gel 3 %, 100 units, 10337-0803-01 had approximately $36,103,097.03 in Medicaid utilization from 2005 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

113. Further, the prices on Bradley's drugs increased during the Relevant Time Period. For example, the price of Solaraze Transdermal Gel 3 %, increased a total of 110.15%, with prices increases occurring on the following dates: 11/22/2006; 3/30/2007; 6/14/2007; 9/22/2007; 4/28/2008; 12/1/2008; 6/1/2009; 12/4/2009; 7/15/2010; 10/15/2010; 4/5/2011. *See* Exhibit A.

114. By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

115. By failing to factor its off-invoice price increases in its AMP calculations, Bradley: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to from Bradley, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Bradley violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 4.   Eisai

116.   Eisai is a Service Fee Defendant.

117.   On March 1, 2006, Eisai executed a "Manufacturer Service Agreement" ("Eisai Service Agreement") with Rx Distribution Network (the "Network"), a group of small, regional wholesalers.[15]

118.   The Eisai Service Agreement provides that Eisai will pay the Network for distribution and additional "value added" services on a fee-for-service basis. Section I of the Eisai Service Agreement describes the services to be performed by the Network, including, but not limited to: sales and distribution services, management updates, product launch support, and financial reporting.

119.   Further, the Agreement lists additional "Value Added Services" in Section II, including, but not limited to: "Core Distribution Services[,]" "Inventory Management" services and sales reporting services. The Network must provide "Core Distribution Services" including pick, pack and ship services, and emergency shipments on a 24/7/365 basis. Eisai Service Agreement, Exhibit B. For sales reporting, the Network must provide daily inventory reports (852 data) and weekly sales reports (867 data).

120.   In exchange for these services, Eisai agrees to pay a 0.85% Service Fee. At the end of each financial quarter, Eisai determined the Service Fee through a simple four-step process. First, Eisai multiplied 0.85% by the wholesaler's gross purchases from Eisai during the quarter (the "Gross Service Fee"). Second, Eisai determined the amount of product the wholesaler had in inventory – on hand and/or on order – at the time of each price increase during the quarter. Third, Eisai multiplied the amount of product in inventory by the amount of the

---

[15] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

price increases (the "Gross Price Increase"). Fourth, the Gross Price Increase was subtracted from the Gross Service Fee, which resulted in the "Service Fee."

121. If the Gross Service Fee was greater than the Gross Price Increase, the wholesaler got paid the difference, i.e., the wholesaler received a Service Fee. Contrariwise, if the Gross Price Increase was greater than the Gross Service Fee, the wholesaler actually *owed the manufacturer money*, even though the wholesaler provided the numerous services outlined in the contract. The example below will illustrate this series of calculations.

122. Relator can state that members of the Network represent approximately 2% of Eisai's U.S. distributor sales. During the first quarter of 2007, the Network members' sales of Eisai products amounted to $1,787,000, on which they earned a service fee of $151,879 ($1,787,000 x .085%). The sum of Eisai's Gross Price Increase during the same quarter was $251,244. As such, the members of the Network actually received no Service Fee, and in fact ended up owing $99,365 to Eisai during Q1 2007 ($151,879 minus $251,244).

123. Since Eisai contractually defined Service Fee to include Gross Price Increases, and since Service Fees are statutorily excluded from AMP, Eisai was able to use the terms of its own contract as a pretext for excluding these price increases from its AMP reporting.

124. In terms of quantifying the fraud, Eisai's principal products include Aciphex, Aricept, Fragmin, Targretin and Zonegran, all of which are covered and paid for by the Government Plaintiffs. From January, 2004 until January, 2007, each product increased in price an average of nearly 20%.

125. Had Eisai followed the law, Eisai would have added Gross Price Increases into its calculation of AMP, and thereby paid a 15.1% Basic Rebate on those price increases. Further, given that Eisai has increased the prices of its products by nearly 20% since 2004, many of these

34

A171

price increases exceeded the CPI. Accordingly, had Eisai followed the law, every off-invoice price increase which exceeded the CPI would have been factored into AMP, and Eisai would have paid an Additional Rebate on said price increases.

126.    In late 2008, in an effort to renegotiate the Service Agreement and render it more beneficial to the Network members, Relator engaged Eisai in negotiations over an extension and a modification of the Service Agreement. In the course of several letters, presentations and phone calls, Relator called to the attention of senior Eisai executives certain liabilities that Eisai was incurring to government programs as a function of the Service Agreement.

127.    On November 20, 2008, Relator conducted a conference call with Eisai for the purpose of negotiating the terms of the Service Agreement extension. The participants on that call included Relator and Eisai executives Sean Spears ("Spears"), Andy Cohen ("Cohen"), and Steven Brown ("Brown"). According to Spears, he, Cohen and Brown were the Eisai executives who were the decision-makers concerning Service Agreements with wholesalers.

128.    Relator told Spears, Cohen and Brown that Eisai was required to include price increases on inventory in its AMP calculations, thus increasing both AMP and the rebate Eisai owed to the Government Plaintiffs.

129.    Relator conveyed this to the Eisai executives using numbers from the actual results under the Service Agreement with the Network members. Relator stated that, with respect to a particular time period, Eisai owed the Network members Gross Service Fees amounting to $1,697,000. During that same time period, Eisai clawed-back $750,000 via off-invoice price increases on inventory. Relator told Eisai that the $750,000 had to be included in AMP. In addition, given Eisai's significant price increases beyond the CPI, Relator explained, Eisai owed an Additional Rebate.

130.    To increase the Network members' margins and simultaneously to reduce the rebates Eisai would owe, Relator suggested an alternative agreement with Eisai.    He recommended that Eisai reduce its Service Fees to Network members from 0.85% to 0.35%, while simultaneously eliminating "clawing back" off-invoice price increases from the wholesalers. Relator explained that his proposed alternative arrangement would enable Eisai to reduce its rebate obligations by eliminating off-invoice price increases on inventory.

131.    The Eisai executives agreed that the Service Fees Eisai paid to the Network members were *bona fide* Service Fees, and they admitted that Eisai did not include off-invoice price increases on inventory in its calculation of AMP. Rather, according to Spears, Cohen, and Brown, these price increases had no relation to AMP or Medicaid rebates. By its own admission, therefore, Eisai failed to include off-invoice price increases on inventory in its AMP calculations, thereby materially reducing the rebates owed to the Government Plaintiffs.

132.    On December 23, 2008, Relator conducted another phone call with Eisai executive Spears. Spears stated that a distributor should not benefit from an Eisai product price increase through inventory appreciation. According to Spears, Eisai's agreement to pay a Service Fee is based on there being no price increases during the quarter. Spears concluded that any excess profit that a distributor receives from inventory appreciation due to an Eisai product price increase, therefore, is a windfall and belongs to Eisai. Thus, Eisai conceded that each time it claws back price increases on inventory by subtracting same from the Service Fee, the prices for the drugs sold during the rebate period increases and the manufacturer is paid more for those drugs, i.e, these price increases on inventory "adjust the prices actually realized." Medicaid Rebate Agreement, Section I(a).

