Nos. 23-2134, 23-2216, 23-2958, and 23-3035

# United States Court of Appeals
# For the Seventh Circuit

UNITED STATES, ET AL. EX REL., RONALD J. STRECK,
*Plaintiff-Appellee, Cross-Appellant,*

v.

ELI LILLY AND COMPANY,
*Defendant, Appellant-Cross-Appellee,*

On Appeal From the United States District Court
for the Northern District of Illinois
Hon. Harry D. Leinenweber, Case No. 1:14-cv-09412

**RELATOR'S RESPONSIVE BRIEF AS APPELLEE, OPENING
BRIEF AS CROSS-APPELLANT, AND REQUIRED SHORT
APPENDIX**

Jackson Martin
MARTIN LAW, P.C.
1934 Old Gallows Road, Suite 350
Tysons Corner, Virginia 22182
Tel: (202) 909-3455

Daniel R. Miller
 *Counsel of Record*
Jonathan Z. DeSantis
WALDEN MACHT & HARAN LLP
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Tel: (212) 335-2030
dmiller@wmhlaw.com

Michael Behn
BEHN & WYETZNER, CTD.
17 N. State Street, Suite 1600
Chicago, IL 60602
Tel: (312) 236-0000

*Attorneys for Relator Ronald J. Streck*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 23-2134; 23-2216; 23-2958, & 23-3035

Short Caption: United States, et al., ex rel., Streck v. Eli Lilly and Company

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Ronald J. Streck

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 Walden Macht & Haran LLP; Martin Law, P.C.; Behn & Wyetzner, Ctd.; Berger & Montague PC; Faruqi & Faruqi, LLP

(3)     If the party, amicus or intervenor is a corporation:

     i)        Identify all its parent corporations, if any; and

         N/A

     ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

         N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

     N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

     N/A

Attorney's Signature: /s/ Daniel R. Miller      Date: 2/23/2024

Attorney's Printed Name: Daniel R. Miller

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☑   **No** ☐

Address: 2000 Market Street, Suite 1430 Philadelphia, PA 19103

Phone Number: (215) 825-5283      Fax Number: (212) 335-2040

E-Mail Address: dmiller@wmhlaw.com

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: <u>23-2134; 23-2216;</u> 23-2958, & 23-3035

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
<u>Ronald J. Streck</u>

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
<u>Walden Macht & Haran LLP; Martin Law, P.C.; Behn & Wyetzner, Ctd.; Berger & Montague PC; Faruqi & Faruqi, LLP</u>

(3)   If the party, amicus or intervenor is a corporation:

    i)   Identify all its parent corporations, if any; and

       <u>N/A</u>

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

---

Attorney's Signature: <u>/s/ Jonathan Z. DeSantis</u>   Date: <u>2/23/2024</u>

Attorney's Printed Name: <u>Jonathan Z. DeSantis</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   **Yes** ☐  **No** ☑

Address: <u>2000 Market Street, Suite 1430 Philadelphia, PA 19103</u>

Phone Number: <u>(215) 825-5283</u>   Fax Number: <u>(212) 335-2040</u>

E-Mail Address: <u>jdesantis@wmhlaw.com</u>

rev. 12/19 AK

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-2134; 23-2216;</u> 23-2958, & 23-3035

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

     ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Ronald J. Streck</u>

_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Walden Macht & Haran LLP; Martin Law, P.C.; Behn & Wyetzner, Ctd.; Berger & Montague PC; Faruqi & Faruqi, LLP</u>

_____

(3)   If the party, amicus or intervenor is a corporation:

    i)   Identify all its parent corporations, if any; and

        <u>N/A</u>

    ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    <u>N/A</u>

---

Attorney's Signature: <u>/s/ Michael Behn</u>    Date: <u>2/23/2024</u>

Attorney's Printed Name: <u>Michael Behn</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).  **Yes** ☐  **No** ☑

Address: <u>17 N. State Street, Suite 1600  Chicago, IL 60602</u>

_____

Phone Number: <u>(312) 236-0000</u>    Fax Number: _____

E-Mail Address: <u>mbehn@behnwyetzner.com</u>

Save As    Clear Form

## APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

Appellate Court No: <u>23-2134; 23-2216;</u> 23-2958, & 23-3035

Short Caption: <u>United States, et al., ex rel., Streck v. Eli Lilly and Company</u>

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

   ☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

<u>Ronald J. Streck</u>

_____

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

<u>Walden Macht & Haran LLP; Martin Law, P.C.; Behn & Wyetzner, Ctd.; Berger & Montague PC; Faruqi & Faruqi, LLP</u>

_____

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

     <u>N/A</u>

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

     <u>N/A</u>

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

   <u>N/A</u>

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

   <u>N/A</u>

---

Attorney's Signature: <u>/s/ Jackson Martin</u>   Date: <u>2/23/2024</u>

Attorney's Printed Name: <u>Jackson Martin</u>

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d). **Yes** ☐ **No** ☑

Address: <u>1934 Old Gallows Road, Suite 350 Tysons Corner, Virginia 22182</u>

_____

Phone Number: <u>(202) 909-3455</u>   Fax Number: _____

E-Mail Address: <u>jackson@martinlawpc.com</u>

rev. 12/19 AK

# TABLE OF CONTENTS

DISCLOSURE STATEMENTS

TABLE OF AUTHORITIES ...................................................................... v

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 6

STATEMENT OF ISSUES FOR REVIEW .............................................. 7

STATEMENT OF THE CASE ................................................................ 7

I.      Lilly's Obligation to Submit Accurate AMPs ................................... 7

II.     The Rebate Agreement and the Price Actually Realized
        Requirement ................................................................................. 9

III.    Price Increase Value Allows Lilly to "Realize" Additional
        "Price" .......................................................................................... 12

IV.     Lilly's False AMPs and Related Certifications ............................... 16

V.      The Proceedings Below ................................................................. 18

        A.      The District Court's Summary Judgment Decision ............. 18

        B.      Trial .................................................................................. 19

                1.      Lilly's Trial Presentation Focused on One Employee
                        and a Nonsensical Interpretation  ........................... 19

                2.      Lilly's Failure to Offer a Cogent Explanation ............. 21

                3.      Lilly's Lack of Transparency ...................................... 21

        C.      Damages, Verdict, and Judgment ....................................... 25

SUMMARY OF ARGUMENT ................................................................26

STANDARD OF REVIEW .................................................................29

ARGUMENT ...................................................................................29

I.   Lilly's AMPs and Related Certifications Were False ...................29

    A.   Lilly Was Obligated to Include Price Increase Value in AMP ......................................................................................30

    B.   Falsity Turns on Whether Lilly Met the Price Actually Realized Requirement, Not "Objective Reasonableness" .....36

        1.   Lilly Conflates Falsity and Scienter ...........................37

        2.   Lilly's "Reasonable Assumptions" Argument Fails.....40

    C.   Lilly's Remaining "Falsity" Arguments are Irrelevant and Meritless...................................................................................43

        1.   The Supposed Regulatory Complexity ........................43

        2.   HHS-OIG Did Not Reach a "Contrary Determination"..............................................................44

        3.   The *Streck I* Decisions...............................................45

        4.   The District Court Did Not Treat Lilly's 2017 Policy Change as "Conclusive Evidence of Prior Falsity"......47

II.  The Court Should Affirm the Jury Verdict on Materiality ..........49

    A.   The Evidence Supported the Jury's Materiality Finding ....49

        1.   Relator's Evidence of Materiality ...............................50

        2.   The Jury Was Free to Ignore Lilly's Evidence ...........53

B. The District Court Property Instructed the Jury .................. 56

    1. The Jury Instructions Adequately Informed the Jury of the Applicable Law ........................................... 56

    2. Lilly Cannot Demonstrate Prejudice .......................... 58

III. The Jury Was Plainly Entitled to Conclude that Lilly Acted with Scienter ..................................................................................... 59

    A. Ample Evidence Supports the Jury's Finding of Scienter ... 59

        1. The Legal Standard ...................................................... 59

        2. Lilly's Problematic Narrative ...................................... 61

        3. Lilly's Problematic Explanations ................................. 67

        4. Lilly's Problematic Behavior ........................................ 70

    B. Lilly Ignores the Evidence and Misrepresents the Scienter Inquiry ................................................................... 73

IV. The District Court Applied the Wrong Methodology to Determine the Number of Statutory Violations ........................... 77

    A. Additional Facts Relevant to Civil Penalties ...................... 78

    B. The District Court's Decision ............................................... 82

    C. Each False AMP Constitutes a Separate Statutory Violation ............................................................................... 84

CONCLUSION ..................................................................................... 90

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

CERTIFICATE OF SERVICE

REQUIRED SUPPLEMENTAL SHORT APPENDIX

# TABLE OF AUTHORITIES

**Cases**

*Cole v. C.I.R.*,
637 F.3d 767 (7th Cir. 2011) ......................................................65

*Crompton v. BNSF Ry. Co.*,
745 F.3d 292 (7th Cir. 2014) ......................................................66

*E.E.O.C. v. AutoZone, Inc.*,
809 F.3d 916 (7th Cir. 2016) ....................................... 29, 56, 57, 58

*Ebeling v. Morgan*,
237 U.S. 625 (1915) ........................................................ 84, 85, 89

*Ewing v. 1645 W. Farragut LLC*,
---F.4th---, 2024 WL 78292 (7th Cir. Jan. 8, 2024) .......................59

*Gehring v. Case Corp.*,
43 F.3d 340 (7th Cir. 1994) ........................................................57

*Hagood v. Sonoma Cnty. Water Agency*,
81 F.3d 1465 (9th Cir. 1996) ......................................................40

*Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*,
467 U.S. 51 (1984) ............................................................... 60, 73

*Huff v. Sheahan*,
493 F.3d 893 (7th Cir. 2007) ......................................................57

*Lange v. City of Oconto*,
28 F.4th 825 (7th Cir. 2022)........................................................54

*Neder v. U.S.*,
527 U.S. 1 (1999) .......................................................................58

*Pharm. Rsch. & Mfrs. of Am. v. Walsh*,
   538 U.S. 644 (2003) ....................................................... 7, 8, 42

*Rexing Quality Eggs v. Rembrandt Enterprises, Inc.*,
   996 F.3d 354 (7th Cir. 2021) .......................................... 29

*Rock Island, A. & L.R. Co. v. U.S.*,
   254 U.S. 141 (1920) ..................................................... 59, 60

*Ruckh v. Salus Rehabilitation, LLC*,
   963 F. 3d 1089 (11th Cir. 2020) ...................................... 52

*U.S. v. Allergan, Inc.*,
   746 F. App'x 101 (3d Cir. 2018) (unpublished) ....................... 45, 46

*U.S. v. Anchor Mortg. Corp.*,
   711 F.3d 745 (7th Cir. 2013) .......................................... 62

*U.S. v. Bornstein*,
   423 U.S. 303 (1976) .......................................... *passim*

*U.S. v. Chhibber*,
   741 F.3d 852 (7th Cir. 2014) .......................................... 63

*U.S. v. Coffman*,
   94 F.3d 330 (7th Cir. 1996) ........................................... 57

*U.S. v. DiCosola*,
   867 F.3d 793 (7th Cir. 2017) .......................................... 72

*U.S. v. Durham*,
   766 F.3d 672 (7th Cir. 2014) .......................................... 56

*U.S. v. King-Vassel*,
   728 F.3d 707 (7th Cir. 2013) .......................................... 28, 60, 61

*U.S. v. Mbaye*,
   827 F.3d 617 (7th Cir. 2016) .......................................... 67

*U.S. v. Natale,*
719 F.3d 719 (7th Cir. 2013) ......................................................58

*U.S. v. Sikorsky Aircraft Corp.,*
2023 WL 6883637 (E.D. Wis. Oct. 17, 2023)................................77

*U.S. v. Xiao,*
77 F.4th 466 (7th Cir. 2023) .......................................................43

*U.S. v. Ytem,*
255 F.3d 394 (7th Cir. 2001) ................................................ 44, 74

*U.S. ex rel. Burlbaw v. Orenduff,*
548 F.3d 931 (10th Cir. 2008) ....................................................77

*U.S. ex rel. Calderon v. Carrington Mortgage Servs., LLC,*
70 F.4th 968 (7th Cir.), *cert. denied sub nom.*
144 S. Ct. 331 (2023) .................................................................55

*U.S ex rel. Chilcott v. KBR, Inc.,*
2013 WL 5781660 (C.D. Ill. Oct. 25, 2013) ........................... 38, 40

*U.S. ex rel. Drakeford v. Tuomey,*
792 F.3d 364 (4th Cir. 2015) ................................................ 37, 39

*U.S. ex rel. Durcholz v. FKW Inc.,*
189 F.3d 542 (7th Cir. 1999) ......................................... 44, 76, 77

*U.S. ex rel. Gugenheim v. Meridian Senior Living, LLC,*
36 F.4th 173 (4th Cir. 2022).......................................................75

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.,*
---F.4th----, 2024 WL 217696
(7th Cir. Jan. 16, 2024) ....................................................*passim*

*U.S. ex rel. Int'l Bhd. Of Elec. Workers Loc. Union No. 98 v.*
*Farfield Co.,* 5 F.4th 315 (3d Cir. 2021).......................................62

*U.S. ex rel. Lamers v. City of Green Bay,*
    168 F.3d 1013 (7th Cir. 1999) ................................................. 39, 40

*U.S. ex rel. Marcus v. Hess,*
    317 U.S. 537 (1943) ........................................................... 84, 85, 90

*U.S. ex rel. Oliver v. Parsons Co.,*
    195 F.3d 457 (9th Cir. 1999) ................................................. 37, 40

*U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.,*
    892 F.3d 822 (6th Cir. 2018) ....................................................... 73

*U.S. ex rel. Prose v. Molina Healthcare of Illinois, Inc.,*
    17 F.4th 732 (7th Cir. 2021) ........................................................ 37

*U.S. ex rel. Schutte v. SuperValu Inc.,*
    598 U.S. 739 (2023) ................................................. 37, 61, 73, 74

*U.S. ex rel. Streck v. Allergan, Inc.,*
    894 F. Supp. 2d 584 (E.D. Pa. 2012) ..................................... 45, 47

*U.S. ex rel. Streck v. Bristol-Myers Squibb Company,*
    2018 WL 6300578 (E.D. Pa. Nov. 29, 2018) ........................... 10, 47

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics,*
    652 F.3d 818 (7th Cir. 2011) ................................................. 39, 40

*U.S. ex rel. Yates v. Pinellas Hematology & Oncology, P.A.,*
    21 F.4th 1288 (11th Cir. 2021) ..................................................... 60

*Universal Health Servs., Inc. v. U.S. ex rel. Escobar,*
    579 U.S. 176 (2016) ............................................................ *passim*

*Wallace v. McGlothan,*
    606 F.3d 410 (7th Cir. 2010) ....................................................... 50

**Statutes**

28 U.S.C. § 1291 ....................................................................6

28 U.S.C. § 1331 ....................................................................6

28 U.S.C. § 1367(a) ................................................................6

31 U.S.C. § 3729(a) .......................................................... *passim*

31 U.S.C. § 3729(b)(1)(B) ................................................. 60, 74

31 U.S.C. § 3729(b)(4) ...................................................... 27, 50

31 U.S.C. § 3730(a)(1)(G) ........................................................89

31 U.S.C. § 3732(b) .................................................................6

42 U.S.C. § 1396r-8 .......................................................... *passim*

104 Stat 1388.........................................................................8

740 Ill. Comp. Stat. §175/3(a)(1)(G) ......................................89

**Rules**

Fed. R. App. 4(a)(3)................................................................7

Fed. R. Evid. 407 .................................................................48

**Regulations**

42 C.F.R. § 447.502 ..............................................................34

42 C.F.R. § 447.504(i)(3) (2007) ...........................................33

42 C.F.R. § 447.510(e) ..........................................................17

72 FR 39142-01 (2007) ..............................................................*passim*

75 Fed. Reg. 69,591 (2010) ................................................................11

77 Fed. Reg. 5,318-01 (2012) .......................................................23, 72

81 Fed. Reg. 5,170-01 (2016) ...................................................... 11, 78

## Other Authorities

3 *Handbook of Fed. Evid.* § 407:1 n.2 (9th ed.).....................................48

Merriam-Webster, https://www.merriam-webster.com/dictionary/
    cumulative ..................................................................................34

Merriam-Webster, https://www.merriam-webster.com/dictionary/
    subsequent..................................................................................34

# INTRODUCTION

The Medicaid Drug Rebate Program ("MDRP") is designed to reduce the cost of providing prescription drugs to the poorest Americans.

If a pharmaceutical manufacturer elects to participate in the MDRP, it must sign the Medicaid Drug Rebate Agreement ("Rebate Agreement"). The Rebate Agreement requires manufacturers to pay rebates whenever Medicaid pays for their drugs. The rebates are designed to ensure Medicaid gets the benefit of its significant purchasing power, thereby reducing Medicaid's costs.

The rebates are based on "average manufacturer prices" ("AMP") that manufacturers periodically report to the government. In general, the higher the AMP for a drug, the higher the rebate the manufacturer owes to Medicaid. Thus, manufacturers are financially incentivized to report lower AMPs.

Aware that drug manufacturers could defraud the system through clever pricing arrangements, the Rebate Agreement imposes a variety of requirements designed to ensure that AMP actually reflects the average price paid to the manufacturer. As relevant here, the Rebate Agreement requires manufacturers to adjust AMP if, after the initial sale,

1

"cumulative discounts or other arrangements subsequently adjust the price actually realized" (the "Price Actually Realized Requirement").

Eli Lilly and Company ("Lilly") is one of the world's largest pharmaceutical manufacturers. Lilly signed the Rebate Agreement in 1991, and it has been renewed every year since.

In 2005, Lilly signed contracts with its customers which contained contractual "clawback" provisions. These provisions stated that if Lilly sold a drug to a customer at an initial price of, say, $100, then subsequently raised the price of the drug to $110, the customer was required to pay Lilly an additional $10, for a total price of $110. Over the course of the relevant time period (2005 to 2016), this revenue stream to Lilly added up to more than $500 million.

In violation of the Price Actually Realized Requirement, Lilly did not include this money in its AMP calculations. Because rebates are a byproduct of AMP, this directly led Lilly to underpaying its Medicaid rebates by $61.2 million.

In 2017, during the investigation of Relator's lawsuit conducted by the Department of Justice, Lilly finally changed its illegal practice. But Lilly failed to pay back the money it owed for its misconduct, so this

lawsuit continued to a jury trial, where Lilly was found liable on all counts after less than six hours of deliberations.

