No. 23-2134, 23-2216, 23-2958, 23-3035

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

UNITED STATES, ET AL., EX REL., RONALD J. STRECK,

Plaintiff-Appellee/ Cross-Appellant,

v.

ELI LILLY AND COMPANY,

Defendant-Appellant/ Cross-Appellee.

On Appeal from the United States District Court
for the Northern District of Illinois Eastern Division

BRIEF FOR THE UNITED STATES OF AMERICA AS
AMICUS CURIAE SUPPORTING APPELLEE

SARAH HARRINGTON
  *Deputy Assistant Attorney General*

MORRIS PASQUAL
  *Acting United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
JOSHUA DOS SANTOS
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7224*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-0213*

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST ...................................................................... 1

STATEMENT OF THE ISSUES ................................................................. 1

STATEMENT OF THE CASE ..................................................................... 2

      A.    The False Claims Act.............................................................2

      B.    The Medicaid Drug Rebate Statute........................................3

      C.    Prior Proceedings ..................................................................5

SUMMARY OF ARGUMENT.................................................................... 6

ARGUMENT ..............................................................................................10

I.     The District Court Correctly Held That Lilly's "Average
      Manufacturer Price" Reports Were False.................................10

      A.    Lilly's "Average Manufacturer Price" Reports Were False
            Because They Violated Applicable Requirements.........................10

      B.    The Rebate Agreement's Allowance for "Reasonable
            Assumptions" Does Not Support Lilly's Argument. ....................17

II.    The Jury Reasonably Found That Lilly's "Average Manufacturer
      Price" Reports Were Material to Lilly's Rebate Obligations. ...............21

      A.    The Jury Had Sufficient Evidence to Find Materiality. ...............22

      B.    The District Court Did Not Err in Giving a Materiality
            Instruction to the Jury that Tracked the Statutory
            Definition..........................................................................27

III.   The Jury Reasonably Found that Lilly Acted Knowingly. ....................29

A. The FCA Reaches Reckless Behavior and Encompasses Both Subjective and Objective Knowledge. ....................................30

B. Sufficient Evidence of Recklessness or Deliberate Ignorance Supports the Jury's Verdict. ........................................32

CONCLUSION................................................................................................35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                                    **Page(s)**

*Farmer v. Brennan,*
511 U.S. 825 (1994) ................................................................ 29, 30-31

*Gehring v. Case Corp.,*
43 F.3d 340 (7th Cir. 1994) ................................................................ 28

*Godecke v. Kinetic Concepts, Inc.,*
937 F.3d 1201 (9th Cir. 2019) ................................................................ 34-35

*Heckler v. Community Health Servs. of Crawford Cty., Inc.,*
467 U.S. 51 (1984) ................................................................ 15

*Huff v. Sheahan,*
493 F.3d 893 (7th Cir. 2007) ................................................................ 27

*Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.,*
276 F.3d 1032 (8th Cir. 2002) ................................................................ 13

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
575 U.S. 175 (2015) ................................................................ 15

*Rapold v. Baxter Int'l Inc.,*
718 F.3d 602 (7th Cir. 2013) ................................................................ 27

*Thulin v. Shopko Stores Operating Co.,*
771 F.3d 994 (7th Cir. 2014) ................................................................ 29

*United States v. Bourseau,*
531 F.3d 1159 (9th Cir. 2008) ................................................................ 10, 12

*United States v. Care Alts.,*
952 F.3d 89 (3d Cir. 2020) ................................................................ 12, 15, 16

*United States v. Dunkel,*
927 F.2d 955 (7th Cir. 1991) ................................................................ 9

*United States v. Johnson,*
916 F.3d 579 (7th Cir. 2019) ................................................................ 28

*United States v. King-Vassel,*
728 F.3d 707 (7th Cir. 2013) ................................................................ 29, 30, 35

*United States v. Krizek,*
111 F.3d 934 (D.C. Cir. 1997) ...................................................................... 30

*United States v. Molina Healthcare of Ill., Inc.,*
17 F.4th 732 (7th Cir. 2021) ........................................................ 22, 23, 25

*United States ex rel. Burlbaw v. Orenduff,*
548 F.3d 931 (10th Cir. 2008) .................................................................. 30

*United States ex rel. Calderon v. Carrington Mortg. Servs., LLC,*
70 F.4th 968 (7th Cir. 2023) ...................................................... 25, 26

*United States ex rel. Drakeford v. Tuomey,*
792 F.3d 364 (4th Cir. 2015) ................................................ 11, 12, 16

*United States ex rel. Druding v. Care Alts.,*
81 F.4th 361 (3d Cir. 2023) .................................................... 25, 26

*United States ex rel. Heath v. Wisconsin Bell, Inc.,*
92 F.4th 654 (7th Cir. 2024) ................................................ 25, 27, 32

*United States ex rel. Lamers v. City of Green Bay,*
168 F.3d 1013 (7th Cir. 1999) .................................................. 16, 17

*United States ex rel. Oliver v. Parsons Co.,*
195 F.3d 457 (9th Cir. 1999) .................................................... 12, 16

*United States ex rel. Polukoff v. St. Mark's Hosp.,*
895 F.3d 730 (10th Cir. 2018) .................................................. 13, 16

*United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.,*
892 F.3d 822 (6th Cir. 2018) ........................................... 22, 26, 30

*United States ex rel. Rostholder v. Omnicare, Inc.,*
745 F.3d 694 (4th Cir. 2014) .................................................... 10

*United States ex rel. Schutte v. SuperValu Inc.,*
598 U.S. 739 (2023) ...................................................... 13, 14, 29, 31

*United States ex rel. Sibley v. University of Chi. Med. Ctr.,*
44 F.4th 646 (7th Cir. 2022) .................................................... 27

*United States ex rel. Streck v. Allergan, Inc.,*
746 F. App'x 101 (3d Cir. 2018) ................................................ 21

*United States ex rel. Yannacopoulos v. General Dynamics*,
  652 F.3d 818 (7th Cir. 2011) ............................................................ 17

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
  579 U.S. 176 (2016) ................................ 10, 14, 15, 22, 23, 26, 28, 30

