Nos. 23-2134, 23-2216, 23-2958, 23-3035, 24-1352 and 24-1884

# United States Court of Appeals
# for the Seventh Circuit

UNITED STATES, ET AL., EX REL., RONALD J. STRECK,

*Plaintiff-Appellee, Cross-Appellant,*

v.

ELI LILLY AND COMPANY,

*Defendant-Appellant, Cross-Appellee.*

On Appeal from the United States District Court
for the Northern District of Illinois
Case No. 1:14-cv-09412

## DEFENDANT-APPELLANT/CROSS-APPELLEE'S
## MOTION TO STAY THE MANDATE

Erin E. Murphy
Matthew D. Rowen
Julia R. Grant*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900

John C. O'Quinn, P.C.
Luke P. McGuire
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington DC, 20004
(202) 389-5000
john.oquinn@kirkland.com

*Supervised by principals of the firm who are members
of the Virginia Bar

*Counsel for Defendant-Appellant/Cross-Appellee Eli Lilly and Company*

November 26, 2025

## TABLE OF CONTENTS

INTRODUCTION.........................................................................................1

BACKGROUND .......................................................................................2

ARGUMENT ...........................................................................................5

    A.    There is a reasonable chance the Supreme Court will grant certiorari and reverse....................................................6

        1.    The False Claims Act's qui tam provisions are unconstitutional. .................................................6

        2.    The panel created a circuit split. ...............................11

    B.    There is good cause to stay the mandate.............................13

CONCLUSION ........................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bricklayers Local 21 v. Banner Restoration, Inc.*,
   384 F.3d 911 (7th Cir. 2004) (Ripple, J., in chambers) ....................... 6

*California v. Am. Stores Co.*,
   492 U.S. 1301 (1989) (O'Connor, J., in chambers) ........................... 13

*Collins v. Yellen*,
   594 U.S. 220 (2021) ........................................................... 11

*Constitutionality of the Qui Tam Provisions of the False
   Claims Act*,
   13 Op. O.L.C. 207 (1989) ..................................................... 7

*U.S. ex rel. Eisenstein v. City of New York*,
   556 U.S. 928 (2009) ........................................................... 7

*U.S. ex rel. Gentry v. Encompass Health Rehab. Hosp. of
   Pearland, L.L.C.*,
   157 F.4th 758 (5th Cir. 2025) ................................................. 8

*McBride v. CSX Transp., Inc.*,
   611 F.3d 316 (7th Cir. 2010) (Ripple, J., in chambers) ........ 6, 9, 10, 12

*U.S. ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*,
   133 F.4th 395 (5th Cir. 2025) ................................................. 8

*Nat'l Insts. of Health v. Am. Pub. Health Ass'n*,
   145 S. Ct. 2658 (2025) ....................................................... 14

*U.S. ex rel. Penelow v. Janssen Prods., L.P.*,
   No 25-1818 (3d Cir. appeal docketed Apr. 29, 2025) ........................... 9

*Phillip Morris USA Inc. v. Scott*,
   561 U.S. 1301 (2010) (Scalia, J., in chambers) .............................. 14

iii

*U.S. ex rel. Polansky v. Exec. Health Res., Inc.*,
   599 U.S. 419 (2023) ................................................................ 9

*Riley v. St. Luke's Episcopal Hosp.*,
   252 F.3d 749 (5th Cir. 2001) (en banc) ................................ 8

*Seila Law LLC v. Consumer Financial Protection Bureau*,
   591 U.S. 197 (2020) ........................................................ 6, 11

*U.S. ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
   41 F.3d 1032 (6th Cir. 1994) ................................................ 8

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) .............................................................. 11

*Trump v. Boyle*,
   145 S. Ct. 2653 (2025) ........................................................ 10

*Trump v. Slaughter*,
   2025 WL 2692050 (Sept. 22, 2025) .................................... 10

*Trump v. United States*,
   603 U.S. 593 (2024) .............................................................. 11