133.     As alleged above, during the Relevant Time Period, Defendant Eisai participated in the Medicaid Program and Eisai's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Eisai's drug, Aciphex Oral Tablet Delayed Release 20 MG, 30 units, 62856-0243-30, had approximately $296,645,774.82 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

134.     Further, the prices on Eisai's drugs increased during the Relevant Time Period. For example, the price of Aciphex Oral Tablet Delayed Release 20 MG increased a total of 65.97%, with prices increases occurring on the following dates: 1/5/2005; 8/18/2005; 3/21/2006; 2/15/2007; 8/9/2007; 2/25/2008; 8/26/2008; 1/7/2009; 7/23/2009; 1/5/2010; 7/28/2010. *See* Exhibit A.

135.     By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

136.     By failing to factor its off-invoice price increases in its AMP calculations, Eisai: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to from Eisai, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Eisai violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 5.     Mallinkrodt

137.     Mallinkrodt is a Service Fee Defendant.

138.    On April 1, 2007, Mallinkrodt and a national wholesaler executed a "Distribution Services Agreement" ("Mallinkrodt DSA").[16] According to the Mallinkrodt DSA, the purpose of the agreement is for Mallinkrodt to purchase certain services from the wholesaler, "including but not limited to logistics and inventory management services, administrative services, and financial services."

139.    In Section 2.1 of the Mallinkrodt DSA, the wholesaler agrees to provide "Base Distribution Services[,]" including the provision of sophisticated ordering technology, daily deliveries to providers, emergency shipments to providers, contract and chargeback administration, returns processing, customer service support, adequate inventories, and licensed and environmentally controlled facilities.

140.    Section 2.2 requires the wholesaler to provide certain "Inventory Management Services[,]" including inventory maintenance levels, purchase limits and best efforts to ensure product availability.

141.    Section 2.3 requires the wholesaler to provide certain "Data/Reporting Services[,]" including weekly inventory reports (852 data) and sales reports (867 data) for each product and formulation.    In addition, the agreement provides for service levels, order monitoring, new product launch support and purchase forecast requirements. *See* Sections 2.4-2.7.

142.    Section 4.1 of the Mallinkrodt DSA    describes the relationship between Mallinkrodt and the wholesaler as that of a "service buyer-seller."

143.    In exchange for these services, Mallinkrodt agrees to pay the wholesaler a service fee of 2.875%. See Article 2 Preamble; Schedule A. The service fee will be calculated and paid

---

[16] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

quarterly in the form of a credit memo and will be reduced by the value of the inventory appreciation. Section 2.2; Schedule A. That is, Section 2.2. states that "[u]pon a price increase, [the wholesaler] and [Mallinkrodt] will calculate the inventory appreciation associated with the on-hand inventory and [Mallinkrodt] can reduce the Service Fee . . . by such amount."

144. By virtue of the fact that the Service Fees paid by Mallinkrodt to the wholesaler were *bona fide*, and the fact that Mallinkrodt netted off-invoice price increases against those Service Fees, Mallinkrodt is precluded from factoring off-invoice price increases into its calculations of AMP. Consequently, Mallinkrodt improperly excludes price increases from its AMP calculations, in turn understating its AMPs, and consequently underpaying Medicaid rebates it owes to the Government Plaintiffs.

145. As alleged above, during the Relevant Time Period, Defendant Mallinkrodt participated in the Medicaid Program and Mallinkrodt's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Mallinkrodt's drug, Restoril Oral Capsule 7.5 MG, 100 units, 00406-9915-01, had approximately $79,353,491.85 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

146. Further, the prices on Mallinkrodt's drugs increased during the Relevant Time Period. For example, the price of Restoril Oral Capsule 7.5 MG increased a total of 327%, with prices increases occurring on the following dates: 4/25/2005; 10/1/2005; 4/8/2006; 10/1/2006; 3/31/2007; 9/29/2007; 2/2/2008; 6/28/2008; 1/24/2009; 10/10/2009; 10/2/2010. *See* Exhibit A.

147. By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs.

Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

148. By failing to factor its off-invoice price increases in its AMP calculations, Mallinkrodt: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Mallinkrodt violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 6. Novo Nordisk

149. Novo Nordisk is a Service Fee Defendant.

150. On October 11, 2005 and October 19, 2005, respectively, the wholesaler and Novo Nordisk executed a "Core Distribution Services Agreement" ("Novo DSA").[17] According to the Novo DSA, Novo "wishes to obtain certain distribution information and services . . . to enable it to more efficiently and effectively manage its promotional, marketing and sales activities, and for such other reasons as are deemed necessary."

151. Section 1.3 details the obligations of the wholesaler, including transmitting daily inventory data (852 data) and weekly inventory data (867 data). The wholesaler also agrees to pick, pack and ship Novo Nordisk products to the wholesaler's customers, and to "perform back-end administrative services to support the distribution of Novo Nordisk's products and the maintenance of efficient inventory levels for servicing customers."

---

[17] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

152.    The Novo DSA includes "Attachment A" which further defines and describes the "Core Services" the wholesaler agrees to provide.    Attachment A also provides more particularity with respect to the data services the wholesaler must provide, defines purchase commitments, eliminates speculative buying, and establishes inventory levels.

153.    In exchange for these Core Distribution Services, the Novo CDSA binds Novo Nordisk to pay the wholesaler a "Core Services Fee." Attachment A, Section 4(a), describes the Core Services Fee for each of 2005, 2006 and 2007, beginning the first year with a $5 million flat fee in exchange for the wholesaler's performing the Core Distribution Services. For 2006, Novo Nordisk agreed to pay a quarterly fee equal to $1.25 million, multiplied by "1 plus the percentage change in the CPI index between 2005 and 2006. . . , subject to a minimum multiplier adjustment of 1.025." Novo Nordisk would also adjust the wholesaler's fee to reflect the percentage increase or decrease in product sales by the wholesaler between 2005 and 2006. The Core Services Fee Novo Nordisk was entitled to in 2007 was its 2006 fee, adjusted upward by the CPI multiplier, and adjusted either up or down based on the sales increase or decrease 2007 over 2006.

154.    Regarding the Service Fees and payment for same, the Novo DSA indicates that the parties consider the services *bona fide*. Section 2.2 states:

> The Fee has been determined through good faith and arms-length bargaining to be the fair market value or less of the Core Services. No amount paid hereunder is intended to be, nor shall it be construed as, an offer, or payment made, whether directly or indirectly, to induce the referral of business, the purchase, lease or order of any item or other service, or the recommending or arranging for the purchase, lease or order of any item or service.

155.    In addition, in Attachment A, Section 4(c)(iv), the wholesaler "represents and warrants that the service fees earned pursuant to this Agreement shall not be passed on in whole or in part to a wholesaler client or customer." These statements – in Section 2.2 and in

41

Attachment A – directly express the parties' understanding that the Core Services Fee is a *bona fide* Service Fee. According to the terms of the Novo DSA, therefore, Novo Nordisk excluded the Core Service Fees it paid to the wholesaler from its AMP calculations.