Now on appeal, Lilly's recounts the facts by making sweeping overstatements of supposedly "undisputed" and "unrebutted" facts presented to the jury. In truth, Lilly simply ignores any unfavorable evidence and disregards the fundamental rule that on appeals of jury verdicts, the facts are viewed in the light most favorable to the verdict. Instead, Lilly describes what the company hoped the jury would find, but did not.

Intertwined with these distorted facts are hyperbolic legal claims ungrounded in reality. For example, Lilly begins its brief by claiming that the verdict is "effectively unavoidable punishment without fair notice of the conduct supposedly prescribed" while relegating that very notice – in the form of the Price Actually Realized Requirement – to a footnote. Lilly-Br.1, 50.

While mostly ignoring the Price Actually Realized Requirement, Lilly vaguely suggests that its language was hopelessly ambiguous. But Lilly does not offer any explanation how the Price Actually Realized

Requirement could be interpreted differently than it was by the District Court, which found the requirement "very clear." SA30.

Internally, so did Lilly. The company alternatively referred to this money as "price recapture" "retroactive price increase" and "price increase value," all of which expressly connote price. Likewise, Lilly's internal documentation explained that "[a]t the time of a price increase, *Lilly earns additional revenue* as it receives a price recapture from the wholesalers." Supp.A402 (emphasis added). A fifth grader would recognize that this money was part of the "price actually realized."

Yet, Lilly asserts that the calculation of AMP is "notoriously complicated." Lilly-Br.2. But Lilly fails to explain why *this particular decision* – whether to include Price Increase Value in AMP – is complicated. Because it wasn't. And the District Court saw that with clarity, observing that Lilly's exclusion of Price Increase Value from AMP was "foreclosed by the AMP's definition, which explicitly states that the AMP 'must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized.'" SA33, 38-39.

Relegating this critical language to the sidelines, Lilly's brief detours into years of notice-and-comment rulemaking, all in service of its argument that the regulatory environment was "a labyrinthine regulatory regime." Lilly-Br.2. But nothing in that history changed the Price Actually Realized Requirement, which remained in place throughout the relevant time period. Instead, every enacted regulation contained the same requirement.

Lilly's evidentiary challenges to the jury verdict on scienter and materiality grounds fare no better. Lilly sought to persuade the jury that price increases *paid to Lilly* were instead a "component" of the service fees *paid by Lilly*. But Lilly's star witness utterly failed to explain how this made any sense in light of the applicable legal requirements.

In addition, the jury heard Lilly witnesses admit: (1) Lilly never contemporaneously documented its initial 2005 decision to exclude Price Increase Value from AMP despite a legal obligation to do so; (2) when Lilly documented its position for the first time in 2011, it did so in a letter it knew no one would read and thereby created an exculpatory paper trail; (3) no Lilly supervisor recalls being consulted about this decision involving more than $500 million; (4) Lilly's internal documents

contradict its position; and (5) despite myriad opportunities and now claiming confusion, Lilly failed to ask the government (or its own retained government pricing experts) for guidance.

Finally, although AMP directly determines what rebates Lilly owes the government, and although Lilly's false statements directly cost the government over $61 million, Lilly claims that no rational jury could find that its AMP submissions were material. Plainly they were, but more to the point, the jury was certainly permitted to conclude as much.

In sum, Lilly's arguments on falsity, scienter, and materiality defy common sense. The District Court correctly rejected the first as a matter of law, and the jury correctly rejected the second and third after weighing the evidence.

## JURISDICTIONAL STATEMENT

The District Court exercised jurisdiction over Relator's federal claims pursuant 31 U.S.C. § 3732(b) and 28 U.S.C. § 1331, and over Relator's state law claims under 31 U.S.C. §3732(b) and 28 U.S.C. §1367(a). This Court has appellate jurisdiction under 28 U.S.C. § 1291. Relator filed a timely notice of cross-appeal on October 12, 2023, following

the entry of judgment and Lilly's notice of appeal. SA-85; R.563; R. 566. *See* Fed. R. App. 4(a)(3).

## STATEMENT OF ISSUES FOR REVIEW

1. Whether the District Court correctly determined that Lilly's AMPs and related certifications were false as a matter of law.

2. Whether a rational jury could find that Lilly's false AMPs and certifications were material.

3. Whether the District Court correctly instructed the jury on materiality, and if not, whether any such error was harmless.

4. Whether a rational jury could find that Lilly acted knowingly.

5. On cross-appeal, whether the District Court incorrectly held that Lilly's overall quarterly submissions to CMS – irrespective of the number of false AMPs they contained – constituted a single statutory violation,

## STATEMENT OF THE CASE

### I.    Lilly's Obligation to Submit Accurate AMPs

Medicaid is jointly funded by the federal and state governments and provides healthcare coverage to indigent and disabled Americans. *Pharm. Rsch. & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 540 (2003). In the

1980s, Medicaid prescription drug expenditures sky-rocketed and, despite its significant purchasing power, Medicaid was paying 30% to 40% more for drugs than other payors. *Id.* at 649 n.1; R. 313-6 at 25.[1]

In response, in 1990, Congress established the Medicaid Drug Rebate Program ("MDRP"). *See* 104 Stat 1388. This "cost-saving measure" has "two basic parts": (1) to qualify for Medicaid reimbursement of their products, "drug companies must enter into agreements … to provide rebates on their Medicaid sales of outpatient prescription drugs"; and (2) in exchange, drug manufacturers receive nearly guaranteed Medicaid coverage for their drugs. *Walsh*, 528 U.S. at 649-652.

The rebates are calculated based on pricing information submitted by drug manufacturers to the Centers for Medicare & Medicaid Services ("CMS") each quarter. Manufacturers are required to report the "average manufacturer price," or "AMP" for each of their drugs, and the per-unit rebate amount is the greater of (1) AMP minus "best price" or (2) a

---

[1] Lilly's principal brief is cited as "Lilly-Br."; Lilly's short appendix as "SA"; Lilly's appendix as "A"; Relator's short appendix as "Supp.SA"; Relator's supplemental appendix as "Supp.A"; and the electronic record as "R."

percentage of AMP (currently 23.1%). 42 U.S.C. § 1396r-8(b)-(c). Either way, AMP is "the central component for determining the amount of the rebate." Supp.A436.

Based on manufacturers' self-reported AMPs, CMS calculated a "unit rebate amount" on each individual drug. Supp.A437. CMS provides the unit rebate amounts to the 50 state Medicaid programs, which then invoice each manufacturer based on the utilization of each of the manufacturer's drugs by Medicaid beneficiaries during that quarter. Supp.A438. Because the federal government partially funds Medicaid, the states share the rebates with the federal government. *Id.*

## II.  The Rebate Agreement and the Price Actually Realized Requirement

The foundational document governing a drug manufacturer's participation in the MDRP is the Rebate Agreement. 42 U.S.C. § 1396r-8(a). As Lilly describes, the Rebate Agreement "more clearly define[s] the structure of the calculations and other key requirements of the Rebate Program." Supp.A353. Lilly signed the Rebate Agreement in 1991, and it remained in effect at all times relevant to Relator's claims. Supp.A278-279.

The Rebate Agreement provided Lilly with detailed requirements for calculating AMP, including that AMPs "must be ***adjusted*** by the manufacturer if cumulative discounts or other arrangements ***subsequently adjust the prices actually realized***." A436-437 (emphasis added). This "Price Actually Realized Requirement" has been a requirement since 1991, and Lilly was required to comply with it at all relevant times. Supp.A279.

As the Department of Justice advised the District Court earlier in this litigation, the Price Actually Realized Requirement reflects "the fundamental principle that AMP … [is] to be determined based on the amounts manufacturers ***ultimately receive*** for the sale of their drugs." Supp.A16 (emphasis added). This requirement expressly prohibits manufacturers from artificially reducing AMP and AMP-based rebates owed to Medicaid by dissecting payments into multiple, ostensibly discrete, transactions and only including the *initial* payment in AMP, a concern long held by the government. *See U.S. ex rel. Streck v. Bristol-Myers Squibb Company*, 2018 WL 6300578, at *4 (E.D. Pa.) ("[T]he government has been concerned with manufacturers seeking ways to artificially reduce rebates.").

CMS has repeatedly "reinforced [this] fundamental principle." Supp.A15-16. In August 1991, CMS issued a MDRP Program Release reminding manufacturers of their obligation to "revise AMPs … to reflect the impact of cumulative discounts or other arrangements on the prices actually realized in any quarter." Supp.A325. Likewise, a December 1994 Program Release reiterated that CMS "consider[s] *any price adjustment* which ultimately affects the price actually realized by the manufacturer" to constitute "other arrangements" that must be "included in the calculations of AMP." Supp.A329 (emphasis added).

In 2007, CMS codified the Price Actually Realized Requirement in a regulation. 72 Fed. Reg. 39,142-01 (2007) (the "2007 Rule"). The 2007 Rule was withdrawn in 2010 for unrelated reasons, and CMS re-codified the requirement in 2016. *See* 75 Fed. Reg. 69,591 (2010); 81 Fed. Reg. 5,170-01 (2016). However, there was no gap in Lilly's obligations because the Rebate Agreement – which independently imposed the Price Actually Realized Requirement – was in effect continuously during the time period relevant to this case (2005 to 2016). Supp.A278.

### III. Price Increase Value Allows Lilly to "Realize" Additional "Price"

Lilly sells its products to drug wholesalers, who then distribute the drugs to downstream customers such as pharmacies. Supp.A81-82.

Lilly sets the prices charged to wholesalers and can unilaterally implement price increases whenever it wants. *Id.*

In January 2005, Lilly entered new agreements (the "2005 Agreements") with three national wholesalers that account for 96% of its sales. *Id.* For the first time, the 2005 Agreements required the wholesalers to pay "Price Increase Value" to Lilly in addition to the initial price paid. A469-70; Supp.A91.

Price Increase Value arises when Lilly implements a price increase after the initial sale. The increase applies to drugs that the wholesaler has purchased from Lilly but not yet sold to a downstream customer. Supp.A124-125.

Price Increase Value has two components: the amount of the price increase and the quantity of the drug in the wholesaler's inventory. It is "calculated by multiplying the price increase for the Product by the amount of inventory of such Product Wholesaler has on the date of the price increase." A470. For example, in one instance, Lilly increased the

price of one product by $225 from $2,277 to $2,502, and a wholesaler had 3,477 units of the drug in its inventory at the time of the price increase. Supp.A423. Accordingly, the wholesaler owed Lilly $782,325 in Price Increase Value for that one product ($225 x 3,477 = $782,325). *Id.*

Plainly, Price Increase Value represents money, above the initial price, that wholesalers pay Lilly for drugs. As Lilly's internal documents clearly stated, Price Increase Value allowed Lilly "to retain the value of a price increase for products in the wholesalers' inventory." R-313-33 at 88; R-313-35 at 13.

The 2005 Agreements also required Lilly to pay fees to wholesalers for performing specified distribution and administrative services. A470. Instead of Lilly paying the wholesalers for these services and the wholesalers separately paying Lilly for Price Increase Value, Lilly and the wholesalers agreed to net the two transactions.

Lilly's contemporaneous internal documents acknowledge that this netting was an "administrative short-cut" to avoid having two transactions flowing in opposite directions every quarter. Supp.A402. That short-cut did not change the fact that the price actually realized by

Lilly for the drug increased, dollar for dollar, in the amount of the price increases that Lilly instituted.

As an internal May 2006 memo acknowledged: "At the time of a price increase, *Lilly earns additional revenue* as it receives a price recapture from the wholesalers." Supp.A402 (emphasis added). Consequently, Lilly treated Price Increase Value as revenue for both accounting and tax purposes. Supp.A402, 407-408; R.313-6 at 245-250.

Lilly nonetheless claims, contrary to these documents, that Price Increase Value *from* wholesalers is somehow a "component" of service fees Lilly paid *to* wholesalers. Lilly-Br.38-40.

But Lilly itself exposed this falsehood when, in its 2009 Wholesaler agreements (the "2009 Agreements"), it separated the payment of service fees and the receipt of Price Increase Value into two distinct transactions. One section of the 2009 Agreements titled "Distribution Fees" addressed service fees paid by Lilly to the wholesalers and the services rendered in exchange. Another section titled "Billing, Credit, and Payment" addressed Price Increase Value paid by the wholesalers to Lilly. Supp.A373-375.

Accordingly, Lilly began sending the wholesalers itemized invoices for Price Increase Value at the end of each quarter, as the images below of an invoice for $23,542,974 sent to a wholesaler in 2015 illustrate:



Supp.A422-423. As the invoice shows, Price Increase Value (or "Price Recapture") is part of the "price" paid to and "realized" by Lilly.

In 2016, Lilly entered into a third generation of wholesaler agreements. R.334 at 23. Lilly returned to netting Price Increase Value

15

against service fees for one wholesaler but retained the separate invoice model for the other two wholesalers. R.334 at 33-34.

## IV.  Lilly's False AMPs and Related Certifications

Throughout this period, Lilly aggressively raised the prices of its drugs. Supp.A139-140. For example, Lilly raised the price of one insulin product from $55.97 to $284.70 between September 2005 and May 2017. R.334-19 at 13. Given the magnitude and frequency of its price increases, Lilly generated enormous revenue by "clawing back" Price Increase Value from wholesalers. Overall, Lilly "recaptured" over $500 million in added revenue from its "retroactive price increases" between 2005 and 2016. Supp.A171, 419.

Although Lilly recognized internally that it "earn[ed] additional revenue as it receives a price recapture from the wholesalers," Supp.A402, Lilly did not include any of the $500+ million in revenue generated through Price Increase Value in AMP between 2005 and 2016. By failing to include this revenue, Lilly violated the Price Actually Realized Requirement that AMP "must be adjusted by [Lilly] if cumulative discounts or other arrangements subsequently adjust the prices actually realized." A436-437. And because lower AMPs directly

result in reduced liability, this led Lilly to pay $61.2 million less in rebates than the law required. Supp.A144, 148.

When manufacturers submit their AMPs to CMS, they "do not also submit narrative descriptions and quantifications of their various types of sales, agreements, and other transactions, or detailed descriptions of how they calculated their AMPs." Supp.A437. Instead, manufacturers simply submit the raw AMP numbers. *Id.* Consequently, CMS relies on manufacturers to comply with the legal requirements governing their AMP calculations. Supp.A438. Emphasizing that reliance, CMS requires manufacturers to certify that the AMPs they submit are accurate and comply with the Rebate Agreement and other legal requirements. Supp.A279-280, 438.

Underscoring their importance, CMS requires a high-level executive to execute the certifications, 42 C.F.R. § 447.510(e), and manufacturers who submit false information face significant penalties, 42 U.S.C. § 1396r-8(b)(3)(C). In addition, since the correct calculation of rebates entirely depends on the accuracy of manufacturers' submissions, CMS will not accept uncertified AMPs. Supp.A259.

## V.   The Proceedings Below

### A. The District Court's Summary Judgment Decision

The parties cross-moved for summary judgment. R.313, R.315. The District Court granted Relator's motion as to the falsity element of FCA liability, but denied both parties' motions on scienter, materiality, and causation. SA31-42.

As to falsity, the District Court determined that "Lilly's AMP calculations and related certifications were factually and legally false." SA40. Applying the Price Actually Realized Requirement, the District Court held that Lilly's exclusion of Price Increase Value from AMP "is foreclosed by the AMP's definition, which explicitly states that the AMP 'must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized.'" SA38-39. The District Court explained that "Lilly has not proffered, *nor has the Court been able to imagine,* a reasonable alternative interpretation to both the mechanics and the definition of 'price increase value' to be anything other than an adjustment of price and thus within the definition" of AMP. SA36 (emphasis added).

**B. Trial**

The case proceeded to trial on scienter, materiality, causation, and damages. The jury returned a verdict in Relator's favor on every issue and every count after less than six hours of deliberation. R-521-522.

Since Lilly raises sufficiency-of-the-evidence challenges to scienter and materiality,[2] Relator summarizes the trial record on those issues here and details the evidence more fully in responding to Lilly's arguments herein.

### 1. Lilly's Trial Presentation Focused on One Employee and a Nonsensical Interpretation

Lilly, a 40,000-employee company, sought to persuade the jury that a single Lilly employee (Heather Dixson) decided to exclude Price Increase Value from AMP after diligent review, that she sincerely believed her own rationale, and that this exculpated Lilly from liability.

Lilly's narrative, including the adequacy (and veracity) of Ms. Dixson's supposed review, was hotly contested. The evidence showed that when Lilly appointed Ms. Dixson to lead the government pricing team in 2005, she had little government pricing experience. Supp.A185-192.

---

[2] Lilly does not challenge the verdict as to causation or damages.

Further, neither she nor any of her colleagues documented the grounds of the decision to exclude Price Increase Value from AMP, despite a legal obligation to do so. Supp.A200, 211. Indeed, Lilly admitted "there's not a single document that discussed how [Lilly is] treating price increase value for AMP purposes" before 2011, let alone *why*. Supp.A210, 231-232. Similarly, Ms. Dixson could not recall speaking to anyone about the decision to exclude Price Increase Value from AMP. R.516 at 1248.

Three other key Lilly personnel—Ms. Dixson's predecessor in charge of government pricing (Rick Brown, who sat in the same cubicle), her supervisor until mid-2005 (Pamala Vaal), and her supervisor from mid-2005 to 2011 (Frank Cunningham)—all disclaimed any role in, and could not recall any decision-making process concerning, Lilly's exclusion of Price Increase Value from AMP. Supp.A83, 97, 191, 316-319,

Mr. Cunningham's testimony was especially inculpatory. He had "direct supervisory responsibility over government pricing" from 2005 to 2011. Supp.A83, 89. Yet, the jury heard that he *never even read the Rebate Agreement* despite routinely signing certifications that Lilly's AMPs complied with it. Supp.A83, 96-97.

## 2. Lilly's Failure to Offer a Cogent Explanation

Lilly's trial strategy rested largely on the dubious notion that money paid by wholesalers *to Lilly* due to Lilly's price increases is somehow a "component" of the bona fide service fees Lilly paid *to wholesalers* for their services. Supp.A.217-219. Confronted with this discord, Ms. Dixson effectively admitted on the stand that Price Increase Value did not meet the bona fide service fee test. R.516 at 1289 ("It doesn't make sense to me to look at price increase value and apply the bona fide service fee test."). And she admitted that price increases did not affect the services wholesalers provided, *i.e.*, the services were the same regardless of whether Lilly instituted a price increase on the wholesaler's inventory. R.516 at 1289, 1294-95.