*Urquilla-Diaz v. Kaplan Univ.*,
  780 F.3d 1039 (11th Cir. 2015) ....................................................... 30

**Statutes:**

False Claims Act (FCA):
  31 U.S.C. § 3729 *et seq.* ................................................................. 1
    31 U.S.C. § 3729(a)(1)(A) ............................................... 2, 10, 16, 21
    31 U.S.C. § 3729(a)(1)(A)-(B) ..................................................... 29
    31 U.S.C. § 3729(a)(1)(B) ............................................... 2, 10, 16, 21
    31 U.S.C. § 3729(a)(1)(G) ............................................... 2, 10, 16, 21
    31 U.S.C. § 3729(b)(1)(A)(i)-(iii) ................................................ 9, 29
    31 U.S.C. § 3729(b)(1)(B) ........................................................... 29
    31 U.S.C. § 3729(b)(4) .................................................... 21, 23, 28
    31 U.S.C. § 3730(a) ................................................................... 2
    31 U.S.C. § 3730(b)(1) ............................................................... 2
    31 U.S.C. § 3730(b)(2) ............................................................... 2
    31 U.S.C. § 3730(c)(2)(A) ........................................................... 26
    31 U.S.C. § 3730(c)(3) ............................................................... 2
    31 U.S.C. § 3730(d) ................................................................... 2

42 U.S.C. § 1396 *et seq.* ................................................................. 3

42 U.S.C. § 1396r-8(a)(1) ............................................................... 3

42 U.S.C. § 1396r-8(b)(3)(A) ........................................................... 4

42 U.S.C. § 1396r-8(c)(1)(A) ........................................................... 3

42 U.S.C. § 1396r-8(k)(1)(A) ........................................................... 4

42 U.S.C. § 1396r-8(k)(1)(B) ....................................................... 4, 20

42 U.S.C. § 1396r-8(k)(1)(B)(II) ....................................................... 4

**Regulation:**

42 C.F.R. 447.504 .............................................................................. 5

**Legislative Materials:**

H.R. Rep. No. 101-881 (1990) ........................................................... 3

S. Rep. No. 99-345 (1986) .......................................................10, 25, 31

**Other Authorities:**

56 Fed. Reg. 7049 (Feb. 21, 1991) ............................ 4, 6, 7, 11, 18, 19

72 Fed. Reg. 39,142 (July 17, 2007) ................................................. 5

77 Fed. Reg. 5318 (Feb. 2, 2012) ..................................................... 33

81 Fed. Reg. 5170 (Feb. 1, 2016) ........................................... 18, 20, 21

W. Page Keeton et al.,
  *Prosser and Keeton on the Law of Torts* (5th ed. 1984)................................15

Restatement (Second) of Torts (Am. Law Inst. 1977).......................................15

## STATEMENT OF INTEREST

The False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, is the federal government's primary tool to recover losses from fraud in federal programs. Defendant's challenges to the judgment in this case misconstrue three of the FCA's elements—falsity, materiality, and knowledge. Falsity only requires a court to assess whether a defendant's statement violated applicable requirements. Materiality may be established in various ways and evidence of government inaction with respect to the same or similar violations is only one non-dispositive factor. And the FCA's knowledge provisions encompass both subjective and objective forms of knowledge. The atextual limits on those elements that defendant asks this Court to adopt would undermine the government's ability to combat fraud in myriad federal programs and contracts.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly held that defendant's reported "average manufacturer prices" were false because they violated the legal requirements for calculating such prices.

2.     Whether the jury reasonably found that defendant's "average manufacturer prices" were material to defendant's obligation to pay rebates

to Medicaid and whether the district court's jury instruction reciting the statutory definition of materiality was legally sufficient.

3.      Whether the jury reasonably found that defendant knowingly submitted false price reports based in part on evidence that defendant disregarded an objectively obvious and unjustifiable risk of submitting false statements.

## STATEMENT OF THE CASE

### A.    The False Claims Act

The FCA imposes liability if a person "knowingly presents, or causes to be presented, a false or fraudulent claim" or "a false record or statement material to an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). Either the Attorney General or a private person (known as a *qui tam* relator) may bring suits in the name of the United States. *Id.* § 3730(a), (b)(1). If a relator files suit, the government may intervene and take over the case. *Id.* § 3730(b)(2). If the government does not intervene, the relator conducts the litigation and receives a share of any proceeds. *Id.* § 3730(c)(3), (d).

**B.    The Medicaid Drug Rebate Statute**

The Medicaid program is a cooperative federal-state program that provides medical assistance to certain low-income individuals.  *See* 42 U.S.C. § 1396 *et seq.*  In 1990, Congress discovered that Medicaid routinely paid more for prescription drugs than private entities and enacted the Medicaid Drug Rebate Statute to remedy that problem.  *See* H.R. Rep. No. 101-881, at 96 (1990).  The statute requires drug manufacturers that seek to have their drugs covered by Medicaid to enter into a Rebate Agreement with the Secretary of Health and Human Services.  Under the statute and agreement, manufacturers must pay a quarterly rebate to State Medicaid programs per unit of drug paid by those programs.  *See* 42 U.S.C. § 1396r-8(a)(1), (c)(1)(A).

The rebate amount generally depends on the manufacturer's "average manufacturer price" (or AMP) and "best price."  For single source drugs or innovator multiple source drugs (essentially, brand-name drugs), the rebate is based on the greater of: (1) the manufacturer's "average manufacturer price" multiplied by a statutory minimum rebate percentage, or (2) the difference between the manufacturer's "average manufacturer price" and "best price."  42 U.S.C. § 1396r-8(c)(1)(A).  Manufacturers must periodically report their "average manufacturer price" and "best price" to the Centers

3

for Medicare & Medicaid Services (CMS), which calculates the unit rebate amount that the manufacturer must pay for each drug. *See id.* § 1396r-8(b)(3)(A).