*Trump v. Wilcox*,
   145 S.Ct. 1415 (2025) .......................................................... 10

*United States v. Allergan, Inc.*,
   746 F. App'x 101 (3d Cir. 2018) .................................. 3, 4, 12

*United States v. Sun-Diamond Growers of Cal.*,
   526 U.S. 398 (1999) .............................................................. 13

*U.S. ex rel. Zafirov v. Fla. Med. Assocs.*,
   751 F.Supp.3d 1293 (M.D. Fla. 2024) .............................. 7, 8

*U.S. ex rel. Zafirov v. Fla. Med. Assocs., LLC*,
   Nos. 24-13581 & 24-13583 (11th Cir. appeal docketed Oct.
   30, 2024) ................................................................................ 9

**Statutes**

42 U.S.C. §§1396r-8................................................................. 2

**Rules**

Fed. R. App. P. 41(d) ........................................................ 1, 5, 6

Sup. Ct. R. 10(a) .................................................................. 12

Sup. Ct. R. 10(c)..................................................................... 7

**Other Authorities**

72 Fed. Reg. 39,142 ............................................................. 3

## INTRODUCTION

Pursuant to Rule 41(d) of the Federal Rules of Appellate Procedure, Defendant-Appellant/Cross-Appellee Eli Lilly and Company ("Lilly") respectfully asks the Court to stay the issuance of the mandate pending the filing of a timely petition for a writ of certiorari and, if certiorari is granted, pending disposition on the merits.

This case raises at least two important questions worthy of Supreme Court review:  First, whether the False Claims Act's *qui tam* provisions are unconstitutional—a question several members of the Supreme Court have already signaled merits review.  And second, whether a company can be subjected to essentially punitive damages for a good-faith interpretation of ambiguous regulatory guidance, which an agency refused to clarify, when another Circuit concluded that the same interpretation was reasonable in dismissing a case brought by this same *qui tam* relator.  There is a reasonable probability that the Supreme Court will grant certiorari and reverse on either one of those issues.

Good cause supports a brief stay of the mandate to allow for disposition of Lilly's forthcoming petition for certiorari.  Absent a stay of the mandate, Lilly would suffer irreparable harm.  Lilly would be

required to pay more than $200 million in treble damages, statutory penalties, and interest (about $55 million of which the *qui tam* relator would collect for himself). Lilly may be unable to recover those funds even if it later prevails at the Supreme Court. A brief delay in Lilly's payment of that $200 million, until the appellate process has been exhausted, would not prejudice Plaintiff-Appellee, Cross-Appellant Ronald J. Streck. Lilly thus asks the Court for a limited stay of the mandate while Lilly seeks further appellate review.

## BACKGROUND

For the past 17 years, Streck has attempted to profit from his idiosyncratic interpretation of an ambiguous Medicaid reporting requirement. Streck's theory concerns Medicaid's requirement that drug manufacturers calculate and report an Average Manufacturer Price ("AMP") for certain of their drugs. *See* 42 U.S.C. §§1396r-8(a)(1), (b)(1)(A), (k)(8). Specifically, Streck believes that Lilly should have considered the in-kind portion of service fees that Lilly *paid* to its wholesalers as part of the "price" Lilly *received* for its drugs, even though Lilly paid those fees in exchange for drug distribution and other services the wholesalers performed. But neither the AMP statute nor any

regulation required Lilly to break its service fees apart and treat their in-kind and cash components differently, at least during the time period at issue here. *See* Lilly Opening Br. 17-21 (detailing AMP regulations over the relevant time period). The Centers for Medicare and Medicaid Services ("CMS") had directed manufacturers to make "reasonable assumptions" in calculating AMP absent clear regulatory guidance—and declined to provide such guidance here. Medicaid Program; Prescription Drugs, 72 Fed. Reg. 39,142, 39,191 (July 17, 2007); A456 at A458. So Lilly made "reasonable assumptions" as instructed.