156. The Novo DSA provides for Novo Nordisk to offset the Core Services Fee it paid by off-invoice price increases. According to Attachment A, Section 4(c)(ii), "if a price increase occurred during the quarter invoiced, Novo Nordisk shall be entitled to reduce any Core Services Fee due by the amount of price benefit obtained to the wholesaler due to the price increase (soft appreciation)." The Novo DSA further provides: "if the benefit from the price increase exceeds the invoiced amount, the credit due Novo Nordisk will be applied against any future quarterly invoices." Thus, Novo Nordisk nets price appreciation against Core Service Fees owed, thereby excluding off-invoice price increases from its AMP calculations.

157. By virtue of the fact that the Service Fees paid by Novo to the wholesaler were *bona fide*, and the fact that Novo netted off-invoice price increases against those Service Fees, Novo is precluded from factoring off-invoice price increases into its calculations of AMP. Consequently, Novo improperly excludes price increases from its AMP calculations, in turn understating its AMPs, and consequently underpaying Medicaid rebates it owes to the Government Plaintiffs.

158. As alleged above, during the Relevant Time Period, Defendant Novo Nordisk participated in the Medicaid Program and Novo Nordisk's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Novo Nordisk's drug, Prandin Oral Tablet 2 MG, 100 units, 00169-0084-81, had approximately $36,609,457.70 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

159. Further, the prices on Novo Nordisk's drugs increased during the Relevant Time Period. For example, the price of Prandin Oral Tablet 2 MG increased a total of 102.72%, with prices increases occurring on the following dates: 2/28/2004; 1/19/2005; 1/15/2006; 2/12/2007; 11/15/2007; 5/30/2008; 11/13/2008; 6/18/2009; 4/7/2010. *See* Exhibit A.

160. By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

161. By failing to factor its off-invoice price increases in its AMP calculations, Novo Nordisk: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Novo Nordisk violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 7. **Reliant**

162. Reliant is a Service Fee Defendant.

163. On February 1, 2005, Reliant and The wholesaler executed a "Distribution Services Agreement" ("Reliant DSA"). In the first quarter of 2007, the parties executed an Amendment to the Reliant DSA (the "Reliant Amendment").[18]

---

[18] A redacted copy of the agreement and the amendment are attached within Exhibit C and are incorporated by reference as if fully set forth herein.

164.    According to the Reliant DSA, the purpose of the agreement is for Reliant to purchase certain services from the wholesaler, "including but not limited to logistics and inventory management services, administrative services, and financial services."

165.    In Section 2.1 of the Reliant DSA, the wholesaler agrees to provide "Distribution and Inventory Management Services[,]" including the provision of sophisticated ordering technology, daily deliveries to providers, emergency shipments to providers, consolidated accounts receivable management, contract and chargeback administration, returns processing, customer service support, adequate inventories, and licensed and controlled facilities.

166.    Section 2.2 requires the wholesaler to provide certain "Additional Inventory Management Services[,]" including inventory maintenance levels, purchase limits, best efforts to ensure product availability, and data reporting services (852 data and 867 data). In addition, the Reliant DSA provides for service levels, order monitoring, new product launch support and purchase forecast requirements. Reliant DSA § 2.2.

167.    Section 6.1 of the Reliant DSA describes the relationship between Reliant and The wholesaler as that of a "service buyer-seller." Further, the wholesaler represents "that the services hereunder are *bona fide* and the consideration there for is no greater than the fair market value for such services and as such are not discounts as defined in the CMS December 9, 2004 letter with respect to Average Sales Price." Reliant DSA § 6.1.

168.    In exchange for each of these services, Reliant agrees to pay the wholesaler a Service Fee of 6% through 2007; and a Service Fee from 3.95% to 4.90% after 2007. *See* Article 2 Preamble; Schedule A; the Reliant Amendment. The Service Fee will be calculated and paid quarterly in the form of a credit memo and will be reduced by the value of the "Price

Appreciation on Aggregate Inventory" after a price increase. *See* Schedule A; the Reliant Amendment.

169. By virtue of the fact that the Service Fees paid by Reliant to the wholesaler were *bona fide*, and the fact that Reliant netted off-invoice price increases against those Service Fees, Reliant is precluded from factoring off-invoice price increases into its calculations of AMP. Consequently, Reliant improperly excludes price increases from its AMP calculations, in turn understating its AMPs, and consequently underpaying Medicaid rebates it owes to the Government Plaintiffs.

170. As alleged above, during the Relevant Time Period, Defendant Reliant participated in the Medicaid Program and Reliant's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Reliant's drug, Lovaza Oral Capsule 1 GM, 120 units, 65726-0425-27 had approximately $17,782,634.14 in Medicaid utilization from 2007 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

171. Further, the prices on Reliant's drugs increased during the Relevant Time Period. For example, the price of Lovaza Oral Capsule 1 GM increased on a total of 11.18%, with prices increases occurring on the following dates: 7/9/2007; 10/1/2007; 7/22/2008. *See* Exhibit A.

172. By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

173. By failing to factor its off-invoice price increases in its AMP calculations, Reliant: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to

45

pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Reliant violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 8. Sepracor

174. Sepracor is a Service Fee Defendant.

175. On January 1, 2007, Sepracor and a national wholesaler executed a "Wholesaler Purchase and Distribution Agreement" (the "Sepracor Agreement").[19] The Sepracor Agreement provides for the wholesaler to buy and distribute Sepracor's products in exchange for a Service Fee. Section 2.2 and Exhibits D and D1 describes the "Services and Fees." Services include, but are not limited to, monitoring customer orders to limit speculative buying by customers, collaborative forecasting, new product support, environmentally controlled storage, service level requirements, inventory level requirements, the use of the wholesaler's logistics center, and access to the wholesaler's marketing programs.

176. Inventory management and service level commitments involve the wholesaler maintaining a specified level of on-hand and on order inventory and a minimum order fulfillment level of 97%. Distribution services include, *inter alia*, having less than 1% of returned goods and providing new product launch support. Data services require the wholesaler to send daily inventory reports (852 data) and weekly sales reports (867 data).

177. In exchange for these services, Sepracor agrees to pay the wholesaler a Service Fee, ranging from 3.25% to 5% and based on the services performed and quarter in which they

---

[19] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

were performed. Sepracor Agreement §2.2(c); Exhibit D, D1. The parties intended the fees paid for the services under the Sepracor Agreement to be considered *bona fide* Service Fees. Specifically, in Section 3.1(c), the Sepracor Agreement states:

> Wholesaler further represents and warrants that it has performed an analysis of the value of the services to be provided to Sepracor hereunder and that the compensation described in this Agreement constitutes fair market value, or less, for such services. Wholesaler represents and warrants that none of the services to be provided hereunder would be provided to Sepracor by Wholesaler in the absence of this Agreement. Wholesaler further represents and warrants that any compensation for services it performs hereunder is specifically not intended to be passed through as [a] discount or rebate to Wholesaler's Customers.