Ms. Dixson also suggested that after the initial sale, AMP cannot *increase* and instead can only *decrease*. Supp.A226-230. But she could not explain how this position squared with the plain language of the Price Actually Realized Requirement. *Id.*

## 3. Lilly's Lack of Transparency

Lilly tried to convince the jury that it "want[ed] to operate in the sunshine" with the government. Supp.A107. But the evidence at trial flatly contradicted this claim.

When it wanted to obtain input from the government, Lilly had multiple available options, including in-person meetings, phone calls, and emails, R-513 at 838-840. Indeed, its government pricing unit (including Ms. Dixson) was on a first name basis with CMS officials. Supp.A.216; R.509 at 337; R-513 at 839. In short, Lilly – one of the largest pharmaceutical companies in the world – knew how to reach the government when it wanted to do so.

Measured against these available options, the government communications that Lilly presented to the jury rang hollow. Lilly first touted a May 2005 letter from its outside counsel to HHS-OIG stating that "Lilly has decided to exclude wholesaler fees from its Medicaid Rebate calculation." A228. But, as Ms. Dixson admitted, the letter says nothing about *Price Increase Value*, let alone Lilly's exclusion of it from AMP. Supp.A210.

Six years later, after learning about the "*Streck I*" litigation in July 2011, Lilly sent CMS a letter stating that Lilly had made a "reasonable

assumption" that it could exclude Price Increase Value from AMP as "part of" the service fees paid to Wholesalers. A393; Supp.A265-267.[3]

However, CMS specifically instructed manufacturers *not* to submit such letters and made clear that any such letters "will not be reviewed and their receipt should not be considered as acquiescence by CMS to the submitted assumptions." Supp.A340. Consistent with CMS's policy, Lilly admitted that it received no acknowledgment of receipt, nor any other response to the letter. Supp.A111, 215, 276. Thus, there is no evidence that CMS ever opened the letter, let alone read it.

Just six months later, the government publicly rejected the exclusion of Price Increase Value from AMP. In February 2012, CMS issued a proposed rule whose preamble stated that "retroactive price adjustments, sometimes also known as price appreciation credits, *do not meet the definition of a bona fide service fee* as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer." 77 Fed. Reg. 5,318-01, at 5332 (2012) (emphasis added).

---

[3] As discussed below, the "*Streck I*" litigation refers to Relator's lawsuit in the Eastern District of Pennsylvania and Third Circuit.

23

Lilly admitted that it reviewed the 2012 Proposed Rule. Supp.A276. Nonetheless, despite the plain statement repudiating its exclusion of Price Increase Value from AMP, Lilly never followed up on its July 2011 letter, *e.g.*, to explain how its conduct was somehow lawful, or to seek clarity. R.513 at 907-909.

Lilly next points to a report from HHS-OIG. In 2013, HHS-OIG asked 20 manufacturers to provide information regarding certain government programs. A4415. Lilly itself submitted at least six documents in response; and its *only* reference to Price Increase Value appears in a vaguely-worded footnote buried in a 79-page document. A415; A400 n.31; Supp.A113, 117. Further, HHS-OIG's subsequent report said nothing at all about Price Increase Value, let alone that Lilly could exclude it from AMP. A415. The jury therefore had no reason to credit Lilly's claim that the HHS-OIG report somehow endorsed Lilly's practice.

Finally, Lilly met with CMS in March 2016 and claimed it disclosed its methodology during that meeting. A231-233. The jury, however, heard only Lilly's one-sided account of what transpired; no government witness

confirmed what was said. Moreover, Lilly's witness admitted that CMS never endorsed Lilly's perspective:

> Q. So as you sit here today, you've never gotten CMS's – other than the body language you read in the room on that day, *CMS has never blessed your view of this, correct*?
>
> A. *Correct.*

Supp.A122 (emphasis added).

## C. Damages, Verdict, and Judgment

The FCA imposes two types of damages: (1) trebled actual damages, and (2) a per-violation civil penalty. 31 U.S.C. § 3729(a). Relator's damages expert testified that Lilly underpaid approximately $61.2 million in rebates by excluding price increase value from AMP. Supp.A148. Separately, the District Court ruled that each overall quarterly AMP submission – not each falsely certified AMP within these submissions – constituted a single statutory violation for civil penalty purposes. Supp.SA2-3, 12, 21.

Through a special verdict form, the jury found that Lilly acted "knowingly," that Lilly's conduct was "material," that Lilly proximately caused loss to the government, and that the government had sustained $61.2 million in losses. R.486. Following trial, the District Court denied

Lilly's motion for judgment as a matter of law or for a new trial. R.541. The District Court trebled the damages found by the jury, imposed civil penalties, and entered judgment against Lilly. R.543.

**SUMMARY OF ARGUMENT**

**I.** The element of falsity in this case involves a simple legal question: did the Price Actually Realized Requirement obligate Lilly to include Price Increase Value in AMP? The District Court correctly determined that the answer is "yes." The court explained that the Rebate Agreement required Lilly to adjust AMP "if cumulative discounts or other arrangements subsequently adjust the prices actually realized" after the initial sale. Lilly's Price Increase Value "subsequently adjust[ed] the prices [Lilly] actually realized." Thus, by *not* adjusting AMP based on Price Increase Value, Lilly submitted false AMPs and certifications.

Lilly says (1) it reasonably believed AMP meant only *initial* prices and (2) it could reasonably treat Price Increase Value received *from* wholesalers as a "component" of services fees paid *to* wholesalers. These defenses fail. The "initial price" defense ignores the Price Actually Realized Requirement. The "component" defense requires alchemy by transforming money received into money paid, and in any event, provides

26

no basis to circumvent the plain language of the Price Actually Realized Requirement.

**II.** Abundant evidence supported the jury's determination that Lilly's false AMPs and certifications were material. A false statement is material if it "ha[s] a natural tendency to influence, or [is] capable of influencing, the payment or receipt of money." 31 U.S.C. § 3729(b)(4). Lilly's false AMPs did more than potentially "influence" payments—they *actually* and *directly* decreased Lilly's rebate payments by over $61 million.

At trial, Lilly sought to prove that the government knew and approved of its exclusion of Price Increase Value from AMP. However, none of Lilly's evidence suggested – let alone required the jury to find – *either* actual government knowledge *or* government approval.

As to Lilly's challenge to the materiality jury instruction, it fails for two independent reasons. First, the District Court did not err by directly quoting the statutory definition of materiality. Second, any error did not prejudice Lilly given the overwhelming evidence of materiality, and the fact that Lilly's elected *not* to address materiality in its closing.

**III.** Ample evidence supports the jury finding of scienter. Lilly simply ignores most of the extensive trial evidence and asks this Court to reweigh the disputed evidence and accept Lilly's (implausible) narrative. Viewing the evidence in the light most favorable to the verdict, the jury was well within its province to conclude that Lilly "had reason to know of facts that would lead a reasonable person to realize that [it] was causing the submission of a false claim" and/or that Lilly "failed to make a reasonable and prudent inquiry into that possibility." *U.S. v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013).

**IV.** The District Court erred in its ruling on civil penalties. The federal and state FCAs require payment of a civil penalty for *each* statutory violation. The number of violations is determined by how many "causative acts" and completed statutory offenses the defendant committed. *U.S. v. Bornstein*, 423 U.S. 303, 309 (1976).

Here, each false AMP was a "causative act" and completed statutory offense. Lilly calculated, reported, and certified AMPs on a drug-by-drug basis. Every quarter, Lilly submitted multiple false AMPs to the government. Each false AMP independently led Lilly to underpay its rebate for that particular drug. But the District Court incorrectly held

28

that Lilly's overall quarterly submissions constituted a single statutory violation no matter how many false AMPs Lilly submitted.

## STANDARD OF REVIEW

Relator agrees with the standards of review stated in Lilly's brief, with one exception: this Court reviews the District Court's refusal to give Lilly's requested jury instruction on materiality only for abuse of discretion. *See E.E.O.C. v. AutoZone, Inc.,* 809 F.3d 916, 921–22 (7th Cir. 2016).

Relator's cross-appeal is reviewed *de novo. See Rexing Quality Eggs v. Rembrandt Enterprises, Inc.,* 996 F.3d 354, 365 n.52 (7th Cir. 2021).

## ARGUMENT

### I.    Lilly's AMPs and Related Certifications Were False

The District Court's falsity analysis is straightforward. It analyzed the language of the Price Actually Realized Requirement in the Rebate Agreement, found it "very clear," then applied it to the undisputed facts to determine that Lilly was obligated Lilly to include Price Increase Value in AMP. SA30. Although Lilly recognizes that the District Court's falsity decision was "based on" the Price Actually Realized Requirement,

Lilly-Br.47, Lilly spends most of its brief pretending the requirement does not exist.

Instead of engaging the District Court's analysis, Lilly tries to convert the falsity inquiry into an analysis of Lilly's "objective reasonableness" when supposedly faced with "unclear" regulatory requirements. Lilly-Br.38. This argument both asks the wrong question and provides the wrong answer. Falsity turns on what the Rebate Agreement actually required, not Lilly's supposed reasonableness. And the language of the Price Actually Realized Requirement is "very clear," not ambiguous. Regardless, Lilly's interpretation of the requirement is decidedly unreasonable.

### A. Lilly Was Obligated to Include Price Increase Value in AMP

As the District Court held, Lilly's AMPs and certifications were "false" because (1) the Price Actually Realized Requirement in the Rebate Agreement required that AMP "must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized," (2) Price Increase Value "subsequently adjusted" the price Lilly "actually realized," (3) Lilly did not adjust AMP based on Price Increase Value despite this "very clear" requirement, and

30

consequently, (4) Lilly's AMPs were factually false (*i.e.*, understated) and legally false (because Lilly falsely certified compliance with the Price Actually Realized Requirement). SA30-40.

Lilly does not contend that any genuine issues of material fact precluded resolution of falsity at summary judgment. Nor does it challenge the District Court's factual descriptions of Price Increase Value as being "the difference between the price the wholesaler originally paid for the drug and the current price, multiplied by the number of units." SA32-33. And it follows inexorably from this unchallenged description that Price Increase Value is an "'adjust[ment]' 'paid to the Manufacturer' and 'by the wholesalers.'" *Id.*

Lilly's own words reflect this economic reality. Lilly's internal documents state that it "*earn[ed] additional revenue* as it receive[d] a price recapture from the wholesalers." Supp.A402 (emphasis added). Likewise, Lilly's various monikers for this money— "Price Increase Value," "price recapture," "clawback," and "retroactive price increases"— all plainly connote an increase in the price that Lilly "actually realized." Supp.A195-196.

Simple math confirms this truth. If Lilly raises the price of a drug from $90 to $100 on Wednesday, a wholesaler who purchases the drug on Thursday will pay the full $100 at the initial sale, while a wholesaler who purchased the drug on Tuesday and still had the drug in inventory on Wednesday will *also* pay Lilly $100 ($90 at the time of the initial sale and $10 as Price Increase Value). Supp.A133-134.

Either way, Lilly "actually realizes" the same $100, and the only difference is timing. Lilly does not dispute that in the first scenario, it was required to include the full $100 in AMP. But in the second scenario, Lilly asserts it was only required to include the first $90. However, as noted, the two transactions are functionally equivalent, and the Price Actually Realized Requirement unambiguously provides that the sequencing differences between the two transactions are irrelevant. And for good reason: it would be contrary to the purpose and function of the MDRP to allow manufacturers to evade paying rebates simply by dissecting their sales into multiple (ostensibly discrete) transactions.

Faced with this simple arithmetic, Lilly engages in incomprehensible circumlocutions by claiming that it "reasonably understood the 2007 Rule to refer to discounts and rebates that reduced

a drug's *original* sale price itself, not to wholesaler service fees (and price appreciation offsets to the monetary fee payments that might never occur)." Lilly-Br.50.

This attempted rationalization is flawed in multiple respects. First, the 2007 Rule was enacted 2 years *after* Lilly began excluding Price Increase Value from AMP in 2005. Lilly cannot credibly claim that its 2005 decision was based on its subjective "understanding" of a rule that did not yet exist.

Second, the 2007 Rule *codified* the existing Price Actually Realized Requirement from the Rebate Agreement as a regulation, thus making Lilly's exclusion of Price Increase Value both a violation of the Rebate Agreement and a regulatory violation. *See* 72 FR 39142-01, at 39242 (2007). Violating two legal requirements instead of one is, self-evidently, no defense.

Third, neither the Rebate Agreement nor the 2007 Rule limits the calculation of AMP to "original sales price." In fact, both say precisely the opposite: "The manufacturer *must adjust* the AMP for a rebate period if *cumulative* discounts, rebates, or other arrangements *subsequently adjust the prices actually realized*." A435; 42 C.F.R. § 447.504(i)(3) (2007)

(emphasis added). Lilly's claimed "understanding" that AMP is only the "original sale price itself" literally reads the words "cumulative," "subsequent," "adjust," and "prices actually realized" out of the text of both the Rebate Agreement and the 2007 Rule. No one who understands English can "reasonably" ascribe a meaning that is the exact opposite of what the text says.[4]

Lilly next argues that because the 2007 regulation permitted exclusion of "bona fide service fees" from AMP, Lilly could exclude Price Increase Value from AMP as a "component" of the service fees. Lilly-Br.49-50. But a bona fide service fee is "a fee paid ***by a manufacturer*** to an entity that represents fair market value for a bona fide, ***itemized service*** actually performed on behalf of the manufacturer that the manufacturer would otherwise perform," such as distribution or inventory management services. 42 U.S.C. § 1396r-8(k)(1)(B); 42 C.F.R. § 447.502 (emphasis added).

Price Increase Value falls squarely outside that definition.

---

[4] *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/ cumulative ("cumulative" means *increasing by successive additions*"); https://www.merriam-webster.com/dictionary/subsequent ("subsequent" means "following in time, order, or place").

First, Price Increase Value is paid *by the wholesaler* to Lilly.

Second, Price Increase Value is assessed solely based on Lilly's price increases and expressly not on itemized services that the wholesaler performs.

Again, simple math debunks Lilly's position. If Price Increase Value was actually a component of the service fee, then the service fee would be different in two transactions, one of which involves Price Increase Value and one of which does not. But the opposite is true. Wholesalers receive the same service fee regardless of whether Lilly implements a price increase. Supp.A137, 141.

For example, assume a wholesaler pays $100 to Lilly for a package of drugs, and Lilly pays a 2% service fee to the wholesaler. Everyone would agree that the price here is $100 and that the wholesaler earned $2 on the transaction. Next assume a second transaction with the dollar value, except that *after* the wholesaler pays $100 to Lilly for the package of drugs and Lilly pays the $2 service fee, Lilly raises the price to $110 while the package of drugs remains in the wholesaler's inventory. By function of the Price Increase Value clawback, the wholesaler pays Lilly an additional $10 in price, but winds up with the same fee: $2. In both

transactions, the $2 fee is the same, revealing that Price Increase Value has no impact on the service fees Lilly pays to its wholesalers.

In addition to ignoring economic reality, Lilly's position would allow drug manufacturers to circumvent the Price Actually Realized Requirement merely by hiding price increases in service fees. The District Court saw these economic realities and rejected Lilly's attempt to sell its "component" defense as a "conservative" approach, explaining that "there is nothing conservative about an approach where two distinct transactions that were explicitly not permitted to be coupled, the price of the product and the service fees, are nonetheless combined to lower AMP calculations." SA35.

## B. Falsity Turns on Whether Lilly Met the Price Actually Realized Requirement, Not "Objective Reasonableness"

Conflating falsity and scienter, Lilly argues that "reasonable regulatory interpretations are not false." Lilly-Br.37–40. But falsity involves a legal analysis of what the Rebate Agreement *actually* required, not "reasonableness."

Ultimately, Lilly's erroneous argument does not affect the end result since, as described above, Lilly's legal interpretation is patently unreasonable. But since "objective reasonableness" appears to be the

centerpiece of Lilly's challenge to the District Court's decision, Relator explains why it is not the correct inquiry.

## 1. Lilly Conflates Falsity and Scienter

The Supreme Court recently held that reasonable interpretations of ambiguous legal requirements may be relevant to assessing *scienter* if the defendant can establish that it adopted the interpretation contemporaneously (rather than *post-hoc*). *U.S. ex rel. Schutte v. SuperValu Inc.,* 598 U.S. 739 (2023).

However, falsity and scienter are separate elements of FCA liability. *U.S. ex rel. Prose v. Molina Healthcare of Illinois, Inc.,* 17 F.4th 732, 740 (7th Cir. 2021). Thus, "[w]hile the reasonableness of [Lilly's] interpretation ... may be relevant to whether it knowingly submitted a false claim, the question of 'falsity' itself is determined by whether [Lilly's] representations were accurate in light of applicable law." *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999); *accord U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 383–84 (4th Cir. 2015).

Where, as here, falsity requires application of legal requirements, courts "determine the proper interpretation of" the legal requirements "which will resolve whether Defendants' claims were 'false'," while a

defendant's interpretation of the requirements goes to the "separate inquiry" of scienter. *U.S ex rel. Chilcott v. KBR, Inc.*, 2013 WL 5781660, at \*6 (C.D. Ill. Oct. 25, 2013).

Attempting to justify its conflation of these distinct elements, Lilly appeals to "the fundamental constitutional requirement of fair notice." Lilly-Br.30-31. Setting aside that Lilly's notice concerns are unfounded because the Price Actually Realized Requirement is clear, the Supreme Court has rejected this very argument. "[I]nstead of adopting a circumscribed view of what it means for a claim to be false or fraudulent, concerns about fair notice and open-ended liability can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 192 (2016) (quotations omitted).

In making its fair notice argument, Lilly claims that the FCA proscribes only "objective falsehoods." Lilly-Br.37. But the FCA says no such thing. The statute proscribes "false" claims and statements, not "objective falsehoods." 31 U.S.C. § 3729(a).

Even so, Lilly's AMPs and related certifications contained objective representations that its AMPs were accurate and complied with the

applicable legal requirements. *See Drakeford*, 792 F.3d at 383–84 ("Tuomey either complied with the Stark Law or it didn't. This is an objective inquiry."). Here, Lilly either complied with Price Actually Realized Requirement, or it didn't. Thus, this case does not require parsing the metaphysical distinction between "objective" and "non-objective" falsehoods.

Lilly next cites to *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1017 (7th Cir. 1999) and *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011) for the proposition that "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA." Lilly-Br. at 37.

These decisions do not support Lilly's argument.

First, both cases considered falsity and scienter *together*. *Lamers*, 168 F.3d. at 836 ("[O]ur consideration of the falsity question will be incorporated into our knowledge discussion"); *Yannacopoulos,* 652 F.3d at 837 (similar).