The statute defines "average manufacturer price" as "the average price paid to the manufacturer" by "wholesalers for drugs distributed to retail community pharmacies" and, since 2010, also by "retail community pharmacies that purchase drugs directly from the manufacturer." *See* 42 U.S.C. § 1396r-8(k)(1)(A). The statute excludes various kinds of payments from a manufacturer's calculation of AMP. *See id.* § 1396r-8(k)(1)(B). For example, a manufacturer must not reduce the prices in the calculation based on "bona fide service fees" that the manufacturer pays to a wholesaler for services like distribution or storage. *See id.* § 1396r-8(k)(1)(B)(II).

CMS's regulations and policy have long required manufacturers' calculations of their AMP to include not just initial prices, but also subsequent arrangements that adjust the prices paid. The Rebate Agreement has since 1991 stated that "[t]he Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or other arrangements subsequently adjust the prices actually realized." 56 Fed. Reg. 7049, 7050 (Feb. 21, 1991). CMS's regulations have stated the

4

same from 2007 to 2010 and, after an unrelated rescission, since 2016.  *See* 72

Fed. Reg. 39,142, 39,242 (July 17, 2007); 42 C.F.R. § 447.504.  And several

CMS program releases have reiterated the requirement.  *See* Streck

Supplemental Appendix (Supp.A) 324, 329.

### C.    Prior Proceedings

Relator brought this FCA suit alleging that defendant Eli Lilly and

Company (Lilly) knowingly submitted false AMP reports that reduced its

rebate obligations to State Medicaid programs by millions of dollars from

2005 to 2017.  *See* Dkt. 77.

Relator's claims focus on Lilly's "price increase value" arrangement

with wholesalers.  Lilly's agreements with wholesalers stated that when Lilly

announced a price increase for its drugs, the wholesalers would owe Lilly a

credit or payment for the difference between the new, increased price and

the price that the wholesalers had paid for any drugs still in the wholesalers'

inventory.  Thus, if Lilly raised the price of a drug by $1 per unit after a

wholesaler initially bought the drug, the wholesaler would owe Lilly $1 for

every drug unit still in the wholesaler's inventory.  From 2005 to 2009,

wholesalers provided this "price increase value" to Lilly as credits reducing

fees that Lilly paid to the wholesaler for services.  After 2009, Lilly generally

invoiced the wholesalers for a cash payment in the amount of Lilly's unilateral price increase. Lilly did not include these "price increase value" payments when it reported its "average manufacturer prices." Lilly Short Appendix (SA) 5-7.

The district court held that Lilly's AMP reports and accompanying certifications during that period were false because they violated the Rebate Agreement's clear requirements. The court explained that Lilly's "price increase value" provisions constituted "arrangements" that "subsequently adjust the prices actually realized" and therefore clearly had to be included in calculations of the "average manufacturer price" under the 1991 Rebate Agreement and applicable regulations. SA38-40 (quoting 56 Fed. Reg. at 7050).

The case proceeded to trial on the remaining elements and the jury rendered a verdict in favor of relator. *See* SA58. Lilly filed a post-trial motion for judgment as a matter of law on various grounds, which the district court denied. *See* SA58-59, 70.

### SUMMARY OF ARGUMENT

**I.** The district court correctly concluded that Lilly submitted false "average manufacturer price" reports. A statement or claim made in

6

violation of a legal requirement is false under the False Claims Act.  Here, the district court correctly concluded that Lilly's AMP reports were false because they did not comply with the longstanding requirement to include "arrangements" that "subsequently adjust[ed] the prices actually realized." *E.g.*, 56 Fed. Reg. at 7050.

Lilly argues that its claims were not false because the requirements were susceptible to a reasonable (but incorrect) alternative interpretation— regardless of whether Lilly violated the correct interpretation of the requirements.  That argument is inconsistent with the FCA's text and conflates falsity with the separate "knowledge" element.  Lilly's reported "average manufacturer prices" were false because they violated a longstanding requirement to account for subsequent arrangements that increase the prices actually realized.  The atextual limit on falsity proposed by Lilly would incentivize noncompliance with requirements whenever an attorney could come up with an arguable ambiguity.

Lilly's separate argument that it complied with the Rebate Agreement because its practice was based on a "reasonable assumption" rests on a mistaken interpretation of the Agreement.  Because Lilly's practice violated

express legal requirements, it did not constitute a reasonable assumption under the Agreement.

**II.**     The jury reasonably found that Lilly's AMP reports were material to Lilly's rebate obligations. The jury could take into account many factors when assessing materiality. Here, Lilly's false "average manufacturer prices" violated express requirements that go to the essence of the government's bargain to fund prescription drug benefits programs and directly and substantially reduced Lilly's rebate obligations to Medicaid, so the jury was well within its province to find the price reports material.

Lilly asks this Court to overturn the jury's verdict based solely on its assertion that it had informed CMS of its calculation method and CMS did not respond. But the jury was not required to find either that the government knew of Lilly's exclusion of "price increase value" payments from AMP reports or that the government approved of it. In any event, the jury was entitled to find that Lilly's false price reports were material based on other factors that made materiality particularly clear here.

For the same reasons, the district court's jury instruction reciting the statutory definition of materiality was not erroneous. Although the Supreme Court in *Escobar* described various (non-exhaustive) factors that can bear on

8

materiality, the Court did not depart from the statutory definition, much less suggest that jury instructions must enumerate all possible factors bearing on materiality.  In any event, the materiality instruction in this case was not prejudicial, as Lilly remained free to (and did) make all of its arguments that its false price reports were not material, which the jury heard and rejected.

**III.**    The jury also reasonably found that Lilly acted knowingly under the FCA.  Lilly argues that the FCA requires a finding of knowledge based solely on evidence of a defendant's *subjective* state of mind.  But the statute defines knowledge capaciously, to include "actual knowledge," "deliberate ignorance," or "reckless disregard."  31 U.S.C. § 3729(b)(1)(A)(i)-(iii).  At a minimum, the "reckless disregard" standard may be satisfied through evidence of objective recklessness—that is, failure to heed an unjustifiably high risk of illegality that was so obvious that it should have been known.  And the jury here heard ample evidence that Lilly acted with either deliberate ignorance or reckless disregard of such a risk. [1]

---

[1] Lilly asserts in a footnote that the FCA's *qui tam* structure may be unconstitutional.  Br. 66 n.11.  Lilly did not preserve that argument in district court or sufficiently develop it on appeal, so the argument is forfeited.  *See, e.g.*, *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam).