Streck's efforts to monetize his interpretation of federal law were rejected in the Third Circuit. There, in an earlier lawsuit that Streck filed against more than 30 pharmaceutical manufacturers (including Lilly), a Third Circuit panel unanimously concluded that it was at least reasonable for manufacturers like Lilly to exclude from their AMP calculations the service fees they paid to wholesalers. *United States v. Allergan, Inc.*, 746 F. App'x 101, 103 (3d Cir. 2018) ("*Streck I*").

Undeterred, Streck brought his theory to this Circuit. He argued that Lilly's interpretation of the AMP statute and regulations was so unreasonable, and so reckless, that it amounted to fraud on the

Government.   R.1.   After the district court diverged from the Third Circuit and concluded as a matter of law that Lilly's AMP certifications were false, Lilly was ultimately found liable for nearly $200 million in trebled damages—of which Streck stands to recover about $55 million himself.   R.486.

A panel of this Court affirmed.   The panel concluded that the only reasonable interpretation of the opaque AMP statute and limited regulatory guidance was that in-kind payments should be separated from service fees (which are generally excluded from AMP) and treated as part of a drug's price.   Op.16-28.   The panel thus departed from the contrary reasoning of *Streck I*, effectively determining that the four federal judges who previously endorsed Lilly's interpretation were not just wrong, but patently unreasonable.   The upshot of the panel's view is that, by adhering to the Third Circuit's understanding of the law, Lilly has somehow defrauded the Government to the tune of $200 million (after trebling).

Lilly unsuccessfully sought rehearing.   *See* ECF 116.   Lilly first asked the Court to decide whether the False Claims Act's *qui tam* provisions are unconstitutional, which is a question only the en banc

4

court can answer, given circuit precedent.  *Id.* at 7-13.  Lilly also argued

that en banc review was needed to resolve the panel's creation of a circuit

split on this issue, given the Third Circuit's directly contrary decision.

*Id.* at 13-16.  Lilly emphasized the importance of these issues, given that

the panel's opinion illustrated the severe problems with permitting *qui*

*tam* bounty hunters to usurp the Executive's role and subject

unsuspecting companies—who have done as their regulators require and

adopted reasonable, good-faith interpretations of ambiguous regulatory

guidance, which agencies have refused to clarify—to potentially ruinous

liability.  *Id.* at 16-17.

The Court denied Lilly's petition for rehearing on November 21,

2025, ECF 136, and the mandate is set to issue on November 28, 2025.

## ARGUMENT

The Court may stay the mandate where a petition for certiorari

"would present a substantial question" and "there is good cause for a

stay."  Fed. R. App. P. 41(d)(1).  A "substantial question" is one that raises

"a reasonable probability of succeeding on the merits," meaning a

"reasonable probability that four Justices will vote to grant certiorari and

a reasonable possibility that five Justices will vote to reverse the

judgment of this court." *McBride v. CSX Transp., Inc.*, 611 F.3d 316, 317 (7th Cir. 2010) (Ripple, J., in chambers). There is "good cause" to stay the mandate if the movant demonstrates that it will suffer "irreparable injury absent a stay." *Bricklayers Local 21 v. Banner Restoration, Inc.*, 384 F.3d 911, 912 (7th Cir. 2004) (Ripple, J., in chambers). Rule 41(d)'s requirements are satisfied here.

### A.   There is a reasonable chance the Supreme Court will grant certiorari and reverse.

> ### 1.   *Three Justices have recently signaled an interest in deciding whether the False Claims Act's* qui tam *provisions are constitutional, and there is reason to believe others share the same view.*

The False Claims Act's *qui tam* provisions are unconstitutional. The provisions impermissibly vest private relators with the "quintessentially executive power" to initiate a lawsuit in the Government's name and "seek daunting monetary penalties against private parties in federal court." *Seila Law LLC v. CFPB*, 581 U.S. 197, 199 (2020). At the same time, the *qui tam* provisions deprive the Executive of any meaningful opportunity to supervise or guide the relator's self-interested litigation. That is especially troubling considering that any judgment in the *qui tam* relator's case would bind the Government in future cases and preclude it from taking contrary

6

positions in future litigation.  *See United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 937 (2009); *Constitutionality of the Qui Tam Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 224 (1989).  In short, the False Claims Act allows private profiteers to wield Article II power, and it insulates their exercise of that power from Executive review or control.  The Constitution prohibits that scheme.