178. The Sepracor Agreement further provides that the wholesaler should invoice Sepracor for the Service Fees after each calendar quarter. Sepracor will pay the invoice amounts except that Sepracor will receive credit towards Service Fees for "price appreciation on Aggregate Inventory plus On-Order quantities that are eventually received by [The wholesaler]." Sepracor Agreement §2.2(c), (d). Thus, Sepracor reduced the Service Fees it paid by the amount of any off-invoice price increases, i.e., Sepracor defined Service Fees to camouflage price increases on inventory.

179. By virtue of the *bona fide* nature of the services the wholesaler provides to Sepracor, and the express terms of the Sepracor Agreement indicate that Sepracor treats the service fees it pays as *bona fide*, Sepracor "properly" excludes those fees from its calculations of AMP. However, by netting off-invoice price increases against those Service Fees, Sepracor improperly excludes material price increases from its AMP calculations, in turn understating its AMPs, and consequently underpaying Medicaid rebates it owes to the Government Plaintiffs.

180. As alleged above, during the Relevant Time Period, Defendant Sepracor participated in the Medicaid Program and Sepracor's Relevant Drugs were paid for by all of the

Government Plaintiffs. For example, Sepracor's drug, Xopenex Inhalation Nebulization Solution 1.25 MG/3ML, 3 units, 63402-0513-24, had approximately $566,967,727.20 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

181.   Further, the prices on Sepracor's drugs increased during the Relevant Time Period. For example, the price of Xopenex Inhalation Nebulization Solution 1.25 MG/3ML increased a total of 117.13%, with prices increases occurring on the following dates: 1/18/2005; 1/11/2006; 7/3/2007; 11/1/2007; 6/18/2008; 12/2/2008; 1/1/2010; 7/1/2010; 4/1/2011. *See* Exhibit A.

182.   By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

183.   By failing to factor its off-invoice price increases in its AMP calculations, Sepracor: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Sepracor violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 9.   Upsher-Smith

184.   Upsher-Smith is a Service Fee Defendant.

185.    Effective January 1, 2007, Upsher-Smith and a national wholesaler executed the Wholesaler Health Developing Suppliers Program Distribution Services Agreement ("Upsher DSA").[20]

186.    Under Section 1.1, the wholesaler agrees to provide services including "sophisticated ordering technology, daily consolidated deliveries to providers, emergency shipments to providers 24/7/365, consolidated accounts receivable management, contract and chargeback administration, returns processing, customer service support, adequate working inventories to meet customer needs, [and] licensed, environmentally controlled, PDMA compliant secure facilities."

187.    In addition, the wholesaler agrees to provide additional services and commitments, including committing to certain inventory levels, providing daily inventory reports (852 data) and weekly sales reports (867 data), and providing "business development support."

188.    In exchange for the wholesaler's provision of these services, pursuant to Section 1.3, Upsher-Smith owes a "Service Fee" as set forth in Exhibits B and C to the Upsher DSA. Exhibit B to the Upsher DSA details the Service Fees due to the wholesaler as well as certain offsets thereto. Contingent upon the wholesaler provided the specified services, Upsher-Smith owes a quarterly Service Fee of 4.57% of actual product purchased, measured at WAC. Upsher-Smith, however, offset the Service Fee by netting "Inventory Appreciation" against the Service Fee. According to Exhibit B, Inventory Appreciation "means the difference in the value of on hand and on order inventory actually received (or on order) immediately preceding a price increase and the value of such inventory after a price increase for Product." Thus, Upsher-Smith netted off-invoice price increases against its Service Fees.

---

[20] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

189. With respect to the Service Fees, Section 3.11 of the Upsher DSA manifests the parties' understanding as to their *bona fide* nature. In discussing each party's compliance with applicable federal and state laws, the wholesaler "represents and warrants that any fees required of [Upsher-Smith] under this Agreement reflect the fair market value of the services for which such fees are being assessed."

190. Thus, by the terms of the Upsher DSA, Upsher-Smith considered the Service Fees it paid *bona fide*. Consequently, Upsher-Smith excluded the Service Fees it paid from its AMP calculations. In excluding the Service Fees from its AMP calculations, however, Upsher-Smith also excludes the off-invoice price increases, because these price increases are netted against the Service Fees. By netting off-invoice price increases against its Service Fees, Upsher-Smith improperly excludes material price increases from its AMP calculations, in turn understates its AMP, and consequently underpays Medicaid rebates it owes to the Government Plaintiffs.

191. As alleged above, during the Relevant Time Period, Defendant Upsher-Smith participated in the Medicaid Program and Upsher-Smith's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Upsher-Smith's drug, Upsher-Smith's drug, Klor-Con Oral Tablet 10 MEQ, 500 units, 00245-0041-15, had approximately $136,313,185 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

192. Further, the prices on Upsher-Smith's drugs increased during the Relevant Time Period. For example, the price of Klor-Con Oral Tablet 10 MEQ increased a total of 277.61%, with prices increases occurring on the following dates: 1/15/2004, 12/15/2004, 12/20/2005, 10/15/2007, 7/18/2008 and 8/11/2010. *See* Exhibit A.

193.     By contrast, the CPI for the period 2004-2010 rose less than 3% per year. *See* Exhibit B. A similar analysis applies to the remainder of this Defendant's Relevant Drugs. Utilization data for each of the Government Plaintiffs is attached as Exhibit E and is incorporated herein by reference as if fully set forth herein.

194.     By failing to factor its off-invoice price increases in its AMP calculations, Upsher-Smith: (1) caused CMS to underreport the unit rebate amounts to the states, (2) caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Upsher-Smith violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

**B.     Discount Defendants**

**1.     AstraZeneca**

195.     AstraZeneca is a Discount Defendant.

196.     AstraZeneca's "Wholesale Distribution Services Agreement" ("AZ Agreement") with wholesalers became effective in 2005.[21] The "[w]hereas" clause in the AZ Agreement includes a description of the contract's purpose, namely: 1) to provide services including inventory management to ensure access for downstream customers and to better forecast future product demand, 2) to provide certain data to assist AstraZeneca in formulating forecasts and its inventory management efforts, and 3) to restrict the wholesaler from speculative/investment buying.

---

[21] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

197.    Sections 2, 5 and 7 set forth the wholesaler's inventory management requirements including the prohibition on speculative buying, maintenance of target inventory levels, and data reporting.  With respect to the data reporting requirements, the wholesaler must report daily sales data (852 data) and monthly transaction data (867 data) to AstraZeneca.  Moreover, the wholesaler is required to provide AstraZeneca with 28-day purchase forecasts.

198.    Section 3 of the AZ Agreement describes the wholesaler's "Core Distribution Services," including pick, pack and ship services, accounts receivable management, contract and chargeback administration, returns processing, customer service support and adequate inventory maintenance.