Second, both cases predate *Escobar'*s rejection of circumscribed views of falsity. 579 U.S. at 192.

Third, *Lamers* (and by extension, *Yannacopoulos*, which cites *Lamers*) rely on the Ninth Circuit's decision in *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465 (9th Cir. 1996) for a proposition that the Ninth Circuit has long since repudiated. *Oliver,* 195 F.3d at 463 ("*Hagood* does not stand for the proposition that a 'reasonable interpretation' of a regulation precludes falsity.").

Consistent with these observations, Seventh Circuit courts have not interpreted *Yannacopoulos* and *Lamers* in the way Lilly proposes, and instead have recognized that falsity and scienter present "separate inquiries." *Chilcott,* 2013 WL 5781660, at \*\*6-8 (explaining that neither decision "endorsed the view that any 'reasonable' interpretation of a contract that an FCA defendant might develop is sufficient to avoid liability").

## 2. Lilly's "Reasonable Assumptions" Argument Fails

Lilly next claims that its AMP calculations could not be "objectively false" because it "lacked specific guidance" on how to treat "service fees, including their Price Increase Value component," thus allowing it to adopt a "reasonable assumption." Lilly-Br.38.

40

This argument also conflates falsity and scienter. But regardless, it fails on its own terms. Under the Rebate Agreement, reasonable assumptions are subject to three conditions: (1) there must be an "absence of specific guidance" in the Rebate Agreement and other legal requirements; (2) any assumptions must be reasonable and effectuate the intent of the MDRP; and (3) any assumptions must be documented and maintained. A441-442.

Lilly fails to satisfy any of these requirements. As to the "absence of specific guidance," the Price Actually Realized Requirement is "very clear." SA30. Further, the District Court correctly rejected Lilly's argument that because the Price Actually Realized Requirement does not mention Lilly's internal name for its price increases (Price Increase Value), the requirement was not sufficiently specific. The District Court found that Lilly's argument:

> strains the meaning of 'specific guidance.' Under Lilly's standard, any creation and subsequent definition of a new phrase in a contract, as present here, would allow drug manufacturers to avoid its clear obligations under statute. Courts have recognized that "[b]y requiring regulations to be too specific [courts] would be opening up large loopholes allowing conduct which should be regulated to escape regulation.

SA33 (quotations and citation omitted).

The next condition imposed by the reasonable assumption requirement is that any interpretation must effectuate the MDRP's purpose. A442. Lilly violated the condition because Lilly's interpretation *increased* drug costs to Medicaid when the MDRP is designed to *reduce* drug costs. *Walsh*, 538 U.S. at 649.

Next, Lilly failed to satisfy the requirement that it document any assumptions it made. In the first instance, Lilly did not document on a single scrap of paper its 2005 decision to exclude Price Increase Value from AMP, let alone document any explanation of how doing so was reasonable. Supp.A231-232. And later – despite now claiming that the various proposed and final rules over a period of many years were material to its understanding of AMP – Lilly failed to document **any** of these alleged "understandings," either. In fact, at trial Lilly admitted its first written treatment of Price Increase Value occurred in its *July 2011* letter to CMS. Supp.A231-232.

Finally, Lilly's assertion that its assumptions were "reasonable" does not make them so. For example, Lilly argues that "the 2007 Rule was confirmation of its historical approach" of clawing back Price Increase Value from wholesalers. Lilly-Br.46. And throughout its brief,

Lilly asserts that the clawback served all sorts of good purposes. Lilly-Br.14 (explaining how the clawback helped Lilly avoid AKS concerns), Lilly-Br.41-42 (explaining how the clawback helped "ensure more consistency in the distribution of drugs to pharmacies and consumers").

All of this is legally irrelevant. Relator makes no claim that the clawback of Price Increase Value does not serve good purposes. But this case is not about the clawback itself. It is about Lilly failing to report the clawback money in AMP. Put simply, the clawback is fine, but hiding the clawback money from the government is not.

## C. Lilly's Remaining "Falsity" Arguments are Irrelevant and Meritless

Lilly's remaining arguments on falsity are likewise legally irrelevant and meritless.

### 1. The Supposed Regulatory Complexity

Lilly belabors Medicaid's "complex" and "labyrinthine regulatory regime." Lilly-Br.1-2, 10-11, 17-20. But the unremarkable observation that a regulatory regime *can* be complex as to certain issues does not mean that it is complex as to a particular issue. *See U.S. v. Xiao,* 77 F.4th 466 (7th Cir. 2023). The Tax Code can undoubtedly present difficult issues, but that does not absolve simple tax evasion. *U.S. v.*

*Ytem,* 255 F.3d 394, 397 (7th Cir. 2001) ("[T]he fact that illegal income is taxable is widely known, even among lay people" and "[e]veryone knows that Al Capone, for example, was nailed for income-tax evasion.").

Recognizing that the Price Actually Realized Requirement is simple, Lilly tries to buttress its complexity argument by citing authorities addressing different aspects of the MDRP. But Lilly fails to explain how those authorities apply here. Lilly-Br.10-11. Whatever "zones of uncertainty" might exist in the overall framework governing Medicaid, Lilly-Br.12, none are present here.

## 2. HHS-OIG Did Not Reach a "Contrary Determination"

Lilly contends that the District Court ignored the Inspector General's "contrary determination." Lilly-Br.50. Had HHS-OIG actually made a "contrary determination" (it did not) that Lilly relied on, that might be relevant to scienter or materiality—but not falsity. *Cf. U.S. ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 (7th Cir. 1999).

But more fundamentally, the record flatly contradicts Lilly's argument that HHS-OIG endorsed its practice. HHS-OIG collected vast quantities of information from twenty drug manufacturers. A.415. Lilly

itself submitted at least six different documents, and the only reference to Price Increase Value was a single footnote buried in a 79-page document. Supp.A113; A400, 406.

HHS-OIG's subsequent report primarily addressed an unrelated issue concerning whether "the 20 selected manufacturers' methodologies consistently included transactions from retail community pharmacies" in their AMP calculations. A420. The report says nothing about Price Increase Value (by name or concept).

### 3. The *Streck I* Decisions

Lilly contends that the "*Streck I*" decisions undermine the District Court's falsity analysis by "demonstrating that Lilly's approach was at the very least objectively reasonable." Lilly-Br.42 (citing *U.S. ex rel. Streck v. Allergan, Inc.,* 894 F. Supp. 2d 584 (E.D. Pa. 2012), *aff'd sub nom. U.S. v. Allergan, Inc.*, 746 F. App'x 101 (3d Cir. 2018) (unpublished)). Going even further, Lilly claims that it took the Third Circuit's decision "as reliable assurance that its conduct was a 'reasonable assumption' it could permissibly make." Lilly-Br.33.

Lilly's reliance on the *Streck I* decisions fails for several reasons. First, Lilly obviously could not have relied on the Third Circuit's decision

in 2018 during the relevant time period (2005-2016). Indeed, the Third Circuit's decision came a year *after* Lilly (finally) began *including* Price Increase Value in AMP in 2017. R-334 at 85.

Second, as discussed above, the falsity of Lilly's AMPs does not turn on objective reasonableness, and Lilly cannot offer the *Streck I* decisions as "evidence" to support this point.

Third, and most importantly, the two *Streck I* decisions **did not address** the Price Actually Realized Requirement which formed the foundation of the District Court's falsity analysis in this case. Indeed, neither *Streck I* decision even mentions this vital requirement.

Instead, in its non-precedential decision,[5] the Third Circuit concluded that the *AMP statute* could hypothetically be interpreted as referring to only the "initial" price paid, and thus does not encompass "price appreciation credits." 746 App'x at 108 (applying 42 U.S.C. § 1396r-8)). It reasoned that because "neither the word "initial" nor the word "cumulative" appears before "price" in any of the applicable versions *of the statute*," the "*statute* is … susceptible to multiple interpretations, one

---

[5] The Third Circuit designated its opinion as non-precedential, meaning that it "does not constitute binding precedent" even as to courts in the Third Circuit. 746 F.App'x at 102 n.**.

of which excludes the price-appreciation credits." *Id*. (emphases added) The district court in *Streck I* had reached a similar conclusion by looking at the statute in isolation. 894 F. Supp. 2d at 600 (emphasis added).

As the Department of Justice explained to the District Court in this case, both courts inexplicably "look[ed] only at the statutory language and ignore[ed] the national rebate agreement and applicable regulations." Supp.A10. Here, by contrast, the District Court analysis was premised on the Price Actually Realized Requirement. SA30-40. Accordingly, the *Streck I* decisions provide no basis to overturn the District Court's decision.[6]

### 4. The District Court Did Not Treat Lilly's 2017 Policy Change as "Conclusive Evidence of Prior Falsity"

In 2017, Lilly finally began including Price Increase Value in AMP. R-334 at 85. Lilly claims that the District Court treated this change as "conclusive evidence of prior falsity," Lilly-Br.52, and that the court's

---

[6] Indeed, after the Third Circuit's non-precedential decision, even a district court in the Third Circuit found that AMP is cumulative, and that excluding "price appreciation credits" led to false AMPs and underpaid rebates. *See U.S. ex rel. Streck v. Bristol-Myers Squibb Co.*, 2018 WL 6300578 (E.D. Pa. Nov. 29, 2018), *clarified on denial of reconsideration*, 370 F. Supp. 3d 491 (E.D. Pa. 2019).

reasoning "flies in the face of the reasoning of Federal Rule of Evidence 407." Lilly-Br.53.

As to Rule 407, Lilly asserts that its 2017 change was "in response to the agency's adoption of a new Rule in 2016." Lilly-Br.52-53. This is false. Lilly's 2017 change was in response to the Department of Justice telling Lilly that it should have included Prince Increase Value in AMP. R.427-1. More to the point, this is not a voluntary remedial measure of the kind within the ambit of Rule 407. *See* 3 *Handbook of Fed. Evid.* § 407:1 n.2 (9th ed.) ("Subsequent remedial measures mandated by governmental authority are not excluded by Rule 407; such conduct is not voluntary and thus does not fall within the policy of the rule.").

Regarding Lilly's claim that the District Court treated its 2017 change as "conclusive evidence of prior falsity," that is not what happened. Specifically, the District Court's falsity ruling was not based on Lilly's 2017 change. Instead, the District Court ruled that Lilly's AMPs were false as a matter of law based on the Price Actually Realized Requirement that has been in place in the Rebate Agreement since 1991. SA37-39.

*After* reaching this conclusion, the District Court noted Relator 's argument that Lilly reversed course in 2017 even though the relevant legal requirements had not changed. SA40. The District Court then made the unremarkable observation that Lilly's course change corroborated its earlier holding. SA40 (observing that Lilly cannot argue its AMPs were not false because the court had already "determined as a matter of law that Lilly's interpretation … was objectively unreasonable" under the existing requirements).

## II. The Court Should Affirm the Jury Verdict on Materiality

Lilly asserts a sufficiency-of-the-evidence challenge to the jury verdict on materiality, and separately argues that the Supreme Court's decision in *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176 (2016) required the District Court to adopt Lilly's preferred jury instruction. Lilly-Br.55-66. The first argument ignores the expansive evidence of materiality at trial. The second argument misapprehends the law on jury instructions.

### A. The Evidence Supported the Jury's Materiality Finding

Lilly contends that "Relator presented no real evidence of materiality" and that it offered "overwhelming evidence of

49

immateriality." Lilly-Br.57-58. Lilly is wrong on both fronts. Further, Lilly cannot show, as it must, that "the evidence presented, combined with all reasonable inferences" was insufficient "to support the verdict when viewed in the light most favorable" to Relator. *Wallace v. McGlothan*, 606 F.3d 410, 418 (7th Cir. 2010) (quotations omitted).

### 1. Relator's Evidence of Materiality

Under the FCA, materiality "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The evidence at trial plainly permitted the jury to conclude that Lilly's false AMPs and certifications satisfied this standard.

1.  Government witnesses testified that the MDRP "is directly dependent upon the accuracy" of reported AMPs. Supp.A439. In particular: (1) AMP is "[t]he central component for determining the amount of rebate due for a particular quarter;" (2) CMS uses AMPs to calculate the rebates manufacturers owe; (3) understated AMPs cause underpayment of rebates to the government; (4) CMS relies on manufacturers' certifications that their AMPs comply with the Rebate Agreement and other legal requirements; and (5) manufacturers must

correct false AMP statements and pay additional rebates due after any correction. Supp.A.437-440.

2. Relator's damages expert explained that (1) under-reporting AMPs "translate[s] to corresponding underpayments of Medicaid rebates," and (2) Lilly's failure to include Price Increase Value in AMP resulted in a reduction in Lilly's rebate liability of $61.2 million. Supp.A144-149.

3. Heather Dixson admitted that incorrect AMPs translate directly into underpaid rebates. Supp.A.184. She also highlighted the materiality of Lilly's certifications by explaining that CMS will not accept uncertified AMPs, and that CMS requires high-level executives to sign the certifications. Supp.A247, 259.

4. Frank Cunningham, who supervised Lilly's government pricing department for years, admitted that Lilly "knew [AMP] *was material* to the states" and that Lilly knew that if it reported AMPs that were lower than the law requires, Lilly would pay less in rebates than required. Supp.A85-86 (emphasis added),

This evidence established that Lilly's false AMPs were not only "capable" of "influencing, the payment or receipt of money," but actually

did so; that the government attached importance to accurate AMPs; and that Lilly's noncompliance, which cost the government $61 million, was not "minor or insubstantial." *Escobar*, 579 U.S. at 194.

This Court's recent decision in *U.S. ex rel. Heath v. Wisconsin Bell, Inc.,* -- F. 4th --, 2024 WL 217696 (7th Cir. Jan. 16, 2024), confirms that such evidence amply supports a finding of materiality. *Heath* concerned a government program that based the amount of government subsidies on prices reported by program participants. Because the subsidies were "tied directly" to the reported prices, the Court had no trouble concluding that the reported prices were material. *Id.* at *7. So too, here.

Lilly contends that this obvious conclusion "runs headlong into *Escobar*." Lilly-Br.57. However, *Escobar* "does not suggest that violating such a relevant requirement of a government subsidy program should be found immaterial." *Heath,* 2024 WL 217696, at *7. Indeed, it was obvious—as Lilly acknowledged—that accurate AMPs are "important to the [MDRP's] functioning and thus that non-compliance could influence reimbursement decisions." *Id.* This "plain and obvious materiality" goes "to the essence of the parties' economic relationship." *Ruckh v. Salus Rehabilitation, LLC*, 963 F.3d 1089, 1105 (11th Cir. 2020).

Moreover, Lilly's reliance on *Escobar* is misplaced given the drastically different facts. In *Escobar*, the question was whether the defendant's violations of certain licensing regulations were significant enough to cause the government agency in question to deny claims for payment. 579 U.S. at 183-186. Here, the government exercised no decision-making of any kind. Rather, Lilly's underpaid rebates were the result of a domino-like statutory and regulatory cascade which started with Lilly's false AMPs and ended with Lilly's underpaid rebates. Supp.A436-438.

## 2. The Jury Was Free to Ignore Lilly's Evidence

Lilly claims it presented "strong" and "unrebutted" evidence that the government was aware of and accepted Lilly's AMP methodology. Lilly-Br.60. This argument fails for multiple reasons.

First, Lilly's argument begins with a false premise: that if its evidence were "strong" and "unrebutted," it would be entitled to judgment as a matter of law. But *Escobar* does not treat such evidence as conclusive, but rather as one consideration. 579 U.S. at 191-192.

Second, Lilly's evidence of government knowledge was weak and heavily contested, and thus, the weight and sufficiency to be afforded the

evidence were matters for the jury. *Lange v. City of Oconto*, 28 F.4th 825, 841 (7th Cir. 2022). The jury could easily conclude that the government never knew of, much less approved, Lilly's exclusion of Price Increase Value from AMP. For example, Lilly claims it disclosed its methodology in a May 2005 letter to HHS-OIG. The letter merely states: "Lilly has decided to exclude wholesaler fees from its Medicaid Rebate calculation." A228. It says nothing about Price Increase Value, let alone that Lilly excluded this revenue from AMP. Lilly's star witness admitted exactly that at trial. Supp.A210.

Lilly also points to its July 2011 letter to CMS. But, as Lilly admits, CMS instructed manufacturers *not* to send such letters, adding: "Should a manufacturer disregard these instructions and submit such assumptions, *they will not be reviewed and their receipt should not be considered as acquiescence by CMS to the submitted assumptions.*" Supp.A.340; Supp.A.109, Supp.A215-216 (emphasis added). And Lilly admitted that it had no evidence CMS even opened or reviewed the letter, let alone expressed any approval. Supp.A275-276.[7]

---

[7] That instruction exists because CMS is a large federal bureaucracy overseeing hundreds of drug manufacturers that may communicate

Lilly then points to its January 2013 submission to HHS-OIG. But, as explained above, the only reference to Price Increase Value in Lilly's submission was a single footnote buried in a 79-page document (among at least six documents submitted by Lilly, among documents submitted by 19 other manufacturers). Supp.A113; A400, 406.

Finally, Lilly claims CMS endorsed its position in a meeting in 2016. But Lilly's "evidence" is one witness's perception of CMS representatives' "body language," and the witness admitted that "CMS has never blessed [Lilly's] view of this." Supp.A.119-122.

None of this evidence suggests – let alone compelled the jury to conclude – that the government had "actual knowledge of actual violations." *Heath,* 2024 WL 217696, at *7; s*ee U.S. ex rel. Calderon v. Carrington Mortgage Servs., LLC*, 70 F.4th 968 (7th Cir.), *cert. denied sub nom.* 144 S. Ct. 331 (2023) (summary judgment on materiality improper where "the extent of [the government's] knowledge is contested").

---

through in person meetings, telephone calls, and emails rather than by post. Supp.A436.

## B. The District Court Property Instructed the Jury

In reviewing challenges to jury instructions, this Court "examine[s] the jury instructions as a whole" and will "only reverse and remand for a new trial if the instructions did not sufficiently inform the jury of the applicable law" **and** "the instructions prejudiced" Lilly. *E.E.O.C. v. AutoZone, Inc.,* 809 F.3d 916 (7th Cir. 2016) (quotations omitted). Here, there was no error, and regardless, there was no prejudice to Lilly.

### 1. The Jury Instructions Adequately Informed the Jury of the Applicable Law

Lilly claims that *Escobar* required the District Court to further instruct the jury that it "must place significant weight" on evidence of supposed government knowledge and acquiescence. Lilly-Br.63. This argument fails.