**ARGUMENT**

## I. The District Court Correctly Held That Lilly's "Average Manufacturer Price" Reports Were False.

The False Claims Act imposes civil liability where a defendant knowingly presents to the government a "false or fraudulent claim" or "a false record or statement material to an obligation" owed to the government. 31 U.S.C. § 3729(a)(1)(A), (B), (G).  A claim or statement can be false in many ways, including when it is made in violation of applicable law.  *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 192 (2016); S. Rep. No. 99-345, at 9 (1986) (noting the same).

In such cases, courts must "interpret[]" the applicable statute or regulation and "determin[e] whether a defendant's representations are accurate in light of applicable law."  *United States v. Bourseau*, 531 F.3d 1159, 1164 (9th Cir. 2008); *see, e.g.*, *United States ex rel. Rostholder v. Omnicare, Inc.*, 745 F.3d 694, 701-02 (4th Cir. 2014) (answering the falsity question by interpreting statutes and regulations).

### A. Lilly's "Average Manufacturer Price" Reports Were False Because They Violated Applicable Requirements.

The district court correctly concluded that Lilly's AMP reports were false because they violated requirements to account for subsequent price

adjustments. When Lilly announced a price increase for its drugs, wholesalers paid or credited Lilly the amount of the price increase for each drug unit that was still in the wholesalers' inventory. The district court correctly held that this constituted an "arrangement[]" that "subsequently adjust[ed] the prices actually realized" and therefore clearly needed to be included in "average manufacturer price" calculations under the binding 1991 Rebate Agreement. 56 Fed. Reg. at 7050.

Lilly does not contend that its prior approach reflects the correct interpretation of applicable requirements and has since stopped that practice. Br. 53. Lilly argues instead that its AMP reports cannot be false, regardless of whether the reports violated the correct interpretation of the Rebate Agreement and CMS regulations, because any violation is not "objective" and is merely a "disputed legal question." Br. 37, 54. That argument is incorrect for several reasons.

A defendant's compliance with law is an "objective" "either/or proposition"—the defendant "either complied with the [law] or it didn't." *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 383-84, 384 n.14 (4th Cir. 2015). Even if a regulation is "technical and complex, … [its] meaning is ultimately the subject of judicial interpretation, and it is

11

[defendant's] compliance with these regulations, as interpreted by [the] court, that determines whether [defendant's] practices resulted in the submission of a 'false claim.'" *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 463 (9th Cir. 1999)*; accord Bourseau*, 531 F.3d at 1164. A defendant's alternative "'reasonable interpretation' of a regulation" thus does not "preclude[] falsity." *Oliver*, 195 F.3d at 463; *United States v. Care Alts.*, 952 F.3d 89, 95 (3d Cir. 2020) (similar).

Lilly's argument improperly conflates falsity with knowledge, which is a separate element of FCA liability. Indeed, most of Lilly's arguments about falsity here—regarding its purported good faith conduct—are typically relevant to a defendant's knowledge. *See* Br. 46, 51, 54. As numerous courts have recognized, "[t]he subjective inquiry—whether [defendant] knew that its claims were in violation of the [law]" is "covered under the knowledge element," not falsity. *Drakeford*, 792 F.3d at 383-84; *see also Oliver*, 195 F.3d at 464 ("A contractor relying on a good faith interpretation of a regulation is not subject to liability, not because his or her interpretation was correct or 'reasonable' but because the good faith nature of his or her action forecloses the possibility that the scienter requirement is met."); *Care Alts.*, 952 F.3d at 97, 100 (A defendant's reasonable interpretation "speaks to the element of

12

*scienter*, not *falsity*"); *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 742 (10th Cir. 2018) (similar); *Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002) (similar).

The Supreme Court's decision in *SuperValu* forecloses plaintiffs' argument that a defendant's identification of an alternative reasonable-but-incorrect interpretation of a requirement precludes a finding of falsity. *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739 (2023). There, the defendant drug pharmacies similarly argued that their reported "usual and customary" prices could not be false on the ground that "misrepresentations of law are not actionable" and "their claims would have been false only because of their view of the law." *Id.* at 755-56. The Supreme Court squarely rejected that argument, holding that defendants had not provided a legal opinion; instead, defendants had said "'this is what our 'usual and customary' prices are.'" *Id.* (emphasis omitted). And the Supreme Court took it as true that the defendants' reported prices had been inconsistent with applicable requirements. *See id.* at 752-53.

*SuperValu*'s holding with respect to knowledge compels the same result with respect to falsity in this case. The Supreme Court held that a

13

defendant can make a statement with "knowledge" of falsity due to a violation even if a "reasonable person could have thought" the defendant was in compliance based on an objectively-reasonable-but-incorrect interpretation of the requirements.  598 U.S. at 749, 753-54.  The Court's knowledge holding would have no meaningful practical import if courts treated the same arguable legal uncertainty as negating falsity.  And that result would be especially strange because evidence of any legal uncertainty is more logically relevant to knowledge than falsity.

*Escobar* likewise warns against the imposition of atextual limits on falsity.  There, the Supreme Court rejected a limit on the phrase "false or fraudulent" to "misrepresentations about express conditions of payment," holding that "[n]othing in the text of the False Claims Act support[ed] [the] proposed restriction," and that "policy arguments cannot supersede the clear statutory text."  *Escobar*, 579 U.S. at 190-92 (quotation marks omitted).  The Court made clear that "concerns about fair notice and open-ended liability" are best channeled "through strict enforcement of the Act's materiality and scienter requirements"—not by "adopting a circumscribed view of what it means for a claim to be false or fraudulent."  *Id.* at 192 (quotation marks omitted).  As in *Escobar*, Lilly's "fair notice" arguments (Br. 31, 52) do not

14

justify the imposition of atextual limits on falsity.