The unconstitutionality of the False Claims Act's *qui tam* provisions is an exceptionally important issue of federal law that warrants Supreme Court review.  *See* Sup. Ct. R. 10(c).  *Qui tam* actions make up an increasingly large portion of False Claims Act cases filed.  Although the *qui tam* device was initially "obscur[e]," amendments to the False Claims Act in 1986 "triggered an explosion of qui tam lawsuits." *United States ex rel. Zafirov v. Fla. Med. Assocs.*, 751 F.Supp.3d 1293, 1302 (M.D. Fla. 2024).  Fiscal Year 2024 saw the largest number of such lawsuits in history.[1]  These lawsuits collectively result in *billions* of dollars in settlements and judgments each year.  *See id.* ($2.4 billion in FY 2024 alone).  But because the FCA's *qui tam* provisions are

---

[1]     *See* Dep't of Justice, *False Claims Act Settlements and Judgments Exceed $2.9B in Fiscal Year 2024* (Jan. 15, 2025), https://www.justice.gov/archives/opa/pr/false-claims-act-settlements-and-judgments-exceed-29b-fiscal-year-2024.

unconstitutional, these enormous dollar amounts were obtained illegitimately—as the relators' cases should never have gotten off the ground. *See Zafirov*, 751 F.Supp.3d at 1322-23.

A circuit split on this question is already brewing. Questions regarding the constitutionality of the False Claims Act are not new.[2] But in recent months, many more voices have joined the chorus, suggesting that this issue warrants the Supreme Court's urgent attention.[3] And, at this moment, two other Circuits—the Third and Eleventh—are

---

[2] *See Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 775 (5th Cir. 2001) (en banc) (Smith, J., dissenting) (concluding that the False Claims Act's *qui tam* provisions are unconstitutional); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1050 (6th Cir. 1994) (Nelson, J., concurring) (explaining that the "constitutional question is … troubling," but questioning whether it was properly presented in that case).

[3] *United States ex rel. Montcrief v. Peripheral Vascular Assocs., P.A.*, 133 F.4th 395, 410 (5th Cir. 2025) (Duncan, J., concurring) (highlighting "constitutional flaws in the FCA's *qui tam* device"); *United States ex rel. Gentry v. Encompass Health Rehab. Hosp. of Pearland, L.L.C.*, 157 F.4th 758, 766 (5th Cir. 2025) (Ho, J., concurring) (calling on the Fifth Circuit to "revisit whether there are serious constitutional problems with the *qui tam* provisions"); *Zafirov*, 751 F.Supp.3d at 1323 (relator's "ultra vires actions" must be "set aside").

considering cases that squarely address the constitutionality of the False Claims Act's *qui tam* provisions.[4]

There is a "reasonable probability that four Justices will vote to grant certiorari" on this question. *McBride*, 611 F.3d at 317. In fact, the prospects are more than reasonable: even *before* all this recent activity in the federal circuit courts, three sitting Supreme Court Justices had already recognized "substantial arguments that the *qui tam* device is inconsistent with Article II" and proposed that the Court grant certiorari "in an appropriate case." *United States ex rel. Polansky v. Exec. Health Res., Inc.*, 599 U.S. 419, 442 (2023) (Kavanaugh, J., joined by Barrett, J., concurring); *see also id.* at 451-52 (Thomas, J., dissenting). It is reasonably probable that at least one additional Justice will agree that the unconstitutionality of *qui tam* provisions merits the Supreme Court's review. This case cleanly presents the question and vividly illustrates the fundamental problems with unelected *qui tam* relators usurping the Executive power, and would thus serve as an "appropriate" vehicle. *Id.*

---

[4] *United States ex rel. Zafirov v. Fla. Med. Assocs., LLC*, Nos. 24-13581 & 24-13583 (11th Cir. appeal docketed Oct. 30, 2024); *United States ex rel. Penelow v. Janssen Prods., L.P.*, No 25-1818 (3d Cir. appeal docketed Apr. 29, 2025).