199.    In exchange for the wholesaler providing these services, AZ pays the wholesaler a quarterly Service Fee.  The amount of the Service Fee ranges from 1.2% and 1.25% of gross purchases, less off-invoice price increases on inventory.  AZ Agreement, § 4, 4.2.3.

200.    Notwithstanding the *bona fide* nature of these Service Fees – indeed, they are the very same Service Fees that the Service Fee Defendants admit are *bona fide* – AstraZeneca unlawfully elected to characterize these Service Fees as *discounts*.  AstraZeneca admits as much in its agreement: Section 13 states: "AstraZeneca believes the Service Fees paid hereunder are a discount . . . ."

201.    As discussed in detail above, discounts are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide.  In blatant defiance of the law, AstraZeneca improperly includes these "discounts" in its AMP calculations, in turn understates its AMP, and consequently underpays the Medicaid rebates it owes to the Government Plaintiffs.

202.    In addition to the AZ Agreement, an internal AstraZeneca PowerPoint further underscores the *bona fide* value of the services provided by the wholesaler.[22] In the document, AstraZeneca describes the components of the AZ Agreement and notes that it "includes several metrics designed to *increase the value* of our wholesale vendor relationships" (emphasis added). The document goes on to state that "[f]ee adjustments [are] mostly weighted on inventory adherence (i.e., the fees are partly contingent on performance). Moreover, the PowerPoint describes the value of the data provided from the wholesaler to AstraZeneca pursuant to the data reporting requirements. The document further supports the *bona fide* value of the fees paid pursuant to the AZ Agreement by stating that "To Begin *Earning* Service Fees" the wholesaler is required to meet a series of milestones, and that "To Be *Eligible* for Payment" several other milestones are required to be met by the wholesaler (emphasis added).

203.    The PowerPoint also states that a company known as "ValueCentric" is "AstraZeneca's service provider responsible for the technical implementation and ongoing application support of the DSA agreement." The PowerPoint then states that "All EDI transactions will be sent to ValueCentric who will manage and process the 852 and 867 data transaction sets." The value of the 852 data and the 867 data – and the other information provided by the wholesaler pursuant to the DSA – is made clear on ValueCentric's website, which states:

> ValueCentric receives data on a daily basis from over 100 wholesaler entities, including the Big 3: Cardinal Health, McKesson and AmerisourceBergen. ValueCentric gathers sales, inventory, orders, chargebacks and returns data to help manufacturers make more accurate business decisions, measure the effectiveness of their sales operations and marketing efforts, and reduce costs by proactively managing their product inventories.

---

[22] A redacted copy of this PowerPoint is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

> With wholesaler data, manufacturers are able to drive increased revenue by ensuring appropriate product availability at the wholesaler distribution center, thereby preventing stock-outs. Complete, timely and accurate views of the supply channel make it possible for manufacturers to proactively manage their manufacturing facilities and their order-to-cash process.

204.    It is beyond dispute that the services provided by the wholesaler pursuant to the DSA were valuable to AstraZeneca, and that payment for these services was contingent on the services being rendered. Payments for services rendered are not "discounts."

205.    During the Relevant Time Period, Defendant AstraZeneca participated in the Medicaid Program and AstraZeneca's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, AstraZeneca's drug, Seroquel Oral Tablet 300 MG, 60 units, 00310-0274-60 had approximately $1,768,392,407.43 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

206.    AstraZeneca's DSA, discussed in detail above, improperly characterizes *bona fide* service fees as discounts and, thereby, illegally understates its AMP calculations.

207.    By understating its AMP calculations, AstraZeneca: (1) caused CMS to underreport the unit rebate amounts to the states, (2), caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, AstraZeneca violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 2.    Biogen

208.    Biogen is a Discount Defendant.

209. Biogen and a national wholesaler executed a "Services Agreement" ("Biogen SA"), effective April 1, 2005.[23]

210. According to the Biogen SA, the purpose of the agreement is for Biogen to purchase certain services from the wholesaler, including, but not limited to, distribution services, logistics and inventory management services, administrative services, and financial services.

211. Section 7 of the Biogen SA details the services the wholesaler must provide, including inventory maintenance levels, purchase limits, product availability. Also, the wholesaler is required to provide Inventory Reports (852 data) and Sales Reports (867 data) on a weekly basis. In addition, the Biogen SA provides for customer monitoring, service levels, deductions reconciliation, and contract and chargeback administration.

212. In return for these services, Biogen agrees to pay the wholesaler a Service Fee in the form of a quarterly credit memo. Biogen SA § 8. According to Appendix A to the Biogen SA, Biogen agrees to pay the wholesaler a Service Fee equal to 1% of the total volume of all products purchased.

213. The services for which Biogen pays the Service Fee are strikingly similar to *bona fide* services the Service Fee Defendants receive from wholesalers. Under the Biogen SA, the wholesaler agrees to provide distribution services, inventory management services and data services, such as weekly inventory and sales reports. Despite this, and despite the wholesaler's express position in the agreement that "the fees are *bona fide* fees for service[,]" Biogen unlawfully elected to rename these fees "discounts." Indeed, Biogen expressly states that it will recognize the Service Fees as discounts in its "government pricing calculations." Biogen SA § 8.c.

---

[23] A redacted copy of this agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.

214. As discussed in detail above, discounts are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In blatant defiance of the law, Biogen Idec improperly includes these "discounts" in its AMP calculations, in turn understates its AMP, and consequently underpays the Medicaid rebates it owes to the Government Plaintiffs.

215. During the Relevant Time Period, Defendant Biogen participated in the Medicaid Program and Biogen's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Biogen's drug, Avonex Prefilled Intramuscular Kit 30 MCG/0.5ML, 1 unit, 59627-0002-05, had approximately $424,352,841.72 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

216. Biogen's DSA, discussed in detail above, improperly characterizes *bona fide* service fees as discounts and, thereby, illegally understates its AMP calculations.

217. By understating its AMP calculations, Biogen: (1) caused CMS to underreport the unit rebate amounts to the states, (2), caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of this fraudulent conduct, Biogen violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 3. Cephalon

218. Cephalon is Discount Defendant.

219.    On March 31, 2006, Cephalon and a national wholesaler executed a "Distribution Services Agreement" ("Cephalon DSA").[24]  The purpose of the Cephalon DSA is to ensure "the availability and integrity" of Cephalon's products to patients.  In Section 2, Cephalon expressed its desire, through the Cephalon DSA, to "maximize[e] service levels for wholesalers, and improve[e] the efficiency of its manufacturing, forecasting, warehousing, and distribution efforts."

220.    The Cephalon DSA defines the manner in which the wholesaler will be paid as the "Wholesaler Discount Program."    Cephalon DSA §3.    In return for the wholesaler's "handling all distribution and related support service functions," the wholesaler "earns discounts from its purchases of Product for performing the activities as set forth in Exhibit C."    The Cephalon DSA continues that "the discount to the Wholesaler is intended to be 2.00% of sales of Cephalon Pharmaceutical Products. . . ."  Cephalon DSA §3.