The District Court instructed the jury by directly quoting the FCA's definition of materiality. Supp.A314. A jury instruction that tracks the statutory language "hardly deprived … [Lilly] of a fair trial." *U.S. v. Durham*, 766 F.3d 672, 683 (7th Cir. 2014). Such an instruction "adequately put[] the issue before the jury and allow[ed]" Lilly "to argue in [its] closing statement that … the misrepresentation concerned a

56

matter that was irrelevant" to the government *U.S. v. Coffman*, 94 F.3d 330, 335 (7th Cir. 1996).

In *Escobar*, the Supreme Court noted that if the government "pays a particular claim in full despite its actual knowledge that certain requirements were violated," that is probative evidence that the violations are not material. 579 U.S. at 195. But *Escobar* does not *mandate* that a judge single out this factor to the jury. A judge "need not deliver instructions describing all valid legal principles," "[e]specially not when the principle in question describes a permissible, but not an obligatory inference." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994). Instead, "the judge may and usually should leave the subject of the interpretation of the evidence to the argument of counsel." *Id.* The District Court instruction left Lilly free "to make its … argument to the jury in its closing arguments." *Autozone,* 809 F.3d at 923.

Citing *Huff v. Sheahan*, 493 F.3d 893 (7th Cir. 2007), Lilly contends that the District Court's instruction "failed to convey the relevant legal principles in full." Lilly-Br.63. But in *Huff*, the trial court failed to instruct the jury on an element of an affirmative defense in direct derogation of the Supreme Court's "explicit" decision on the issue. *Id.* at

900. That is markedly different from this case: the District Court provided an instruction that correctly stated the law and left it to the parties to argue how the law should be applied to the facts.

### 2. Lilly Cannot Demonstrate Prejudice

Even if Lilly demonstrated error, it is also required to show prejudice, and it cannot for at least two independent reasons.

First, as described above, Relator presented overwhelming evidence of materiality. In analogous circumstances where a criminal defendant's failure to report income "incontrovertibly establishe[d] that [his] false statements were material to a determination of his income tax liability," the Supreme Court determined that it was harmless error to provide *no instruction at all* on materiality and thus to not even submit the issue for the jury's consideration. *Neder v. U.S.*, 527 U.S. 1, 16–17 (1999).

Second, Lilly chose not to address materiality in its closing argument. R-520. Because Lilly "decided not to present [a materiality] argument," it "cannot now claim that it was prejudiced by the district court's refusal to admit its proposed jury instruction." *Autozone*, 809 F.3d at 923; *see U.S. v. Natale*, 719 F.3d 719, 738 (7th Cir. 2013) (erroneous instruction harmless where defendant "never argued to the jury that the

false statements … were not material to Medicare" and instead "argued intent").

### III. The Jury Was Plainly Entitled to Conclude that Lilly Acted with Scienter

Lilly challenges the jury's finding that it acted "knowingly." While making no attempt to review the record in the light most favorable to the verdict and simply ignoring the wide array of evidence supporting the jury's determination, Lilly resorts to misrepresenting the nature of the scienter inquiry and Relator's arguments.[8]

### A. Ample Evidence Supports the Jury's Finding of Scienter

#### 1. The Legal Standard

Over a century ago, Justice Holmes observed: "[m]en must turn square corners when they deal with the Government." *Rock Island, A. &*

---

[8] Lilly asserts that "[t]he jury's finding was improperly tainted by the district court's erroneous summary judgment ruling on falsity and its resulting instruction to the jury that Lilly's statements were false." Lilly-Br.67. If this cursory statement is intended as argument, it is meritless. Falsity is an element of FCA liability on which Relator otherwise bore the burden of proof, R-400-5 at 42-49. Thus, the District Court had to inform the jury that it did not need to determine falsity. Further, because Lilly and Relator *jointly* proposed the District Court's instruction on falsity, R-519 at 1571-73, Lilly waived any objection. *Ewing v. 1645 W. Farragut LLC*, ---F.4th---, 2024 WL 78292, at *4 (7th Cir. Jan. 8, 2024).

*L.R. Co. v. U.S.*, 254 U.S. 141, 143 (1920). Citing Justice Holmes, the Supreme Court later explained that "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of law." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984). Consequently, companies that participate in and benefit from government-funded programs "ha[ve] a duty to familiarize" themselves with the law, and if a disputed question arises, a concomitant duty to seek clarity. *Id.* at 64.

Consistent with these expectations, the FCA defines "knowingly" as including actual knowledge, deliberate ignorance, or reckless disregard and makes clear that no specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B). Reckless disregard is "the most capacious," *U.S. v. King-Vassel*, 728 F.3d 707, 713 (7th Cir. 2013), or "lowest scienter threshold under the FCA," *U.S. ex rel. Yates v. Pinellas Hematology & Oncology, P.A.,* 21 F.4th 1288, 1303 (11th Cir. 2021). Accordingly, "so long as a reasonable jury could have found that [Lilly] acted with reckless disregard of the truth or falsity of the relevant information," the jury's verdict must be upheld. *Id.* at 1303.

The reckless disregard standard "encompasses 'defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." *U.S. ex rel. Heath v. Wisconsin Bell, Inc.,* --- F.4th ---, 2024 WL 217696, at *6 (7th Cir. Jan. 16, 2024) (quoting *SuperValu*, 598 U.S at 751)). A defendant acts with reckless disregard if either: (1) it "had reason to know of facts that would lead a reasonable person to realize that [it] was causing the submission of a false claim," or (2) it "failed to make a reasonable and prudent inquiry into that possibility." *King-Vassel*, 728 F.3d at 713. Here, the record easily allowed the jury to find both standards satisfied.

### 2. Lilly's Problematic Narrative

The jury's verdict regarding scienter was supported by the inconsistent and problematic narrative Lilly presented to the jury with respect to how it decided to exclude Price Increase Value from AMP.

At trial, Lilly's defense centered on a single employee, Heather Dixson, mentioning her name approximately 150 times in its closing argument. R-519. Lilly tried to turn the trial into a referendum on Ms. Dixson's sincerity and credibility, telling the jury that "in our view, this trial is going to turn in your deliberation, your collective wisdom on the

answer to this question: Did Heather Dixson genuinely believe Lilly followed the government guidelines from the period 2005 through 2017?" R.507 at 134.

But this case was against *Lilly*, not Ms. Dixson. The relevant question is whether *Lilly* conducted a reasonable and prudent inquiry under the circumstances.[9] The jury may have inferred that *Lilly*, a 40,000 employee company, failed to do so by relying (1) on a single employee, (2) who was new to her job, (3) who shared a cubicle with three colleagues, and who (4) did not consult with her colleagues or supervisors when making the decision to exclude Price Increase Value from AMP. Supp.A191-194. *See U.S. ex rel. Int'l Bhd. Of Elec. Workers Loc. Union No. 98 v. Farfield Co.,* 5 F.4th 315, 348 (3d Cir. 2021) (company "recklessly delegated to unknowledgeable individuals the responsibility for ensuring that employees were properly classified").

---

[9] Of course, since Lilly's defense centered on Ms. Dixson as the decision-maker, her acts and omissions are relevant to assessing Lilly's scienter, and as discussed below, underscore the company's recklessness. *See U.S. v. Anchor Mortg. Corp.,* 711 F.3d 745, 747–48 (7th Cir. 2013) ("Corporations … 'know' what their employees know.").

Going from bad to worse, Mr. Cunningham, admitted that he had never even *read* the Rebate Agreement despite regularly signing certifications that Lilly's AMP were calculated in compliance with it, routinely participating in meetings where Lilly's AMPs were reviewed, and having "direct supervisory responsibility" for government pricing for six years. Supp.A83, 96-97. Nor could Mr. Cunningham recall any decision-making process with respect to Lilly's exclusion of Price Increase Value from AMP, or even knowledge of the decision. Supp.A100.

If the jury believed Mr. Cunningham's testimony, it could view the certifications he signed and the meetings he participated in as meaningless and attempts to create an exculpatory paper trail by documenting a façade of compliance efforts. *See U.S. v. Chhibber,* 741 F.3d 852, 860 (7th Cir. 2014) (citing evidence that defendant "documented … made-up medical symptoms and diagnoses in his patients' charts in order to backstop his claims"). The same testimony also allowed the jury to conclude that Lilly failed to make a reasonable and prudent inquiry into the possibility it was submitting false claims.

Ms. Dixson's failure to even discuss the issue with Rick Brown – her predecessor in the government pricing role and who trained her in

63

government pricing – further showed the lack of a reasonable and prudent inquiry. Supp.A186-188, 191. Ms. Dixson testified that Mr. Brown was knowledgeable about government pricing and that she considered him a resource. Supp.A198-199. Nonetheless, Mr. Brown made clear that he "had no responsibilities related to, awareness of, discussions regarding, or involvement in any decisions regarding how Eli Lilly should or did treat price increase value." Supp.A316.

Recalling the chronology here is also important. Prior to 2005, Lilly's agreements with its wholesalers did not contain clawback provisions, such that when Lilly raised prices and wholesalers sold Lilly products to downstream customers, wholesalers pocketed the price increases. Supp.A137. That changed in 2005, when Lilly began clawing back Price Increase Value from Wholesalers. Supp.A90-91.

Lilly's 2005 agreements thus created *a brand-new revenue stream* for Lilly. This was a red flag. Any company conducting a reasonable and prudent inquiry of this new (and large) stream of income would have carefully analyzed it to make sure it was properly reported to the government.

Yet, Lilly could not produce *a single scrap of paper* substantiating its claimed rigorous decision-making process to exclude Price Increase Value from AMP. In fact, Lilly did not document its decision at all until six years after the fact, in 2011 (and even then, only in response to learning about the *Streck I* lawsuit). Supp.A201, 211.

The notion that a global pharmaceutical company conducted a "reasonable and prudent" inquiry of a brand-new income stream without a single document to reflect its process or decision strains credulity. This left the jury free to infer an intentional effort to avoid documenting a meritless interpretation, or to conclude that Lilly did not conduct the investigation it claimed. *See Cole v. C.I.R.,* 637 F.3d 767, 781 (7th Cir. 2011).

While Lilly now claims that it was "undisputed that Dixson, Lilly's government pricing specialist, consulted every legal authority," Lilly-Br.68, that's not true. In addition to the lack of contemporaneous documentation, Ms. Dixson testified – seventeen years after the fact – that she did not have "specific memories" or "actual memories" of the decision-making process relating to Price Increase Value, but *believed* that is what she would have done based on "general practice." Supp.A219-

223. And when questioned about other important decisions and events in the same time period, Ms. Dixson was repeatedly unable to recall them. Supp.A185, 188-190, 197.

This is hardly the "undisputed" evidence Lilly imagines, and the jury was free to reject her uncorroborated testimony regarding undocumented events from 17 years earlier. See *Crompton v. BNSF Ry. Co.*, 745 F.3d 292, 298 (7th Cir. 2014) ("When there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion.") (quotations omitted).

Beyond the passage of time, Ms. Dixson had a powerful motive to provide exculpatory testimony since she remains employed at Lilly and the company made her conduct and sincerity the focal points of its defense. In short, Lilly's strategy of trying to persuade the jury that this case was about whether they believed that Ms. Dixson "genuinely believed" in Lilly's decision was not only legally misguided, but it also made Ms. Dixson's credibility an important issue in the trial, and the jury was not required to credit her testimony.

### 3. Lilly's Problematic Explanations

The jury was also free to weigh Lilly's failure to offer a sensible explanation for why it excluded Price Increase Value from AMP in the face of the plain language of the Price Actually Realized Requirement. *See U.S. v. Mbaye*, 827 F.3d 617, 620 (7th Cir. 2016) ("[H]is story was implausible, which the jury could weigh against him").

Ms. Dixson's testimony highlighted this dissonance. She admitted that Lilly was "legally obligated to follow what's in the rebate agreement with respect to AMP." Supp.A225. She also volunteered an analogy in an attempt to justify Lilly's position on the Price Actually Realized Requirement. She asked the jury to consider a car purchase that was part cash, part trade-in value as akin to how Lilly viewed the initial purchase price and Price Increase Value. Supp.A205-206. But she also admitted that the total price of the car would be considered the cash component *and* trade-in value. *Id.* That is exactly the point.

Instead of offering any cogent explanation, Lilly claimed that (1) the "cumulative" requirement could only make AMP go down, not up and (2) Price Increase Value is a "component" of the service fees paid to wholesalers, not as a revenue stream. Supp.A.217-219, 226-229, 230. But

for the same reasons the District Court determined that Lilly's representations were false, the jury could find Lilly's continued inability to offer a plausible explanation as evidence of scienter.

Indeed, Lilly's witnesses only served to highlight the lack of merit in the company's position. Ms. Dixson admitted that the imposition of Price Increase Values was neither caused by, nor itself caused, a change in the services provided by the wholesaler, and that the percentage-based service fee alone compensated the wholesaler for its services. R.516 at 1294-95. Further, she admitted that she could not actually apply the bona fide service fee test to Price Increase Value. R.516 at 1289.

The following analogy illustrates Lilly's dissonance with great clarity. Assume a teacher is paid a $75,000 salary by the school, and the teacher's daughter is a student at the school whose tuition is $25,000. If the school and the teacher agree to net the two transactions by making a single payment to the teacher of $50,000, that does not change the fact that the teacher's salary is $75,000.

Additional evidence undercut Lilly's "component of the service fee" claim. In February 2016, when Lilly re-negotiated its distribution service agreement with the wholesalers, an initial draft squarely admitted that

money paid by wholesalers for drugs and money paid by Lilly for service are unrelated. Supp.A381-382 ("These transactions *are not related*, but [are] administered together for efficiency") (emphasis added).

However, shortly before the agreements were ultimately signed, Ms. Dixson and Lilly's attorney altered the agreement to remove the damning admission that the transactions "are not related." Supp.384. All of this occurred in February 2016, just as Lilly was preparing to meet with CMS in an effort to persuade the agency that Price Increase Value *was related* to service fees. A231-233. The jury could view the removal of the "are not related" language as an intentional effort to avoid documenting an admission that was diametrically opposed to the position it was preparing to present to CMS.

Ms. Dixson also refused to admit that Lilly's $500+ million revenue stream arising from Price Increase Value was in fact revenue, claiming incredibly—against Lilly's own accounting documents, invoices, and the plain language of the 2009 Agreements—that she did not see any "money coming back to Lilly." R.516 at 1247.

Similarly, Lilly's own AMP-calculation policy directly contradicted Ms. Dixson's testimony that AMP could only decrease after the initial

sale. That policy provided that "[c]redits and adjustments are defined as commercial transactions with customers other than gross sales and returns," which "are relevant for the AMP calculation as they may affect gross sales." Supp.A358 Lilly noted that such transactions "typically include credit and debit memos *reflecting price adjustments* and billing adjustments." *Id.* (emphasis added). It is impossible to square Lilly's acknowledgement that both credits and debits occurring outside the initial sale are relevant for AMP with Ms. Dixson's claimed belief that AMP could only decrease after the initial sale.

### 4. Lilly's Problematic Behavior

Lilly sought to prove its lack of scienter through its transparency and diligence with the government. That strategy backfired and permitted the jury instead to conclude that Lilly intentionally sought to mislead the government.

First, Lilly's May 2005 letter to CMS was materially misleading. The letter explained that Lilly was deducting services fees from AMP. A225. As Lilly witnesses admitted, it did not disclose that it was clawing back Price Increase Value from its wholesalers, and more importantly, it did not disclose that Lilly was excluding this revenue from AMP.

70

Supp.A210. All of this despite the fact that by May 2005, Lilly was actively receiving – for the first time – this new revenue stream.

Simply put, if Lilly was confused and was conducting a "reasonable and prudent" inquiry regarding whether to report Price Increase Value, the 2005 letter was the perfect opportunity to obtain clarity. The fact that Lilly bypassed this opportunity is powerful evidence that Lilly knew its conduct was illegal. More specifically, there are two highly incriminating inferences for the jury to draw from this letter: (1) Lilly consciously elected not to tell its own lawyer about its exclusion of Price Increase Value from AMP or (2) Lilly did tell its lawyer, but Lilly and its lawyer intentionally did not tell the government.

Second, Lilly did not discuss Price Increase Value *at all* with the outside experts who spent several months auditing Lilly's government price reporting practices in 2009, and who interviewed Ms. Dixson nearly half a dozen times. Supp.A236-237, 271. The jury was entitled to infer that if Lilly was confused regarding the complex regulatory regime, it would have asked its retained experts for their views, and that Lilly's failure to do so is highly probative evidence of scienter.

Third, Lilly sent its 2011 letter—in response to learning about *Streck I*—to a known dead letter box, having been instructed not to send such letters and that CMS's failure to respond should not be construed as acquiescence. The letter established that Lilly was now concerned about its conduct – why else write the letter? – but did so through a channel that it knew would *not* result in any disclosure to the agency (and indeed Lilly offered no proof at trial that the government ever received, let alone read, the letter). Supp.A276. Given the circumstances, the jury could "reasonably interpret [the letter] as an attempt to create an exculpatory record." *U.S. v. DiCosola,* 867 F.3d 793, 798 (7th Cir. 2017).

Then, in February 2012, CMS expressly stated in a regulatory preamble "retroactive price adjustments, sometimes also known as price appreciation credits, do not meet the definition of a bona fide service fee as they do not reflect any service or offset of a bona fide service performed on behalf of the manufacturer." 77 Fed. Reg. 5,318-01, at 5332 (2012). Lilly admits that it received and reviewed the proposed rule. Supp.A276-277. Yet, Lilly still made no effort to obtain clarity from the agency.

All of this occurred in an environment where all Lilly had to do to obtain clarification was pick up the phone, send an email, or request a meeting. The jury was obviously entitled to view this as compelling evidence of scienter. *See Heckler,* 467 U.S. at 64; *U.S. ex rel. Prather v. Brookdale Senior Living Communities, Inc.,* 892 F.3d 822, 838 (6th Cir. 2018) (defendants who "knew that their practices with respect to claims were potentially in violation of governing regulations … had an obligation to inquire into whether they were actually in compliance with all appropriate regulations").

## B. Lilly Ignores the Evidence and Misrepresents the Scienter Inquiry

Instead of engaging this evidence or even attempting to view it in the light most favorable to the verdict, Lilly simply ignores it. Further, Lilly resorts to mispresenting the scienter inquiry, mischaracterizing Relator's arguments at trial, and insisting the jury was required to adopt Lilly's dubious perspective on its "transparency" with the government.