The law of "common-law fraud," on which the Supreme Court has relied when interpreting the falsity element, further weighs against Lilly's approach. *Escobar*, 579 U.S. at 187. Common law fraud "include[d] *more* than just claims containing *express* falsehoods." *Id.* (emphases added). Instead, it permitted suits based on "ambiguous statements"—*i.e.*, statements that could have been susceptible to multiple interpretations—so long as the defendant acted with sufficient knowledge. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 201 (2015) (Scalia, J., concurring in part and concurring in the judgment); Restatement (Second) of Torts §§ 527, 551 (Am. Law Inst. 1977) (noting this rule); *cf.* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 106, at 736-38 (5th ed. 1984) (similar); *Care Alts.*, 952 F.3d at 95-96 (describing the common law).

Lilly's restrictive rule could have pernicious consequences for government programs and contracts that depend on the good faith of participants. Contrary to the principle that "those who seek public funds" must "act with scrupulous regard for the requirements of law," *Heckler v. Community Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63 (1984),

15

Lilly's rule could incentivize defendants to push the boundaries of compliance by relying (or hoping to later rely) on arguable ambiguity, even if they are aware of the agency's contrary view. Nothing in the Act's text, history, or common-law background support that result.

Lilly relies on cases from other circuits to support its argument that the FCA requires an "objective falsehood." Br. 37, 54 (citing cases). But *all* of those circuits have subsequently explained that legal compliance is an "objective" "either/or" question with only one answer, often expressly clarifying the cases on which Lilly relies. *See Drakeford*, 792 F.3d at 383-84, 384 n.14 (distinguishing prior statements about "objective falsehood"); *Oliver*, 195 F.3d at 463 (holding that prior cases "d[id] not stand for the proposition that a 'reasonable interpretation' of a regulation precludes falsity."); *Care Alts.*, 952 F.3d at 95. In any event, as several courts have recognized, the FCA's text nowhere requires that a claim or statement be "objectively" false. *See* 31 U.S.C. § 3729(a)(1)(A), (B), (G); *Care Alts.*, 952 F.3d at 97, 100; *Polukoff*, 895 F.3d at 742.

Lilly's reliance (Br. 37) on dicta in other cases is likewise unavailing. *United States ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013 (7th Cir. 1999), turned on knowledge; the Court found "no reasonable inference that

16

the [defendant] knowingly misrepresented its compliance" with certain requirements, *id.* at 1019. The statements that Lilly cites occur in dicta conflating falsity with knowledge. *See id.* at 1018. Similarly, *United States ex rel. Yannacopoulos v. General Dynamics*, 652 F.3d 818 (7th Cir. 2011), cited *Lamers'* dicta but repeatedly answered the falsity question simply by interpreting the relevant authorities, *id.* at 825, 827-28, 834-35, 838-40. In all events, that dicta has been superseded by the Supreme Court's more recent decisions in *Escobar* and *SuperValu*, which draw a clear line between falsity and knowledge and reject Lilly's policy-driven carveouts for falsity.

### B. The Rebate Agreement's Allowance for "Reasonable Assumptions" Does Not Support Lilly's Argument.

Lilly makes a separate argument that its reliance on an allegedly reasonable understanding for calculating its AMP defeats falsity here because the Rebate Agreement allowed Lilly to make "reasonable assumptions." *E.g.*, Br. 30, 38. That argument rests not on an interpretation of the FCA, but on an interpretation of Lilly's obligations in the Rebate Agreement. It, too, is mistaken.

The Rebate Agreement states that, "[i]n the absence of specific guidance in section 1927 of the Act, Federal regulations and the terms of this agreement, the Manufacturer may make reasonable assumptions in its

17

calculations of AMP and Best Price, *consistent with* the intent of section 1927 of the Act, *Federal regulations and the terms of this agreement*." 56 Fed. Reg. at 7052 (emphases added). This provision reflects an understanding that a manufacturer may make reasonable assumptions in good faith in unaddressed areas—but always "consistent with" any "specific guidance" and existing "Federal regulations and the terms of this agreement." Thus, for example, CMS has at times stated that manufacturers may make assumptions about whether a pharmacy remains a licensed pharmacy or whether a wholesaler is in fact distributing a drug unit to certain entities. *See* 81 Fed. Reg. 5170, 5180, 5215 (Feb. 1, 2016).

Nevertheless, assumptions that are contrary to guidance, the terms of the Agreement itself, or applicable regulations are not reasonable assumptions permitted by the Agreement, and AMP reports based on such assumptions are therefore false. A manufacturer might have believed that it was relying on an assumption consistent with applicable requirements, but that would be evidence relevant to knowledge, not falsity.

In any event, as the district court concluded, Lilly's practice was not based on a reasonable assumption. SA33. Lilly argues that it reasonably excluded "price increase value" payments (or credits) from its AMP reports

18

because it reasonably could think of those payments as a component of fees that Lilly paid *to wholesalers* for services, and Lilly argues that guidance on defining the content and value of service fees generally has been insufficient. Br. 40-42, 45, 48-49. Thus, by Lilly's logic, it could require a wholesaler to pay any part of the price for a drug unit as a component of its service fee arrangement without ever reporting it to CMS. Or, for example, Lilly could have doubled its price one day after an initial sale and received that additional revenue as "price increase value" in its service agreements without reporting that increased price to CMS.

That view of the requirements is unreasonable. Since 1991, binding requirements have stated that "[t]he Average Manufacturer Price for a quarter must be adjusted by the Manufacturer if cumulative discounts or *other arrangements subsequently adjust the prices actually realized.*" 56 Fed. Reg. at 7050 (emphasis added); *see supra* pp. 4-5. Here, Lilly received value from wholesalers solely as a result of Lilly's unilateral price increase, either as cash or as a credit reducing fees that Lilly otherwise would owe. That is clearly a price adjustment. Notably, for most of the relevant period Lilly simply sent wholesalers an invoice for the amount of the price increase and the wholesalers sent Lilly a cash payment—regardless of what Lilly paid

19

as service fees.

Lilly emphasizes that it could not reduce its average manufacturer prices by subtracting bona fide service fees that it paid *to wholesalers* (because that would improperly lower the prices based on fees that were not truly price adjustments). *See* 42 U.S.C. 1396r-8(k)(1)(B). But that does not mean that Lilly could exclude any increased *prices* that wholesalers paid or credited *to Lilly* just because those retroactively increased prices were paid or credited alongside service fees. Lilly did not need further guidance on that obvious point.