In just the last few months, the Court has repeatedly demonstrated that cases involving Executive authority are worthy of its attention—even on the emergency docket, where applicants must satisfy a higher bar than those, like Lilly, not seeking emergency relief.[5]  Given the Court's persistent safeguarding of Executive authority, and the fact that three Justices are already on the record in support of considering the constitutionality of the *qui tam* device in an appropriate case, it is reasonably probable that at least four Justices would vote to grant certiorari.

And if certiorari is granted, there is "a reasonable possibility that five Justices will vote to reverse the judgment of this court," *McBride*, 611 F.3d at 317, including for the reasons set out in Lilly's petition for rehearing, ECF 116.  As noted, the Court has consistently enforced the

---

[5]  *See, e.g.*, *Trump v. Slaughter*, 2025 WL 2692050 (Sept. 22, 2025) (granting application for stay and certiorari to allow the President to immediately discharge a member of the FTC); *Trump v. Wilcox*, 145 S.Ct. 1415 (2025) (granting application for stay to allow the President to remove members of the National Labor Relations Board and Merit Systems Protection Board, emphasizing that because "the Constitution vests the executive power in the President," the Government faces a significant "risk of harm from an order allowing a removed officer to continue exercising the executive power"); *Trump v. Boyle*, 145 S. Ct. 2653 (2025) (similar).

Constitution's separation of powers and protected the Executive's sphere of authority from encroachment, especially in recent years.[6] The *qui tam* provisions present precisely this sort of issue: They farm out the core Executive power to "prioritize and [choose] how aggressively to pursue legal actions" to private citizens not subject to meaningful supervision. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). That is incompatible with the Constitution. There is thus a reasonable possibility that a majority of the Court will take issue with this incursion on executive authority.

### 2. The panel created a separate circuit split that likewise warrants Supreme Court review.

While the unconstitutionality of the False Claims Act's *qui tam* provisions—and the corresponding likelihood that the Supreme Court will consider this case in order to address that issue—is itself enough to

---

[6] *See, e.g.*, *Seila Law*, 591 U.S. at 203 (emphasizing that "the 'executive power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed'"); *Collins v. Yellen*, 594 U.S. 220, 252 (2021) (recognizing that the President must "maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch"); *cf. Trump v. United States*, 603 U.S. 593, 606 (2024) (recognizing that the President has "absolute" immunity "from criminal prosecution for official acts during his tenure in office … with respect to [his] exercise of his core constitutional powers").

justify staying the mandate, Lilly also has "a reasonable probability of succeeding on the merits" of its argument that it cannot be liable under the False Claims Act as a matter of law. *See McBride*, 611 F.3d at 317.

The panel's opinion directly conflicts with the Third Circuit's decision in a case involving the same relator's same theory about the same issues and the same conduct. And this is no ordinary circuit split: the consequence of the panel's decision here is to call the prior decision of a unanimous three-judge panel, and the decision of a federal district judge that the Third Circuit affirmed, not just wrong but *unreasonable*.

The Third Circuit rightly held that drug manufacturers' "decision to exclude these [price-appreciation] credits from the calculation of a drug's [AMP] reflected a reasonable interpretation of" the law. *Allergan*, 746 F. App'x at 103. That holding irreconcilably conflicts with the panel's conclusion in this case that "Lilly's decision to exclude price increase values from AMP" was not "a reasonable one." Op.16. Indeed, the panel "note[d]" the "divergence" without meaningfully attempting to distinguish the two cases. Op.27. An acknowledged circuit split such as this is a prime candidate for Supreme Court review. *See* Sup. Ct. R. 10(a).