221.    That Cephalon unlawfully treated the payment it made to the wholesaler in exchange for the services the wholesaler provided as a discount cannot be disputed.  In Section 3(b)(iii) of the Cephalon DSA, the parties state:

> [The wholesaler] acknowledges that Cephalon's position is that the payments made hereunder are a discount and that Cephalon will recognize such payments as a discount in its own books and records and in its government pricing calculations.   Cephalon acknowledges that [The wholesaler's] position is that   the payments are a bona fide fee for service provided under this Agreement.

222.    As for the services themselves, they are virtually the same a those the Service Fee defendants properly characterize as *bona fide*.  For example, Exhibit C describes the "Discount Program Breakdown," itemizes services the wholesaler performs, and states the fees to which the

---

[24] This agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.  The agreement was amended on October 2, 2006.  The amendment is also attached within Exhibit C and is incorporated by reference as if fully set forth herein.

wholesaler entitled as follows: Inventory Management services, Customer Service Level services, Returns Management Services, Deduction Management Services, and Data Submission Services. For Data Submission, the wholesaler earns from zero (0) basis points for providing no data to twenty-five (25) basis points for providing all data Section 5 requires. Similarly, the wholesaler can earn up to seventy-five (75) basis points for maintaining proper levels of inventory.

223. As discussed in detail above, discounts are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In blatant defiance of the law, Cephalon improperly includes these "discounts" in its AMP calculations, in turn understates its AMP, and consequently underpays the Medicaid rebates it owes to the Government Plaintiffs.

224. During the Relevant Time Period, Defendant Cephalon participated in the Medicaid Program and Cephalon's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Cephalon's drug, Provigil Oral Tablet 100 MG, 100 units, 63459-0201-01, had approximately $388,790,375.97 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

225. Cephalon's DSA, discussed in detail above, improperly characterizes *bona fide* service fees as discounts and, thereby, illegally understates its AMP calculations.

226. By understating its AMP calculations, Cephalon: (1) caused CMS to underreport the unit rebate amounts to the states, (2), caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of

this fraudulent conduct, Cephalon violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

### 4.    Genzyme

227.    Genzyme is a Discount Defendant.

228.    On December 5, 2005, Genzyme transmitted a letter agreement described as an "Inventory Management Agreement" ("Genzyme IMA") to a national wholesaler.    The wholesaler counter-executed this letter agreement on December 16, 2005.  On September 22, 2006 and October 3, 2006 respectively, Genzyme and the wholesaler executed the "First Amendment to Inventory Management Agreement."[25]

229.    Genzyme expressed the goal of its IMA as "ensur[ing] that wholesalers establish and maintain inventory levels that reflect true customer demand and continue to provide inventory management services."  From its opening, the Genzyme IMA describes a 2.25% "discount" it will provide if the wholesaler provides certain services as described in the agreement. Genzyme agrees to apply the "Inventory Management Discount" to the WAC of its products in the form of a rebate at the end of each calendar quarter.

230.    The services for which Genzyme pays the Inventory Management Discount are strikingly similar to *bona fide* services the Service Fee Defendants receive from wholesalers. Included in the services the wholesaler provides to Genzyme are daily 852 inventory data and weekly 867 sales data (via EDI Transaction Data Reports).  The wholesaler also agrees to meet certain inventory maintenance levels, purchase requirements, and to process returns in accordance with Genzyme's returns policy.

---

[25] This agreement is attached within Exhibit C and is incorporated by reference as if fully set forth herein.  The amendment is also attached within Exhibit C and is incorporated by reference as if fully set forth herein.

231. Although Genzyme acknowledges the wholesaler's "position that the fees paid hereunder are bona fide inventory management services," Genzyme maintains that the service fees it pays are discounts. Indeed, in the context of requests for information from Medicare or Medicaid programs, the Genzyme IMA mandates that the wholesaler "shall report the net Product purchase price and, to the extent required by law or as requested by a government agency, the Inventory Management Discount received under this agreement."

232. As discussed in detail above, discounts are excluded from AMP by statute, regulation, the Medicaid Rebate Agreement, and the Medicaid Rebate Operational Training Guide. In blatant defiance of the law, Genzyme improperly includes these "discounts" in its AMP calculations, in turn understates its AMP, and consequently underpays the Medicaid rebates it owes to the Government Plaintiffs.

233. During the Relevant Time Period, Defendant Genzyme participated in the Medicaid Program and Genzyme's Relevant Drugs were paid for by all of the Government Plaintiffs. For example, Genzyme's drug, Renagel Oral Tablet 800 MG, 180 units, 58468-0021-01, had approximately $296,645,774.82 in Medicaid utilization from 2004 to 2010. *See* Exhibit D (national and state Medicaid utilization for this particular product, which is incorporated by reference as if fully set forth herein).

234. Genzyme's DSA, discussed in detail above, improperly characterizes *bona fide* service fees as discounts and, thereby, illegally understates its AMP calculations.

235. By understating its AMP calculations, Genzyme: (1) caused CMS to underreport the unit rebate amounts to the states, (2), caused itself to pay less in rebates than it actually owed, (3) caused the states to receive less in rebates than they were entitled to, and (4) caused the federal government to pay more than it should have in FMAP funds to the states. As a result of

this fraudulent conduct, Genzyme violated Section 3729(a)(1)(A) and (G) of the Federal False Claims Act and comparable "reverse false claim" sections of the State False Claims Acts.

## VII. CONCLUSION

236. As fully detailed above, Defendants knowingly reported falsely deflated AMPs for their Relevant Drugs. This caused CMS to inaccurately calculate URAs. The States then used inaccurate URAs to invoice Defendants for the rebates Defendants owed. Defendants thus unlawfully underpaid their rebates as a consequence of their own false reporting, the States expended more of their own funds, and the States sought more in federal matching funds through their quarterly requests for Medicaid payments on CMS Form-64.[26] Consequently, the Government Plaintiffs were defrauded by Defendants.

### COUNT I

### Federal False Claims Act

### 31 U.S.C. §3729(a)(1)[1986] and
### 31 U.S.C. §3729(a)(1)(A)[2009]
### (Against All Defendants)

237. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

238. During the Relevant Time Period, Defendants provided to CMS false quarterly reports of their AMPs with respect to the Relevant Drugs. As a result of these submissions, Defendants knowingly caused the States and the District of Columbia to present false and inflated claims for Medicaid payments to officials of the United States in violation of 31 U.S.C. §3729(a)(1)[1986], and 31 U.S.C. §3729(a)(1)(A)[2009].

---

[26] An exemplar of such a claim is attached as Exhibit F and is incorporated by reference as if fully set forth herein.

239.     By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT II

### Federal False Claims Act

### 31 U.S.C. §3729(a)(1)(B)[2009]
### (Against All Defendants)

240.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

241.     During the Relevant Time Period, Defendants knowingly made, used or caused to be made or used, false records or statements material to false or fraudulent claims to the United States.  Specifically, Defendants knowingly submitted to CMS false quarterly reports of their AMPs with respect to the Relevant Drugs which improperly reduced their respective rebate obligations to the States and the District of Columbia under the Medicaid Drug Rebate Program. Defendants' false reports caused the States and the District of Columbia to submit false and inflated claims for Medicaid payments to the United States in violation of 31 U.S.C. §3729(a)(1)(B)[2009].