Cherry-picking language from *SuperValu,* Lilly contends that "Relator did not introduce any evidence to show that Lilly subjectively *knew* that its AMP certifications were false, or even that Lilly was 'aware

of a substantial risk' of falsity and 'intentionally avoided learning' the truth." Lilly-Br.67 (quoting *Supervalu,* 59 8 U.S. at 751, 757).

This sweeping assertion misapprehends the FCA's scienter standard by claiming that Relator was required to provide direct evidence of Lilly's subjective intent. That is not the law. First, the FCA "require[s] no proof of specific intent to defraud." *Escobar*, 579 U.S. at 187, n. 2 (citing 31 U.S.C. § 3729(b)(1)(B)). Second, "[a] relator may of course rely on circumstantial evidence to prove scienter," *Heath*, 2024 WL 217696, at *6. It is often necessary to establish scienter through circumstantial evidence since "there are no eyewitnesses to the mental contents of a person's head." *Ytem*, 255 F.3d at 396.

Lilly also selectively quotes the Supreme Court's decision in *SuperValu* to misrepresent the controlling standard. Proof that Lilly was 'aware of a substantial risk' of falsity and 'intentionally avoided learning' the truth" is how the Supreme Court described *deliberate ignorance. SuperValu.* 598 U.S. at 757. But the very next sentence explains that *reckless disregard* reaches defendants who "were aware of such a substantial and unjustifiable risk but submitted the claims anyway." *Id.*

Thus, while the evidence supported a finding that Lilly "intentionally avoided learning the truth," this was not required to prove recklessness.

Next, Lilly cherry-picks ten words from Relator's lengthy closing to claim that Relator "conceded at trial that Lilly 'may have made a good faith decision at the time.'" Lilly-Br.68. In fact, Relator cast doubt on Ms. Dixson's good faith, stating: "She *may* have made a good faith decision at the time, but *who knows*? *We don't know* what she did *because she didn't write it down*." Supp.A311 (emphasis added). Supp.A311-312.[10]

Lilly then tries to analogize this case to *U.S. ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173 (4th Cir. 2022). Lilly-Br.68-70. But the facts are utterly inapposite. In *Gugenheim*, the court found that the billing requirements at issue "were ambiguous" and that the defendants' "interpretation of the policy and agency guidance [was] reasonable." *Id.* at 181. The court also concluded that the relator did "not identify any evidence to suggest that Defendants knew, or had any reason to believe, their interpretation of the regulation was incorrect or that Defendants ignored any relevant agency guidance in reaching their

---

[10] In any event, the jury was specifically instructed that "[a] defendant does not act 'knowingly' if its conduct was the result of an innocent mistake or negligence." Supp.A313.

conclusion." *Id.* at 181. The defendants' employee had also directly communicated with the state Medicaid agency, which responded that agency auditors would "'review to see if what was billed … met … policy and billing requirements,' and would contact him if any documentation was missing." *Id.* at 182.

Here, by contrast, the legal requirements were not ambiguous, Relator provided considerable evidence undermining Lilly's supposed compliance efforts, and Lilly's internal documents contradicted its witnesses. And Lilly offered no evidence of communication with agency personnel who agreed that Lilly could continue its practices while they studied the matter.

Next, Lilly claims that its transparency with the government negated scienter. Lilly-Br.-70-71. The government's knowledge and approval "of the particulars of a claim for payment before that claim is presented" can permit an inference that a defendant did not act knowingly. *U.S. ex rel. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 (7th Cir. 1999). To invoke this inference, however, Lilly must establish "that a reasonable jury would be compelled to find that (1) an official with decision-making authority … (2) knew [of Lilly's exclusion of price

increase value from AMP] and (3) communicated his or her approval of that arrangement." *U.S. v. Sikorsky Aircraft Corp.*, 2023 WL 6883637, at *18 (E.D. Wis. Oct. 17, 2023) (applying *Durcholz*).

As described above, the jury was free to view Lilly's communications with the government (or lack thereof) as affirmative evidence of scienter. The jury was certainly not compelled to adopt Lilly's far-fetched view that its communications represented government knowledge and approval. Indeed, Lilly's own witness admitted that "CMS has never blessed [Lilly's] view." Supp.A122. Moreover, the government knowledge inference "is only an inference" and "does not *automatically* preclude a finding of scienter." *U.S. ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008). Accordingly, even if applicable, it would not defeat the wide array of evidence substantiating Lilly's recklessness.

## IV. The District Court Applied the Wrong Methodology to Determine the Number of Statutory Violations

A company that violates the FCA must pay a civil penalty for *each* statutory violation. 31 U.S.C. § 3729(a); *U.S. v. Bornstein*, 423 U.S. 303, 309 (1976). Here, Lilly calculated, reported, and certified AMPs on a drug-by-drug basis, and that each individual AMP directly resulted in losses to the government. Nonetheless, the District Court determined

that each of Lilly's quarterly pricing submissions – which contained scores of false AMPs – constituted a single statutory violation. This was legal error.

## A. Additional Facts Relevant to Civil Penalties

Each of Lilly's drugs were each assigned a product-specific National Drug Code ("NDC"). Supp.A180-181. Manufacturers are required to calculate and report AMP on a drug-by-drug basis using each product's NDC. *See* 42 U.S.C. § 1396r-8(c)(1); 81 Fed. Reg. 5,170-01 (2016) ("[D]rug manufacturers calculate the AMP at the NDC-9 level" and "[t]he drug manufacturers report and certify the same AMP calculated at the NDC-9 level."). Accordingly, "each calendar quarter, Lilly calculated an AMP for each product." Supp.A354.

Lilly reported AMPs using CMS's electronic Drug Data Reporting ("DDR") system, Supp.A939-940, as shown in the images below:





Supp.A394-396 (emphases added). These images – both of which refer to drug-specific AMPs as individual "records" – demonstrate how Lilly reported and certified AMPs on a drug-by-drug basis.

Discussing the first image, Ms. Dixson testified that each of the 227 "quarterly pricing records" were to be submitted and, of those, 200 had already been certified while 27 were awaiting certification. Supp.A253. The second image shows that each AMP (on an NDC-level) has a separate "check box" requiring individual certification for that specific drug. Ms. Dixson explained that to certify each NDC-specific record, the certifier needed to check the appropriate box, which could either be done by selecting all of the boxes or, as here, selecting some but not others. Supp.A252-255. She also confirmed that certification of each drug-specific AMP is required, and that CMS will not accept an uncertified AMP. Supp.A259.

In turn, each individual false AMP directly led to reduced rebate liability for that particular drug. At trial, a CMS official explained that AMP is "[t]he central component for determining the amount of the rebate due for a *particular drug in a particular quarter*," and "[t]he AMP reported by a manufacturer for a *particular drug in a particular quarter*

impacts … the unit rebate amount *for the drug.*" Supp.A436-438 (emphases added). Then, "the amount of MDRP rebates a manufacturer must pay for a particular drug in a particular quarter is determined by multiplying the drug's unit rebate amount by the number of units reimbursed by Medicaid for that quarter." *Id.*

In sum, each step of the process is completed on a drug-by-drug basis. Lilly calculates, reports, and certifies AMPs for individual drugs independent of other drugs. Each drug's specific AMP is individually reported to CMS, which calculates the unit rebate amount for each drug and provides this information to the state Medicaid program. Each individual state Medicaid program then generates a rebate amount by multiplying the product-specific rebate amount by the number of units of that individual drug that the Medicaid program paid for during the previous financial quarter.

Another CMS official described how underpaid rebates directly harm both the state and federal governments. Supp.A428-433. States prospectively request federal funding to support their Medicaid programs on a quarterly basis using a form that "provide[s] estimates of various types of services, including drug costs." *Id.* States then draw down the

federal funds as they incur costs. *Id.* After each quarter, each state submits "a reconciliation of its actual Medicaid expenditures, net of Medicaid drug rebates received from drug manufacturers, against the monetary advance." *Id.* Accordingly, "[i]f a manufacturer underpays MDRP rebates owed to a state Medicaid program for a particular quarter, then the state's net expenditures … will be overstated for that quarter, and the federal government will have overpaid the federal share of Medicaid expenditures for that quarter." *Id.*

## B.    The District Court's Decision

Relator filed a motion *in limine* seeking a ruling that each individual false AMP constituted a separate statutory violation. R.398. Before trial, the District Court partially resolved the issue. It held that that only quarterly AMPs (and not monthly AMPs, which manufacturers also submit) could constitute violations. Supp.SA2-3. However, the District Court did *not* determine whether each false AMP within the quarterly submissions constituted a separate violation, instead stating that "the jury will determine the precise number" of violations based on expert testimony. *Id.*

At trial, Relator moved to admit an exhibit prepared by his damages expert to show the number of false AMPs contained in Lilly's quarterly submissions. Supp.A153, 427, 601. Lilly did not dispute the contents of the exhibit but objected to its admissibility by claiming (incorrectly) that the District Court had already ruled *in limine* that each overall quarterly submission – regardless of how many false AMPs were included – constituted a single violation. Supp.SA7-8. The District Court sustained Lilly's objection. Supp.SA12.

Relator filed a motion for clarification, pointing to the evidence outlined above showing that Lilly calculated, reported, and certified AMPs on a drug-by-drug basis. R.474. The District Court denied Relator's motion and held that each quarterly submission constituted a single violation regardless of how many individual false AMPs it contained. Supp.SA21.

Subsequently, the District Court asked the parties whether, given that ruling, they could agree on the number of statutory violations rather than submitting the issue to the jury. Supp.A32-34. Relator, while expressly reserving his right to appeal, agreed with Lilly that there were 1,251 statutory violations under the District Court's methodology.

Supp.A304, 306-307; R.492. Accordingly, the issue of the number of violations was taken off the verdict form and removed from the jury's consideration. R.486.

## C. Each False AMP Constitutes a Separate Statutory Violation

It is well-settled that a defendant is liable for a separate civil penalty for *each* statutory violation. *Bornstein*, 423 U.S. at 30. Applying that rule and a century of Supreme Court precedent to the facts at bar, each false AMP Lilly submitted constituted an independent statutory violation requiring imposition of a separate civil penalty.

The Supreme Court's jurisprudence on this issue began in *Ebeling v. Morgan*, 237 U.S. 625 (1915). There, a defendant was charged with multiple statutory counts of illegally opening and stealing from mail bags. The defendant cut into several mail bags "in the same transaction" and was sentenced to a fine and prison term for each bag. *Id.* at 627-628. The Supreme Court held that "[a]lthough the transaction of cutting the mail bags was in a sense continuous, the complete statutory offense was committed every time a mail bag was cut." *Id* at 629.

Thirty years later, the Supreme Court applied *Ebeling* to the FCA. In *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), a defendant engaged

84

in a scheme to submit multiple false bids for multiple public contracts. The Supreme Court rejected the defendant's argument that the false bids should be lumped together and treated as one violation. Analogizing to *Ebeling,* the Supreme Court explained that "[t]he incidence of the fraud on each additional project is as clearly individualized as is the theft of mail from separate bags" and that "we cannot suppose that Congress meant thus to reduce the damages recoverable for respondents' fraud and thereby allow them to spread the burden progressively thinner over projects each of which individually increased their profit." *Id.* at 552.

Thirty-three years later, the Supreme Court revisited how to count the number of statutory violations in FCA cases in *U.S. v. Bornstein*, 423 U.S. 303 (1976). In *Bornstein,* the government retained a prime contractor (Model) to provide radio kits, and Model hired a subcontractor (United) to supply radio tubes for the kits. United sent three separately invoiced shipments of substandard tubes to Model, which then sent the government 35 shipments of radio kits containing the faulty tubes.

The case presented three options as to the number of violations: 1 (the single contract between United and Model); 3 (United's total invoices); or 35 (Model's total invoices).

The Court held that "[a] correct application of the statutory language requires that the focus in each case be upon the specific conduct of the person from whom the Government seeks to collect the forfeiture." *Id.* at 312. Accordingly, it held that the number of violations must be determined by the number of "causative acts" that the defendant (United) committed. *Id.*

The Court rejected the imposition of 35 penalties as "fail[ing] to distinguish between the acts committed by Model and the acts committed by United." *Id.* at 312. "The fact that Model chose to submit 35 false claims instead of some other number was, so far as United was concerned, wholly irrelevant[,] completely fortuitous and *beyond United's knowledge or control.*" *Id.* at 312 (emphasis added).

Likewise, the imposition of one penalty incorrectly focused on the single contract rather than the number of "causative acts" United committed. *Id.* at 311-312. Moreover, the "one penalty" approach would be at "odds with the statutory language" and "defeat the statutory purpose" of "punishing and preventing . . . fraud" since it would "result almost always in but a single forfeiture, no matter how many fraudulent

acts the subcontractor might have committed." *Id.* at 311 nn. 5-6 (footnote and quotations omitted).

Since it was United's three shipments that caused Model to submit invoices to the government, the Court determined that United was liable for three penalties *because it knew* that each shipment of faulty tubes would lead to the government paying for substandard radio kits: "[w]hen . . . United dispatched each shipment of falsely marked tubes to Model, it did so *knowing* that Model would incorporate the tubes into the radio kits it later shipped to the Government, and that it would ask for payment from the Government on account of those tubes." *Id.* at 313 (emphasis added).

This precedent establishes that (1) the number of violations depends on the number of "causative acts" that *the defendant knows* will ultimately result in a violation of the FCA; (2) each completed statutory offense supports a separate penalty irrespective of whether the offenses were, in some sense, committed in the same transaction or were continuous; and (3) penalties should not be imposed in a manner that dilutes the FCA's purpose by lumping separate statutory violations together.

Applying these principles here, each of Lilly's false AMPs represents a separate statutory violation. Lilly calculated AMP on a drug-by-drug basis and entered product-specific AMPs for each drug into the CMS rebate system every quarter. Lilly then certified the accuracy of each AMP by checking an individual box next to each drug certifying that the product-specific AMP was accurately calculated pursuant to, *inter alia*, the Rebate Agreement. CMS calculated the rebates on a drug-by-drug basis, and the states invoiced Lilly based on the amount of the particular drug utilized in the state for that quarter.

Thus, each drug-specific false AMP that Lilly submitted independently decreased the amount of the rebates that Lilly paid each individual state for that individual drug. Indeed, Ms. Dixson agreed that "if the AMP is wrong for one individual Lilly product, one individual drug, the rebate amount sought by the invoice [from CMS] will be incorrect." A185. As a result, the relevant "causative act" that triggered Lilly's underpayment of rebates for a particular drug was Lilly's submission of a false AMP for that individual drug.

Likewise, looking to the statutory language, *Bornstein*, 423 U.S. at 311-312, each product-specific false AMP represented a "complete

88

statutory offense," *Ebeling*, 237 U.S. at 629. Relator brought claims under the federal FCA and its state law analogs. Both the federal and state statutes prohibit "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G); *see e.g.* 740 Ill. Comp. Stat. §175/3(a)(1)(G).

Each false AMP that Lilly submitted represented a complete statutory offense. Lilly made and used a "false record or statement" – the individual AMP for the drug in question– that was "material to an obligation to pay" a rebate for that individual drug to each state. And because the states share the rebates with the United States, each false AMP was also "material to an obligation to pay" the United States.[11] Indeed, the electronic interface that Lilly utilized to submit its AMPs specifically referred to the number of drug-specific AMPs as *"records"* and

---

[11] In addition to violating 31 U.S.C. § 3730(a)(1)(G), by causing the states to (unwittingly) submit a false request for federal funds, Lilly also caused the states to (unwittingly) present false claims to the federal government in violation of 31 U.S.C. § 3729(a)(1)(A), based on false records and statements material to those claims in violation of 31 U.S.C. § 3729(a)(1)(B). However, the analysis is the same under § 3729(a)(1)(A), § 3729(a)(1)(B), or § 3729(a)(1)(G) since the "causative act" that Lilly committed was the submission of a product-specific false AMP.

required that Lilly separately certify each such "record" by checking a box for each drug-specific AMP. Supp.252-253.

None of this was "completely fortuitous and beyond [Lilly]'s knowledge or control." *Cf. Bornstein*, 423 U.S. at 312. Rather, as a longtime participant in the MDRP, Lilly knew that submitting a false AMP was a "causative act" that would set in motion a domino-like series of events that directly led to the underpayment of rebates as to that drug. Indeed, treating each overall quarterly submission – no matter how many false AMPs it contained – "result[s] … in but a single forfeiture, no matter how many fraudulent acts [Lilly] might have committed" each quarter. *Id.* at 311 (footnote and quotations omitted). Not only is this inconsistent with the "causative acts" analysis, but it allow[s Lilly] … to spread the burden progressively thinner over projects each of which individually increased [its] profit." *Marcus,* 317 at 552.

## <u>CONCLUSION</u>

The Court should affirm the District Court's judgment in all respects, *except that*, the Court should reverse the District Court's ruling regarding the method for counting the number of statutory violations and

remand that issue for a re-assessment of civil penalties under the correct methodology.

Date: February 23, 2024        By:   */s/ Daniel R Miller*

**WALDEN MACHT & HARAN LLP**
Daniel R. Miller
Jonathan Z. DeSantis
2000 Market Street, Suite 1430
Philadelphia, PA 19103
Tel: (212) 335-2030
dmiller@wmhlaw.com
jdesantis@wmhlaw.com

**BEHN & WYETZNER, CHARTERED**
Michael Behn
17 N. State Street, Suite 1600
Chicago, IL 60602
Tel: (312) 236-0000

**MARTIN LAW, P.C.**
Jackson Martin
1934 Old Gallows Road, Suite 350
Tysons Corner, Virginia 22182
Tel: (202) 909-3455
jackson@martinlawpc.com

***Attorneys for Plaintiff-Appellee-
Cross-Appellant***

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28(e)(2) and 32(a)(7)(B), as modified by Circuit Rules 28.1 and 32(c), because the brief contains 16,488 words, excluding the parts of the brief exempted from the word count by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6), as modified by Circuit Rule 32(b), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: February 23, 2024

By: /s/ *Daniel R. Miller*
*Attorney for Plaintiff-Appellee-Cross-Appellant*

## CERTIFICATE OF COMPLIANCE WITH CIRCUIT RULE 30(d)

Pursuant to 7th Circuit Rule 30(d), counsel certifies that all materials required by 7th Circuit Rule 30(a) and (b) are included in the appendix.

Dated: February 23, 2024     By: /s/ *Daniel R. Miller*
*Attorney for Plaintiff-Appellee-*
*Cross-Appellant*

# CERTIFICATE OF SERVICE

I hereby certify that on February 23, 2024, I caused a copy of the foregoing to be served via this Court's ECF filing system, which will provide a copy to all counsel of record.