Contrary to Lilly's characterization, Br. 47, CMS's statement in its 2016 rule preamble confirms this conclusion. *See* 81 Fed. Reg. at 5228. CMS explained that it "continue[d] to believe that price appreciation credits would likely not meet the definition of bona fide service fee" and went on to describe "situations" when "these credits *would amount to a subsequent price adjustment*." *Id.* (emphasis added). Those specified "situations" precisely matched Lilly's practice: the credits were not an "offset for a bona fide service performed," but instead "adjust[ed] (increase[d]) the wholesaler's purchase price of the drugs in such instances when the drugs were purchased at a certain price and [were] remaining in the wholesaler's

20

inventory at the time the manufacturer's sale price of the drug increased."
*Id.*

Lilly's reliance (Br. 1, 3) on a different court's unpublished decision regarding other manufacturers' *knowledge* does not support Lilly's argument. *See United States ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 103 (3d Cir. 2018). That court did not adopt Lilly's service-fee theory; instead, it concluded that CMS rules were ambiguous as to whether subsequent price adjustments affect calculation of average manufacturer prices. *See id.* at 108. Lilly (understandably) makes no argument that this reasoning is correct because it is flatly contrary to the plain language of the Rebate Agreement. And indeed, Lilly itself included subsequent *reductions* in price in its AMP reports. *See* Dkt. 513 at 870-80.

## II. The Jury Reasonably Found That Lilly's "Average Manufacturer Price" Reports Were Material to Lilly's Rebate Obligations.

The FCA imposes liability for "false record[s] or statement[s]" that are "material" to a claim or "obligation … to the Government." 31 U.S.C. § 3729(a)(1)(A), (B), (G). The Act defines "material" as "having a *natural tendency* to influence, or be *capable* of influencing, the payment or receipt of money or property." *Id.* § 3729(b)(4) (emphases added). In general, that

21

standard is met when "a reasonable person would view the condition as important to a choice of action in the transaction" or "the recipient of the representation" would "attach[] importance to that condition." *United States v. Molina Healthcare of Ill., Inc.*, 17 F.4th 732, 743 (7th Cir. 2021) (quotation marks omitted).

The materiality inquiry is "holistic" and no factor is typically "dispositive alone." *E.g.*, *United States ex rel. Prather v. Brookdale Senior Living Cmtys., Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (quotation marks omitted). The Supreme Court has identified a variety of factors that can be relevant—including whether the falsehood went to the "essence of the bargain," whether the "noncompliance is minor or insubstantial," whether the falsehood involved an "express[] … condition of payment," and whether "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Escobar*, 579 U.S. at 193 n.5, 194-95 (quotation marks omitted).

## A.     The Jury Had Sufficient Evidence to Find Materiality.

The jury had ample grounds to find Lilly's AMP reports to be material to its rebate obligations. Accurate rebates are an essential condition on the government's willingness to fund prescription drug benefits under Medicaid.

22

Indeed, an improper decrease of the "average manufacturer price" directly decreases the rebates, and the amounts at issue run in the millions of dollars.

As a matter of common sense, Lilly's price reports thus have a "natural tendency" to influence the government's "receipt of money," or they are at least "capable" of doing so. *See* 31 U.S.C. § 3729(b)(4). The noncompliance was not "minor or insubstantial," and the relevant parties certainly would have "attach[ed] importance" to compliance with the Rebate Agreement's price reporting provisions, which were an "express condition" that went to the "essence" of Lilly's rebate obligation. *Escobar*, 579 U.S. at 192, 193 & n.5, 194 (quotation marks omitted); *Molina*, 17 F.4th at 743 ("The size of the price differential alone offers strong support for a finding of materiality: it is hard to see why the government would be indifferent" about paying substantially higher prices.); *id.* (noting that terms "essential" to "payment" were likely material).

Lilly largely ignores the overwhelming evidence supporting the jury's common-sense conclusion that Lilly's misrepresentations with respect to its rebate obligations were material. Instead, Lilly focuses on one factor mentioned in *Escobar*, arguing that this Court should overturn the jury's materiality finding solely because Lilly purportedly informed CMS of its

methodology and CMS "did not respond." Br. 27, 55-56.

To begin, the jury was not required to find that the government actually knew about Lilly's treatment of "price increase value" payments or approved of it. Lilly's evidence generally consists of communications with CMS or the U.S. Department of Health and Human Services Inspector General that either did not mention the "price increase value" arrangement or did so under circumstances that do not suggest CMS's acquiescence—or, indeed, even awareness of the relevant facts. *See* Br. 59-60.

For example, Lilly relies on a 2005 letter to CMS that did not mention the "price increase value" arrangement at all; a 2011 letter to CMS explaining Lilly's "reasonable assumptions" for calculations, which CMS had instructed manufacturers not to send because it would not review them, *see* A458 (Lilly Separate Appendix); a single footnote in lengthy documents that Lilly provided to the HHS Inspector General in 2013, in response to a request for a group of manufacturers to provide information on average manufacturer price calculations writ large (this is the request that Lilly refers to as an "audit"); and a 2016 meeting with CMS during a pending Department of Justice investigation and shortly before Lilly ceased the practice at issue here. *See* Br. 25-28.

24

The jury had ample grounds to reject Lilly's characterization of those communications. Indeed, "[a] juror could reasonably conclude that [CMS] was unaware of" the relevant facts during the relevant time. *United States ex rel. Calderon v. Carrington Mortg. Servs., LLC*, 70 F.4th 968, 978 (7th Cir. 2023). A reasonable jury may easily "conclude that the government's inaction is not conclusive" as to materiality when it is not even "clear that the government … acquired 'actual knowledge.'" *United States ex rel. Druding v. Care Alts.*, 81 F.4th 361, 374-75 (3d Cir. 2023) (emphasis omitted); *United States ex rel. Heath v. Wisconsin Bell, Inc.*, 92 F.4th 654, 665 (7th Cir. 2024) (emphasizing the importance of "actual knowledge" to support an acquiescence argument).