And the underlying issue is undeniably important. The Seventh Circuit, unlike the Third, has affirmed essentially punitive damages without affording a defendant fair notice and due process, and in that sense the implications of the panel's decision go far beyond the AMP statute and even the pharmaceutical industry. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 411 (1999). There is at least a reasonable possibility that the Supreme Court will want to weigh in on the acknowledged circuit split before the industry is forced to deal with such a disruptive change.

### B.     There is good cause to stay the mandate.

Good cause supports a brief stay of the mandate. To determine whether there is "good cause" to stay the mandate, the Court must balance the equities of granting a stay by assessing the harm to each party if a stay is granted. *See, e.g.*, *California v. Am. Stores Co.*, 492 U.S. 1301, 1307 (1989) (O'Connor, J., in chambers). Here that balance weighs in favor of staying the mandate.

Lilly will be irreparably harmed absent a stay. As a result of the panel's decision, Lilly will have to pay $200 million in trebled damages, statutory penalties, and interest. Lilly may be unable to recover all of

those funds even if Lilly later prevails at the Supreme Court (though Lilly would certainly seek repayment). As the Supreme Court has recently reiterated, "the loss of money" may constitute irreparable harm "if the funds 'cannot be recouped' and are thus 'irrevocably expended.'" *Nat'l Insts. of Health v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per cuiram) (quoting *Phillip Morris USA Inc. v. Scott*, 561 U.S. 1301, 1304 (2010) (Scalia, J., in chambers)). Here, Streck has "not state[d] that [he] will repay" the funds if Lilly "ultimately prevails." *Id.*

By contrast, Streck has not identified any prejudice that he would suffer if the mandate is stayed. Staying the mandate would simply maintain the current status quo for the brief period of time necessary for the Supreme Court to resolve Lilly's forthcoming petition for certiorari. Streck would not be prejudiced by waiting until after the exhaustion of Lilly's appellate options to receive approximately $55 million out of the judgment that he personally would be entitled to recover under the unconstitutional *qui tam* provisions of the False Claims Act. Because declining to stay the mandate would risk irreparable harm to Lilly, without prejudicing Streck, good cause exists to stay the mandate.

## CONCLUSION

The Court should stay the mandate pending disposition of Lilly's forthcoming petition for certiorari and, if certiorari is granted, pending disposition on the merits at the Supreme Court.


Dated: November 26, 2025      Respectfully submitted,


                    */s/ John C. O'Quinn*

|  |  |
|---|---|
| Erin E. Murphy | John C. O'Quinn, P.C. |
| Matthew D. Rowen | Luke P. McGuire |
| Julia R. Grant* | KIRKLAND & ELLIS LLP |
| CLEMENT & MURPHY, PLLC | 1301 Pennsylvania Avenue, NW |
| 706 Duke Street | Washington DC, 20004 |
| Alexandria, VA 22314 | (202) 389-5000 |
| (202) 742-8900 | john.oquinn@kirkland.com |

\*Supervised by principals of the firm who are members of the Virginia Bar

*Counsel for Eli Lilly and Company*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This brief complies with the type-volume limit of Fed. R. App. P. 40(d)(3) because it contains 2,939 words, as determined by the word counting feature of Microsoft Word 2016.

2.     This brief complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5), as modified by Circuit Rule 32(b), because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook font.

Dated: November 26, 2025

*/s/ John C. O'Quinn*
John C. O'Quinn

*Counsel for Eli Lilly and Company*

## <u>CERTIFICATE OF SERVICE</u>

I, John C. O'Quinn, hereby certify that on November 26, 2025, a true and accurate copy of Defendant-Appellant, Cross-Appellee Eli Lilly and Company's Motion to Stay the Mandate was served upon counsel of record at the addresses indicated by CM/ECF electronic notification.

Dated: November 26, 2025

*/s/ John C. O'Quinn*
John C. O'Quinn

*Counsel for Eli Lilly and Company*