242.     By virtue of the false or fraudulent claims that Defendants caused to be presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT III

### Federal False Claims Act

#### 31 U.S.C. §3729(a)(7)[1986] and 31 U.S.C. §3729(a)(1)(G)[2009] (Against All Defendants)

243.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

244.    Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their respective Relevant Drugs. Defendants also knew that their AMP submissions would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the States and the District of Columbia.

245.    Since Defendants submitted false AMPs, the States and the District of Columbia received less in Medicaid rebates from Defendants with respect to the Relevant Drugs, and the United States paid more to the States and the District of Columbia in Medicaid payments. Had Defendants properly reported their respective AMPs for the Relevant Drugs during the Relevant Time Period, Defendants would have had a larger financial obligation to the Government Plaintiffs in the form of higher Medicaid rebates.

246.    By virtue of this conduct, Defendants knowingly made, used, or caused to be made or used, false records or statements in order to conceal, avoid, or decrease their respective obligations to pay or transmit money or property to the Medicaid programs of the States and the District of Columbia, which are jointly funded by the United States and the States and the District of Columbia, thus resulting in significant financial loss to the United States, all in violation of 31 U.S.C. §3729(a)(7)[1986].

247. By virtue of this conduct, Defendants further knowingly made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, and/or Defendants knowingly concealed, or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. §3729(a)(1)(G)[2009].

### COUNT IV

### California False Claims Act
### Cal Gov't. Code §12651(a)(7)
### (Against All Defendants)

248. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

249. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of California. Since Defendants submitted false AMPs, the State of California received less money in Medicaid Rebates.

250. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of California, within the meaning of Cal Gov't. Code §12651(a)(7). The State of California has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT V

### Connecticut False Claims Act
### Conn. Gen. Stat. § 17b-301b(a)(7)
### (Against All Defendants)

251.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

252.    During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Connecticut. Since Defendants submitted false AMPs, the State of Connecticut received less money in Medicaid Rebates.

253.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Connecticut, within the meaning of Conn. Gen. Stat. § 17b-301b(a)(7). The State of Connecticut has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VI

### Delaware False Claims And Reporting Act
### 6 Del Code §1201(a)(7)
### (Against All Defendants)

254.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

255.    During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the

United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Delaware. Since Defendants submitted false AMPs, the State of Delaware received less money in Medicaid Rebates.

256. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Delaware, within the meaning of 6 Del. Code §1201(a)(7). The State of Delaware has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)(g)
### (Against All Defendants)

257. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

258. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Florida. Since Defendants submitted false AMPs, the State of Florida received less money in Medicaid Rebates.

259. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Florida, within the meaning of Fla. Stat. Ann. §68.082(2)(g). The State of Florida has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT VIII

### Georgia False Medicaid Claims Act
### Ga. Code Ann. §49-4-168.1(7)
### (Against All Defendants)

260.　Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

261.　During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Georgia. Since Defendants submitted false AMPs, the State of Georgia received less money in Medicaid Rebates.

262.　By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Georgia, within the meaning of Ga. Code Ann. §49-4-168.1(7). The State of Georgia has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)(7)
### (Against All Defendants)

263.　Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

264.　During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the

United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Hawaii. Since Defendants submitted false AMPs, the State of Hawaii received less money in Medicaid Rebates.

265. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Hawaii, within the meaning of Haw. Rev. Stat. §661-21(a)(7). The State of Hawaii has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
#### 740 Ill. Comp. Stat. §175/3(a)(7)
#### (Against All Defendants)

266. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

267. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Illinois. Since Defendants submitted false AMPs, the State of Illinois received less money in Medicaid Rebates.

268. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Illinois, within the meaning of 740 Ill. Comp. Stat. §175/3(a)(7). The State of Illinois has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(6)
### (Against All Defendants)

269. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

270. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Indiana. Since Defendants submitted false AMPs, the State of Indiana received less money in Medicaid Rebates.

271. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Indiana, within the meaning of IC 5-11-5.5-2(b)(6). The State of Indiana has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XII

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 46:438.3(C)
### (Against All Defendants)

272. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

273. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the

United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Louisiana. Since Defendants submitted false AMPs, the State of Louisiana received less money in Medicaid Rebates.

274. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Louisiana, within the meaning of La. Rev. Stat. § 46:438.3(C). The State of Louisiana has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### COUNT XIII

#### Massachusetts False Claims Law
#### Mass. Gen. Laws ch. 12 §5B(8)
#### (Against All Defendants)

275. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

276. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the Commonwealth of Massachusetts. Since Defendants submitted false AMPs, the Commonwealth of Massachusetts received less money in Medicaid Rebates.

277. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Commonwealth of Massachusetts, within the meaning of Mass. Gen. Laws ch. 12 §5B(8). The Commonwealth of Massachusetts has

70

thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT XIV**

**Michigan Medicaid False Claims Act**
**§400.607(3)**
**(Against All Defendants)**

278. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

279. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Michigan. Since Defendants submitted false AMPs, the State of Michigan received less money in Medicaid Rebates.

280. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Michigan, within the meaning of §400.607(3). The State of Michigan has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT XV**

**Montana False Claims Act**
**Mont. Code Ann. 17-8-403(1)(g)**
**(Against All Defendants)**

281. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

71

A208

282. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Montana. Since Defendants submitted false AMPs, the State of Montana received less money in Medicaid Rebates.

283. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Montana, within the meaning of Mont. Code Ann. 17-8-403(1)(g). The State of Montana has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XVI

### Nevada Submission of False Claims
### to State or Local Government Act
### Nev. Rev. Stat. Ann. §357.040(1)(g)
### (Against All Defendants)

284. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

285. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Nevada. Since Defendants submitted false AMPs, the State of Nevada received less money in Medicaid Rebates.

286.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Nevada, within the meaning of Nev. Rev. Stat. Ann. §357.040(1)(g).  The State of Nevada has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XVII

### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. §167:61-b(I)(e)
### (Against All Defendants)

287.     Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

288.     During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of New Hampshire.   Since Defendants submitted false AMPs, the State of New Hampshire received less money in Medicaid Rebates.

289.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Hampshire, within the meaning of N.H. Rev. Stat. Ann. §167:61-b(I)(e).   The State of New Hampshire has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

73

## COUNT XVIII

### New Jersey False Claims Act
### N.J. Stat. §2A:32C-3(g)
### (Against All Defendants)

290. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

291. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of New Jersey. Since Defendants submitted false AMPs, the State of New Jersey received less money in Medicaid Rebates.

292. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Jersey, within the meaning of N.J. Stat. §2A:32C-3(g). The State of New Jersey has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XIX

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-14-3(a)(7)
### (Against All Defendants)

293. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

294. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the

74

A211

United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of New Mexico. Since Defendants submitted false AMPs, the State of New Mexico received less money in Medicaid Rebates.

295. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New Mexico, within the meaning of N.M. Stat. Ann. § 27-14-3(a)(7). The State of New Mexico has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XX

### New York False Claims Act
### NY CLS St. Fin. §189(g)
### (Against All Defendants)

296. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

297. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of New York. Since Defendants submitted false AMPs, the State of New York received less money in Medicaid Rebates.

298. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of New York, within the meaning of NY CLS St. Fin. §189(g). The State of New York has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXI

### North Carolina False Claims Act
### 2009-554 N.C. Sess. Laws §1-607(a)(7)
### (Against All Defendants)

299. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

300. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of North Carolina. Since Defendants submitted false AMPs, the State of North Carolina received less money in Medicaid Rebates.

301. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of North Carolina, within the meaning of 2009-554 N.C. Sess. Laws §1-607(a)(7). The State of North Carolina has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXII

### Oklahoma Medicaid False Claims Act
### Okla. Stat. tit. 63, §5053.1B (7)
### (Against All Defendants)

302. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

303. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs.

76

Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Oklahoma. Since Defendants submitted false AMPs, the State of Oklahoma received less money in Medicaid Rebates.

304. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Oklahoma, within the meaning of Okla. Stat. tit. 63, §5053.1B (7). The State of Oklahoma has thereby suffered actual damages and is entitled to recover treble Oklahoma damages and a civil penalty for each false claim.

## COUNT XXIII

### Rhode Island State False Claims Act
### R.I. Gen. Laws §9-1.1-3(7)
### (Against All Defendants)

305. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

306. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Rhode Island. Since Defendants submitted false AMPs, the State of Rhode Island received less money in Medicaid Rebates.

307. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Rhode Island, within the meaning

of R.I. Gen. Laws §9-1.1-3(7). The State of Rhode Island has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXIV

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a)(7) and 71-5-181(a)(1)(D)
### (Against All Defendants)

308. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

309. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Tennessee. Since Defendants submitted false AMPs, the State of Tennessee received less money in Medicaid Rebates.

310. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Tennessee, within the meaning of Tenn. Code Ann. §§ 4-18-103(a)(7) and 71-5-181(a)(1)(D). The State of Tennessee has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXV

### Texas Medicaid Fraud Prevention Act
### Tex. Hum. Res. Code Ann. §36.002(12)
### (Against All Defendants)

311. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

312.    During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Texas. Since Defendants submitted false AMPs, the State of Texas received less money in Medicaid Rebates.

313.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Texas, within the meaning of Tex. Hum. Res. Code Ann. §36.002(12).  The State of Texas Texas has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXVI

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(7)
### (Against All Defendants)

314.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

315.    During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the Commonwealth of Virginia.  Since Defendants submitted false AMPs, the  Commonwealth of Virginia received less money in Medicaid Rebates.

79

316. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Commonwealth of Virginia, within the meaning of Va. Code Ann. §8.01-216.3(a)(7). The Commonwealth of Virginia has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXVII

### Wisconsin False Claims For Medical Assistance Act
### Wis. Stat. §20.931(2)(g)
### (Against All Defendants)

317. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

318. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the State of Wisconsin. Since Defendants submitted false AMPs, the State of Wisconsin received less money in Medicaid Rebates.

319. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State of Wisconsin, within the meaning of Wis. Stat. §20.931(2)(g). The State of Wisconsin has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT XXVIII

### District of Columbia False Claims Act
### D.C. Code Ann. §2-308.14(a)(7)
### (Against All Defendants)

320. Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

321. During the Relevant Time Period, Defendants were aware of their obligations to make and to use truthful records or statements regarding the AMPs for their Relevant Drugs. Defendants also knew that their AMP submissions for their Relevant Drugs would be used by the United States to calculate the unit rebate amount, which would affect the amount of the rebates that Defendants were obligated to pay to the District of Columbia. Since Defendants submitted false AMPs, the District of Columbia received less money in Medicaid Rebates.

322. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia, within the meaning of D.C. Code Ann. §2-308.14(a)(7). The District of Columbia has thereby suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

### PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment against the Defendants as follows:

B. that Defendants cease and desist from violating 31 U.S.C. §3729 *et seq*., and the counterpart provisions of the state statutes set forth above;

C. that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

81

D.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of California has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §1651(a);

E.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Connecticut has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Conn. Gen. Stat. § 17b-301b;

F.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

G.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Fla. Stat. Ann. §68.082(2);

H.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Georgia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Ga. Code Ann. §49-4-168.1.

I.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

J.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

K.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of Defendants' actions, plus a civil penalty of at least $5,000 for each violation of IC 5-11-55;

L.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et. seq.;

M.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

N.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of MI Public Act 337;

O.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Mont. Stat. Ann. 17-8-401;

P.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

Q.    that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of Defendants' actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. §167:61-b(I);

83
A220

R.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Jersey has sustained because of Defendants' actions, plus a civil penalty of $11, 000 for each violation of N.J. Stat. §2A:32C-3;

S.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of N.M. Stat. Ann. §27-2F-4;

T.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of New York has sustained because of Defendants' actions, plus a civil penalty of $12,000 for each violation of NY CLS St. Fin. §189;

U.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of North Carolina has sustained because of Defendants' actions, plus a civil penalty or $11,000 for each violation of 2009-554 N.C. Sess. Laws §1-607(a);

V.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Oklahoma has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Okla. Stat. tit. 63, §5053.1B;

W.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Rhode Island has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of R.I. Gen. Laws §9-1.1-3;

X.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

Y.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

Z.      that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of Defendants' actions, plus a civil penalty of $11,000 for each violation of Va. Code Ann. §8.01-216.3(a);

AA.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the State of Wisconsin has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of Wis. Stat. §20.931(2);

BB.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of Defendants' actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §2-308.14(a);

CC.     that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

DD.     that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

EE.     that Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

323.    Plaintiff Relator demands a trial by jury.

Dated: September 7, 2011

Respectfully Submitted:

**FARUQI & FARUQI, LLP**

/s/ Jacob A. Goldberg JAG 3869
Kendall S. Zylstra
(Pa Bar No. 64006)
Jacob A. Goldberg
(Pa Bar No. 66399)
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Tel: (215) 914-2460
Email:kzylstra@faruqilaw.com
jgoldberg@faruqilaw.com

BERGER & MONTAGUE, P.C.
Todd S. Collins
Daniel R. Miller
Joy Clairmont
1600 Locust Street
Philadelphia, PA 19103
Tel: (215) 875-3000
Email: tcollins@bm.net
dmiller@bm.net
jclairmont@bm.net

RAWLINGS & ASSOCIATES, PLLC
Mark D. Fischer
Jeffrey C. Swann
325 W. Main Street
Louisville, KY 40202
Tel: (502) 587-8060
Email: mfischer@rawlingsandassociates.com
js5@rawlingsandassociates.com

*Attorneys for Relator Ronald J. Streck*

kal778974_920_26.docx