By: /s/ *Daniel R. Miller*
*Attorney for Plaintiff-Appellee-Cross-Appellant*

**REQUIRED SUPPLEMENTAL SHORT APPENDIX**

**CASE NOS. 23-2134, 23-2216, 23-2958, and 23-3035**

**INDEX TO DOCUMENT REFERENCES IN
REQUIRED SUPPLEMENTAL SHORT APPENDIX**

| Description of Item | Record Entry No. | Appendix Page No. |
|---|---|---|
| **Transcript of Proceedings – July 13, 2022 Excerpts (07/27/2022)** ........................................................ | **R.466** | Supp.SA1 |
| **Trial Transcript Volume 3B July 26, 2022 Excerpts (09/22/2022)** ........................................................ | **R.510** | Supp.SA5 |
| **Trial Transcript Volume 6B July 29, 2022 Excerpts (09/22/2022)** ........................................................ | **R.517** | Supp.SA14 |
| **Trial Transcript Volume 7A August 1, 2022 Excerpts (09/22/2022)** ........................................................ | **R.518** | Supp.SA22 |

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERCAL, *et al.*)
*ex rel.* RONALD J. STRECK,       )
                                  )
        Plaintiffs-Relator,       )
                                  )  No. 14 C 9412
                vs.               )  Chicago, Illinois
                                  )  July 13, 2022
TAKEDA PHARMACEUTICALS AMERICA,   )  3:00 p.m.
*et al.*,                         )
                                  )
        Defendants.               )

TRANSCRIPT OF PROCEEDINGS - MOTIONS

(Via teleconference)

BEFORE THE HONORABLE HARRY D. LEINENWEBER

APPEARANCES:
For the Plaintiffs:        WALDEN MACHT & HARAN LLP
                           2000 Market Street
                           Suite 1430
                           Philadelphia, Pennsylvania 19103
                           BY:  MR. DANIEL R. MILLER
                                MR. JONATHAN Z. DE SANTIS

                           MARTIN LAW, P.C.
                           1934 Old Gallows Road
                           Suite 350
                           Tysons Corner, Virginia 22182
                           BY:  MR. JACKSON MARTIN

                           UNITED STATES DEPARTMENT OF JUSTICE
                           CIVIL DIVISION
                           COMMERCIAL LITIGATION BRANCH
                           Post Office Box 261
                           Ben Franklin Station
                           Washington, D.C. 20044
                           BY:  MR. JUSTIN DRAYCOTT
                                MR. JEFFREY A. TOLL

Official Court Reporter:   JENNIFER COSTALES, CRR, RMR, CRC
                           219 S. Dearborn St., Room 2342
                           Chicago, Illinois 60604
                           (312) 435-5895
                           *jenny.uscra@yahoo.com*

**Supp.SA1**

Any changes that the relator wants to make obviously would change the substance of those responses and make them different than what Lilly admitted to there. The only thing that's evidence is obviously the admissions that Lilly agreed to.

As to the --

THE COURT: I would think the appropriate way obviously is to read them in and then, if you in your final arguments you could make a demonstrative exhibit I think to show the questions and the answers. But I don't think that we'll put the actual document into evidence.

I will instruct the jury, you know, that the rules of civil procedure provide for requests for admission and that the responses are just that, that they are evidence in the case.

MR. HILEMAN: We think that's fine, Your Honor. I think there is a standard probably pattern instruction on that, it would be fine.

THE COURT: Yeah, there is a standard instruction. I'm not necessarily familiar with it at the exact moment. But if not, you know, I can certainly fashion one about -- because it's the procedure provided by law that the parties may ask questions and then the responses are admissible as evidence, as admissions.

All right. The next one, plaintiffs' motion to count

the number of statutory violations.  I'm not sure that's -- I know the jury will determine the precise number.  And I think that the experts will testify.

The one matter that came up is how it should be counted, whether quarterly or by monthly.  And my ruling will be that they're quarterly rather than monthly, because the actual rebates are paid by drug manufacturers on a quarterly basis to the states, and they're shared between the states and the federal government.

So that the actual document, the actual statement upon which the payments are made are quarterly.  So that would be the Court's ruling on that.

The next one is plaintiffs', preclude evidence of the government's intervention decision.  That's objected to.  But there is a corresponding one that Lilly has filed to preclude the -- I'm trying to find it.  Hold on a minute -- to exclude the DOJ's investigations and the settlement discussions.  I'm granting that.

But I'm also granting the relator's request to keep out the government's decision not to intervene.  So that, in other words, the DOJ's investigation is not coming in, nor the result of its investigation not to intervene.

Motion to preclude references to trebled actual damages and civil penalties.  Lilly wants the jury to be told that this is a punitive statute.  I'm granting the motion.  I

don't believe it's relevant. It will confuse and prejudice the jury.

Almost every other instance that I'm aware of where there is an increase, where the court by statute increases the damages award, that the jurors are not instructed that that's going to happen.

So I'm granting the relator's motion.

The next one, let's see, the relator's motion to prevent Lilly from calling relator as a witness or at least strictly limiting the testimony.

Lilly wants to have the right to call him. I'm denying the motion. Lilly may call the relator as a witness, but he should testify and not be asked about past settlements, nor should he be called to attack his character or his credibility.

So in other words, I'm denying the motion, but certainly limited to what questions can be asked if Lilly wants to call him.

The next one, plaintiffs' motion to preclude evidence or argument that Lilly sought or relied on advice of counsel. That's denied.

Lilly may elect to tell the jury that it consulted counsel as long as Lilly does not get into any specific advice or that it relied on any -- or the fact that it relied on the counsel and will not waive the attorney-client privilege. But

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, *et al. ex rel*. RONALD J. STRECK,  )
        )
        Plaintiffs-Relator,  )
        ) Case No. 14 CV 09412
-vs-        )
        ) Chicago, Illinois
TAKEDA PHARMACEUTICALS  ) July 26th, 2022
AMERICA, INC., *et al.*,  ) 1:52 p.m.
        )
        Defendants.  )

EXCERPT TRANSCRIPT OF PROCEEDINGS - Trial
VOLUME 3-B
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

APPEARANCES:

For the Plaintiffs:    WALDEN MACHT & HARAN LLP
        BY:  MR. DANIEL R. MILLER
           MR. JONATHAN Z. DeSANTIS
           MR. DEREK A. COHEN
        2000 Market Street, Suite 1430
        Philadelphia, Pennsylvania 19103

        MARTIN LAW, P.C.
        BY:  MR. ROBERT JACKSON MARTIN IV
        1934 Old Gallows Road, Suite 350
        Tysons Corner, Virginia 22182

For the Defendants:    KIRKLAND & ELLIS LLP
        BY:  MR. ANDREW A. KASSOF
           MS. DIANA M. WATRAL
           MR. JAMES R.P. HILEMAN
           MR. RYAN MOORMAN
        300 North LaSalle Street, Suite 4300
        Chicago, Illinois 60654

Court Reporter:    AMY M. SPEE, CSR, RPR, CRR
        Federal Official Court Reporter
        United States District Court
        219 South Dearborn Street, Room 2318A
        Chicago, IL  60604
        Telephone:  (312) 818-6531
        amy_spee@ilnd.uscourts.gov

**Supp.SA5**

the federal damages for all 50 states or just the federal portion of damages for the state -- the *qui tam* states listed on the slide?

A.   That is the federal damages for -- only for the *qui tam* states, the 28 *qui tam* states listed on this slide.

Q.   Okay.

MR. MILLER:   If we can go to the next page.

BY MR. MILLER:

Q.   Here you have -- the title is "Federal Damages to the Non-qui Tam States."  And there's roughly 20 -- 22 states listed, if my math is correct.

Do these states have False Claims Acts?

A.   No, they do not.  And that's why they're called non-*qui tam* states.

Q.   So what does -- I see the figure at the bottom there is $12,981,000.  What does that reflect?

A.   That reflects the federal government's portion of damages related to these states.  And they're not sharing that portion with these states because these are non-*qui tam* states that do not have a False Claims Act.

Q.   So the $48 million on the first slide added to the $12.9 million on the second slide, do they add up to the $61,229,217 that you testified to earlier?

A.   Yes, they tie out to the total damages that you mentioned.

Q.   Did you also calculate for all 50 states the total amount

of damages strictly to the federal government?

MR. MILLER: If we can go to the next slide, please.

BY THE WITNESS:

A. Yes.

BY MR. MILLER:

Q. And is that depicted here?

A. That's depicted here. Again, the federal government is entitled to damages that occurred in any state.

MR. MILLER: Bear with me a moment, Your Honor.

(Brief pause.)

MR. MILLER: I'd like to pull up RX 1330 and move that into evidence.

MR. HILEMAN: Your Honor, may we have a sidebar on this?

THE COURT: All right.

(Proceedings heard at sidebar on the record.)

MR. HILEMAN: Your Honor, can you hear me?

THE COURT: Yes.

MR. HILEMAN: Your Honor, I think counsel is about to get to an issue once again that's already been ruled on by a motion *in limine*. As you know, Your Honor denied motion *in limine* No. 1 by the plaintiffs regarding how to count violations in this case. He's now put up a slide, and I think it tends to try to argue, essentially, the theory that they already proposed, and that you rejected, that they could get

penalties on an NDC-by-NDC basis. That was the basis of a motion; you denied it. And if he puts these numbers up the jury, the only possible result is confusion to the jury when they're eventually asked to come up with a penalty number. So this exhibit should not be shown and this whole line of inquiry should be stopped here.

MR. MILLER: Your Honor, I couldn't disagree more with the Court's ruling -- or the fact that this implicates the Court's ruling. It's very plain when you read what the Court said and what the motion said that you were going to leave the counting of the violations to the jury.

This slide depicts the exact number of false AMPs, which we assert, each one of, is a violation that Lilly caused to be submitted to the federal government and the states across the relevant time period.

It's based strictly on the exact data that underlies Mr. Kimelblatt's report. And if we're not allowed to admit this, the jury will have no idea how to calculate the number of violations leaving them literally in a vacuum to guess.

Now, the defense can put up its -- it can cross and do -- put on whatever evidence it says, hey, there's only 17 false violations, which is what they claimed in their motion, and you denied that. You didn't find in their favor and say, yes, you can only -- there's only 17 violations. You said that is quarterly, not monthly. So we had Mr. Kimelblatt

calculate the number of quarterly false AMPs that Lilly caused to be submitted to the states and the federal government, and this is the number.

If they want to submit contrary evidence, they have plenty of chance to talk about it in their case-in-chief.

MR. HILEMAN:  Your Honor, the -- counsel is conflating two issues.  What you ruled on and what they moved on and you denied the motion is not the number of false violations -- we agree, that's for the jury -- it's how to count them.  And what you ruled is that what would be counted was the actual document, the actual statement upon which the payments are made.

THE COURT:  Yes, I'm looking for -- here it is.

MR. MILLER:  Judge, I'm sorry, but if I can just -- there is evidence that we are going to admit through Ms. Dixson that every individual AMP has to be individually certified as accurate.  There's literally -- you have to check a box for every NDC, which is every drug, and you have to certify that every AMP is accurate.  The government specifically defines these as records, individual records, which is the language that's in the False Claims Act.

So each time Lilly submits a quarterly AMP, it's not submitting one big report -- it can even submit it at different times.  It can submit one AMP and then come back to it and submit ten more the next day, but each individual AMP

is an individual record, even by the way that the government collects the information and also by the way that Lilly submits it.  This is absolutely crucial.  And Mr. Hileman is not accurately recounting what the Court did.

MR. HILEMAN:  I absolutely -- Your Honor, I was quoting you --

THE COURT:  I can remember what I did and what I said was that the certifications -- now, the quarterly certifications, not the monthly ones, because the -- the intent to get the government to pay is the quarterly one, and then --

MR. MILLER:  And this is the quarterly AMPs, Your Honor.

MR. HILEMAN:  Let the judge finish.

THE COURT:  All right.  Just the quarterly ones is the -- but not the monthly ones.

MR. MILLER:  That's correct, Your Honor.

MR. HILEMAN:  Your Honor, this is essentially a motion for reconsideration.  He's arguing the same issue we argued before.

You also said, and I'm quoting Your Honor, "The actual document, the actual statement upon which the payments are made are quarterly."

This is the issue we briefed.  There's plenty of law on this.  And, in fact, they didn't have a single case going

the other way. The AMPs are submitted in a data file all at once and that is the submission, that's the record that's counted for purposes of violations. Individual line items within that -- the individual AMPs are -- do not result in a separate penalty for each one. The law is crystal clear on this.

Hold on, Mr. Miller.

We briefed this issue, we had --

THE COURT: I know, and I've ruled. And I remembered --

MR. MILLER: I can show the Court the actual document that shows that every individual AMP is an individual record. We would just have to take the jury out for a few minutes.

This is crucial, Judge, please.

MR. HILEMAN: That's why we had motion practice on this before trial.

THE COURT: We did.

"If Lilly underpays rebates owed pursuant to the Medicaid Drug Rebate Program for a particular quarter, then each respective state Medicaid program reflected in the forms will be inaccurate for that quarter, leading the federal government to overpay the federal share for that quarter."

That's from the statement of facts. So it's the -- in order to be a false claim, it has to be a claim which, as I understand it, tends to have the government pay out money or

to have the government accept money on the basis of a false claim. And that's based on quarterly.

So I ruled -- I intended to rule and I ruled that the false claims would be counted on a quarterly basis, not on a monthly basis. So that was the ruling.

So that -- that -- and I -- this is a motion for reconsideration. It's denied. So that's my ruling.

MR. HILEMAN: Thank you, Your Honor.

MR. MILLER: Judge, may I be heard for five more seconds?

MR. HILEMAN: Your Honor, we just --

THE COURT: Yeah, five seconds more. Okay.

MR. MILLER: This exhibit is based on the quarterly AMPs. We followed the instruction.

MR. HILEMAN: But, Your Honor, it's individual line items instead of the quarterly forms, which was your ruling. So, again, it's only going to lead to confusion for the jury.

MR. MILLER: Perhaps we can revisit this when we have Ms. Dixson on the stand and I show her that each AMP is individually certified to.

THE COURT: Whatever it is. Okay. I will at this time deny the offer of that exhibit.

MR. MILLER: Thank you, Your Honor.

(End of sidebar.)

BY MR. MILLER:

Q. Let me catch up to my outline here, Mr. Kimelblatt.

Turning you back to your $61 million estimate of damages, did you base that on data from anyone other than Eli Lilly?

A. No, the damages calculations, as I mentioned, were based on -- only on data that Lilly provided me from their own AMP calculations that did not include the PIV amounts, price increase value amounts, that they clawed back from the wholesalers.

Q. Is there any other reason to believe that -- or that you believe that this damages estimate is accurate?

A. Yes. In fact, there was a file that Lilly produced --

MR. HILEMAN: Your Honor -- I'm sorry -- but once again, I think we need to have a sidebar on this issue.

(Proceedings heard at sidebar on the record.)

MR. HILEMAN: I apologize, Your Honor, but Mr. Kimelblatt is about to testify about an issue that came up at a hearing before trial, these impact analyses. Those impact analyses are not admissible, and I'm afraid he is going to try to open the door and move these in. I'd like to cut this off now.

They were prepared for litigation purposes. They are not evidence in the case. There is absolutely no foundation for them. Nobody has testified about it. And case law is clear that analyses like these are inadmissible. For example,

1303

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, *et al. ex rel.* RONALD J. STRECK,     )
                                                                 )
          Plaintiffs-Relator,                                    )
                                                                 ) Case No. 14 CV 09412
-vs-                                                             )
                                                                 ) Chicago, Illinois
TAKEDA PHARMACEUTICALS                                           ) July 29, 2022
AMERICA, INC., *et al.*,                                         ) 2:00 p.m.
                                                                 )
          Defendants.                                            )

TRANSCRIPT OF PROCEEDINGS - Trial
VOLUME 6B
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

APPEARANCES:

For the Plaintiffs:      WALDEN MACHT & HARAN LLP
                         BY:  MR. DANIEL R. MILLER
                              MR. JONATHAN Z. DeSANTIS
                              MR. DEREK COHEN
                         2000 Market Street, Suite 1430
                         Philadelphia, Pennsylvania 19103

                         MARTIN LAW, P.C.
                         BY:  MR. ROBERT JACKSON MARTIN IV
                         1934 Old Gallows Road, Suite 350
                         Tysons Corner, Virginia 22182

For the Defendants:      KIRKLAND & ELLIS LLP
                         BY:  MR. ANDREW A. KASSOF
                              MS. DIANA M. WATRAL
                              MR. JAMES R.P. HILEMAN
                              MR. RYAN MOORMAN
                         300 North LaSalle Street, Suite 4300
                         Chicago, Illinois 60654

Court Reporter:          MR. JOSEPH RICKHOFF
                         Official Court Reporter
                         219 South Dearborn Street, Room 2128
                         Chicago, Illinois  60604
                         (312) 435-5562

**Supp.SA14**

THE COURT: Okay.

(Brief pause.)

MR. MILLER: There's a few things to talk about. Counsel and I are suggesting that we take the 15-minute break now. It's not going to interfere -- we're not -- it's not going to interfere with anything as far as the trial goes.

THE COURT: All right. 15 minutes.

(Jury out.)

MR. MILLER: Your Honor, from a process standpoint, we are not -- the next step will be, we were going to read in the admissions and the declarations and so on.

The -- your Honor may have noted that just in the last few minutes, we filed a motion in relation to Mr. Kimelblatt's testimony. And the --

THE COURT: I have not seen it, so --

MR. KASSOF: We haven't even received a copy of it yet, your Honor.

MR. HILEMAN: Your Honor --

MR. KASSOF: They said they --

MR. MILLER: Oh, I'm not trying to hear it. I'm just notifying the Court.

MR. KASSOF: I know you're --

THE COURT: Your motion --

MR. MILLER: We have a copy --

THE COURT: -- I'm not aware of it.

**Supp.SA15**

MR. KASSOF: Same here.

MR. MILLER: So, I'll give you the gist of it, Judge. We gave counsel a heads-up about this yesterday. We just didn't file it and get it done until today.

The testimony from Ms. Dixson yesterday was relating to the DDR system and that each individual AMP is certified and is an individual record and -- even in the manner that the government looks at it. And the motion speaks to that. It speaks to that each individual AMP gets its own certification.

If the Court denies our motion, then we will be ready to rest when we're done reading the admissions and the declarations.

If the Court grants our motion, which we obviously think the Court should because of the testimony that has been developed about how these -- the quarterly records are all individually certified, and this will give the jury a great basis upon which to count the records -- we would like to call Mr. Kimelblatt for five minutes to get the exhibit in where he summarized the fact that -- how many individual false records and false certifications were sent to the states. And, so, that's the motion.