Moreover, a mere non-response to those few, vague communications does not constitute acquiescence sufficient to compel a finding of immateriality. Such inaction by the government could instead reflect scarce resources or other practical considerations. *See Molina*, 17 F.4th at 744 (evidence of acquiescence was for the jury to weigh because "[m]any things could explain the government's" actions); *cf.* S. Rep. No. 99-345, at 7-8 (describing the government's inability to investigate every possible fraud due to "resource factors").

25

Lilly's reliance on the government's decision not to intervene in the litigation is similarly flawed. *See* Br. 61. As many courts have recognized, no basis exists to draw an inference about materiality from the government's decision not to intervene. Such decisions may stem from many other factors, like resource constraints. *See, e.g.*, *Prather*, 892 F.3d at 836; *Druding*, 81 F.4th at 374-75, 374 n.14 (collecting cases). And Lilly's suggested inference is particularly inappropriate here, since the government filed a statement of interest explaining the violations and exercised a statutory veto to dismissal on public disclosure bar grounds. *See* Dkt. 97, 98.

In any event, no factor is typically "dispositive alone." *Prather*, 892 F.3d at 831. Rather, such alleged acquiescence (if factually supported) would just be "strong evidence" to be balanced against other considerations. *Escobar*, 579 U.S. at 195; *Druding*, 81 F.4th at 375 (explaining that such evidence is "not dispositive" and rejecting similar argument for immateriality as a matter of law); *Calderon*, 70 F.4th at 976 (rejecting similar immateriality argument in light of other factors). The jury was plainly entitled to find materiality despite Lilly's arguments given the fact that Lilly's false reports directly and mathematically reduced Lilly's rebate payments by millions. Where the requirement is "tied directly" to funding in this way, "*Escobar*

26

does not suggest that violating such a relevant requirement … should be found immaterial." *Heath*, 92 F.4th at 665.   Indeed, "it is difficult to imagine" that the jury could reasonably find the price reports immaterial under these circumstances.  *See United States ex rel. Sibley v. University of Chi. Med. Ctr.*, 44 F.4th 646, 661 (7th Cir. 2022) (making similar point).

### B.      The District Court Did Not Err in Giving a Materiality Instruction to the Jury that Tracked the Statutory Definition.

For similar reasons, Lilly is incorrect that the district court's jury instruction "relieved Relator of the burden of proving materiality."  Br. 1.  As Lilly admits, the district court's instruction tracked the statute's definition of materiality.  That instruction "convey[ed] the relevant legal principles in full" and was not likely to "confuse or mislead the jury," *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007) (quotation marks omitted), so it was not an "abuse of discretion" for the court to reject Lilly's lengthier instruction, *Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 609 (7th Cir. 2013).

Lilly argues that *Escobar* compelled the district court to adopt a longer instruction enumerating additional factors bearing on materiality.  In particular, Lilly focuses (Br. 59) on *Escobar*'s statement that the government's "actual knowledge" of noncompliance and failure to take any

27

corrective action may be "strong evidence" against materiality. *Escobar*, 579 U.S. at 195. But the Court mentioned that possibility in a non-exhaustive discussion of various factors that could be relevant to whether a reasonable person paying the money would attach importance to the violation such that the noncompliance had a "natural tendency" to influence payment of money or was "capable" of doing so. 31 U.S.C. § 3729(b)(4).

Nothing in *Escobar* departed from statutory text or required district courts to enumerate all possible factors that could bear on materiality in jury instructions in FCA cases. The district court's instruction tracking the statute's language gave Lilly the opportunity to argue against materiality based on *any* relevant factors—whether mentioned in *Escobar* or not. Lilly made its arguments to the jury and the jury rejected them. Nothing about the instruction was confusing or prejudiced Lilly. *See Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994) (instruction was not required to canvass inferences that were not "obligatory"); *United States v. Johnson*, 916 F.3d 579, 586 (7th Cir. 2019) (holding that instruction's inclusion of some, but not all, relevant factors was permissible, and noting that "simple and succinct instructions" are often better than exhaustive ones).

28

## III. The Jury Reasonably Found that Lilly Acted Knowingly.

The FCA imposes liability on a person who submits a false claim to the government with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth." 31 U.S.C. § 3729(a)(1)(A)-(B), (b)(1)(A)(i)-(iii). "[N]o proof of specific intent to defraud" is "require[d]." *Id.* § 3729(b)(1)(B).

The first two forms of knowledge are subjective. "Actual knowledge" means that "a person is 'aware of' information." *SuperValu*, 598 U.S. at 751. And "deliberate ignorance" covers "defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statement's truth or falsity." *Id.*

The third term, "reckless disregard," exists when a defendant disregards a "high risk" of falsity "that is either known or so obvious that it should be known," *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)—*i.e.*, either when the defendant was subjectively aware of such a risk or the risk was objectively apparent. This Court has described this standard as "gross negligence" as "to the existence of a potentially false claim." *United States v. King-Vassel*, 728 F.3d 707, 712-13 (7th Cir. 2013); *Thulin v. Shopko Stores Operating Co.*, 771 F.3d 994, 1000-01 (7th Cir. 2014) (explaining that *King-Vassel* "defined" recklessness).

29

**A.　The FCA Reaches Reckless Behavior and Encompasses Both Subjective and Objective Knowledge.**

Lilly argues that the jury was permitted to find knowledge based only on evidence of Lilly's *subjective* beliefs. *See* Br. 67. That argument is incompatible with the Act's three-pronged knowledge definition and decades of precedent.

This Court and many others have long held that the "reckless disregard" prong of the FCA's definition of knowledge includes objective disregard for an unjustifiably high risk so obvious that it should have been known. *E.g.*, *King-Vassel*, 728 F.3d at 712-13; *Prather*, 892 F.3d at 837; *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 & n.15 (11th Cir. 2015); *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 945 n.12 (10th Cir. 2008); *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997). The Supreme Court has recognized the same. *See Escobar*, 579 U.S. at 191 ("[B]ecause a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to 'deliberate ignorance' or 'reckless disregard' … even if the Government did not spell this out."). That conclusion flows directly from the need to give sufficient effect to the Act's three different forms of knowledge, the ordinary meaning of recklessness in the civil context, *Farmer*, 511 U.S. at

30

836, and the history underpinning Congress's decision to expand the knowledge provisions, S. Rep. No. 99-345, at 7.