So, we're ready to rest --

THE COURT: Do you have a copy of your motion?

MR. DeSANTIS: We're printing it right now, your Honor.

**Supp.SA16**

THE COURT:  All right.

Well, whatever it is, that's all it is, that you want to call Kimelblatt --

MR. HILEMAN:  I don't think that's all it is, your Honor.

THE COURT:  -- to -- I ruled at the in limine stage that they were quarterly because those were the documents that were submitted which caused the government to take the wrong amount of money --

MR. MILLER:  Actually, Judge --

THE COURT:  -- and that monthly --

MR. MILLER:  -- these documents were the ones --

THE COURT:  Pardon?

MR. MILLER:  The whole process -- it's not the quarterly report that causes the government to go down the wrong path.  It's the individual AMPs.  Each -- hold on, Mr. Hileman.

THE COURT:  Let him finish his argument.

MR. MILLER:  Yeah.

And that's -- we just want the Court to consider the motion.  We have -- it's --

THE COURT:  I'd like to look at it.

MR. HILEMAN:  Your Honor, our --

MR. MILLER:  Hold on, Mr. Hileman, if I may.

MR. HILEMAN:  I thought you were done.

MR. MILLER: I'm not.

This is a -- the reason I want to express to the Court that this is so important is because it will have such an impact on --

THE COURT: The amount of money.

MR. MILLER: -- on the money.

THE COURT: Right.

MR. MILLER: Right. Because if there's 30,000 false records, which is 12,000 more than the 18,000 false records that the Court let through in the Amerigroup case, there's a big pen- -- there's a penalty attached to each one of those. If there's 17 records, then the penalties are, you know, minuscule.

So, we have -- took very good careful care to listen to the Court's motion in limine and to establish a factual record that these individual AMPs are individual records. And that's the actual word in the statute. The word "record" is what -- "statements and records." And the evidence is slam dunk on point that they're individually certified and they're individually calculated, and each individual AMP leads to an individually underpaid rebate.

So, we really want the Court to look at that. And we know we just filed it, but we couldn't file it until we got the testimony.

MR. HILEMAN: Your Honor, if I may address that?

**Supp.SA18**

THE COURT: Yes.

MR. HILEMAN: Your Honor has addressed this, as you pointed out. You've already ruled on this twice now, in fact. You ruled on it on the motion in limine stage when they had Mr. Kimelblatt here. You also ruled on it once again when they tried to get the exhibit in.

I'm glad Mr. Miller is now being transparent about why they are not listening to your motion in limine ruling and trying to bring this up for now a third time, a second motion for reconsideration, because they obviously are trying to inflate the amount of penalties beyond what the law allows for.

I think the law on this is very clear. We briefed this very issue at the motion in limine stage and you ruled on it. And the testimony from Ms. Dixson was not at all inconsistent with anything you said.

It's also -- wasn't what Mr. Miller just described. She very clearly said all the AMPs get sent in at one time. There's one button that she hits, one certification that comes up, all the AMPs go in at one time. And under the law, that's one submission and one violation, to the extent there's any violation.

THE COURT: Well, I remembered going over this on the motion in limine, which is the precise issue and whether it was the monthly or the quarterly.

**Supp.SA19**

So, have you got a copy of the motion yet or --

MR. DeSANTIS: It's printing, your Honor.

THE COURT: Or have you got it on your computer?

MR. MILLER: I do, your Honor.

MR. HILEMAN: Your Honor, obviously, this is now, I think, a second motion for --

THE COURT: I just want to look at it. I don't like --

MR. HILEMAN: Understood.

And --

MR. MILLER: Judge, I can only give you my colleague's computer.

THE COURT: She's got it.

MR. MILLER: Okay.

MR. HILEMAN: Your Honor, we'd like a chance to see it, as well. We have not seen the motion.

MR. MILLER: I sent --

MR. HILEMAN: We've not -- that's not a --

MR. MILLER: We would very much prefer to have the Court have the time -- take the time and give Lilly the opportunity to do what it wants to do.

But this is based on testimony from yesterday, your Honor. The -- what was briefed -- and the Court even said at the motion in limine stage, if the evidence changes --

THE COURT: Give me a break. Let me read this.

**Supp.SA20**

MR. MILLER: Okay. Sorry, your Honor.

(Brief pause.)

MR. MILLER: And, Judge, right as you're opening that --

THE COURT: I haven't finished it yet. I'm a --

MR. MILLER: Okay.

THE COURT: -- slow reader.

(Brief pause.)

THE COURT: G, knowingly makes, uses, or causes to be made or used a false record or statement material to an obligation to pay or transmit money or property to the government or knowingly conceals or knowingly improperly avoids or decreases an obligation to pay or transfer money or property to the government.

And that's the act of submitting the invoice for -- well, not invoice, the actual document which the payment is made.

So, I'm going to deny your motion and reaffirm what I ruled on in the motion in limine.

So, does that mean that you're resting now? You're going to read to the -- how long will that take?

MR. MILLER: I'm sorry, your Honor?

THE COURT: How long will it take, your stuff, the admissions or --

MR. MILLER: I think it will take at least an hour.

**Supp.SA21**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, *et* )
*al. ex rel*. RONALD J. STRECK, )
)
      Plaintiffs-Relator, )
) Case No. 14 CV 09412
-vs- )
) Chicago, Illinois
TAKEDA PHARMACEUTICALS ) August 1, 2022
AMERICA, INC., *et al*., ) 9:45 a.m.
)
        Defendants. )

TRANSCRIPT OF PROCEEDINGS - Trial
VOLUME 7A
BEFORE THE HONORABLE HARRY D. LEINENWEBER, and a Jury

APPEARANCES:
For the Plaintiffs:   WALDEN MACHT & HARAN LLP
                BY:  MR. DANIEL R. MILLER
                     MR. JONATHAN Z. DE SANTIS
                     MR. DEREK COHEN
                2000 Market Street, Suite 1430
                Philadelphia, Pennsylvania 19103

                MARTIN LAW, P.C.
                BY:  MR. ROBERT JACKSON MARTIN IV
                1934 Old Gallows Road, Suite 350
                Tysons Corner, Virginia 22182

For the Defendants:   KIRKLAND & ELLIS LLP
                BY:  MR. ANDREW A. KASSOF
                     MS. DIANA M. WATRAL
                     MR. JAMES R.P. HILEMAN
                     MR. RYAN MOORMAN
                     MR. MAX SAMELS
                     MR. NICHOLAS M. RUGE
                300 North LaSalle Street, Suite 4300
                Chicago, Illinois 60654

Court Reporter:      JENNIFER COSTALES, RMR, CRR, CRC
                Federal Official Court Reporter
                United States District Court
                219 South Dearborn Street, Room 2342
                Chicago, IL  60604
                Telephone:  (312) 435-5895
                jenny.uscra@yahoo.com

cause. And as Mr. Ruge pointed out, there is some evidence about whether or not --

THE COURT: I mean, you are going back to Posner in his -- what was the case where the scale fell on the woman?

MR. DE SANTIS: *Palsgraf*, I think.

THE COURT: *Palsgraf,* foreseeability.

MR. HILEMAN: The train station, yeah.

MR. MILLER: You know what, Your Honor, we're fine with --

THE COURT: Lilly's proposal.

MR. MILLER: Yeah.

THE COURT: Okay. We'll take Lilly.

MR. MILLER: I'm accepting, James, your representation. If *Molina* says that, and it says the foreseeability is still part of it, then that's fine.

THE COURT: All right. It just didn't seem an issue.

A number of violations. All right. This one.

MR. HILEMAN: This one I think you've ruled on now three times, Your Honor.

THE COURT: Yeah, I've ruled on it, yeah.

MR. HILEMAN: So I'd ask that you -- Lilly's proposal is also much simpler than the page and a half proposed by the relator.

This is one though, to be clear, we do have to go to our amended instructions, Your Honor, because we've amended it

in light of your rulings.

THE COURT: All right.

MR. HILEMAN: This is page 33, instruction 30 at docket 478.

THE COURT: That's your motion. Page 33?

MR. HILEMAN: Page 33, yes, Your Honor.

MR. MILLER: Where are you, James?

MR. HILEMAN: Page 33.

THE COURT: Page 33 of their new ones.

MR. MILLER: Mine is all redlined on page 33.

MR. DE SANTIS: Do you want to look at the clean version?

MR. MILLER: Yes.

Well, wait a minute. First off, we've already talked to them about materiality. So we don't need to tell the jury that they need to find both and knowingly.

And this is counting the number of violations. They've already found knowingly. They've already found materiality. They're only counting the number of violations when they've determined liability. That's even how Lilly's verdict sheet reads. So that language should come out.

MR. HILEMAN: That is what the sentence says: If you found this, then you have to determine this.

MR. MILLER: I mean, then that's --

THE COURT: What are you saying, if they don't find

it material, they're not going to find the number of violations?

MR. MILLER: Right. Like the way that the verdict sheet even that you guys submitted, the same with the one we submitted is first you go through whether the elements have been met. And if they've been met, then you count the number of times there was a violation.

So there shouldn't be any language in the instruction about counting the violations that would cause the jury to go back to what it already has determined. It only gets to count the violations if it finds that all the other elements have been met.

MR. HILEMAN: But what they are counting are the number of times --

THE COURT: Okay. Total number of violations is the total number of times Lilly submitted -- let's see -- knowingly false quarterly AMP submission. You are instructed only quarterly AMP submissions may count as violations.

Should you find relator has proven liability, not the individual AMPs or drug codes in these quarterly submission.

That could be worked on. Can you live with "knowingly false quarterly AMP submissions to HMS" and leave out "was material"?

MR. MILLER: Judge, maybe -- we've just seen this for the first time today. Do you mind if we, when I get a chance

to talk to my colleagues about this?

THE COURT: Talk to your colleagues about this and then talk to them about it, yeah.

MR. MILLER: The one other thing that's not addressed here, and it's something that I don't think any of the prior Courts' rulings have addressed are the --

THE COURT: What?

MR. MILLER: I'm sorry, I'm getting a little tired.

The Court's rulings on the issue of the counting of the violations --

THE COURT: Yeah.

MR. MILLER: -- have all been in the context of the number of false AMPs and the number of false certifications. And we get that you're -- what you say about that.

THE COURT: Yeah.

MR. MILLER: We've never talked, I don't think, about the false claims that the states submitted.

MR. RUGE: That's not true.

MR. MILLER: Okay. Bear with me. You can argue if you disagree.

THE COURT: He's just shaking his head. I'm looking at you, not him.

MR. MILLER: Okay.

THE COURT: I can see him shaking his head.

MR. MILLER: Thanks.

**Supp.SA26**

Unless I don't recall the Court ruling on the issue of the false CMS 64 and false CMS 37s that Lilly caused the states to submit, and we're not asking to revisit that, but this just talks about these AMP submissions.

There is a separate count that we pled that deals with the actual claims that are false, which are the requests for money. And if there is a -- if we prove -- and this is under (a)(1)(A) and (a)(1)(B) and the False Claims Act, if we prove that those claims, and I think we have proved that those claims were false and they caused the government to pay out money, that has to count as a violation because that, when you prove a False Claims Act violation, it's three times the treble damages times the number of violations.

And in that context, the actual claim is the submission of the forms. So our view on the submission of the CMS 64s and 37s is that each state once a quarter submitted two false claims. And that's the whole basis of Count 1 of our complaint, which is the false claims are when the states go to the federal government and demand money and the federal government pays them.

So putting aside the counting of the AMPs and the counting of the certifications, we get Your Honor's ruling on that, we need to talk about how to count the Form 37s and 64s.

MR. HILEMAN: Your Honor, I cannot believe we are having this argument again. This exact issue was briefed in

their motion in limine before trial. They made this argument about Form 64 and Form 37. They then abandoned it in their reply brief because they realized it's not right.

THE COURT: What --

MR. HILEMAN: *US v Bornstein* directly addresses this question.

THE COURT: This should be one we could almost agree on, I mean, you know, maintaining your objections. But how many quarterly are there?

MR. HILEMAN: 2005, you know, obviously we have an objection about the time period. So I want to maintain that objection as well.

THE COURT: Yeah, I'm not asking you to give up anything. But I'm just wondering if we could agree on, just save a lot --

MR. HILEMAN: We could certainly agree on the number of quarters between 2005 and 2017.

THE COURT: Yeah.

MR. HILEMAN: Which I think Your Honor is correctly realizing that is the number under their theory.

THE COURT: Then you both can object to it for differing reasons. That would make it easier on the jury, because I don't think it's -- assuming you get 61 million, I forget what the rate is for each violation.

MR. MILLER: It's like 11 -- in the earlier years

it's 5500 minimum.  Later years it's a little over 11,000 minimum.

THE COURT:  So you're talking about chump change.

MR. MILLER:  Right.

THE COURT:  And I just wonder if it's worth screwing around with it.  You can maintain your objections, so if you appeal, you know, you can raise the appeal.

MR. MILLER:  Can we argue this, though, the Form 37 and 64?

MR. HILEMAN:  They did and you rejected it.  It's also directly contrary to the *US v Bornstein* Supreme Court precedent on this issue, which says the violation is the act of the party who violates the FCA, not the number of claims they've submitted.

So in *Bornstein* the issue was there were 35 different claims submitted by a third party to the government based on three different shipments that the violator had made.  And the Supreme Court says it's not 35 claims that are violations.  It doesn't matter how many claims that third party submitted to the government.  What matters is how many times you said something false, which is the three shipments with the false -- false shipments in that case.

So it's exactly applicable here.  The issue here is the quarterly AMP submission file, not how many claims the state eventually submitted to the government under Form 37 and

Form 64.

THE COURT: That's my recollection.

MR. MILLER: But there is one big point that's not mentioned just now though, Your Honor. Causation is, as we just talked about, and I just conceded that causation involves issues of foreseeability.

In *Bornstein*, the fraudster that submitted three separate shipments had no idea what the subcontractor was going to send one invoice or 35 invoices. So the Supreme Court wouldn't hold the fraudster liable for the random unknown uncontrolled fact about what happened after they committed the fraud. That's the exact opposite here.

Everything that happened after Lilly caused the false AMPs to be submitted is prescribed by statute. It led directly to the Form 64s and 37s. Everybody knows that. Lilly knew when it submitted the false AMPs that there were going to be 50 states and the District of Columbia that were going to submit Form 37s and Form 64s. It's directly different than *Bornstein*.

This isn't -- Lilly wants to say that the number of violations here is, what, 25 or 30, once a quarter between 25 -- even though there are thousands and thousands of false AMPs because of some concepts of foreseeability. That would grossly underestimate what they did after 12 years.

But if we're allowed to -- when they foreseeably knew

that these Form 37s and 64 were going to come in, it's not *Bornstein*. This is what the proximate cause standard that Lilly just argued for.

MR. HILEMAN: Now we're conflating issues. Proximate cause goes to whether there is a violation of the statute. How you count violations is a completely separate question that was determined by *Bornstein*.

As a general principle, violations are determined by the act of the party, not how many claims were submitted.

Foreseeability and causation has nothing to do with this question. That's a liability question.

MR. MILLER: That's not what *Bornstein* says.

MR. HILEMAN: We're talking about violations now. And you've already ruled on this, Your Honor. In fact, you've ruled on it three times.

I think subject to, as Your Honor said, being able to maintain our objection over the time period, I think we're okay with reaching agreement on the number of quarters at issue and just handling it that way. I think that is much simpler.

MR. MILLER: Judge, I'm reading from *Bornstein* right now: "The government's claim that United 'caused' Model to submit 35 false claims is not accurate. While United committed certain acts which caused Model to submit false claims" -- the three acts that Mister -- "it did not cause

but we can work that out.

MR. MILLER: Okay.

THE COURT: Why don't we instruct the jury that if they find in favor of the relator, that the number of claims, false claims is 54.

MR. MILLER: There is one, there is one caveat to that though, Judge, and the caveat is, if you don't mind --

MR. HILEMAN: Well, just before you begin, just on the number, I think it's 13 years times 4 is 52.

THE COURT: Whatever it is.

MR. MILLER: Okay. We're darn close.

THE COURT: Yeah, it's chump change. Not in my book, but --

MR. MILLER: Understood. But it becomes not chump change because, just like in *Tyson*, there was a federal -- Your Honor found 18,000 violations of the Federal False Claims Act and there was an Illinois False Claims Act claim, and you found 18,000 false claims under Illinois.

THE COURT: 18,000 separate enrollments, I think it was, right?

MR. MILLER: Right, right. So here we have 54 false claims that violate the Federal False Claims Act.

THE COURT: Yeah.

MR. MILLER: And we have 54 false claims that violate the 28 state statutes.

MR. HILEMAN:  52.

MR. MILLER:  So it's 54 times 28.

MR. HILEMAN:  52.

MR. MILLER:  52, whatever.

MR. COHEN:  Let's call it 53.

MR. MILLER:  So we can agree on that?

MR. HILEMAN:  We do agree that there are separate penalties under the state statutes and the federal statutes.

I don't think that math works because some of the statutes -- you don't have claims for the entire time period for each state.  So some of the statutes weren't passed until partway through the time period.

MR. MILLER:  Okay.

THE COURT:  If you can agree, why don't we just --

MR. HILEMAN:  We should be able to work out those numbers.

THE COURT:  And then you don't even have to have the jury decide that.  Just leave it off the verdict form.

MR. MILLER:  Yeah, it adds up to 1500.  It might come down to 1400.

MR. HILEMAN:  I think it's something less than that, yes.

THE COURT:  Whatever you can agree on.  You know, disagree to agree on is, I guess...

MR. HILEMAN:  Yes, subject to our -- we want to

1512

preserve our objection to the time period.

THE COURT: Yeah. Both sides want to preserve the objection. But in light of the Court's ruling, in order to uncomplicate the case as much as possible, we will --

MR. COHEN: We can agree on the application of the Court's ruling.

THE COURT: We will agree on the Court's application, right.

MR. HILEMAN: Yes, I think we can do that, Your Honor.

MR. MILLER: Okay.

THE COURT: Work that out so it's the Court. All right. That solves that. That should make -- let's see what's next.

AMP restatements.

MR. HILEMAN: I'm sorry, Your Honor. What page?

THE COURT: This is on page 77.

MR. HILEMAN: This one I think has been mooted essentially. We would withdraw ours. Because the restatement didn't come into evidence, I think this would just be confusing for the jury.

THE COURT: So withdrawn?

MR. MILLER: No, we don't withdraw ours, Your Honor.

THE COURT: Okay.

MR. MILLER: We feel very strongly about this one.