Lilly's cursory argument to the contrary depends entirely on a misreading of *SuperValu*. There, defendants argued that if their conduct was objectively reasonable, they could not have acted knowingly, regardless of their subjective states of mind. *SuperValu*, 598 U.S. at 749-50. The Supreme Court rejected that argument, holding that the FCA allows a finding of knowledge based on a defendant's subjective state of mind. *Id.* at 749-51. Lilly cites statements made in the course of that holding (Br. 66-67, 72-73), but the Court nowhere suggested that evidence of a defendant's subjective beliefs was the *only* way to demonstrate knowledge, much less that objectively reckless conduct was now irrelevant. The Court instead made clear that it was not deciding whether the "reckless disregard" provision in the False Claims Act includes an objective component. *See* 598 U.S. at 751 n.5 ("We need not consider how (or whether) [an] objective form of 'recklessness' relates to the FCA.").

*SuperValu* thus does not overturn longstanding precedent interpreting the FCA to include objective "reckless disregard." Just as the defendants in *SuperValu* were wrong that the FCA's three-pronged definition of

31

knowledge includes *only* objective knowledge, so too Lilly is wrong that the FCA includes *only* subjective knowledge.

Lilly's other arguments are likewise inconsistent with longstanding law. Lilly's suggestion that direct evidence of a defendant's subjective state of mind is necessary ignores that a jury may find subjective awareness based on "circumstantial evidence" showing that any reasonable person would have realized the risk. *See Heath*, 92 F.4th at 663. And Lilly's suggestion that objective recklessness is too much like "mere negligence" (Br. 1, 5, 70) ignores that the law has long distinguished between those states of mind. Indeed, here, the jury was expressly instructed that mere "negligence does not suffice." SA52.

## B. Sufficient Evidence of Recklessness or Deliberate Ignorance Supports the Jury's Verdict.

The jury had sufficient evidence to find that Lilly acted with conscious "deliberate ignorance" or at least recklessness. Since 2005, Lilly employees themselves referred to the "price increase value" arrangement as a "price increase," "price recapture," or "clawback," and Lilly treated this revenue in the same way as sales revenue for accounting and invoicing purposes, separately from service fee calculations. *See, e.g.*, Supp.A402; Dkt. 510 at 506-07; Dkt. 512 at 780; Dkt. 525 at 647, 653-56, 679. At all times, binding

requirements repeatedly stated that Lilly's "average manufacturer prices" needed to include "arrangements" that "subsequently adjust the prices actually realized." *Supra* pp. 4-5. Yet despite the obvious likelihood that this additional "price increase" revenue counted as a price adjustment, there was no evidence that Lilly tried to obtain advice on that issue. Lilly employees could not recall when the decision to exclude these payments was made or whether any authorities were consulted. *See* Supp.A100, 219-22, 316; Dkt. 513 at 855-56, 859-61. Nor did Lilly ever contemporaneously explain its failure to report those payments. *See, e.g.*, Dkt. 513 at 832, 844, 900-04; Dkt. 516 at 1248-50. Indeed, the first written mention of its exclusion of these payments occurred in a 2011 letter to CMS, which Lilly's employees knew would not be read. *See id.*; Supp.A215, 217.

After that letter, CMS's 2012 proposed rule stated that "price appreciation credits" operated as "retroactive price adjustments" that needed to be reported, 77 Fed. Reg. 5318, 5332 (Feb. 2, 2012). But there was no evidence that Lilly sought advice or engaged in any analysis or reconsideration—even after a trade group pointed out that statement. *See* Dkt. 510 at 541-44; Dkt. 513 at 915-16, 921. Nor had Lilly mentioned its exclusion of those payments to the consultants conducting an audit of its

reporting.  Dkt. 512 at 812-15; Dkt. 513 at 927-933.  Instead, Lilly did not attempt to seek advice until 2016.  *See, e.g.*, Dkt. 509 at 390-92.

Relator further argued to the jury that Lilly's purported evidence of disclosures to the government through vague letters and a footnote in lengthy documents instead appeared to obfuscate and bury the specifics so as not to be noticed, which along with Lilly's failure to take obvious steps to seek advice, supported a reasonable inference that Lilly was aware of the risk.  *See* Streck Br. 70-72; Supp.A215-217; Dkt. 507 at 112-16; Dkt. 509 at 429-30.  And the jury was also entitled to discredit testimony that a Lilly employee believed only retroactive *decreases* in price needed to be reported, and that this revenue was not really a price adjustment despite what Lilly employees called it.  *See, e.g.*, Dkt. 513 at 870-80; Dkt. 512 at 789, 795-802, 807-08.

In short, although Lilly argued that it acted in good faith, the jury was entitled to make credibility determinations and had sufficient evidence to reasonably decide either that Lilly's conduct demonstrated an "ostrich type situation of deliberate ignorance" in which Lilly consciously "buried [its] head in the sand and failed to make simple inquiries," *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1212 (9th Cir. 2019) (quotation marks omitted),

or that Lilly "showed reckless disregard to the existence of a potentially false claim," *King-Vassel*, 728 F.3d at 713.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed with respect to falsity, materiality, and knowledge.

Respectfully submitted,

SARAH E. HARRINGTON
*Deputy Assistant Attorney*
*General*

MORRIS PASQUAL
*Acting United States Attorney*

MICHAEL S. RAAB
CHARLES W. SCARBOROUGH
*s/ Joshua Dos Santos*
JOSHUA DOS SANTOS
*Attorneys, Appellate Staff*
*Civil Division, Room 7224*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-0213*
*joshua.y.dos.santos@usdoj.gov*

MARCH 2024

35

## CERTIFICATE OF COMPLIANCE

This amicus brief complies with the type-volume limit of Circuit Rule 29 because it contains 6,928 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in CenturyExpd BT 14-point font, a proportionally spaced typeface.

*s/ Joshua Dos Santos*

Joshua Dos Santos

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service will be accomplished by the appellate CM/ECF system.

*s/ Joshua Dos Santos*

Joshua Dos Santos